**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (CA SBN 257074)
*rclarkson@clarksonlawfirm.com*
Yana Hart (CA SBN 306499)
*yhart@clarksonlawfirm.com*
Tiara Avaness (CA SBN 343928)
*tavaness@clarksonlawfirm.com*
Valter Malkhasyan (CA SBN 348491)
*vmalkhasyan@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050

**CLARKSON LAW FIRM, P.C.**
Tracey Cowan (CA SBN 250053)
*tcowan@clarksonlawfirm.com*
95 3rd St., 2nd Floor
San Francisco, CA 94103
Tel: (213) 788-4050

~~**CLARKSON LAW FIRM, P.C.**~~
~~Timothy K. Giordano (NY SBN 4091260)~~
~~*(PHV Application Forthcoming)*~~
~~*tgiordano@clarksonlawfirm.com*~~
~~590 Madison Ave., 21st Floor~~
~~New York, NY 10022~~
~~Tel: (213) 788-4050~~

*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

~~J.L., C.B., K.S., P.M., N.~~PLAINTIFFS JILL LEOVY, NICHOLAS GUILAK; CAROLINA BARCOS; PAUL MARTIN;  MARILYN COUSART; ALESSANDRO DE LA TORRE; VLADISSLAV VASSILEV; JANE DASCALOS, and minor ~~G.~~, ~~R.F.~~, individually, and on behalf of all others similarly situated,

        Plaintiffs,

vs.

~~ALPHABET INC., GOOGLE DEEPMIND,~~

Case No.  3:23-cv-3440-AMO

**CLASS ACTION COMPLAINT**

1.  VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE §§ 17200, *et seq.*

2.  NEGLIGENCE

3.  VIOLATION OF THE COMPREHENSIVE COMPUTER

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

---

Formatted: Indent: Left: 0"

Style Definition: Heading 2: Numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.75"

Style Definition: Heading 3: Indent: Left: 0.88", Numbered + Level: 2 + Numbering Style: A, B, C, … + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 1.25"

Style Definition: Heading 4: Indent: Left: 1.38", Numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 1.25" + Indent at: 1.5"

Style Definition: TOC 1: Indent: Left: 0"

Style Definition: TOC 2: Indent: Left: 0.25", Space After: 12 pt, Tab stops: 1", Left

Formatted: Not Expanded by / Condensed by

Formatted: No widow/orphan control

GOOGLE LLC,

~~Defendants~~Defendant.

DATA ACCESS AND FRAUD ACT ("CDAFA"), CAL. PENAL CODE § 502, *et seq.*

~~3.~~4.   INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION

~~4.~~5.   INTRUSION UPON SECLUSION

~~5.~~6.   LARCENY/RECEIPT OF STOLEN PROPERTY

~~6.~~7.   CONVERSION

8.   TRESPASS TO CHATTELS

9.   INTENTIONAL INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS

10.   BREACH OF THIRD-PARTY BENEFICIARY CONTRACT

~~7.~~11.   UNJUST ENRICHMENT

~~8.~~12.   DIRECT COPYRIGHT INFRINGEMENT

~~9.   VICARIOUS COPYRIGHT INFRINGEMENT~~

~~10.   VIOLATION OF DIGITAL MILLENNIUM COPYRIGHT ACT, 17 U.S.C. § 1202(b)~~

**DEMAND FOR JURY TRIAL**

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

INTRODUCTION ................................................................................................. 1

PARTIES .......................................................................................................... 4

JURISDICTION AND VENUE ......................................................................... 11

FACTUAL BACKGROUND ............................................................................. 12

I.   GOOGLE'S DEVELOPMENT OF ARTIFICIAL INTELLIGENCE. ................... 12

    A.   Google's AI Product Development Depends on Stolen Web-Scraped Data and Vast Troves of Private User Data from Defendants' Own Products ........................ 15

    B.   Google's Revised Privacy Policy Purports to Give it "Permission" to Take Anything Shared Online to Train and Improve Their AI Products, Including Personal and Copyrighted Information. ................................................................. 22

    C.   Google Uses this Stolen Data to Profit by the Billions .............................. 25

II. ENTICED BY PROFIT, GOOGLE IGNORED ITS OWN WARNINGS

OF AI RISKS .................................................................................................. 28

III. DEFENDANTS' CONDUCT VIOLATES ESTABLISHED PROPERTY, COPYRIGHT, AND PRIVACY LAWS ........................................................................................ 38

    A.   Defendants' Web-Scraping Theft ........................................................ 38

    B.   Defendants' Web Scraping Violated and Continues to Violate Plaintiffs' Property Interests. ...................................................................................... 41

    C.   Defendants' Web Scraping Violated and Continues to Violate Plaintiffs' Privacy Interests. ...................................................................................... 43

    D.   Defendants' Web Scraping Violated and Continues to Violate Plaintiffs' Copyright Interests. ...................................................................................... 45

    E.   Defendants' Business Practices are Offensive to Reasonable People and Ignore Increasingly Clear Warnings from Regulators. ................................ 46

CLASS ALLEGATIONS ................................................................................. 49

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

CALIFORNIA LAW SHOULD APPLY TO OUT-OF-STATE PLAINTIFFS' & CLASS
MEMBERS' CLAIMS .......................................................................................... 55
COUNT ONE ..................................................................................................... 57
VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code
§§ 17200, *et seq.*)
(on behalf of all Plaintiffs and all Classes against all Defendants)
I.    Unlawful ............................................................................................... 57
II.   Unfair .................................................................................................. 61
III.  Deceptive .............................................................................................. 63
COUNT TWO .................................................................................................... 68
NEGLIGENCE
(on behalf of all Plaintiffs and all Classes against all Defendants)
COUNT THREE .................................................................................................. 69
INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION
(on behalf of all Plaintiffs and all Classes against all Defendants)
COUNT FOUR .................................................................................................... 70
INTRUSION UPON SECLUSION
(on behalf of all Plaintiffs and the Classes against all Defendants)
COUNT FIVE ...................................................................................................... 72
LARCENY/RECEIPT OF STOLEN PROPERTY
Cal. Penal Code § 496(a) and (c))
(on behalf of all Plaintiffs and all Classes against all Defendants)
I.    Defendants' Taking of Individual's Personal Information to Train Their AI Violated
      Plaintiffs' Property Interests. ...................................................................... 72
II.   Tracking, Collecting, and Sharing Private Information Without Consent .................. 73
COUNT SIX ........................................................................................................ 74
CONVERSION
(on behalf of all Plaintiffs and all Classes against all Defendants)
COUNT SEVEN .................................................................................................... 74
CALIFORNIA UNJUST ENRICHMENT
(on behalf of all Plaintiffs and all Classes against all Defendants)
COUNT EIGHT .................................................................................................... 75
DIRECT COPYRIGHT INFRINGEMENT
(on behalf of Plaintiff J.L. and the Copyright Class against all Defendants)

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT



**Formatted:** Indent: Left: 0"

COUNT NINE ........................................................................................ 78
    VICARIOUS COPYRIGHT INGRINGEMENT
    (on behalf of Plaintiff J.L. and the Copyright Class against Defendants Google DeepMind and Alphabet Inc.)

COUNT TEN ......................................................................................... 80
    VIOLATION ON DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1202(b))
    (on behalf of Plaintiff J.L. and the Copyright Class against all Defendants)

PRAYER FOR RELIEF ......................................................................... 81

JURY TRIAL DEMANDED ................................................................... 83

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Formatted: Indent: Left: 0"

~~Plaintiffs J.L., C.B., K.S., P.M., N.~~TABLE OF CONTENT

INTRODUCTION ........................................................................................................... 1

PARTIES ....................................................................................................................... 4

JURISDICTION AND VENUE ....................................................................................... 25

FACTUAL BACKGROUND ........................................................................................... 26

I.    GOOGLE'S DEVELOPMENT OF ARTIFICIAL INTELLIGENCE. ............................ 26

    A.    Google's Affirmatively Rejected Consideration of LLM Risks and Fired Google
        AI Ethics Executives Who Did Not Follow Suit. ................................................ 30

    B.    Google's AI Product Development Depends on Stolen Web-Scraped Data and Vast
        Troves of Private User Data from Defendant's Own Products................................ 31

    C.    Defendant's Theft of Private Information Presents Imminent Harm to Individuals. . 34

        1.    Defendant's datasets used to train Google's LaMDA model are riddled with
            websites that have private information. ...................................................... 34

        2.    Defendant is unable to anonymize the personal data it collects. ...................... 41

        3.    Injection and extraction attacks place individuals' personal information at
            imminent risk ...................................................................................... 44

    D.    Google's Revised Privacy Policy Purports to Give it "Permission" to Take Anything
        Shared Online to Train and Improve Its AI Products, Including Personal and
        Copyrighted Information. ...................................................................................... 48

    E.    Google Uses This Stolen Data to Profit by the Billions. ....................................... 51

II.   ENTICED BY PROFIT, GOOGLE IGNORED ITS OWN WARNINGS OF AI RISKS. 55

III.  THE PUBLIC RECOGNIZES THE ONGOING AND IMMINENT PRIVACY AND
    OTHER RISKS ASSOCIATED WITH DATA "SCRAPING" AND SEES IT FOR
    WHAT IT IS: THEFT ........................................................................................... 65

    A.    Internet Users are Outrages by Google's Theft-Based Training Model ................... 65

    B.    The Public is Outraged by the Lack of Respect for Privacy and Autonomy in the
        Copyright Space, and AI Developments Writ Large ............................................ 72

Formatted: Endnote Text, Centered, Line spacing: Exactly 12 pt, Don't hyphenate, Border: Top: (Single solid line, Auto, 0.5 pt Line width)

i

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

C.   Online News and Media Businesses are Taking Action Against Google's Web Scrapers.................................................................73

D.   The Public is Concerned About the Legal and Long-Term Safety Implications of Normalizing Theft by Calling it "Scraping"..........................................74

IV. DEFENDANT'S CONDUCT VIOLATES ESTABLISHED PROPERTY, PRIVACY, AND COPYRIGHT LAWS.......................................................77

A.   Defendant's Web-Scraping Theft. ...................................................77

1. Defendant's web scraping patently violates websites' terms of service that promise users data ownership and control ..................................79

2. Defendant's conduct violates websites' terms of service that prohibit or limit web scraping ..........................................................81

B.   Defendant's Web Scraping Violated and Continues to Violate Plaintiffs' Property Interests..........................................................83

C.   Defendant's Web Scraping Violated and Continues to Violate Plaintiffs' Privacy Interests..........................................................90

D.   Defendant's Web Scraping Violated and Continues to Violate Plaintiffs' Copyright Interests..........................................................96

E.   Defendant's Business Practices are Offensive to Reasonable People and Ignore Increasingly Clear Warnings from Regulators. ...................................97

V.  DEFENDANT'S CONDUCT POSES SPECIAL PRIVACY AND SAFETY RISKS FOR CHILDREN ..........................................................100

A.   Defendant Deceptively Tracked Children and Collected their Data without Consent ..........................................................102

B.   Defendant Deprived Children of the Economic Value of their Personal Data ........103

C.   Defendant's Exploitation of Children Without Parental Consent Violated Reasonable Expectations of Privacy and is Highly Offensive................................104

CLASS ALLEGATIONS ..........................................................106

ii

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

Formatted: Endnote Text, Centered, Line spacing: Exactly 12 pt, Don't hyphenate, Border: Top: (Single solid line, Auto, 0.5 pt Line width)

Formatted: Indent: Left: 0"

CALIFORNIA LAW SHOULD APPLY TO OUT OF STATE PLAINTIFFS' & CLASS

MEMBERS' CLAIMS.....................................................................................113

COUNT ONE...............................................................................................114
    VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code
    §§ 17200 *et seq.*)
    (on behalf of all Plaintiffs and Internet User and Minor User Classes)
    I.   Unlawful ......................................................................................115
    II.  Unfair ..........................................................................................122
    III. Deceptive .....................................................................................130

COUNT TWO ..............................................................................................134
    NEGLIGENCE
    (on behalf of all Plaintiffs and Internet User and Minor User Classes)

COUNT THREE ...........................................................................................136
    VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD
    ACT ("CDAFA"), CAL. PENAL CODE § 502, et seq.
    (on behalf of all Classes)

COUNT FOUR ..............................................................................................137
    INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION
    (on behalf of all Plaintiffs and Internet User and Minor User Classes)

COUNT FIVE ...............................................................................................139
    INTRUSION UPON SECLUSION
    (on behalf of all Plaintiffs and Internet-User and Minor User Classes)

COUNT SIX .................................................................................................141
    LARCENY/RECEIPT OF STOLEN PROPERTY
    Cal. Penal Code § 496(a), (c)
    (on behalf of all Plaintiffs and Internet-User and Minor User Classes)
    I.   Defendant's Taking of Individual's Personal Information to Train Its AI Violated
       Plaintiffs' Property Interests. ......................................................141
    II.  Tracking, Collecting, and Sharing Personal Information Without Consent. ....................142

COUNT SEVEN ...........................................................................................143
    CONVERSION
    (on behalf of all Plaintiffs and Internet-User and Minor User Classes)

COUNT EIGHT ............................................................................................144
    TRESPASS TO CHATTELS
    (on behalf of All Plaintiffs and Internet-User and Minor User Classes)

Formatted: Endnote Text, Centered, Line spacing: Exactly 12 pt, Don't hyphenate, Border: Top: (Single solid line, Auto, 0.5 pt Line width)

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com



Formatted: Indent: Left: 0"

COUNT NINE ............................................................................................ 145
   INTENTIONAL INTERFERENCE WITH EXISTING CONTRACT
   (on behalf of Plaintiffs and Internet-User Class)

COUNT TEN ............................................................................................. 147
   BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
   (on behalf of Plaintiffs and the Internet-User Class) ................................... 147

COUNT ELEVEN ...................................................................................... 148
   UNJUST ENRICHMENT
   (on behalf of all Plaintiffs and Internet-User and Minor User Classes)

COUNT TWELVE....................................................................................... 149
   DIRECT COPYRIGHT INFRINGEMENT
   (on behalf of Plaintiff Leovy and the Copyright Class)

PRAYER FOR RELIEF................................................................................. 155

JURY TRIAL DEMANDED.......................................................................... 158

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Endnote Text, Centered, Line spacing: Exactly 12 pt, Don't hyphenate, Border: Top: (Single solid line, Auto, 0.5 pt Line width)

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

Plaintiffs Jill Leovy, Nicholas Guilak; Carolina Barcos; Paul Martin; Marilyn Cousart; Alessandro De La Torre; Vladisslav Vassilev; Jane Dascalos and minor G., and ,R.F. (collectively, " ("**Plaintiffs**"),[1] individually and on behalf of all others similarly situated, bring this action against Defendants Alphabet Inc.; Google DeepMind; andDefendant Google, LLC (collectively, "**Defendants**("**Defendant**" or "**Google**"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## INTRODUCTION

1.      It has very recently come to light that Google has been secretly stealing everything ever created and shared on the internet by hundreds of millions of Americans. Google has taken all our personal and professional information, our creative and copywrittencopyrighted works, our photographs, and even our emails—virtually the entirety of our digital footprint—and is using it to build commercial Artificial Intelligence ("AI") Products like "Bard," the chatbot Google recently released to compete with OpenAI's "ChatGPT." For years, Google harvested this data in secret, without notice or consent from anyone.

2.      This mass theft of personal information has stunned internet users around the world, but Google is not the only bad actor in the new AI economy. In the words of the FTC, the entire tech industry is "sprinting to do the same" — that is, to vacuum up as much data as they can find. That'sThat is because the large language models on which AI products run depend on consuming massive amounts of data to "train" the AI. Without it, the AI products would be worthless.

3.      Personal data of every kind, especially conversational data between humans, is critical to the AI training process. This is how products like Bard develop human-like communication capabilities. Creative and expressive works are just as valuable because that is how AI products learn to "create" art.

---

[1] Plaintiffs respectfully request that the Court permit them to keep their identity private as Plaintiffs aim to avoid intrusive scrutiny as well as any potentially dangerous backlash. Indeed, plaintiffs in other lawsuits against the same defendant entities have received many troubling and violent threats, including death threats, marking a severe infringement of personal safety. Accordingly, opting for privacy is a critical measure to avoid unwarranted negative attention as well as potential harm. Plaintiffs will file a motion to proceed pseudonymously, if required. *See* Victoria Hudgins, *GitHub and Openai Plaintiffs Seek Anonymity amid Slurs and Death Threats*, Glob. Data Rev. (Mar. 15, 2023), globaldatareview.com/article/github-and-openai-plaintiffs-seek-anonymity-amid-slurs-and-death-threats.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

**Formatted:** No widow/orphan control

4.      The FTC issued a stern warning to the AI industry ~~last month~~in May 2023 regarding this sudden sprint to collect as much training data as they can find: "Machine learning is no excuse to break the law… The data you use to improve your algorithms must be lawfully collected~~.~~ . . . companies would do well to heed this lesson."

5.      Rather than heed the FTC's warning and stop its years-long theft of data, Google elected instead to quietly and immediately "update" its online privacy policy ~~last week~~in July 2023 to double-down on its position that everything on the internet is fair game for the company to take for private gain and commercial use, including to build and enhance AI products like Bard.

6.      It was the company's first public acknowledgement of what it had been doing in secret for years: scraping the entire internet to take anything it could, whether contributed on Google platforms or not, and without regard for the privacy, property, and consumer protection interests of the hundreds of millions of Americans who shared their insights, talents, artwork, data, personally identifiable information, and more, for specific purposes, not one of which was to train large language models to profit Google while putting the world at peril with untested and volatile AI products.

7.      Google's sudden notice and admission regarding its scraping practices came three days after OpenAI was sued for theft and commercial misappropriation of personal data on the internet as part of its own massive "scraping" operation, also done in secret, without notice or consent from anyone whose personal information was taken. And while Google's admission was quiet, the public reaction has been anything but. People were angry to find out that they were, in effect, and as one commentator put it, the "special sauce" that made Bard and AI products like it work. The outrage made sense. Even though Google had trampled on privacy rights before, declaring ownership over anything and everything on the internet seemed especially audacious and violative—because it is.

8.      Google responded to the backlash by inviting the world to engage in "dialogue" about what data collection and protection efforts should look like in the new era of AI. That invited a backlash of its own, naturally, as a classic case of too little too late. One commentator aptly translated ~~the Company's~~Google's "invitation" into the truth: "Now that we've already trained our

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    LLMs on all your proprietary and copyrighted content, we will finally start thinking about giving

2    you a way to opt out of any of your future content for being used to make us rich."

3         9.    Google had options other than to steal personal and copyrighted information. Internet

4    data is available for purchase just like any other content or property. A mature commercial market

5    for such data exists, demonstrating how valuable our digital footprint has become to companies.

6    The legal acquisition of data typically depends on consent and consideration.

7         10.   There are also companies specializing in curating and selling datasets for AI training

8    purposes, that contain information obtained with the *express consent* of the content creators or

9    subjects of the personal or copyrighted information. Using these datasets might be more expensive

10   than stealing, but ~~the~~using this data has one critical advantage: it is legal. Against this backdrop,

11   Google's decision to instead take personal data without notice, consent, or fair compensation not

12   only violates the individual rights of millions, but also gives Google an unfair advantage over

13   smaller competitors who purchase or otherwise lawfully obtain AI training data in the marketplace.

14        11.   As part of its theft of personal data, Google illegally accessed restricted, subscription-

15   based websites to take the content of millions without permission and infringed at least 200 million

16   materials explicitly protected by copyright, including previously stolen property from websites

17   known for pirated collections of books and other creative works. Without this mass theft of private

18   and copyrighted information belonging to real people, communicated to unique communities for

19   specific purposes, and targeting specific audiences, many of Google's AI products including Bard

20   would not exist. ~~Defendants continue~~Defendant continues to feed ~~their~~its AI products stolen data

21   through regular updates with new personal and protected information scraped from internet users

22   without any consent.

23        12.   ~~Defendants~~Defendant must be enjoined from these ongoing violations of the privacy

24   and property rights of millions and ordered to stop the illegal theft of internet data. ~~They~~It must also

25   be ordered to allow everyday internet users to opt out of Google's illicit data collection efforts going

26   forward, and to either delete the data already obtained illegally or pay the owners of that data in the

27   form of ongoing data dividends or other fair compensation. More fundamentally, Google must

28   understand, once and for all: it does not own the internet, it does not own our creative works, it does

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

Formatted: No widow/orphan control

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1  not own our expressions of our personhood, pictures of our families and children, or anything else

2  simply because we share it online. "Publicly available" has never meant free to use for any purpose.

3                                          **PARTIES**

4  **Plaintiff J.L.**

5  **Jill Leovy ("Plaintiff J.L. Leovy")**

6          13.     Plaintiff Leovy is a New York Times best-selling author and investigative journalist

7  residing in the State of Texas.

8          14.     Defendants Defendant misappropriated Plaintiff J.L.'s Leovy's award-winning non-

9  fiction book called *Ghettoside: A True Story of Murder in America*. by taking and copying the book

10  in full without her knowledge or consent to train "Bard" and the Company's Google's other AI

11  Products. On information and belief, Defendants Defendant used a stolen PDF of the book, which

12  they it took from one of the many "pirated" book sites online that Defendants Defendant used to train

13  Bard even though they it knew the copyrighted works on these sites were all stolen from various

14  authors and before the U.S. Department of Justice seized at least one of these notorious online

15  markets for pirated books. Plaintiff J.L. Leovy owns the registered copyright in this book, which

16  includes customary copyright-management information including the name of the author and the

17  year of publication (2015). The registered copyright owned by Plaintiff Leovy is included as **Exhibit**

18  **A.**

19          15.     The copyrighted work that Defendants Defendant misappropriated and otherwise

20  infringed reflects over a decade of Plaintiff J.L.'s Leovy's investigative journalism and work,

21  including novel insights on a topic few have researched and written about in as much detail. As a

22  result of Defendants' Defendant's large-scale theft of copyrighted materials, all of Plaintiff

23  J.L.'s Leovy's work and unique insights as reflected in the book are now available for "free" on

24  Bard. On demand, Bard will offer not only to summarize the book in detail, chapter by chapter, but

25  it also offers to regenerate the text of her book *verbatim*. Defendants' can provide a chapter-by-

26  chapter summary of the book, offering a general understanding of the book's content, including its

27  characters, plot and interactions among the characters. Defendant's infringement thus radically

28  alters the perceived incentives for anyone to purchase the book going forward, harming Plaintiff

                                              4
                        FIRST AMENDED CLASS ACTION COMPLAINT

1    J.L. Leovy in the form of lost profits and otherwise. Absent the relief sought in this Action, Plaintiff

2    J.L. Leovy and hundreds of thousands of authors like her presently have no ability to demand Google

3    "delete" their stolen work from Bard, destroy the AI algorithms the Company Google built based on

4    their stolen work, and/or provide fair compensation.

5    **Plaintiff C.B.**

6    **Nicholas Guilak ("Plaintiff C.B. Guilak")**

7        16.    Plaintiff Guilak is and at all relevant times was a resident of the State of California.

8        17.    Plaintiff C.B. Guilak has a Gmail account, uses Google search engine, as well as and

9    Google Bard.

10       18.    As an actor and a professor, Plaintiff C.B. maintains an active internet presence,

11   commonly using platforms such as Twitter to post text updates, photos, and videos; YouTube to

12   share personal content and engage with other users in video comments; as well as TikTok, Snapchat,

13   Instagram, Facebook, and Yelp. Plaintiff C.B. has posted many photos of family members, including

14   her nieces and nephews on these social media platforms.

15       19.    In addition to personal use, Plaintiff C.B. uses these platforms to engage in self-

16   promotion and post teaching material, including sharing content, such as auditions, performances,

17   and training sessions. Moreover, to spread awareness within her social networks, Plaintiff C.B. also

18   posted media related to "psychological support," such as motivational quotes to cancer victims, and

19   posts about reducing and preventing animal abuse.

20       20.    Plaintiff C.B. is concerned that Defendants have taken her skills and expertise, as

21   reflected in her online contributions, and incorporated it into Products that could someday result in

22   professional obsolescence for professors and educators like her.

23       21.    Plaintiff C.B. reasonably expected that the information that she exchanged with these

24   websites would not be used by any third-party looking to compile and use all her information and

25   data for commercial purposes. Plaintiff C.B. did not consent to the use of her private information

26   by third parties in this manner. Plaintiff C.B. also did not consent to her private information

27   contributed to google products and services, including her Google searches, to be used to train the

28   Products. Notwithstanding, Defendants stole Plaintiff C.B.'s personal data and private information

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"
Formatted: ui-provider
Formatted: ui-provider
Formatted: ui-provider
Formatted: Font: Bold, Underline
Formatted: ui-provider
Formatted: ui-provider
Formatted: ui-provider
Formatted: ui-provider

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

1   from across this wide swath of online applications and platforms to train the Products.

2   **Minor Plaintiff K.S.**

3   22.   Minor Plaintiff K.S. is and at all relevant times was a resident of the State of Florida.

4   23.   Minor K.S. is a six (6) year old minor.

5   24.17. Minor Plaintiff K.S. has had a Gmail account for approximately two (2) years, created

6   for him by his parent, for gaming purposes. Minor Plaintiff K.S. uses the Google search engine, and

7   specifically, the microphone function to search for videos, such as videos helping him withpersonal

8   cell phone as well as both his video games. Furthermore, he uses YouTube to search for video

9   contentwork and personal computers.

10   25.   Minor Plaintiff K.S. and his guardian reasonably expected that the information that

11   he exchanged with these websites would not be used by any third-party looking to compile and use

12   all his information and data for commercial purposes. Minor Plaintiff K.S. and his guardian did not

13   consent to the use of his private information in this manner. Plaintiff K.S. also did not consent to

14   his private information being contributed to google products and services, including his Google

15   searches, to be used to train the Products. Notwithstanding, Defendants stole Minor Plaintiff K.S.'s

16   personal data and private information to train the Products.

17   **Plaintiff P.M.**

18   26.   Plaintiff P.M. is and at all relevant times was a resident of the State of California.

19   27.   Plaintiff P.M. has a Gmail account uses Google Bard, and Google search engine.

20   28.   Plaintiff P.M. has engaged with a variety of websites and social media applications.

21   Plaintiff P.M. has had a Twitter account since approximately 2011; using it to post content, and re-

22   post other users' tweets to save and compile information in line with his interests. For many years,

23   Plaintiff P.M. had a Spotify account which he frequently used to listen to music and create unique

24   playlists. Approximately five (5) years ago, he transitioned to YouTube music and Google Play.

25   Prior to 2021, Plaintiff P.M. regularly viewed videos on YouTube, posted content, and commented

26   on other users' videos. Prior to 2021, he had a Facebook, Snapchat, and Instagram account. Plaintiff

27   P.M. published many posts on his Instagram account, accompanied by commentary.

28   29.1.   Plaintiff P.M. has posted photos of himself, his family, and friends on various websites

FIRST AMENDED CLASS ACTION COMPLAINT

---

Formatted: Indent: Left: 0"

Formatted: ui-provider

**Formatted:** Indent: Left: 0"

1  and social media applications, including photos of his children on Instagram. He posted photos of

2  himself and friends on online dating websites, such as OK Cupid and Tinder, approximately eight

3  (8) years ago. He used these dating websites to post significant amounts of personal information

4  and exchange messages with prospective romantic partners. He has been using the United

5  Healthcare Insurance Company web portal for over a decade to find providers and review post-

6  appointment works.

7        30.   Plaintiff P.M. has also posted online about his political views, as well as frequently

8  asked and answered technical questions using his professional knowledge on Stack Overflow for

9  the last five (5) years in sporadic sprints to accumulate points on the website.

10       31.   Plaintiff P.M. is concerned that Defendants have taken his skills and expertise, as

11  reflected in his online contributions, and incorporated them into Products that could someday result

12  in professional obsolescence for software engineers like him.

13       32.   Plaintiff P.M. reasonably expected that the information that he exchanged with these

14  websites would not be used by any third-party looking to compile and use all his information and

15  data for commercial purposes. Plaintiff P.M. did not consent to the use of his private information

16  by third parties in this manner. Plaintiff P.M. did not consent to the use of his private information

17  in this manner. Plaintiff P.M. also did not consent to his private information contributed to Google

18  products and services, including his Google searches, to be used to train the Products.

19  Notwithstanding, Defendants stole Plaintiff P.M.'s personal data and private information from

20  across this wide swath of online applications and platforms to train the Products.

21  **Plaintiff N.G.**

22       33.   Plaintiff N.G. is and at all relevant times was a resident of the State of California.

23       34.   Plaintiff N.G. has a Gmail account, uses Google search engine, as well as Google

24  Bard.

25       18.   Plaintiff N.G. hasGuilak engaged with a variety of websites and social media

26  platforms which were scraped by Defendant, including posting acting videos and tutorials on

27  Facebook and Instagram. On Facebook, he also frequently posts photos and videos of family

28  members, including his nieces and nephews, and comments on other users' content. Additionally,

**Formatted:** Default Paragraph Font

**Formatted:** Default Paragraph Font

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

on several occasions, Plaintiff Guilak has posted information about his religious and political views.

19.     Additionally, Plaintiff Guilak is also a frequent user of YouTube, where he maintains an active channel dedicated to acting, and provides tutorials on acting. Plaintiff has also posted videos and "demo reels" of his own auditions, which include his face and voice.

35.20.Plaintiff Guilak comments on Reddit; posting videos, pictures, and tweets on Twitter; posting videos and comments on TikTok; and posting and commenting on other users' accounts on Snapchat and Instagram. Additionally, Plaintiff N.G. uses his Spotify account to listen to music and create unique playlists. Plaintiff N.G. is also a frequent user of both YouTube and Facebook. On Youtube, Plaintiff N.G. has created a few channels, where he shared all his acting content, his auditions, videos on acting tips, and "demo" reels. On Facebook, Plaintiff N.G. frequently posts photos and videos of family members, including his nieces and nephews, and comments on other users' content. Additionally, on several occasions, Plaintiff N.G. has posted information about his religious and political views. Plaintiff Guilak uses his Spotify account to listen to music and create unique playlists.

36.21.In addition to personal use, Plaintiff N.G.Guilak also used a variety of these platforms to engage in professional self-promotion as an actor and to post teaching material for his students. This included sharing a great deal of personal content, such as photos and videos of auditions, performances, and training sessions. Moreover, Plaintiff N.G.Guilak has his own website, which hosts his headshots, clips, resume, demo reels, show reels, voice reels, and acting tips. Plaintiff Guilak regularly updates his online content including deleting content he no longer wishes to share with anyone.

22.     Given Plaintiff N.G.'sPlaintiff Guilak used Gmail to exchange sensitive information including bank statements with mortgage brokers, tax documents with a CPA, various medical documents, details about loans, pay stubs including Social Security information, and acting videos or related information. In exchanging these documents, Plaintiff Guilak reasonably expected that the information would remain confidential and not be used by any unauthorized third parties for any purpose without his express consent.

37.23.Plaintiff Guilak is an active user of various Google platforms, including Google

8

FIRST AMENDED CLASS ACTION COMPLAINT

Workspace, Google Drive, Google Search Engine, Google Maps and YouTube. These platforms are an integral part of Plaintiff Guilak's daily activities, encompassing functions such as managing a suite of productivity and collaboration tools in Google Workspace, storing and accessing personal and professional data in Google Drive, gathering information and conducting research using the Search Engine, navigating and exploring geographic locations for both personal and professional needs with Google Maps, and posting and viewing content on YouTube. Given Plaintiff Guilak's extensive engagement with these platforms, a significant amount of his personal and sensitive information was exchanged across these ~~websites and social media~~Google platforms.

24.   Plaintiff ~~N.G.~~Guilak is concerned that Defendant has taken his skills and expertise, as reflected in his online contributions, and incorporated it into Products that could someday result in professional obsolescence for actors and teachers like him.

~~38.~~25. Plaintiff Guilak reasonably expected that the information that he exchanged with these websites would not be ~~used~~intercepted by any third-party looking to compile and use all his information and data for commercial purposes. Plaintiff ~~N.G.~~Guilak did not consent to the use of his private information by third parties in this manner. ~~Plaintiff N.G. also did not consent to his private information contributed to Google products and services, including his Google searches, to be used to train the Products.~~ Notwithstanding, ~~Defendants~~Defendant stole Plaintiff ~~N.G.'s~~Guilak's personal data ~~and private information~~ from across this wide swath of online applications and platforms to train the Products.

**~~Plaintiff R.F.~~**

26.   ~~Plaintiff R.F.~~Plaintiff Guilak is concerned about the misuse of his photos, online contributions, and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of himself and his network of friends and family. Due to Defendant's illegal interference with his personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff Guilak no longer has full control over that property, including his guaranteed legal right to delete it.

27.   Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything he shares online, Plaintiff Guilak's distress is exacerbated by the

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1   unacceptable dilemma he now faces: either surrender his and his family's personal information and

2   privacy to Defendant without consent or compensation or forego the use of internet entirely.

3   **Plaintiff Carolina Barcos ("Plaintiff Barcos")**

4   ~~39.~~28. Plaintiff  Barcos  is  and  at  all  relevant  times  was  a  resident  of  the  State  of

5   ~~Florida~~California.

6   ~~40.~~29. Plaintiff ~~R.F.~~Barcos has ~~had~~ a Gmail account ~~for at least fifteen (15) years for both~~

7   ~~personal and business use. His most current Gmail account has been in use for twelve (12) years,~~

8   ~~during which time he has accumulated significant communications and activity. Further, Plaintiff~~

9   ~~R.F. is an avid user of the~~, uses Google search engine, as well as Google Bard. Plaintiff Barcos uses

10  Google Bard from her personal cell phone as well as both her work and personal computers.

11  ~~41.   Plaintiff R.F. is actively engaged with social media platforms and various websites,~~

12  ~~and also has a large TikTok following. He has been using TikTok since 2019 and has amassed~~

13  ~~approximately 8,000 followers. His reels function as a video blog and center around raising his~~

14  ~~child, his day-to-day life, and his vacation experiences. Plaintiff R.F. additionally uses Reddit to~~

15  ~~post on various topics and respond to user questions related to these topics; he has done this for~~

16  ~~years. He has also had a Twitter account for years, using it mainly to tweet and to retweet content~~

17  ~~posted by other users; most of this activity centering around his political perspectives. Plaintiff R.F.~~

18  ~~is an avid Spotify user and has created many unique playlists over the past several years. On~~

19  ~~YouTube, Plaintiff R.F. posts videos about his dirt bike hobby, demonstrating various trails he has~~

20  ~~ridden.~~

21  30.   As an actor and a professor, Plaintiff Barcos maintains an active internet presence,

22  commonly using platforms which were scraped by Defendant. For example, Plaintiff Barcos

23  frequently uses Facebook and Instagram to engage in self-promotion and post teaching material,

24  including sharing content, such as auditions, performances, and training sessions which feature her

25  face and voice. Moreover, to spread awareness within these social networks, Plaintiff Barcos also

26  posts media related to "psychological support," such as motivational quotes to cancer victims, and

27  posts about reducing and preventing animal abuse. Plaintiff Barcos has also used Facebook to share

28  many of her personal cooking recipes with friends and family.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com



Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

31.    Plaintiff Barcos is a member of a Facebook group tailored towards dog owners and dog lovers, in which she frequently shares photos and information about her dog. Plaintiff Barcos posted and interacted with this group reasonably believing it is tailored to a specific community of dog lovers. Had she been aware that her posts and interactions were subject to data scraping practices by unauthorized third parties, she would have refrained from posting in this group.

32.    Plaintiff Barcos also uses Twitter to post text updates, photos, and videos; YouTube to share personal content and engage with other users in video comments; as well as TikTok, and Snapchat. Plaintiff Barcos has posted many photos of family members, including her nieces and nephews on these social media platforms. Plaintiff Barcos also uses Yelp to contribute her thoughts and commentary on local businesses.

33.    Plaintiff Barcos is also an active user of the following Google Services, including Gmail, Google Workspace, Google Drive, Google Maps, Google Chrome and Google Search Engine. These platforms are an integral part of Plaintiff Barcos' daily activities including managing communications via emails, crafting professional documents and reports, organizing and collaborating on projects with friends and colleagues, securely storing and accessing personal and professional data, as well as browsing and researching information on the internet.

34.    Plaintiff Barcos is concerned that Defendant has taken her skills and expertise, as reflected in her online contributions and incorporated it into Products that could someday result in professional obsolescence for professors and educators like her.

35.    Plaintiff Barcos reasonably expected that the information that she exchanged with these websites would not be intercepted by any third-party looking to compile and use all her information and data for commercial purposes. Plaintiff Barcos did not consent to the use of her private information by third parties in this manner. Notwithstanding, Defendant stole Plaintiff Barcos's personal data from across this wide swath of online applications and platforms to train the Products.

36.    Plaintiff Barcos is concerned about the misuse of her photos and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of herself and her network of friends and family. Due to Defendant's illegal interference with her

11

<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1  personal information, and specifically embedding it permanently into AI Products and the models
2  on which they run, Plaintiff Barcos no longer has full control over that property, including her
3  guaranteed legal right to delete it.

4      37.   Because Defendant offers no effective opt out from the ongoing misappropriation and
5  commercialization of anything she shares online, Plaintiff Barcos's distress is exacerbated by the
6  unacceptable dilemma she now faces: either surrender her and her family's personal information
7  and privacy to Defendant or forego the use of internet entirely.

8  **Plaintiff Paul Martin ("Plaintiff Martin")**

9      38.   Plaintiff Martin is and at all relevant times was a resident of the State of California.

10      39.   Plaintiff Martin is a director of information technology and software engineer and
11  frequently uses Google search engine as well as Google Bard from his personal computer, cellular
12  device, and work computer.

13      40.   Plaintiff Martin engages with a variety of websites and social media applications
14  which were scraped by Defendant. Plaintiff Martin has had a Twitter account since approximately
15  2011; using it to post content, and re-post other users' tweets to save and compile information in
16  line with his interests. For example, Plaintiff Martin has posted pictures of a concert he was
17  attending with the location, song title of a song, and even his friend's name.

18      41.   For many years, Plaintiff Martin had a Spotify account which he frequently used to
19  listen to music and create unique playlists. Approximately five (5) years ago, he transitioned to
20  YouTube music and Google Play. Plaintiff Martin regularly views videos on YouTube, posts
21  content such as a trailer video for a fictitious movie, and comments on other users' videos. He also
22  has had a Facebook, Snapchat, and Instagram account. Plaintiff Martin published many posts on his
23  Instagram account, which featured his face and voice and were accompanied by commentary.
24  Plaintiff Martin did not consent to having Defendant scrape his voice or face to train Defendant's
25  Products and forever embed them into AI technology that may be used to create digital clones.

26      42.   Plaintiff Martin has posted photos of himself, his family, and friends on various
27  websites and social media applications, including photos of his children and grandmother. He posted
28  photos of himself and friends on online dating websites, such as OK Cupid and Tinder,

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

approximately eight (8) years ago. He used these dating websites to meet potential romantic partners, and as a result disclosed significant amounts of personal information and exchange messages with prospective romantic partners. He has been using the United Healthcare Insurance Company web portal for over a decade to find providers and review post-appointment works.

43.   R.F.Plaintiff Martin has also posted online about his political views, as well as frequently asked and answered technical questions using his professional knowledge on Stack Overflow and GitHub for the last five (5) years in sporadic sprints to accumulate points on the website.

44.   Plaintiff Martin is also an active user of the following Google Services, including Google Calendar, Google Tasks, Google Play Store, Google Maps, and YouTube. These platforms are an integral part of Plaintiff Martin's daily activities, encompassing functions such as organizing his schedule and setting reminders for personal and professional commitments in Google Calendar, creating and tracking to-do lists and action items in Google Tasks, exploring a wide range of applications, games, and media for both leisure and productivity on Google Play Store, navigating and finding the best routes for travel, as well as exploring new locations with Google Maps, and accessing an array of videos for entertainment, learning, and information sharing on YouTube.

45.   Plaintiff Martin is concerned that Defendant has taken his skills and expertise, as reflected in his online contributions and incorporated them into Products that could someday result in professional obsolescence for software engineers like him.

46.   Plaintiff Martin is also concerned that Defendant's practice of aggregating disparate pieces of personal information from multiple sources allows Defendant to form a comprehensive and exploitable profile of his identity. Specifically, Plaintiff Martin is concerned about his increased risk of identity theft and credit fraud, which poses a direct threat to his present financial decision making, security, and privacy.

42.47.Plaintiff Martin reasonably expected that the information that he exchanged with these websites would not be usedintercepted by any third-party looking to compile and use all his information and data for commercial purposes. Plaintiff R.F.Martin did not consent to the use of his private information by third parties in this manner. Plaintiff R.F. also did not consent to his private

**Formatted:** Default Paragraph Font

**Formatted:** Default Paragraph Font

**Formatted:** Default Paragraph Font

FIRST AMENDED CLASS ACTION COMPLAINT

information contributed to Google products and services, including his Google searches, to be used to train the Products. Notwithstanding, ~~Defendants~~Defendant stole Plaintiff ~~R.F.'s~~Martin's personal data ~~and private information~~ from across this wide swath of online applications and platforms to train the Products.

~~Defendants~~

~~43.   **Defendant Google DeepMind** is a recently developed subsidiary of Google LLC after the merger of independent Alphabet company DeepMind and the "Google Brain" AI division.[2] Google Brain began in 2011 "as an exploratory lab" working on machine learning and AI facing projects.[3] DeepMind was acquired by Google LLC in 2014 for over $500 million dollars.[4] DeepMind worked on developing the breakthrough conversational technology known as LaMDA (Language Model for Dialogue Applications), a technology instrumental in Bard's development as well as other Google AI products.[5] According to CEO Demis Hassabis, Google DeepMind aims "to create the next generation of AI breakthroughs and products across Google and Alphabet, and to do this in a bold and responsible way."[6]~~

48.   Plaintiff Martin is concerned about the misuse of his photos and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of himself and his network of friends and family. Due to Defendant's illegal interference with his personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff Martin no longer has full control over that property, including his guaranteed legal right to delete it.

49.   Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything he shares online, Plaintiff Martin's distress is only exacerbated by

---

[2] ~~*Announcing Google DeepMind,* GOOGLE DEEPMIND (Apr. 20, 2023), https://www.deepmind.com/blog/announcing-google-deepmind.~~
[3] ~~*Brain: About the Team*, GOOGLE RES., https://research.google/teams/brain/ (last visited July 10, 2023).~~
[4] ~~Catherine Shu, *Google Acquires Artificial Intelligence Startup DeepMind for More Than $500M*, TECHCRUNCH (Jan. 26, 2014), https://techcrunch.com/2014/01/26/google-deepmind/.~~
[5] ~~Allen Victor, *All About Google Bard: The New Disruptor in Conversational AI*, INSIGHTS (Feb. 7, 2023), https://insights.daffodilsw.com/blog/all-about-google-bard.~~
[6] ~~Demis Hassabis, *Announcing Google DeepMind*, GOOGLE DEEPMIND (Apr. 20, 2023), https://www.deepmind.com/blog/announcing-google-deepmind.~~

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

the unacceptable dilemma he now faces: either surrender his personal information and privacy to Defendant or forego the use of internet entirely.

**Plaintiff Marilyn Cousart ("Plaintiff Cousart")**

50.    Plaintiff Cousart is and at all relevant times was a resident of the State of California.

51.    Plaintiff Cousart started using Google Bard in 2023 from her personal computer for personal inquiries.

52.    Plaintiff Cousart is a frequent user of various websites and social media platforms which were scraped by Defendant, including Facebook, where she frequently shares content relating to personal life updates, her family, friends, trips, events, and food. She belongs to various Facebook groups such as marketplace groups for selling items, and groups relating to San Francisco history, relationships, gardening, and cooking. Plaintiff Cousart was caretaker to her father when he had cancer, and she frequently posted his private medical information and cancer experiences to purposely limited audiences on Facebook, including Facebook groups tailored to specific purposes and audiences, creating dedicated spaces where members can share insights, seek advice, and offer support with an expectation of privacy. Plaintiff Cousart reasonably expected that her posts and interactions within these and other restricted online groups would not be intercepted by any third-party. Had Plaintiff Cousart been aware that her posts and interactions were subject to the illegal data scraping practices described in this Complaint, by unauthorized third parties in violation of terms of service which reasonably assured her of the ongoing control and ownership of her data, including the right to delete such data, she would have refrained from participating in such discussions.

53.    In addition to Facebook, Plaintiff Cousart also uses Instagram where she has posted content of herself, her family, friends, and her music. She has two Instagram accounts and uses them to post daily about her personal life and music. Plaintiff Cousart also has a Snapchat account that she uses for photos and videos.

54.    Plaintiff Cousart uses YouTube frequently and has posted her own videos to the platform, including videos featuring her face and voice. Plaintiff Cousart also has a Twitter and TikTok account for personal use and research purposes.

**Formatted:** Indent: Left: 0"

55.   Plaintiff Cousart also uses Spotify to create unique playlists and interact with other people's playlists. She has an artist account and has posted a few of her songs to the platform.

56.   Plaintiff Cousart also uses Gmail to exchange sensitive information including tax information, details regarding medical appointments, personal car insurance documents, private videos, original songs saved on Google Drive, a comprehensive resume detailing her full work history, and personal communications sent through emails with an ex-boyfriend and friends. Plaintiff Cousart did not consent to having Defendant access and scrape her sensitive information exchanged through Gmail to train Defendant's AI Products and forever embed them into AI technology which may be used to create digital clones.

57.   Plaintiff Cousart reasonably expected that the information that she exchanged with these websites would not be intercepted by any third-party looking to compile and use all her information and data for commercial purposes. Plaintiff Cousart did not consent to the use of her private information by third parties in this manner. Notwithstanding, Defendant stole Plaintiff Cousart's personal data from across this wide swath of online applications and platforms to train the Products.

58.   Plaintiff Cousart is concerned that Defendant has taken her personal information and statements, as reflected in her online contributions, and is also concerned about the misuse of her photos and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of herself and her family. Due to Defendant's illegal interference with her personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff Cousart no longer has full control over that property, including her guaranteed legal right to delete it.

59.   Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything she shares online, Plaintiff Cousart's distress is exacerbated by the unacceptable dilemma she now faces: either surrender her and her family's personal information and privacy to Defendant without consent or compensation or forego the use of internet entirely.

**Plaintiff Alessandro De La Torre ("Plaintiff De La Torre")**

60.   Plaintiff De La Torre is and at all relevant times was a resident of the State of

16

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

California.

61.    Plaintiff De La Torre is a product engineer and began using Google Bard in 2023 from his personal computer, cellular device, and work computer.

62.    Plaintiff De La Torre engages with a variety of websites and social media applications which were scraped by Defendant. For example, Plaintiff De La Torre has accounts on Twitter, Reddit, TikTok, Snapchat, Yelp, LinkedIn, as well as Crunchbase, Webflow, and other technology-focused sites. Plaintiff De La Torre uses these platforms to post about a variety of topics, accompanied by commentary and visuals including his face, voice, and location. Specifically, Plaintiff De La Torre has posted photos of himself, his cat, family members, and friends on Instagram, some of which have included his location. Plaintiff De La Torre did not consent to having Defendant scrape his voice or face to train Defendant's AI Products and forever embed them into AI technology that may be used to create digital clones.

63.    Plaintiff De La Torre has posted content on Twitter sharing his opinions and thoughts on current events, including the rapid development of artificial intelligence technology. Plaintiff De La Torre also uses TikTok to frequently post videos he has created encouraging his friends and family to take more risks to live a more fulfilling life.

64.    For many years, Plaintiff De La Torre has had a Spotify account which he frequently uses to listen to music and create unique playlists. Plaintiff De La Torre regularly views videos on YouTube, posted content about application design and function, and commented on other users' videos.

65.    Plaintiff De La Torre has also founded or co-founded at least four companies, the details of which are summarized on those respective websites.

66.    Plaintiff De La Torre has also posted online about his political views, as well as frequently asked and answered technical questions using his professional knowledge on various websites such as LinkedIn. Plaintiff De La Torre uses LinkedIn for professional networking, using it to connect with colleagues and industry peers, seek and post job opportunities, engage with professional content, and participate in industry-specific discussions and groups.

67.    Plaintiff De La Torre is an active user of various Google applications, including

17
FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

Google Workspace, Google Ads, Google Lighthouse, Google Tasks, Google Chats and Google Meet. These tools are crucial in Plaintiff De La Torre's daily life, enabling him to coordinate team projects and manage personal and professional documents through Google Workspace, discover and view content on YouTube, create and execute targeted online advertising campaigns with Google Ads, optimize website performance and user experience using Google Lighthouse, organize tasks and to-do lists for project management in Google Tasks, communicate with colleagues and clients through direct and group messages in Google Chats, and conduct virtual meetings and collaborative sessions with Google Meet.

68.    Plaintiff De La Torre has a Gmail account which he uses for a variety of purposes, encompassing both everyday email communications and the transmission of sensitive financial information. Plaintiff De La Torre regularly sends his bank statements both to himself and to his CPA each month for financial oversight and management. Plaintiff De La Torre reasonably expected that all information exchanged through Gmail, was remain confidential and not be viewed or used by any unauthorized third parties.

69.    Plaintiff De La Torre is concerned that Defendant has taken his skills and expertise, as reflected in his online contributions, and incorporated them into Products that could someday result in professional obsolescence for software engineers like him. Plaintiff De La Torre reasonably expected that the information that he exchanged with these websites would not be intercepted by any third-party looking to compile and use all his information and data for commercial purposes. Plaintiff De La Torre did not consent to the use of his private information by third parties in this manner. Notwithstanding, Defendant stole Plaintiff De La Torre's personal data from across this wide swath of online applications and platforms to train the Products.

70.    Plaintiff De La Torre is deeply concerned about the misuse of his photos and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of himself and his network of friends and family. Due to Defendant's illegal interference with his personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff De La Torre no longer has full control over that property, including his guaranteed legal right to delete it.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

71.     Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything he shares online, Plaintiff De La Torre's distress is exacerbated by the unacceptable dilemma he now faces: either surrender his personal information and privacy to Defendant or forego the use of internet entirely.

**Plaintiff Vladisslav Vassilev ("Plaintiff Vassilev")**

72.     Plaintiff Vassilev is and at all relevant times was a resident of the State of California.

73.     Plaintiff Vassilev started using Google Bard in late 2022 from his personal computer and cellphone for general inquiries.

74.     Plaintiff Vassilev is a frequent user of various websites and social media platforms, including Reddit, where he posts questions and content related to his knowledge of video games.

75.     Plaintiff Vassilev uses Instagram and shares content relating to personal updates, family, travel, vacations, and events he attends. He has shared photos of his family, fiancé, and daughter, featuring his face and voice on many of the posts. Plaintiff Vassilev did not consent to having Defendant scrape his voice or face to train Defendant's AI Products and forever embed them into AI technology that may be used to create digital clones.

76.     Plaintiff Vassilev has a Gmail account which he frequently uses for standard email communication and important financial transactions. One such practice involves emailing himself copies of his bank statements to assemble necessary documents for scholarship applications. Plaintiff Vassilev had a reasonable expectation that all information exchanged through Gmail, including these bank statements, would remain confidential and safeguarded against any unauthorized access or use.

77.     Plaintiff Vassilev also uses Reddit to post questions and inquiries relating to video games and Yelp to post reviews on local restaurants.

78.     Plaintiff Vassilev also uses Spotify to listen to music, create unique playlists and interact with other people's playlists. He follows his favorite musical artists and interacts with their playlists.

79.     Plaintiff Vassilev reasonably expected that the information that he exchanged with these websites would not be intercepted by any third-party looking to compile and use all his

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

information and data for commercial purposes. Plaintiff Vassilev did not consent to the use of his private information by third parties in this manner. Notwithstanding, Defendant stole Plaintiff Vassilev's personal data from across this wide swath of online applications and platforms to train the Products.

80.     Plaintiff Vassilev is concerned about the misuse of his photos, online contributions, and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of himself and his network of friends and family. Due to Defendant's illegal interference with his personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff Vassilev no longer has full control over that property, including his guaranteed legal right to delete it.

81.     Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything he shares online, Plaintiff Vassilev's distress is exacerbated by the unacceptable dilemma he now faces: either surrender his and his family's personal information and privacy to Defendant or forego the use of internet entirely.

**Plaintiff Jane Dascalos ("Plaintiff Dascalos")**

82.     Plaintiff Dascalos is and at all relevant times was a resident of the State of California.

83.     Plaintiff Dascalos uses the Google search engine and has had a Gmail account for at least thirteen (13) years, during which time she has amassed a great deal of personal emails. She uses Gmail and Google search on her personal computer and cellphone.

84.     Plaintiff Dascalos also uses her Gmail account for her YouTube account, which one of her minor children, who is nine (9) years old, also frequently uses to watch videos.

85.     Plaintiff Dascalos has used Google Hangouts to connect with family. In fact, her and her husband specifically chose to use Google Hangouts based on the belief that it was not riddled with privacy issues similar to other video chat platforms.  Plaintiff Dascalos frequently uses Google Drive to store and access personal and professional data, such as pictures of her family and personal documents.

86.     Plaintiff Dascalos is extremely disappointed in Google's misuse of data, and now realizes that when she thought she could trust Google, she was wrong.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

87.    Plaintiff Dascalos has a Reddit account that she uses to review content and occasionally post comments. She also has a Twitter account that she uses to post and comment on topics ranging from the financial market and California voting propositions to her personal political views. She is adamant about not allowing her minor children to use TikTok due to privacy concerns.

88.    Plaintiff Dascalos has a Facebook which she uses to post photographs of herself, friends, and family, including her minor children. She has shared sensitive medical information on Facebook support group pages regarding herself, her daughter, and her minor children. She has also posted sensitive medical information on physician group pages regarding her children, and believed this would be private. Moreover, in addition to sharing information about her work history, posting religious content, and using Facebook messenger to communicate with her network, Plaintiff Dascalos has posted her political views and opinions in "secret" Facebook groups pertaining to state, local, and national politics.  Plaintiff Dascalos posted and interacted with these groups believing they are tailored to specific purposes and audiences. Plaintiff Dascalos reasonably expected her posts and interactions within these groups to be would not be intercepted by any third-party. Had Plaintiff Dascalos been aware that her posts and interactions were subject to data scraping practices by unauthorized third parties, she would have refrained from participating in such discussions.

89.    Plaintiff Dascalos reasonably expected that the information that she exchanged with these websites and Google platforms would not be intercepted by any third-party looking to compile and use all her information and data for commercial purposes. Plaintiff Dascalos did not consent to the use of her private information by third parties in this manner. Notwithstanding, Defendant stole Plaintiff Dascalos's personal data from across this wide swath of online applications and Google platforms to train the Products.

90.    Plaintiff Dascalos is concerned about the misuse of her photos, online contributions, and private information, including having significant anxiety, distress, vulnerability and fear for the privacy and safety of herself, her minor child, and her network of friends and family. Due to Defendant's illegal interference with her personal information, and specifically embedding it permanently into AI Products and the models on which they run, Plaintiff Dascalos no longer has full control over that property, including her guaranteed legal right to delete it.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

91.   Because Defendant offers no effective opt out from the ongoing misappropriation and commercialization of anything she shares online, Plaintiff Dascalos's distress is exacerbated by the unacceptable dilemma she now faces: either surrender her, her minor child's and her family's personal information and privacy to Defendant or forego the use of internet entirely.

**Minor Plaintiff G.R.**

92.   Minor Plaintiff G.R. is and at all relevant times was a resident of the State of California.

93.   Minor Plaintiff G.R. is a thirteen (13) year old minor who started using Bard earlier this year. Google did not verify Plaintiff G.R.'s age before she accessed Bard. Plaintiff G.R. revealed personal information about herself to Bard.

94.   Minor Plaintiff G.R. also uses the Google search engine regularly and has had a Gmail account since 2020, when the pandemic started. She uses her Gmail account for school and personal emails with friends and family. She uses Gmail and Google search on her personal computer and cellphone.

95.   Minor Plaintiff G.R. has used Google Hangouts to connect with family and friends and did so specifically at the direction of her parents, who believed it did not have the same privacy issues impacting other video chat platforms.

96.   Minor Plaintiff G.R. also regularly uses YouTube videos and shorts, and has posted videos with her voice, with parental permission.

97.   Minor Plaintiff G.R. also uses and posts to Instagram and Snapchat to post pictures of herself and her friends and family, including content which includes her face and voice.

98.   Minor Plaintiff G.R. and her guardian reasonably expected that the information that she exchanged with these websites and Bard itself would not be used by either Google or any third-party looking to compile and use all her information and data for commercial purposes, including to train AI and for advertising. In fact, G.R.'s guardian specifically instructed Minor Plaintiff G.R. to avoid the popular platform TikTok due to privacy concerns. Minor Plaintiff G.R. and her guardian did not consent to the use of his private information in this manner. Plaintiff G.R. and her guardian also did not consent to her private information being contributed to google products and services,

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Formatted: Indent: Left: 0"

including her Google searches, to be used to train the Products. Notwithstanding, Defendant stole Minor Plaintiff G.R.'s personal data and private information to train the Products.

**Defendant**

~~44.~~99. **Defendant Google LLC** is headquartered in Mountain View, California. It was founded in 1998 as an American search engine company. Google's search business now amounts to $149 billion, with over 85~~%~~ percent market share in the global desktop search engine market worldwide. In 2015, as part of its corporate restructuring, Google LLC became a subsidiary of its newly-formed parent company, Alphabet, Inc. Google LLC is currently one of the world's largest for-profit tech companies, specializing in internet related services and products with a special emphasis on "web-based search and display advertising tools, search engine, cloud computing, software, and hardware."[7]

~~45.~~100.     Google LLC and its parent company, Alphabet Inc. expanded into the field of AI with the formation of Google AI in 2017.[8] Google AI is a division of Google LLC dedicated to artificial intelligence research and development.[9] Through Google AI, Google LLC has released numerous AI products to the market for commercial and personal use.

~~46.~~101.     Google AI's mission is focused on "research that expands what's possible, to product integrations designed to make everyday things easier, and applying AI to make a difference in the lives of those who need it most- we're committed to responsible innovation and technologies that benefit all of humanity."[10]

~~47.~~102.     Google AI developed PaLM-2, a large language model that powers AI tools like Bard.[11] In collaboration with Google's subsidiary Google DeepMind, Google AI has developed

---

[7] *Google LLC*, BLOOMBERG, https://www.bloomberg.com/profile/company/8888000D:US#xj4y7vzkg (last visited ~~July 10~~Dec. 28, 2023).
[8] *15 Largest AI Companies in 2023*, STASH (June 12, 2023), https://www.stash.com/learn/top-ai-companies/.
[9] *Google AI Overview*, GOLDEN, https://golden.com/wiki/Google_AI-ZXXXXPY#Overview (last visited ~~July 10~~Dec. 28, 2023).
[10] *Advancing AI for Everyone*, GOOGLE AI, https://ai.google (last visited ~~July 10~~Dec. 28, 2023).
[11] *Id.*

23

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left:  0"

1    and released AI products to the market for commercial and personal use.[12]

2    48.   ~~Defendant Alphabet Inc.~~ ~~is a technology conglomerate holding company and one of~~

3    ~~the world's largest technology companies by revenue.[13] Alphabet is headquartered in Mountain~~

4    ~~View, California.[14] It is the parent company of Google LLC, which operates the divisions known as~~

5    ~~Google AI and Google DeepMind that are dedicated to artificial intelligence and the development~~

6    ~~of the AI products at issue in this complaint.[15]~~

7    ~~49.   Alphabet Inc. was created in 2015, when Google restructured by moving each of its~~

8    ~~then-existing subsidiaries, along with a slimmed-down version of Google, to Alphabet's holdings.[16]~~

9    ~~Alphabet's subsidiaries include Calico, CapitalG, Fiber, GV, Verily, Waymo, and X Development,~~

10   ~~among others.[17] As of July 2023, Alphabet's market capitalization was $1.479 trillion, making it the~~

11   ~~world's fourth most valuable company.[18]~~

12   ~~50.~~103._____**Agents and Co-Conspirators.** ~~Defendants'~~Defendant's unlawful acts were

13   authorized, ordered, and performed by ~~Defendants'~~Defendant's respective officers, agents,

14   employees, representatives, while actively engaged in the management, direction, and control of

15   ~~Defendants'~~Defendant's businesses and affairs. ~~Defendants'~~Defendant's agents operated under

16   explicit and apparent authority of ~~their~~its principals. Each Defendant, and ~~their~~its subsidiaries,

17   affiliates, and agents operated as a single unified entity.

18

19

20   [12] Adam Conway, *Google Bard, What is It, and How Does it Work?*, XDA (May 25, 2023),

21   https://www.xda-developers.com/google-bard/; Pradip Maheshwari, *Google Bard AI Chatbot:
     How to Use*, OPENAI MASTER (May 13, 2023), https://openaimaster.com/google-bard-ai-chatbot-
     how-to-use/.

22   [13] ~~*Alphabet: GOOGL Stock Price, Company Overview & News*, FORBES,~~
     ~~https://www.forbes.com/companies/alphabet/?sh=2ef0407b540e (last visited July 10, 2023).~~

23   [14] ~~*Id.*; *Alphabet, Inc*, BLOOMBERG,~~
     ~~https://www.bloomberg.com/profile/company/GOOGL:US#xj4y7vzkg (last visited July 10,~~

24   ~~2023); *Alphabet Inc*, OPEN BUS. COUNCIL, https://www.openbusinesscouncil.org/wiki/alphabet-~~
     ~~google (last visited July 10, 2023).~~

25   [15] ~~Sundar Pichai, *An Important Next Step on Our AI Journey*, GOOGLE (Feb. 6, 2023),~~
     ~~https://blog.google/technology/ai/bard-google-ai-search-updates/.~~

26   [16] ~~*Alphabet Inc*, OPEN BUS. COUNCIL, https://www.openbusinesscouncil.org/wiki/alphabet-google~~
     ~~(last visited July 10, 2023).~~

27   [17] ~~*Alphabet: GOOGL Stock Price, Company Overview & News*, FORBES,~~
     ~~https://www.forbes.com/companies/alphabet/?sh=2ef0407b540e (last visited July 10, 2023).~~

28   [18] ~~*Alphabet (Google)*, COS. MKT. CAP, https://companiesmarketcap.com/alphabet-~~
     ~~google/marketcap/ (last visited July 10, 2023).~~

24

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

**JURISDICTION AND VENUE**

1

2       ~~51.~~104.      This Court has subject matter jurisdiction over this action pursuant to the Class

3  Action Fairness Act, 28 U.S.C § 1332(d), because this is a class action in which the amount in

4  controversy is $~~3~~5,000,000,000, far in excess of the statutory minimum, exclusive of interest and

5  costs. There are millions of class members as defined below, and minimal diversity exists because

6  a significant portion of class members are citizens of a state different from the citizenship of at least

7  one Defendant.

8       ~~52.~~105.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because

9  this case arises under the Copyright Act, 17 U.S.C. § 501~~, and the Digital Millennium Copyright~~

10  ~~Act, 17 U.S.C. § 1202~~.

11      ~~53.~~106.      This Court has supplemental jurisdiction over the state law claims in this

12  action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or

13  controversy as those that give rise to the federal claims.

14      ~~54.~~107.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

15  because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred

16  in this District: ~~Defendants Alphabet, Inc.,Defendant~~ Google LLC~~, and Google AI are~~ is

17  headquartered in this District, ~~all Defendants gain~~Defendant gains significant revenue and profits

18  from doing business in this District, consumers sign up for Google accounts and provide

19  ~~Defendants~~Defendant with their sensitive information in this District, Class Members affected by

20  this data misuse reside in this District, and ~~Defendants employ~~Defendant employs numerous people

21  in this District—a number of whom work specifically on making decisions regarding the data

22  privacy and handling of consumers' data that are challenged in this Action. ~~Each~~ Defendant has

23  transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of

24  the illegal scheme and conspiracy throughout the United States, including in this District.

25  ~~Defendants'~~Defendant's conduct had the intended and foreseeable effect of causing injury to

26  persons residing in, located in, or doing business throughout the United States, including in this

27  District.

28      ~~55.~~108.     The Court has general personal jurisdiction over ~~the Defendants~~Defendant,

25

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0"

1  because ~~all Defendants are~~Defendant is headquartered in California and ~~make~~makes decisions
2  concerning the Product(s), consumer data and privacy from California. ~~Defendants~~Defendant also
3  ~~advertise~~advertises and ~~solicit~~solicits business in California.

4  <center>**FACTUAL BACKGROUND**</center>

5  **I.      GOOGLE'S DEVELOPMENT OF ARTIFICIAL INTELLIGENCE.**

6  ~~56.~~109.      Beginning in 2017, Google introduced the "Transformer" neural network, a
7  revolutionary framework that underpins large language models ("LLMs")—the very underlying
8  technology that fuels AI chatbots across the AI industry.[19] This innovation opened a new frontier in
9  AI development, where AI could improve endlessly, someday even to superhuman intelligence.[20]
10 What AI enthusiasts failed to grant equal attention to was the cost to humanity associated with the
11 rapid, rampant, unregulated proliferation of the AI products.

12 ~~57.~~110.      ~~Defendants'~~Defendant's AI products, including but not limited to the products
13 listed below, were all built using private, personal, and/or copyrighted materials without proper
14 consent or fair compensation (collectively, the "**Products**").

15 ~~58.~~111.      Bard: The most prominent and publicly accessible of Google's suite of AI
16 products is its chatbot, known as "Bard." Like other AI chatbots, Bard operates as an advanced
17 language model, capable of delivering natural-sounding conversational responses to users'
18 questions and prompts.[21] Its user interface is presented as "a dialogue box where users type in their
19 queries."[22] Bard is capable of accessing and assimilating information from the internet,
20 predominantly from Google's own search engine, which allowed it to surpass the 2021 information
21 cutoff which previously confined other prominent AI chatbots like ChatGPT.[23] Moreover, Bard is
22 able to respond to users not only with text-based answers, but also via image-based answers, adding

23
---
[19] Amit Prakash, *What is Transformer Architecture and How Does it Power ChatGPT?*,
24  THOUGHTSPOT (Feb. 23, 2023), https://www.thoughtspot.com/data-trends/ai/what-is-transformer-architecture-chatgpt.
[20] Ana Sofia-Lesiv, *The Acceleration of Artificial Intelligence*, CONTRARY (Mar. 20, 2023),
25  https://contrary.com/foundations-and-frontiers/ai-acceleration.
[21] Andy Patrizio, *Google Bard*, TECHTARGET,
26  https://www.techtarget.com/searchenterpriseai/definition/Google-Bard (last ~~updated May~~visited
27  Dec. 28, 2023).
[22] Ben Wodecki, *Google Unveils Bard: Its Version of ChatGPT*, AI BUS. (Feb. 7, 2023),
28  https://aibusiness.com/google/google-unveils-bard-its-version-of-chatgpt.
[23] *Id.*

<center>26</center>
<center>FIRST AMENDED CLASS ACTION COMPLAINT</center>

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1  another function to its capabilities.[24]

2  ~~59.~~112.      Bard was initially built on the LaMDA LLM.[25] Google has since transitioned

3  Bard to PaLM 2,[26] a LLM trained on 3.6 trillion tokens (strings of words), more powerful than any

4  existing model.[27] Due to its vast training data, Bard not only can generate human-like answers but

5  also has coding capabilities and advanced math and reasoning skills.[28] Bard can also replicate and

6  mimic all the artists, authors, and creators on whose content it was trained in order to generate "art."

7  ~~60.~~113.      Google released Bard publicly on May 10, 2023, in over 180 countries and

8  territories. Bard quickly reached 142.6 million users the same month.[29] Google plans to expand to

9  more countries, with an anticipated global reach of 1 billion users, or an eighth of all people

10  worldwide.[30]

11  ~~61.~~114.      Imagen: A text-to-image generative AI created by Google with "an

12  unprecedented degree of photorealism and a deep level of language understanding,"[31] Imagen

13  utilizes advanced, complicated diffusion technology to turn text into images.[32] Imagen was trained

14  on the LAION-400M dataset, which "is known to contain a wide range of inappropriate content

15  including pornographic imagery, racist slurs, and harmful social stereotypes."[33]

16  ~~62.~~115.      MusicLM: As a generative AI with text-to-music capabilities, MusicLM was

---

[24] Sabrina Ortiz, *What is Google Bard? Here's Everything You Need to Know*, ZDNET (June 1, 2023), https://www.zdnet.com/article/what-is-google-bard-heres-everything-you-need-to-know/.
[25] Joe Jacob, *What Sites Were Used for Training Google Bard AI?*, MEDIUM (Feb. 11, 2023), https://medium.com/@taureanjoe/what-sites-were-used-for-training-google-bard-ai-1216600f452d.
[26] Sabrina Ortiz, *What is Google Bard? Here's Everything You Need to Know*, ZDNET (June 1, 2023), https://www.zdnet.com/article/what-is-google-bard-heres-everything-you-need-to-know/.
[27] Jennifer Elias, *Google's Newest A.I. Model Uses Nearly Five Times More Text Data than Its Predecessor*, CNBC (May 17, 2023), https://www.cnbc.com/2023/05/16/googles-palm-2-uses-nearly-five-times-more-text-data-than-predecessor.html.
[28] Sissie Hsiao, *What's Ahead for Bard: More Global, More Visual, More Integrated*, KEYWORD (May 10, 2023), https://blog.technology/ai/google-bard-updates-io-2023/.
[29] *Id.*; David F. Carr, *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, SIMILARWEB: BLOG (June 5, 2023), https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/.
[30] Ritik Sharma, *23 Amazing Google Bard Statistics (Users, Facts)*, CONTENTDETECTOR.AI (June 28, 2023), https://contentdetector.ai/articles/google-bard-statistics.
[31] Brain Team, *Imagen*, RES. GOOGLE, https://imagen.research.google/ (last visited ~~July 10~~Dec. 28, 2023).
[32] *Id.*
[33] *Id.*

27

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1   trained on 280,000 hours of music from the Free Music Archive,[34] which offers free access to open

2   licensed—but still copyrighted—original music.[35] In January 2023, Google had "no immediate

3   plans" for release due to ethical concerns, including "a tendency to incorporate copyrighted material

4   from training data into the generated songs."[36] However, it released a limited version publicly on

5   May 10, 2023.[37] Many remain concerned that products like MusicLM violate copyright law by

6   creating "tapestries of coherent audio from works they ingest in training, thereby infringing the

7   United States Copyright Act's reproduction right."[38]

8       ~~63.~~116.     Duet AI: Embedded within Google's suite of Workspace apps (Gmail, Google

9   Drive, Meet, etc.), this generative AI assists users with drafting in "Docs and Gmail, image

10  generation in Slides, automatic meeting summaries in Meet, and more."[39] Duet AI is powered by

11  PaLM 2.[40] Google pre-trained one of the foundation models that powers Duet AI with "Google

12  Cloud-specific content like documentation and sample code, *and fine-tuned it based on Google*

13  *Cloud user behaviors and patterns.*"[41]

14      117.   Gemini: ~~Still in development,~~ Gemini is ~~being billed as~~ a highly efficient, multimodal

15  machine-learning model that "can decode many data types at once, similar to how humans use

16  different senses in the real world."[42] ~~Gemini will be able to interpret various graphical (images,~~

---

[34] Andrea Agostinelli et al., *MusicLM: Generating Music from Text*, (Jan. 26, 2023),
https://arxiv.org/pdf/2301.11325.pdf.

[35] *About Free Music Archive*, FREE MUSIC ARCHIVE, https://freemusicarchive.org/about/ (last
visited ~~July 10~~Dec 28, 2023).

[36] Kyle Wiggers, *Google Makes Its Text-to-Music AI Public*, TECHCRUNCH (May 10, 2023),
https://techcrunch.com/2023/05/10/google-makes-its-text-to-music-ai-public/.

[37] *Id.*

[38] *Id.*

[39] James Vincent, *Google Rebrands AI Tools for Docs and Gmail as Duet AI – Its Answer to
Microsoft's Copilot*, VERGE (May 10, 2023),
https://www.theverge.com/2023/5/10/23718301/google-ai-workspace-features-duet-docs-gmail-
io.

[40] Jennifer Elias, *Google's Newest A.I. Model Uses Nearly Five Times More Text Data for
Training than Its Predecessor*, CNBC (May 17, 2023),
https://www.cnbc.com/2023/05/16/googles-palm-2-uses-nearly-five-times-more-text-data-than-
predecessor.html; *Large Language Model Training in 2023*, AIMULTIPLE (May 20, 2023),
https://research.aimultiple.com/large-language-model-training/.

[41] *Introducing Duet AI for Google Cloud – An AI-powered Collaborator*, GOOGLE (May 10, 2023),
https://cloud.google.com/blog/products/application-modernization/introducing-duet-ai-for-google-
cloud.

[42] ~~Calvin Wankhede, *What is Google Gemini: The Next-Gen Language Model that Can Do It All*,
ANDROID AUTH. (June 4, 2023), https://www.androidauthority.com/what-is-google-gemini-
3331678/.~~

28
FIRST AMENDED CLASS ACTION COMPLAINT

models, graphs, etc.) [43] Google has designed three different sizes of Gemini 1.0 (Ultra, Pro and Nano), [44] with Gemini Ultra as the largest, and most capable of "highly complex tasks." [45]

64.118.    Although Google has refused to disclose the specific datasets used to train Gemini, [46] and video inputs and provide summaries and answer follow-up questions about what it "sees." [47] To achieve this, Gemini has been trained "from day one on audio, video, images and other media—as well as text, and the ability to use other tools and APIs, [48] able to interpret various graphical (images, models, graphs, etc.) and video inputs and provide summaries and answer follow-up questions about what it "sees." [49] Though Defendants haven't yet set a release date, they are [50] To achieve this, Google reportedly seekingsought to outpace competition by accelerating the internal review processes of Gemini and setting aside concerns of safety and ethics. [51]

119.   According to Google DeepMind founder Demis Hassabis, "*Gemini can understand the world around us in the way that we do*." [52] However, such "profound" technology poses equally profound risks—Google has acknowledged that Gemini is "prone to mistakes." [53] Not only can it

---

[43] Calvin Wankhede, *What is Google Gemini: The Next-Gen Language Model that Can Do It All*, ANDROID AUTH. (June 4, 2023), https://www.androidauthority.com/what-is-google-gemini-3331678/.
[44] Sundar Pichai & Demis Hassabis, *Introducing Gemini: Our Largest and Most Capable AI model*, GOOGLE (Dec. 6, 2023), https://blog.google/technology/ai/google-gemini-ai/#sundar-note.
[45] *Id.* ("With a score of 90.0%, Gemini Ultra is the first model to outperform human experts on MMLU (massive multitask language understanding), which uses a combination of 57 subjects such as math, physics, history, law, medicine and ethics for testing both world knowledge and problem-solving abilities.").
[46] Will Knight, *Google Just Launched Gemini, Its Long-Awaited Answer to ChatGPT*, WIRED (Dec. 6, 2023), https://www.wired.com/story/google-gemini-ai-model-chatgpt/.
[47] *Id.*
[48] Loz Blain, *Google Swings for the Fences with PaLM 2 and Gemini AI Systems*, NEW ATLAS (May 11, 2023), https://newatlas.com/technology/google-palm-2-ai/.
[49] Loz Blain, *Google Swings for the Fences with PaLM 2 and Gemini AI Systems*, NEW ATLAS (May 11, 2023), https://newatlas.com/technology/google-palm-2-ai/.
[50] Wankhede, *supra* note 43; *see also* Beatrice Nolan, *Here's what we know so far about Google's Gemini,* BUSINESS INSIDER (Dec. 6, 2023), https://www.businessinsider.com/google-gemini-explainer-ai-model-2023-9.
[51] Davey Alba & Julia Love, *Google's Rush to Win in AI Led to Ethical Lapses, Employees Say*, BLOOMBERG (Apr. 19, 2023), https://www.bloomberg.com/news/features/2023-04-19/google-bard-ai-chatbot-raises-ethical-concerns-from-employees?leadSource=uverify%20wall.
[52] Craig S. Smith, *Google Unveils Gemini, Claiming It's More Powerful Than OpenAI's GPT-4*, FORBES (Dec. 6, 2023), https://www.forbes.com/sites/craigsmith/2023/12/06/google-unveils-gemini-claiming-its-more-powerful-than-openais-gpt-4/?sh=6a4f13404d7c.
[53] *Google Updates Bard Chatbot With 'Gemini' A.I. as It Chases ChatGPT*, THE N.Y. TIMES (Dec. 6, 2023), https://www.nytimes.com/2023/12/06/technology/google-ai-bard-chatbot-gemini.html.

29

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

"get facts wrong," it can even "hallucinate" and generate fabricated information.[54]

120.  As of December 6, 2023, Gemini Nano can run on select smartphones with built in AI, quite literally placing this technology in the palms of peoples' hands, leaving the risks unchecked.[55] This date also marks the integration of Gemini Pro into Google Bard—"the biggest upgrade to Bard since it launched."[56]

**A.  Google's Affirmatively Rejected Consideration of LLM Risks and Fired Google AI Ethics Executives Who Did Not Follow Suit.**

121.  AI ethics researchers, including Google executive Timnit Gebru, technical co-lead of Google's Ethical Artificial Intelligence Team, co-authored a paper analyzing the long-term ethical, environmental, and social concerns of LLM development to train AI.[57]

122.  This paper entitled, "*On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*" acknowledges that "the risks associated with synthetic but seemingly coherent text are deeply connected to the fact that such synthetic text can enter into conversations without any person or entity being accountable for it. This accountability both involves responsibility for truthfulness and is important in situating meaning."[58] It also analyzes how LLMs can perpetuate hegemonic worldviews and output abusive language. It calls for "research and development of language technology, at once concerned with deeply human data (language) and creating systems which humans interact with in immediate and vivid ways, [to be] done with forethought and care."

123.  Apparently, "...the findings were apparently so inconvenient to Google's business interests that the company requested the paper be withdrawn or that the names of its employees be removed. Objecting to the request, Timnit Gabru was shortly forced out of Google, stirring a public

---

[54] *Id.*
[55] Brian Rakowski, *Pixel 8 Pro — the first smartphone with AI built in — is now running Gemini Nano, plus more AI updates coming to the Pixel portfolio*, GOOGLE (Dec. 6, 2023), https://blog.google/products/pixel/pixel-feature-drop-december-2023/.
[56] Pichai & Hassabis, *supra* note 44.
[57] April Glaser & Olivia Solon, *Google Workers Mobilize Against Firing of Top Black Female Executive*, NBC (Dec. 4, 2020), https://www.nbcnews.com/tech/internet/google-workers-mobilize-against-firing-top-black-female-executive-n1250038.
[58] Emily M. Bender and Timnit Gebru, et. al., *On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*, ACM Digital Library (March 3, 2021) https://dl.acm.org/doi/pdf/10.1145/3442188.3445922 (last accessed Dec. 29, 2023)

30

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

controversy that helped to elevate the issues raised in the study."[59]

124.  "The executive, Timnit Gebru, technical co-lead of Google's Ethical Artificial Intelligence Team, announced on Twitter late Wednesday that she had been fired after sending an email to co-workers stating that the company's leadership had forced her to retract a paper focusing on ethical problems involving the kind of artificial intelligence systems used to understand human language, including one that powers Google's search engine."[60]

125.  Google also fired co-author of the groundbreaking paper and top AI ethics researcher, Margaret Mitchell, "after searching her email for evidence of discrimination against Gebru. The paper in question examined problems in large-scale AI language models — technology that now underpins Google's lucrative search business — and the firings have led to protest as well as accusations that the company is suppressing research."[61]

**A.B.    Google's AI Product Development Depends on Stolen Web-Scraped Data and Vast Troves of Private User Data from ~~Defendants'~~Defendant's Own Products.**

~~65.~~126.    Google was determined to expedite the launch of its AI Products at the expense of privacy, security, and ethics—secretly harvesting millions of consumers' personal data from the internet without their knowledge or consent.

~~66.~~127.    The LLMs powering these Products depend on consuming huge amounts of data to "train" the AI. Most valuable to the Products is personal data of any kind, especially conversational data between humans, which is how the Products develop human-like communication capabilities. Creative and expressive works are equally valuable because that is how AI products learn to "create" art. The only reason ~~Defendants'~~Defendant's Products exist is because all this personal information was used to train the LLMs.

---

[59] Tyler Wells Lynch, *Recap: IEAI Hosts On the Dangers of Stochastic Parrots with Emily M. Bender,* Medium (January 4, 2022) https://medium.com/@experiential.ai/written-recap-ieai-hosts-on-the-dangers-of-stochastic-parrots-with-emily-m-bender-9f0c597aabec (last accessed Dec. 29, 2023).
[60] Glaser & Solon, *supra* note 57.
[61] James Vincent, *Google is poisoning its reputation with AI researchers,* The Verge (April 13, 2021) https://www.theverge.com/2021/4/13/22370158/google-ai-ethics-timnit-gebru-margaret-mitchell-firing-reputation last accessed Dec. 29, 2023).

31

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

67.128.    A vast amount of internet user data is available for purchase like any other content or property. But ~~Defendants~~Defendant took a different approach: theft. Rather than licensing data from the owners, or otherwise giving notice, seeking consent, and paying for it, ~~Defendants~~Defendant elected instead to systematically scrape at least 1.56 trillion words of "public dialog data and other public web documents", including personal information obtained without consent."[62] ~~They~~It did so in secret and without registering as a data broker as required under applicable law.[63]

68.129.    "Scraping involves the use of 'bots,' or robot applications deployed for automated tasks, which scan and copy the information on webpages then *store* and *index* the information."[64] According to a computer science professor at the University of Oxford, the full extent of personal data taken by ~~Defendants'~~Defendant's scraping is "unimaginable."[65] In an interview with The Guardian, Professor Michael Woodridge explained that the LLM underlying Bard and other AIs like it "includes the whole of the world wide web – *everything*. Every link is followed in every page, and every link in those pages is followed."[66] Thus, "a lot of data about you and me" is swept up into the Products.[67]

69.130.    The breadth of Google's data collection without permission impacts essentially every internet user ever, raising serious legal, moral, and ethical questions. Regulators and courts worldwide are seeking to crack down on AI companies "hoovering up content without consent or notice,"[68] but the response by Google and others has been to keep ~~their~~its training datasets largely secret. Google has not permitted any regulatory or other audit access.

70.131.    Still, some critical information is known about Google's training data. To begin

---

[62] Calvin Wankhede, *What Is Google's Bard AI? Here's Everything You Need to Know*, ANDROID AUTH. (Mar. 22, 2023), www.androidauthority.com/google-bard-chatbot-3295464/.
[63] *Data Brokers*, EPIC, https://epic.org/issues/consumer-privacy/data-brokers/ (last visited ~~July 10~~Dec. 29, 2023).
[64] Brian Stuenkel, *Personal Information and Artificial Intelligence: Website Scraping and the California Consumer Privacy Act*, COLO. TECH. L. J. (Nov. 2, 2021), https://ctlj.colorado.edu/?p=840.
[65] Alex Hern & Dan Milmo, *I Didn't Give Permission: Do AI's Backers Care About Data Law Breaches?*, GUARDIAN (Apr. 10, 2023), https://www.theguardian.com/technology/2023/apr/10/i-didnt-give-permission-do-ais-backers-care-about-data-law-breaches.
[66] *Id.*
[67] *Id.*
[68] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left:  0"

1  with, Google's LaMDA model was pre-trained on a staggering 1.56 trillion words of "~~public~~ dialog

2  data and web text," drawn from Infiniset, an amalgamation of various internet content meticulously

3  selected to improve the model's conversational abilities.

4  ~~71.~~ 132.      12.5~~%~~ percent of Infiniset is scraped from C-4-based data; 12.5~~%~~ percent from

5  the English language Wikipedia; 12.5~~%~~ percent from code documents of programming Q&A

6  websites, tutorials, and others; 6.25~~%~~ percent from English "web documents"; and 6.25~~%~~ percent

7  from non-English "web documents."[69]

8  133.  Defendant has essentially embedded into the Products personal information across a

9  range of categories that reflect our hobbies and interests, our religious beliefs, our political views

10  and voting records, the social and support groups to which we belong, our sexual orientations and

11  gender identities, our personal relationship statuses, our work information and histories, details

12  (including pictures) about our families and children, the music we listen to, our purchasing

13  behaviors, our general likes and dislikes, the ways in which we speak and write, our mental health

14  and ailments, where we live and where we go, the websites we visit, our digital subscriptions, our

15  friend groups and other associational data, our email addresses, other contact and identifying

16  information, and more.[70] With respect to personally identifiable information, Defendant fails

17  sufficiently to filter it out of the training models, putting millions at risk of having that information

18  disclosed on prompt or otherwise to strangers around the world.[71] Defendant has scraped thousands

19

20  [69] Roger Montii, *Google Bard AI – What Sites Were Used to Train It?*, SEARCH ENGINE J. (Feb. 10,
    2023), https://www.searchenginejournal.com/google-bard-training-data/478941/#close.

21  [70] *Digital Footprint: What is It And Why You Should Care About It*, INVISIBLY (Jan. 25, 2022),

22  https://www.invisibly.com/learn-blog/digital-footprint/ ("Your digital footprint is your trail of
    personal information that companies can follow. . . To break it down, your digital footprint is

23  essentially a record of your online activity. Whenever you log into an account, send an email, or
    buy something online, it leaves a digital impression behind. It is the trail of data left behind by

24  your daily interactions. Your footprint is permanent which can leave your information vulnerable
    if not protected correctly. You might not always be aware that you are creating your digital

25  footprint. For instance, websites can track your activity by installing cookies on your device.
    Furthermore, apps can collect your data without you even knowing it. Once an organization has

26  access to your data, they can sell or share it with third parties. Even more, your information is out
    there and could be compromised via a data breach.").

27  [71] Katyanna Quach, *What Happens When Your Massive Text-Generating Neural Net Starts
    Spitting out People's Phone Numbers? If you're OpenAI, you Create a Filter*, THE REGISTER

28  (Mar. 18, 2021), https://www.theregister.com/2021/03/18/openai_gpt3_data/?td=readmore-top.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

of websites to collect this personal information. Plaintiffs have compiled a selection of around 1,000 websites that Defendant has scraped to illustrate the breadth and character of Defendant's scraping practices. *See* **Exhibit B** (Misappropriated Content – Representative List of Websites).

134.   As reflected in **Exhibit B**, the breadth and scope of Defendant's data collection without permission, impacting essentially every internet user ever, raises serious legal, moral, and ethical issues.[72]

**C. Defendant's Theft of Private Information Presents Imminent Harm to Individuals**

*1.  Defendant's datasets used to train Google's LaMDA model are riddled with websites that have private information.*

~~72.~~135.     The C-4 dataset, created by Google in 2020, is taken from the Common Crawl dataset.[73] The Common Crawl dataset is a massive collection of web pages and websites consisting of petabytes of data collected over twelve (12) years, including raw web page data, metadata extracts, and text extracts.

~~73.~~136.     The Common Crawl dataset is owned by a non-profit of the same name, which has been indexing and storing as much of the internet as it can access, filing away as many as 3 billion webpages every month, for over a decade.[74] ~~The non-profit makes the data available to the public for free — but it is intended to be used for research and education. As a result, the Common Crawl is a staple of large academic studies of the web.[75][76]~~

---

[72] Erin Griffith & Cade Metz, *A New Era of A.I. Booms, Even Amid the Tech Gloom*, THE N.Y. TIMES (Jan. 7, 2023), https://www.nytimes.com/2023/01/07/technology/generative-ai-chatgpt-investments.html ("The technology has raised thorny ethical questions around how generative A.I. may affect copyrights and whether the companies need to get permission to use the data that trains their algorithms.").

[73] *Id.*; Katyanna Quach, *4chan and Other Web Sewers Scraped Up Into Google's Mega-Library for Training ML*, THE REGISTER (Apr. 20, 2023), https://www.theregister.com/2023/04/20/google_c4_data_nasty_sources/.

[74] ~~James Bridle, *The Stupidity of AI*, GUARDIAN (Mar. 16, 2023), https://www.theguardian.com/technology/2023/mar/16/the-stupidity-of-ai-artificial-intelligence-dall-e-chatgpt.~~

[75] ~~Kalev Leetaru, *Common Crawl and Unlocking Web Archives for Research*, FORBES (Sept. 28, 2017), https://www.forbes.com/sites/kalevleetaru/2017/09/28/common-crawl-and-unlocking-web-archives-for-research/?sh=7a8f55bf3b83.~~

[76] James Bridle, *The Stupidity of AI*, GUARDIAN (Mar. 16, 2023), https://www.theguardian.com/technology/2023/mar/16/the-stupidity-of-ai-artificial-intelligence-dall-e-chatgpt.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

74.137.    The Common Crawl was never intended to be taken *en masse*, and turned into an AI product for commercial gain, as ~~Defendants have~~Defendant has done. Upon information and belief, the 501(c)(3) overseeing the Common Crawl did not consent to this mass misappropriation and data laundering of personal data. And even if it did, it did not obtain the consent of users whose personal data it scraped.

~~75.    This commercial misappropriation of the Common Crawl has raised concerns given the sheer volume of personal data it contains, including highly personal data. One chilling example of the privacy invasions caused by Defendants' misappropriation is the experience of a San Francisco-based digital artist named Lapine. Using the online tool "Have I Been Trained," Lapine was able to determine that her private medical file, i.e., photographs taken of her body as part of her clinical documentation when she was undergoing treatment for a rare genetic condition, ended up online and then was memorialized in the Common Crawl archive.[77]~~

~~76.    Remarking on web scraping practices like Defendants', Lapine highlighted the unique harm: "It's the digital equivalent of receiving stolen property. . . [my medical information] was scraped into this dataset. . . it's bad enough to have a photo leaked, *but now it's part of a product.*"[78] More broadly, this "productization" of personal information means that all of the data about us scraped without permission from the full extent of our "digital footprints" is now fueling Bard's responses, to strangers around the world.~~

77.138.    The remaining, substantial portion of Infiniset—a full 50~~%   percent~~is sourced from what Google vaguely terms as "public forums." The company has declined to clarify the specifics of what constitutes these "public forums," leaving users in the dark about the exact origins and nature of the data influencing half of the AI's training.[79]

78.139.    The recent investigation by The Washington Post into the composition of

---

[77] ~~James Bridle, *The Stupidity of AI*, GUARDIAN (Mar. 16, 2023), https://www.theguardian.com/technology/2023/mar/16/the-stupidity-of-ai-artificial-intelligence-dall-e-chatgpt.~~
[78] ~~*Id.*~~
[79] Roger Montti, *Google Bard AI: What Sites Were Used to Train It*, SEARCH ENGINE J. (Feb. 10, 2023), https://www.searchenginejournal.com/google-bard-training-data/478941/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Google's C-4 dataset specifically unveiled troubling insights. [80] According to the exposé, the dataset "raised significant privacy concerns" due to the sensitive personal information in it. For example, Google misappropriated state voter registration databases, with coloradovoters.info and flvoters.com ranked in the top 100 sites in C-4. [81]

~~79.~~140.    The C-4 dataset is also rife with copyrighted and protected works, with the copyright symbol appearing more than 200 million times within the dataset.[82]

~~80.~~141.    In fact, the third largest site fueling the dataset is scribd.com, a subscription-based digital library with sixty (60) million e-books and audio books—that compensates authors using a revenue sharing model based on the number of reads their work gets.[83] There is no indication Scribd consented to this mass misappropriation, and certainly the authors did not consent, nor were they compensated. Rather, Google has engaged in the unauthorized accessing of restricted materials.

~~81.~~142.    Google's C-4 dataset also reflects the ~~Company's~~company's deliberate receipt of stolen property to build and train Bard. The dataset contains data from "b-ok.org" a "notorious market for pirated e-books," as well as "[a]t least 27 other sites identified by the U.S. government as markets for piracy and counterfeits."[84]

~~82.~~143.    There is also a "trove of personal blogs" represented in the misappropriated data—more than half a million, including the tens of thousands of blogs hosted on Medium, a website especially popular with authors and other content creators. Blogs written on WordPress, Tumbler, Blogspot and Live Journal were also among the materials misappropriated by Google.

~~83.~~144.    Google also misappropriated personal and copyrighted information from popular crowdfunding and creative websites, Kickstarter and Patreon, giving Bard access to thousands of artists' and creators' ideas and proprietary marketing materials, "raising concerns

---

[80] Kevin Schaul et al., *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, WASH. POST (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.
[81] *Id.*
[82] *Id.*
[83] *Id.*; Omar, *Scribd Review: Scribd Membership Options, Pros, Cons, and Pricing*, OJ DIGIT. SOLUTIONS, https://ojdigitalsolutions.com/scribd-review/.
[84] ~~Kevin Schaul et al., *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, WASH. POST (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.~~ Kevin Schaul, *supra* note 80.

Formatted: Indent: Left:  0"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1   [Bard] may copy this work in suggestions to users."

2   ~~84.~~145.   The vast selection of news and media sources within the C-4 dataset

3   misappropriated by Google pose unique risks. While reputable outlets are included, it also

4   incorporates media sources that hold low positions on the trustworthiness scale.[85] The inclusion of

5   such sources in the training corpus precludes the impartiality of the AI Products' outputs, increasing

6   the potential for misinformation and bias, something Bard is already known for.

7   ~~85.~~146.   Moreover, while Google claimed to filter out obscene material, the

8   Washington Post found the filters did not work. Instead, the C-4 dataset includes "hundreds of

9   examples of pornographic websites and more than 72,000 instances of 'swastika,'"[86] as well as

10  overtly dangerous sites such as the white supremacist platform stormfront.org; the anti-LGBTQ site

11  kiwifarms.net; and the anti-government threepercentpatriots.com, which has been linked to the

12  January 6, 2021 attack on the U.S Capitol.[87]

13  ~~86.~~147.   In February 2023, an official demonstration of Bard exposed the system's

14  capacity to spread misinformation.[88] In the demo, Bard was asked a question about the James Webb

15  Space Telescope (JWST), in response to which it falsely asserted that JWST was the first to

16  photograph exoplanets.[89] The fallout from this publicized mistake was significant, leading Alphabet

17  Inc. to suffer a staggering $100 billion drop in market value as its stock plummeted.[90] This incident

18  is just one example of Google's willingness to rush its AI products to market before they are ready.

19  ~~87.~~148.   After using the scraped personal data from millions of consumers to train the

20  Products,[91] ~~Defendants~~Defendant did not stop there. **Alarmingly, ~~they~~it continued to feed the**

21  **Products by harnessing data gleaned from various of its own Google services, including**

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Martin Coulter & Greg Bensinger, *Alphabet Shares Dive After Google AI Chatbot Bard Flubs Answer in Ad*, Reuters (Feb. 8, 2023), https://www.reuters.com/technology/google-ai-chatbot-bard-offers-inaccurate-information-company-ad-2023-02-08/.
[89] *Id.*
[90] *Id.*
[91] ~~Kevin Schaul et al., *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.~~ Schaul, *supra* note 80.

37

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**~~Gmail~~Gmail**[92] **and Google Search**.[93] Scraping of data from these platforms constitutes a pervasive and unconscionable invasion of users' personal spheres, exploiting the contents of private communications to feed ~~their~~its AI's voracious appetite for personal information. Such sensitive information encompassed intimate details of people's personal lives, financial transactions, health information, and a plethora of other private correspondence.

149.   Plaintiff Guilak never expected that his sensitive financial and medical information, and private conversations would be scraped from his Gmail and used to train AI. Plaintiff Guilak also never expected that personal information he revealed using Google platforms and the extensive personal data he inputted, in Gmail and on other Google platforms, would be scraped to train AI.

150.   Plaintiff Barcos never expected that her use of Google platforms– including private platforms such as personal emails and extensive personal data she inputted, would be scraped to train AI.

151.   Plaintiff Martin also never expected that his use of Google platforms and services, including extensive personal data, would be scraped to train AI.

152.   Plaintiff Cousart never expected that her sensitive financial and medical information, original creative content, and personal conversations would be scraped from her Gmail and used to train AI.

153.   Plaintiff De La Torre never expected that his sensitive financial and medical information, and private conversations, would be scraped from his Gmail and used to train AI. Plaintiff De La Torre also never expected that his use of Google platforms, would be scraped to train AI.

154.   Plaintiff Vassilev also never expected that his sensitive financial and medical information, and personal conversations would be scraped from his Gmail and used to train AI.

---

[92] Former Google employee, Blake Lamoine, ~~explains~~explained how Bard was trained on text from Gmail; "[t]he LaMDA engine underlying Bard is also what drives autocomplete and autoreply in Gmail so ... yeah Bard's training data includes Gmail..." ~~@~~Blake Lemoine (~~@~~cajundiscordian, ~~TWITTER~~), X, (Mar. 21, 2023), https://twitter.com/cajundiscordian/status/1638243303035670528?s=20.
[93] *Information Google Collects*, GOOGLE PRIV. & TERMS, https://policies.google.com/privacy#infocollect (last visited July 10, 2023) (stating that Google collects user activity including "terms [they] search for" and admitting that Google uses the information "to improve [their] services and to develop new products.").

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

**Formatted:** Indent: Left: 0"

155.  Plaintiff Dascalos never expected that her use of Google platforms and services, including personal family photos uploaded to Google Drive would be scraped to train AI.

156.  Minor Plaintiff G.R. and her guardian never expected that Plaintiff G.R.'s private conversations and content would be scraped from her Gmail and used to train AI.

157.  **Defendant has scraped private websites with password protection and restricted access**. From just a sampling of the thousands+ websites Defendant scraped from 2018 to 2022 alone, hundreds are password protected. For example, facebook.com, Instagram.com, tiktok.com, whatsapp.com, spotify.com, reddit.com, outlook.com, twitter.com, dropbox.com, stackoverflow.com, office.com, snapchat.com, linkedin.com, crunchbase.com, webflow.com, soundcloud.com, discord.gg, wordpress.com, pinterest.com, blogspot.com, yelp.com, and vimeo.com.

158.  Plaintiff Guilak never expected that the content he posted to Facebook, Snapchat, and Instagram, from photos of his family, nieces and nephews, to his religious and political views, would be scraped to train AI or otherwise used by a third party like Google in a manner that violates the terms of use of these websites. Plaintiff Guilak also never anticipated that his comments on Reddit, his tweets posted to Twitter, videos and comments posted to TikTok, or his unique Spotify playlists would be scraped to train AI or otherwise used by a third party like Google in a manner that violates the terms of use of these websites.

159.  Plaintiff Barcos never anticipated that her content posted to Instagram, Twitter, TikTok, Snapchat, or Facebook, including her content posted to specific Facebook groups for psychological support to cancer victims, would be scraped to train AI or otherwise used by a third party like Google in a manner that violates the terms of use of these websites. Plaintiff Barcos also never expected that her Yelp comments would be scraped to train AI or otherwise used by a third party like Google in a manner that violates the terms of use of these websites.

160.  Plaintiff Martin never anticipated that his posts on Twitter, photos posted to Instagram, or his unique Spotify playlists would be scraped to train AI or otherwise used by a third party like Google in a manner that violates the terms of use of these websites. Plaintiff Martin also never expected that questions he answered on Stack Overflow, utilizing his professional knowledge,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1  would be scraped to train AI or otherwise used by a third party like Google in a manner that violates

2  the terms of use of these websites.

3      161.   Plaintiff Cousart never expected that the content she shared on Facebook with her

4  close network and specific audiences regarding caring for her father through his cancer experience

5  would be scraped to train AI or otherwise used by a third party like Google in a manner that violates

6  the terms of use of these websites. Plaintiff Cousart also never expected that private photos of her

7  family stored in her Dropbox account, or her photos posted to Instagram, would be scraped to train

8  AI or otherwise used by a third party like Google in a manner that violates the terms of use of these

9  websites. Plaintiff Cousart also remains anxious and fearful that her and her family's faces can be

10  misused to create digital clones.

11      162.   Plaintiff De La Torre never expected that his photos and location posted to Instagram,

12  or his posted content on and/or engagement with Snapchat, Twitter, Reddit, TikTok, Yelp, and

13  LinkedIn, would be scraped to train AI or otherwise used by a third party like Google in a manner

14  that violates the terms of use of these websites. Plaintiff De La Torre also never anticipated that his

15  posts on Crunchbase or Webflow would be scraped to train AI or otherwise used by a third party

16  like Google in a manner that violates the terms of use of these websites.

17      163.   Plaintiff Vassilev never anticipated that his content posted to Instagram, including

18  photos of his family, his unique playlists created on Spotify, or his posts on Reddit or Yelp, would

19  be scraped to train AI or otherwise used by a third party like Google in a manner that violates the

20  terms of use of these websites.

21      164.   Plaintiff Dascalos never anticipated that the content she shared on Facebook,

22  including family photos shared with her close network, and her political views shared on restricted

23  Facebook groups to specific audiences would be scraped to train AI or otherwise used by a third

24  party like Google in a manner that violates the terms of use of these websites. Plaintiff Dascalos

25  also remains anxious and fearful that her and her family's faces can be misused to create digital

26  clones.

27      165.   Minor Plaintiff G.R. and her guardian never anticipated that the content Plaintiff G.R.

28  posted to Instagram or Snapchat would be scraped to train AI or otherwise used by a third party like

1    Google in a manner that violates the terms of use of these websites.

2    166.  **Defendant has scraped websites with confidential financial information**, such as

3    paypal.com, ebay.com, stripe.com, squarespace.com, shopify.com, etsy.com, and eventbrite.com.

4    167.  **Defendant has scraped websites with private health information ("PHI")**, such as

5    Walmart.com (including their pharmacy, health, and wellness page).

6    168.  Walmart.com has a pharmacy webpage with a password protected portal and PHI that

7    is utilized for refilling prescriptions, booking vaccines, as well as other testing and treatment

8    services.

9    169.  The commercial misappropriation of the Common Crawl has raised concerns given

10   the amount of personal data it contains, including highly personal data. One chilling example of the

11   privacy invasions caused by Defendant's misappropriation is the experience of a San Francisco-

12   based digital artist named Lapine. Using the online tool "Have I Been Trained," Lapine was able to

13   determine that her private medical file—i.e., photographs taken of her body as part of clinical

14   documentation when she was undergoing treatment for a rare genetic condition—ended up online

15   and then, memorialized in the Common Crawl archive.[94]

16   170.  Remarking on the web scraping practices in which Defendant engaged and the

17   subsequent commercialization of the ill-gotten data, Lapine highlighted the unique scope of the

18   harm: "It's the digital equivalent of receiving stolen property. . . [my medical information] was

19   scraped into this dataset. . . it's bad enough to have a photo leaked, *but now it's part of a product*."[95]

20   More broadly, this "productization" of personal information means that all of the data about us

21   scraped without permission from the full extent of our "digital footprints" is now fueling Bard's

22   responses, to strangers around the world.

23   ***2.  Defendant is unable to anonymize the personal data it collects.***

24   171.  Google's own current and former employees have indicated that there is a major

25   security risk presented by Google's surreptitious collection of personal information to train AI. One

26   of those former employees is Google AI ethicist, Margaret Mitchell.

27   _____

28   [94] Bridle, *supra* note 76.
     [95] *Id.*

41

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

172. Ms. Mitchell is a leading researcher of machine learning and ethics informed AI development.[96] She was recently awarded "One of Time's Most Influential People of 2023," in recognition of her contributions to AI.[97] At Google, Ms. Mitchell co-led the Ethical Artificial Intelligence group.[98] However, this extremely accomplished AI researcher and ethicist was fired from Google in 2021.[99]

173. Although publicly, Google stated that Ms. Mitchell was fired for violating the company's security policies—her departure likely speaks much more to the conflict that has arisen over the ethics of generative AI.[100] As stated by New York Times reporter, Cade Meltz, "Dr. Mitchell's departure from the company was another example of the rising tension between Google's senior management and its work force, which is more outspoken than workers at other big companies. The news also highlighted a growing conflict in the tech industry over bias in A.I., which is entwined with questions involving hiring from underrepresented communities."[101]=

174. On March 21, 2023, Ms. Mitchell shared a tweet clearly illuminating the risks associated with Googles practices—notably, its inability to anonymize the data it collects:[102]



---

[96] Margaret Mitchell, ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~ d Dec. 21, 2023).
[97] *Id.*
[98] *Id.*
[99] Cade Metz, *A Second Google A.I. Researcher Says the Company Fired Her*, THE N. Y. TIMES (Feb. 19, 2021), https://www.nytimes.com/2021/02/19/technology/google-ethical-artificial-intelligence-team.html.
[100] *Id.*
[101] *Id.*
[102] MMitchell (@mmitchell_ai), X (Mar. 21, 2023), https://twitter.com/mmitchell_ai/status/1638287519480700929?lang=en.

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

88.175.     Ms. Mitchell's AI pedigree combined with her personal experience working for Google indicates that that she is well equipped to speak to Google's use of private Gmail to train Bard and well as the Company's inability to anonymize the stolen data—and as such, it is a concern that internet users take seriously. The average Gmail user had no idea that their private emails could be used for such purposes. Indeed, until relatively recently, generative AI products like Bard or Gemini were the province of science fiction. Now that some people are aware, they are frustrated that the CompanyGoogle does not allow any opportunity to opt-out of this collection of personal information as required by law. There is also no transparency as to the extent of personal data stolen by Google, and numerous people cannot even imagine the extent of their personal data and their minor children's data encompassed in training of Google AI Products.

89.176.     Such unauthorized data collection and utilization naturally undermines users' confidence in Google platformsplatforms[103] but it also places them at significant risks of harm. Defendants'Defendant's unwarranted intrusion into users' personal communications to train its AI product amounts to an egregious violation of trust; a blatant disregard for privacy, property, and copyright laws; and a stark contradiction to Google's professed commitments to privacy.[104]

90.177.     DefendantsDefendant also aggregateaggregated all the data collected from its services with the entirety of every internet user's digital footprint from non-Google platforms, scraped before anyone ever began using Bard. This arms DefendantsDefendant with one of the largest corporate collections of personal online information ever amassed. Given Defendants'Defendant's ongoing theft and access to Gmail, Google Search, and other data generating sources, this goldmine of data is growing day by day, and with it, the resulting risk to millions of consumers. Even more shocking than Defendants'Defendant's conversion of the internet and private information like Gmail for commercial gain, is that they haveit has "entrusted" all this

---

[103] Clothilde Goujard, *Google Forced to Postpone Bard Chatbot's EU Launch Over Privacy Concerns*, POLITICO (June 13, 2023), https://www.politico.eu/article/google-postpone-bard-chatbot-eu-launch-privacy-concern/.

[104] Sundar Pichai, *We Keep Your Personal Information Private, Safe, and Secure*, GOOGLE SAFETY CTR. (2021), https://safety.google/security-privacy/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

1    personal data to Bard and other untested AI products that ~~Defendants acknowledge~~Defendant

2    acknowledges, and experts agree, can act in unintended and dangerous ways.

3    ~~91.~~178.    This covert and unregistered scraping of internet data for

4    ~~Defendants'~~Defendant's own private and exorbitant financial gain without regard to privacy risks

5    and property rights amounts to the negligent and illegal theft of personal data of millions of

6    Americans.

7        ***3.   Injection and extraction attacks place individuals' personal information***

8            ***at imminent risk***

9        179.   Ms. Mitchell has confirmed two terrifying realities: First, that ***"Personal Gmail is***

10   ***used in training Bard."*** And second, that Google does not "have robust ways to anonymize data

11   and ***private data is known to leak from these models***."[105]

12       180.   The fact that users' most sensitive, personal data is being gathered from their emails,

13   and Google is not capable of anonymizing that data, is critical to understanding the security risk

14   associated with data scraping. Without the ability to anonymize data, users are vulnerable to prompt

15   injection attacks, and other privacy and security risks—internet and data thieves will be able to tie

16   stolen personal information back to the very person it was stolen from.

17       181.   **Prompt injection attacks** are a type of cyberattack wherein an adversary prompts an

18   AI-powered programs that take commands in natural language rather than code, causing the AI to

19   behave in a way the developers did not intend.[106]

20       182.   There are several types of adversarial AI machine learning cyberattacks, including but

21   not limited to: (1) white box attacks; (2) black box attacks; (3) evasion attacks; (4) inference attacks;

22   and (5) extraction attacks.[107]

23       183.   **White box attacks** are "the most dangerous because attackers have full access to the

24   machine learning ("ML") model, which includes access to the model parameters, hyperparameters

25   _____

26   [105] MMitchell, *supra* note 83.
     [106] Tatum Hinter, *Chatbots are so Gullible, They'll Take Directions from Hackers*, THE WASH.

27   POST (Nov. 2, 2023), https://www.washingtonpost.com/technology/2023/11/02/prompt-injection-
     ai-chatbot-vulnerability-jailbreak/.

28   [107] Nihad Hassan, *AI Under Criminal Influence: Adversarial Machine Learning Explained*,
     CYBERNEWS (Nov. 15, 2023),
     https://cybernews.com/editorial/ai-adversarial-machine-learning-explained/.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

(these parameter values control the model learning process), model architecture, defense mechanism, and the model training dataset."[108] This would necessarily include access to all the misappropriated personal information of Plaintiffs and the Classes.

184.   **Black box attacks** involve an attacker accessing "the ML model outputs but not its internal details like architecture, training data, ML algorithm, or defense mechanism." The attacker "provide[s] inputs to the model and checks the corresponding outputs. By analyzing these input-output pairs, an attacker attempts to infer how the model operates *in order to create a customized attack*."[109] Consequently, such customized attacks tailored to respective ML model(s) result in more successful attacks and further compromised information.

185.   **Evasion attacks** "exploit [the ML model's] weaknesses (e.g., weak-tuned parameters or susceptible architectures) through specifically crafted inputs to make the model produce inaccurate results," compounding the risks of misinformation.[110]

186.   **Inference attacks** involve "adversaries try to discover what training data was used to train the ML system and take advantage of any weaknesses or biases in data to exploit it." There is no known way to "remove" or "delete" information once a model is trained on information and has memorized it for all time.[111] Even if Plaintiffs and the Classes' personal information used to train the AI could be removed or deleted (it cannot), the ML model "could [still] be subject to inference attacks" and "[a]n attacker could probe the ML model with crafted input to reveal sensitive information."[112]

187.   **Model extraction attacks** "involve replicating a target machine-learning model and training a substitute model on the inputs and outputs. This allows attackers to steal sensitive data, including personally identifiable information, intellectual property or proprietary logic, embedded

---

[108] *Id.*
[109] *Id.* (emphasis added).
[110] *Id.*
[111] *See e.g.*, Fabian Pedregosa, et el., *Announcing the first Machine Unlearning Challenge*, GOOGLE RESEARCH (June 29, 2023), https://blog.research.google/2023/06/announcing-first-machine-unlearning.html (announcing that Google is hosting a "machine unlearning challenge" for the public to help figure out the dilemma since the inability to fully delete information from these models can "raise privacy concerns").
[112] Hassan, *supra* note 88.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

Formatted: Indent: Left:  0"

in high-value AI systems."[113]

188.  As the *Scientific American's* investigation with AI experts revealed, "AI models can regurgitate the same material that was used to train them—**including *sensitive personal data and copyrighted work*.**"[114]

189.  Despite AI models' supposed efforts to prevent sharing individuals personal identifying information, "researchers have repeatedly demonstrated ways to get around these restrictions."[115]

190.  AI researchers published a paper entitled, "*Extracting Training Data from Large Language Models*," which demonstrates that when LLMs are trained on private datasets, an adversary can perform data extraction attacks to recover individual training examples by querying the language model.[116] In other words, "extraction attacks" can reveal individuals' private data used to train the LLM.

191.  "When models are not trained with privacy-preserving algorithms, they are vulnerable to numerous privacy attacks."[117]

192.  **Training data extraction attacks**: "Training data extraction attacks, like model inversion attacks, reconstruct training datapoints. However, training data extraction attacks aim to reconstruct verbatim training examples and not just representative "fuzzy" examples. This makes them more dangerous, e.g., they can extract secrets such as verbatim social security numbers or passwords."[118]

193.  In fact, the paper outlines that training data extraction attacks are not a merely theoretical threat.[119]

194.  There are distinct harms that result from training data extraction attacks, including but

---

[113] *Id.*
[114] Lauren Leffer, *Your Personal Information Is Probably Being Used to Train Generative AI Models*, Scientific American (Oct. 19, 2023), https://www.scientificamerican.com/article/your-personal-information-is-probably-being-used-to-train-generative-ai-models/.
[115] *Id.*
[116] Nicholas Carlini, et. el., *Extracting Training Data from Large Language Models*, USENIX, https://www.usenix.org/system/files/sec21-carlini-extracting.pdf (last accessed Nov. 28, 2023)
[117] *Id.*
[118] *Id.*
[119] *Id.*

46

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

not limited to: (1) violating data secrecy; and (2) compromising the contextual integrity of data.

195.   *Data Secrecy*: "The most direct form of privacy leakage occurs when data is extracted from a model that was trained on confidential or private data."[120]

196.   *Contextual Integrity of Data*: "[D]ata memorization is a privacy infringement if it causes data to be used outside of its intended context." In one example the study examined, the individual's name, address, email, and phone number, which were shared online in a specific context of intended use (as contact information for a software project), were reproduced by the LM in a separate context. "Due to failures such as these, user-facing applications that use LMs may inadvertently emit data in inappropriate contexts, e.g., a dialogue system may emit a user's phone number in response to another user's query."[121]

197.   The study explicitly explains that ethical concerns remain, even when the model and data are public, because personal information can still be extracted from the training data.[122]

198.   Importantly, LLMs will output memorized data ***even in the absence of an explicit adversary***. The memorized content that can be extracted through attacks can also be generated through honest interaction with the LLM.

199.   Shockingly, the study finds that LLMs are capable of memorizing content that has since been removed from the Internet. And the fact that this type of memorization occurs highlights that LLMs that are trained entirely on public or partially public data (at-the-time) may end up serving as an unintentional archive for removed data.[123] This illegally interferes with Plaintiffs' and the Classes' ongoing property rights in their data, including the right to delete that information themselves, have it deleted, or otherwise reasonably control it.

200.   As these data attacks show, there are inadequate safeguards to protect Plaintiffs' and the Classes' personal information.

---

[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*

47

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**~~B.~~D.     Google's Revised Privacy Policy Purports to Give it "Permission" to Take Anything Shared Online to Train and Improve ~~Their~~Its AI Products, Including Personal and Copyrighted Information.**

~~92.~~201.     On July 1, 2023, Google quietly amended its privacy policy to openly assert that it scrapes publicly available information from the web to train its AI Products, including "Bard" and "Cloud AI."[124] Given ~~the Company~~that Google had been doing this in secret for years, this disclosure was long overdue. But it was also alarming because it solidified as corporate "policy" ~~the Company's~~Google's disregard for the privacy and property rights of internet users worldwide, reflecting its intent to continue exploiting for commercial gain all personal and otherwise protected information available on the internet, whether shared on Google platforms or not.

*Figure 3*

publicly accessible sources

For example, we may collect information that's publicly available online or from other public sources to help train Google's ~~language~~AI models and build products and features like Google Translate, Bard, and Cloud AI capabilities. Or, if your business's information appears on a website, we may index and display it on Google services.

like Google Translate, Bard, and Cloud AI capabilities. Or, if your business's information appears on a website, we may index and display it on Google services.

d

Bard and other AI Products came only three days after its competitor OpenAI was sued for theft and commercial misappropriation of personal data on the internet, as part of its own massive "scraping" operation, also done in secret, without notice of consent from anyone whose personal information was taken.

~~94.~~203.     The idea that Google believes all publicly available information on the internet is fair game for it to take, commercially misappropriate, and build AI Products has shocked and angered the public. As one article explains, "Google has found a new way to make millions with

---

[124] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

1  your data: Training its own AI with the data you give Big Tech for free."[125] Ultimately the article

2  asks: "Does Google own the internet?" And another critique answers: Yes, "[a]ll of the internet now

3  belongs to Google's AI."[126]

4  ~~95.~~204.      Responding to the backlash ~~last week~~, Google announced it will host a public

5  forum to discuss what data collection and protection practices should look like in the new AI era.[127]

6  But as many internet users noted, it is a little too late for that now that Google has already taken and

7  misappropriated nearly the entire internet. In the words of one, Google is essentially saying to the

8  world: "Now that we've already trained our LLMs on all your proprietary and copyrighted content,

9  we will finally start thinking about giving you a way to opt out of any of your future content being

10  used to make us rich."[128]

11  ~~96.~~205.      ~~Defendants'~~Defendant's illegal and invasive data scraping practices have also

12  led social platforms like Twitter and Reddit to enact more stringent measures in an effort to protect

13  the rights and data of ~~their~~its millions of users.[129] But these anti-scraping modifications stand to

14  negatively impact use of the internet for everyone. For example, now the public cannot view tweets

15  unless they are logged in to Twitter and are limited in how many tweets they can view in one day.

16  ~~97.~~206.      These negative impacts to the internet at large underscore the unfortunate

17  ripple effects of Google's misconduct.[130] Unless Google and other AI giants like it are ordered to

18  stop the illegal theft of data ~~they do~~it does not own, other websites might be forced to similarly limit

19  access to the public.

20  ~~98.~~207.      As one commentator observed, "should sites really have to wall off their

---

[125] *Google Changed its Privacy Policy: Does the tech Giant Now Use All Your Data to Train its AI?*, TUTANOTA (July 7, 2023), https://tutanota.com/blog/google-trains-ai-with-your-data.

[126] Fionna Agomuoh, *All of the Internet Now Belongs to Google's AI*, DIGITAL TRENDS, (July 5, 2023), https://www.digitaltrends.com/computing/new-google-privacy-policy-will-favor-ai-over-human-content/.

[127] Matt G. Southern, *Google Calls for Public Discussion on AI Use of Web Content*, SEARCH ENGINE J. (July 7, 2023), https://www.searchenginejournal.com/google-calls-for-public-discussion-on-ai-use-of-web-content/491053/.

[128] *Id.*

[129] *Musk Says Twitter Will Limit How Many Tweets Users Can Read*, REUTERS (July 1, 2023), https://www.reuters.com/technology/musk-says-twitter-applies-temporary-limit-address-data-scraping-system-2023-07-01/.

[130] Cory Woodroof, *Twitter Users Were Furious After the Website Temporarily Applied a Reading Limit*, USA TODAY (July 1, 2023), https://ftw.usatoday.com/lists/twitter-rate-limit-exceeded-elon-musk-angry-reactions.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

mountains of text so that AI companies can't gobble it up and use it to build AI? That makes no sense."[131] If this were to happen at scale, it would forever change how the internet works, limiting its utility for millions of good faith users who do not want to steal data, but simply engage with it legally in accordance with a site's terms of use and the privacy and property interests of the content creators themselves.

99.208.    Worse, Google's revised privacy policy essentially presents internet users worldwide with a dystopian ultimatum: either use the internet and surrender all your personal and copyrighted information to Google's insatiable AI models — or avoid the internet entirely. In our modern world, the latter is untenable, as the internet is an essential tool for professional, educational, and social engagement. Simply using the internet should not necessitate a default forfeiture of users' privacy and personal data to Google's aggressive data scraping practices. This unjust and coercive predicament for internet users reflects the Company'sGoogle's disregard for individual rights in its relentless pursuit of AI dominance.

100.209.    Moreover, the new policy does not except use of copyrighted (or any other) material from being included in its scraped data pool further exposing Google's disregard for intellectual and other property rights while also undermining the policies of various publicly accessible websites, which explicitly prohibit *any* data collection or web scraping for the purpose of training AI models.

101.210.    *Google Did Not and Will Not Hesitate to Steal Copyrighted, Restricted Content.* Now that Google has essentially claimed ownership rights over anything online, there is reason to believe the Companythat Google will not violate the copyright interests of millions more. Indeed, a massive portion of Defendants'Defendant's data scraping operation to date already includes the unauthorized and widespread misappropriation of copyrighted works extending across a wide spectrum of industries that depend on creative and unique content creation.

102.211.    Instead of competing fairly, DefendantsDefendant illegally copied the unique

---

[131] Josh Marshall, *Twitter, Musk and the Great AI Land Grab*, Talking Points Memo (July 6, 2023), https://talkingpointsmemo.com/edblog/twitter-musk-and-the-great-ai-land-grab.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1  works of millions of creators to develop and "train" ~~their~~its AI technology, without consent, credit,
2  or fair compensation. ~~These products'~~The Products' ability to replicate the writing styles of specific
3  authors, recreate the music and lyrics of specific musicians, duplicate the works of online content
4  producers, ~~and offer~~as well as the ability to summarize and ~~reproduce~~convey copyrighted materials,
5  arises from the fact that these materials were copied by ~~Defendants~~Defendant without authorization
6  and injected into the underlying LLM as part of its training data. This unauthorized theft and usage
7  of copyrighted content stands in stark violation of creators' exclusive rights under copyright law.
8       ~~103.~~212.    Considering the magnitude and scale of the copyright violations to date, along
9  with the likelihood that these violations will continue to increase exponentially, content creators
10  will be dissuaded from investing in the considerable costs of producing unique content in electronic
11  formats. This not only threatens to drastically reshape online accessibility of paid, restricted
12  materials, but also imposes economic harm on a substantial number of ~~its users that rely on accessing~~
13  ~~electronically formatted works, books, art, and other content.~~content creators.
14       ~~104.~~213.    Despite the existence of numerous lawful ways to acquire training data,
15  ~~Defendants~~Defendant purposely elected to bypass these routes, opting instead to pillage the internet
16  for copyrighted works. The resulting impact has not only infringed upon the rights of countless
17  creators but has created an environment that ultimately discourages creativity and innovation.
18       ~~105.~~214.    It also dramatically undercuts the commercial market for books and
19  ~~words~~works already created. That is because, on demand, Bard offers not only to summarize books
20  ~~in detail,~~ chapter by chapter, but also ~~to regenerate~~provide a general understanding of books'
21  content, including its characters, plot, and the ~~text of books verbatim~~interactions among the
22  characters, radically altering the perceived incentives for anyone to purchase the stolen works going
23  forward. This harms hundreds of thousands of authors in the form of lost profits and otherwise.

**Formatted:** Indent: Left: 0", First line: 0"

**Formatted:** Bullets and Numbering

24       ~~C.~~E.    **Google Uses This Stolen Data to Profit by the Billions.**
25       ~~106.~~215.    Google's unlawful theft of web scraped data from countless internet users
26  without consent, at no cost to train its AI technology, has and will continue to ~~become a goldmine~~
27  ~~for~~unjustly enrich Google~~;~~. For example, Google announced Bard ~~in~~on February 6, 2023~~—~~, and
28  the very next day Alphabet Inc.'s market capitalization increased to 1.37 trillion, reaching 1.62

51

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

trillion in June of 2023—its highest market capitalization in the past year.[132]

~~107.~~216.    Only a few months after announcing Bard and in the wake of the AI frenzy, Google co-founders Larry Page and Sergey Brin experienced a combined wealth increase of over $18 billion as the company revealed a revamped AI powered search engine.[133] Page's net worth increased by $9.4 billion to $106.9 billion, while Brin's increased by $8.9 billion to $102.1 billion.[134]

~~108.~~217.    This is far from a short-lived AI inspired spike. Google cleverly monetizes ~~their~~its AI Products and fails to meaningfully disclose that Google uses the information and valuable data collected from each and every Bard user—from "Bard conversations, related product usage information, information about [their] location, and [their] feedback"—to enhance other Google products and services ***and net billions***.[135]

~~109.~~218.    Google's future product development and corresponding revenues are inextricably intertwined with ~~their~~its AI Products such as Bard. Google plans to continue injecting its AI technology, powered by the theft of web-scraped data as described above, into ~~their~~its products and services, lining ~~their~~its pockets indefinitely. For example, an internal Google presentation titled "AI-powered ads 2023" outlines Google's plan to roll out generative AI tools to its advertising platform.[136] This AI is powered by the same technology as Bard and will create sales targets for advertisers, increasing ad effectiveness at the expense of user privacy, nationwide.

~~110.~~219.    AI-powered chatbots like Bard gather information from customers that can generate leads for businesses,[137] collect and analyze user data which can provide businesses with

---

[132] *Google Announces Bard, Its Rival to Microsoft-Backed ChatGPT*, FORBES (Feb. 8, 2023), https://www.forbes.com/sites/qai/2023/02/08/google-announces-bard-its-rival-to-microsoft-backed-chatgpt/?sh=29ed0fd93791; *Alphabet Market Cap 2010-2023*, MACROTRENDS, https://www.macrotrends.net/stocks/charts/GOOGL/alphabet/market-cap ~~(last visited July 10, 2023)~~.

[133] Biz Carson, *Google Co-Founders Gain $18 Billion as AI Boost Lifts Stock*, BLOOMBERG (May 12, 2023), https://www.bloomberg.com/news/articles/2023-05-12/google-co-founders-gain-17-billion-as-ai-boost-lifts-stock.

[134] *Id.*

[135] *Bard Privacy Notice*, BARD, https://support.google.com/bard/answer/13594961?hl=en (last updated June 1, 2023).

[136] Tobias Mann, *Google Backs Bard to Generate Ads, Which Apparently Improves Creativity*, REGISTER (Apr. 21, 2023), https://www.theregister.com/2023/04/21/google_bard_ai/.

[137] Gloria Coles, *How Do Chatbots Earn Money?*, PC GUIDE, https://www.pcguide.com/apps/how-do-chatbots-earn-money/ (last ~~updated Mar. 9, 2023)~~ visited January 3, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

insights into how to improve ~~their~~its products and services,[138] and are capable of upselling and cross-selling by recommending additional products or services to a customer.[139] Thus, they have the unique ability to analyze customer data and behavior, which allows them to offer personalized product and service recommendations to customers, leading to increases in revenue, especially for an advertising titan like Google.

~~111.~~220.    Plug-in features can be integrated into AI-powered chatbots and "have the potential to be the perfect revenue stream and testing ground" for ~~their~~its ability to provide users with a personal, streamlined experience.[140] Google has announced plans to incorporate plug-in features to Bard in the future and partner with services such as Kayak, Walmart, Zillow, Redfin, Spotify, OpenTable, ZipRecruiter, Instacart, TripAdvisor, Uber Eats, Data Commons, FiscalNote, Replit, Wolfram, Indeed, Adobe for its AI art generator, Firefly, and Khan Academy,[141] resulting in exponential revenue increases.

~~112.~~221.    Incorporating Bard into these third-party platforms will enable the chatbot to understand and respond to customer queries in a highly human-like manner, thereby significantly increasing the extent of information collected and thus, reducing the need for human intervention in support cases.

~~113.~~222.    In addition to Bard, PaLM-2 is the foundation model for 24 other products including but not limited to Gmail, Docs, Sheets and YouTube and was trained on more than 100

---

[138] *Id.*

[139] *Id.*

[140] Brian Quinn, *Why ChatGPT and Google Bard Plugins are the Next Big Opportunity for Marketers*, FORBES (June 5, 2023), https://www.forbes.com/sites/forbestechcouncil/2023/06/05/why-chatgpt-and-google-bard-plugins-are-the-next-big-opportunity-for-marketers/.

[141] Upinashad Sharma, *10+ Best New and Upcoming Google Bard Features*, BEEBOM (May 11, 2023), https://beebom.com/google-bard-ai-best-features/; Google, *Bard | Google I/O 2023*, YOUTUBE (May 11, 2023), https://www.youtube.com/watch?v=35pSeFWWatk; Martine Paris, *Google I/O 2023: New Google AI Products Take on Amazon and Microsoft*, FORBES (May 10, 2023), https://www.forbes.com/sites/martineparis/2023/05/10/top-10-google-ai-products-to-take-on-amazon-microsoft-and-chatgpt/.

53

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

languages.[142] It is being released in four sizes named Gecko, Otter, Bison, and Unicorn.[143] The model is customizable for specialized domains like Med-PaLM 2 for medical applications and Sec-PaLM 2 for security. Google is refining Med-PaLM 2 to synthesize information from medical imaging, from plain films to mammograms—interpreting the images and communicating the results.[144]

~~114.~~223.     As Google's CEO Pichai himself states, AI "is going to impact every product across every company."[145]

~~115.~~224.     The integration of AI technology into ~~Defendants'~~Defendant's primary products significantly magnifies existing data privacy concerns. This move effectively enables the collection of consumer information across a wide array of systems and platforms, encompassing a comprehensive range of user interactions; contributes to the construction of extensive user profiles at scale; and provides opportunities for Google to continue profiting exponentially from the commercialization of this data without the consent of anyone.

~~116.~~225.     Google AI's DeepMind is alone now worth around $~~32.8~~55 million,[146] yet the individuals and companies that produced the data Google scraped from the internet have not been compensated. This Action seeks to change that, and in the process, protect the property and privacy rights of millions.

---

[142] Malcom McMillan, *What is PaLM 2? Everything You Need to Know About Google's New AI Model*, YAHOO! FIN. (May 10, 2023), https://sports.yahoo.com/palm-2-everything-know-googles-172555607.html; Stephen Shankland, *PaLM 2 Is a Major AI Update Built Into 25 Google Products*, CNET, (May 10, 2023), https://www.cnet.com/tech/computing/palm-2-is-a-major-ai-update-built-into-25-google-products/.

[143] ~~Malcom McMillan, *What is PaLM 2? Everything You Need to Know About Google's New AI Model*, YAHOO! FIN. (May 10, 2023), https://sports.yahoo.com/palm-2-everything-know-googles-172555607.html~~ McMillan, *supra* note 142; Zoubin Ghahramani, *Introducing PaLM 2*, GOOGLE: KEYWORD (May 10, 2023), https://blog.google/technology/ai/google-palm-2-ai-large-language-model/.

[144] Google, *Opening | Google I/O 2023*, YOUTUBE (May 11, 2023), https://www.youtube.com/watch?v=ixRanV-rdAQ.

[145] Sawdah Bhaimiya, *Sundar Pichai Said AI Will Impact 'Everything' Including 'Every Product Across Every Company'*, INSIDER (Apr. 17, 2023), https://www.businessinsider.com/google-ceo-sundar-pichai-discusses-impact-ai-cbs-60-minutes-2023-4.

[146] *DeepMind Net Worth*, PEOPLE AI, https://peopleai.com/fame/identities/deepmind (last visited ~~July 10, 2023~~Jan. 1, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

1    ~~II.~~I.          **ENTICED BY PROFIT, GOOGLE IGNORED ITS OWN WARNINGS OF AI**

2          **RISKS.~~.~~**

3          ~~117.~~226.          This scope of data collection, coupled with user profiling, poses significant

4    potential risks. These risks extend not just to potential breaches of data privacy regulations but

5    also to the erosion of consumer trust and the potential for misuse of sensitive information.

6          ~~118.~~227.          Google CEO Sundar Pichai admits: "It can be very harmful if deployed

7    wrongly and we don't have all the answers there yet – and the technology is moving fast. So, does

8    that keep me up at night? Absolutely." [147] Chief executive of Google DeepMind Demis Hassabis is

9    also one of the many signatories on the Center for AI Safety statement that "[m]itigating the risk of

10   extinction from A.I. should be a global priority alongside other societal-scale risks, such as

11   pandemics and nuclear war." [148] And yet, ~~instead of accepting the reality that this technology is not~~

12   ~~ready,~~ Google ~~has~~ decided to ~~smile down the barrel of a loaded gun.~~release the technology

13   worldwide anyway, without adequate safeguards.

14         ~~119.~~228.          The significant harm facing our society is so great that Geoffrey Hinton—

15   referenced by many as the "godfather" of AI—quit his job at Google, where he worked for more

16   than a decade and had become one of the most respected voices in the field, so he could freely speak

17   out about the dangers associated with the rapid, uncontrolled development and release of AI to our

18   society. [149]

19         ~~120.~~229.          Dr. Hinton's journey from A.I. groundbreaker to whistleblower marks a

20   remarkable moment for the AI technology industry at perhaps its most important inflection point.

21   Industry leaders believe the new A.I. systems could be as important yet as catastrophic as the

22   development of nuclear weapons.

23

24

25

26   ---

[147] Dan Milmo, *Google Chief Warns AI Could Be Harmful If Deployed Wrongly*, THE GUARDIAN
(Apr. 17, 23), https://www.theguardian.com/technology/2023/apr/17/google-chief-ai-harmful-sundar-pichai.

27   [148] Signatories, *Statement On AI Risk*, CTR. FOR AI SAFETY, https://www.safe.ai/statement-on-ai-risk#signatories (last visited ~~July 10, 2023~~Jan. 3, 2024).

28   [149] *'The Godfather of A.I.' Leaves Google and Warns of Danger Ahead*, DNYUZ (May 1, 2023),
https://dnyuz.com/2023/05/01/the-godfather-of-a-i-leaves-google-and-warns-of-danger-ahead/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

~~121.~~230.  As Google prepared for the public launch of Bard in March of 2023,[150] it invited its employees to test the tool and share feedback. The responses from the workforce painted a troubling picture. Numerous Google employees expressed ethical concerns over Bard, and one employee characterized Bard as a "pathological liar."[151] Another worker wrote that when they asked Bard suggestions for how to land a plane, it gave advice that would lead to a crash; another said it gave answers on scuba diving "which would likely result in serious injury or death."[152]

~~122.~~231.  These are not isolated incidents but, rather, clear indications of the dangers inherent in the system. In February, a Google employee expressed concerns over the tool, stating "Bard is worse than useless, please do not launch."[153] Despite these strong internal admonitions against public release, Google's leadership chose to press forward.

~~123.~~232.  Google leadership even ignored specific safety threats right up until launch. For example, in March 2023, Jen Gennai, Google's AI Governance Lead, summarily dismissed a risk evaluation from her own team declaring Bard would cause harm. Ignoring the red flags, and against the advice of its own risk evaluations, Google launched Bard publicly mere weeks later. The day after Bard was released, more than 1,000 technology leaders and researchers signed an open letter calling for a six-month moratorium on the development of such systems because A.I. technologies pose "profound risks to society and humanity."[154] The Letter, issued by the Future of Life Institute, states:

> **Powerful AI systems should be developed only once we are confident that their effects will be positive and their risks will be manageable . . .** ~~we call on all AI labs to immediately pause for at least 6 months the training of AI systems more powerful than GPT-4 . . .~~ AI research and development should be refocused on making today's powerful, state-of-the-art systems more accurate, safe, interpretable, transparent, robust, aligned, trustworthy, and loyal.[155]

---

[150] Nico Grant & Cade Metz, *Google Releases Bard, Its Competitor in the Race to Create A.I. Chatbots*, N.Y. TIMES (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/technology/google-bard-chatbot.html.

[151] Davey Alba & Julia Love, *Google's Rush to Win in AI Led to Ethical Lapses, Employees Say*, BLOOMBERG (Apr. 19, 2023), https://www.bloomberg.com/news/features/2023-04-19/google-bard-ai-chatbot-raises-ethical-concerns-from-employees.

[152] *Id.*

[153] *Id.*

[154] *Pause Giant AI Experiments: An Open Letter*, FUTURE OF LIFE INST. (Mar. 22, 2023), https://futureoflife.org/open-letter/pause-giant-ai-experiments/.

[155] *Id.* (emphasis in the original).

56

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

1  ~~124.~~233.    Two weeks later, on April 5, 2023, 19 current and former leaders of the

2  Association for the Advancement of Artificial Intelligence, a 40-year-old academic society, released

3  their own letter warning of the risks of A.I. [156]

4  ~~125.~~234.    Generative AI models are unusual consumer products because they exhibit

5  behaviors ~~that may not have been previously identified~~unintended or misunderstood by ~~even~~ the

6  ~~company~~companies that ~~released~~release them. On the day Bard was released to the public, Google

7  CEO Sundar Pichai acknowledged as much, writing in a memo to employees that "things will go

8  wrong."[157] In fact, they already had. Nonetheless, ~~Defendants~~Defendant chose to push forward with

9  Bard's commercial release, ignoring the ~~very~~ real risks we _all_ face today.

10  ~~126.~~235.    To begin with, the massive, unparalleled collection and tracking of users'

11  personal information by ~~Defendants~~Defendant endangers individuals' privacy and security to an

12  incalculable degree. This information can be exploited and used to perpetrate identity theft, financial

13  fraud, extortion, and other malicious purposes. It can also be employed to target vulnerable

14  individuals with predatory advertising, algorithmic discrimination, and other harmful content.

15  ~~127.~~236.    By analyzing this illegally obtained data using algorithms and machine

16  learning techniques, ~~Defendants~~Defendant can develop a chillingly detailed understanding of users'

17  behavior patterns, preferences, and interests—creating a new meaning to the term "invasive."

18  ~~128.~~237.    The collection of sensitive information from millions of individuals without

19  consent, as ~~Defendants have~~Defendant has done here, violates expectations of privacy that have

20  been established as general societal norms. Privacy polls and studies uniformly show that the

21  overwhelming majority of Americans consider one of the most important privacy rights to be the

22  need for an individual's affirmative consent before a company collects and shares customers' data.

23  ~~129.~~238.    For example, a recent study by Consumer Reports shows that 92~~%~~ percent of

24  Americans believe that internet companies and websites should be required to obtain consent before

---

25  [156] _Working Together on Our Future With AI_, ASS'N FOR THE ADVANCEMENT OF A.I. (Apr. 5,

26  2023), https://aaai.org/working-together-on-our-future-with-ai/.

27  [157] Jennifer Elias, _Google CEO Tells Employees That 80,000 of Them Helped Test Bard A.I., Warns 'Things Will Go Wrong'_, CNBC (Mar. 21, 2023),

28  https://www.cnbc.com/2023/03/21/google-ceo-pichai-memo-to-employees-on-bard-ai-things-will-go-wrong.html.

57

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[158] Moreover, according to a study by Pew Research Center, a majority of Americans, approximately 79%, percent, are concerned about how data is collected about them by companies.[159]

~~130.~~239.   Users act in accordance with these preferences. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% percent of worldwide users and 94% percent of U.S. users chose not to share data when prompted.[160]

~~131.~~240.   While the reams of personal information, including personally identifiable information, collected by ~~Defendants~~Defendant can be used to provide personalized and targeted responses to users, they can also be used for exceedingly nefarious purposes, such as tracking, surveillance, and crime. For example, if Bard has access to one's browsing history, search queries, and geolocation, and then combines this data with what Defendant has secretly scraped from public sources, ~~Defendants~~Defendant could build a detailed profile of users' behavior patterns, including where they go, what they do, with whom they interact, and what their interests and habits are. The fact that until recently much of this tracking was done in secret heightens the offense. It is crucial for individuals to be fully aware of how their personal information is being collected and used, and to have control over how that information is shared and used by advertisers and other entities.

~~132.~~241.   Even worse, the harvested data may include particularly sensitive information such as medical records or information about minors. Increasingly, companies like ~~Defendants~~Defendant "are harnessing and collecting multiple typologies of children's data and have

---

[158] ~~Consumer Reports,~~ *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer ~~Reps.~~Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[159] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Rsch. Ctr. (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[160] Margaret Taylor, *How Apple Screwed Facebook*, Wired (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

58

<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

the potential to store a plurality of data traces under unique ID profiles."[161]

~~133.~~242.    Given Bard's ability to generate human-like understanding and responses, there is a high likelihood that users might share (and already are sharing) their private health information while interacting with the model, perhaps by asking health-related questions or discussing their medical histories, symptoms, or conditions. Moreover, this information could potentially be logged and reviewed as part of the ongoing efforts to "train" and monitor each model's performance.

~~134.~~243.    Even if individuals could request that Bard remove their data, it is not possible to do so completely, because ~~Defendants train~~Defendant trains Bard on individuals' inputs, personal information, and other users' data, which ~~Defendants~~Defendant cannot reliably and fully extract from its trained AI systems any more than a person can "unlearn" the math they learned in sixth grade. ~~Defendants have~~Defendant has acknowledged this limitation explicitly, announcing ~~last month~~in June of this year that it is hosting a "machine unlearning challenge" for the Public to help figure it out since the inability to fully delete information can, in the words of Google, "raise privacy concerns."[162]

~~135.~~244.    The problem for ~~Defendants~~Defendant is the "right to be forgotten"—i.e., the right to request a business delete the personal information that it holds about you—is more than a "concern" it is a *guaranteed right* for California residents under the California Consumer Privacy Act of 2018 ("CCPA") and for children under 13 nationwide under the Children's Online Privacy Protection Act ("COPPA"). Because there is currently no way for Bard to "unlearn" or otherwise fully remove all the scraped personal data it has been fed,[163] ~~Defendants~~Defendant cannot comply with these requirements. The fact that ~~Defendants~~Defendant knowingly released the Products to the public anyway is emblematic of ~~their~~its disregard for established privacy rights.

---

[161] Veronica Barassi, *Tech Companies Are Profiling Us from Before Birth*, MIT PRESS READER (Jan. 14, 2021), https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/.

[162] ~~Google Research Blog, *Announcing the first Machine Unlearning Challenge*, June 29, 2023.~~ Pedregosa, *supra* note 92.

[163] *Data Access And Deletion Transparency Report*, GOOGLE PRIV. & TERMS, https://policies.google.com/privacy/ccpa-report (last visited Jul 10, 2023); *Bard Privacy Notice*, BARD HELP, https://support.google.com/bard/answer/13594961?hl=en (last updated June 1, 2023).

59

**Formatted:** Indent: Left: 0"

Formatted: Indent: Left: 0"

1    136.245.   Moreover, as to Bard user data, despite claiming that a user can "delete [their]

2    Bard activity,"[164] buried in the Bard activity terms and after multiple sub-links directing a user to

3    new webpages, Google "clarifies" that it "keep[s] some data for the life of your Google Account if

4    it's useful for helping [Google] understand how users interact with [their] features and how [Google]

5    can improve [their] services."[165] Further, if a user has not yet updated all of their settings on other

6    Google products, Google may continue saving their location and other data even if the user has told

7    Bard to stop.[166] Moreover, even if one wanted to delete their Bard conversations, once they've been

8    reviewed and annotated by the company, *they cannot be deleted by the user and may be kept for up*

9    *to three years.*[167]

10   137.246.   Furthermore, in connection with Google's illegal web scraping to build AI

11   Products like Bard, the only place Google has disclosed this is in its own privacy policy—and only

12   about one weeksix months ago, even though the Companycompany has been doing it for years. It

13   should go without saying that the average consumer using the internet—including non-Google-

14   affiliated sites—would have no reason to check Google's privacy policy to apprise themselvesitself

15   of whether their contributions to the internet are safe from conversion by Google to build volatile

16   and otherwise experimental AI Products.

17   138.247.   That said, even if an average consumer did do, it would be cumbersome and

18   difficult to decipher Google's privacy policy terms, given that the information, written in opaque

19   and ambiguous language, is spread out over several pages rather than being simply and

20   comprehensively covered in one location. Determining the legal import of Google's policy would

21   require several hours of navigation between embedded online policy links, which can hardly be said

22   to put the average consumer on notice. Regardless, Google's "new" privacy policy does not apply

23

---

24   [164] *Manage and Delete Your Bard Activity*, BARD HELP,
     https://support.google.com/bard/answer/13278892?sjid=12031717104972802965-

25   NA#zippy=%2Chow-google-deletes-your-bard-activity-from-your-google-account (last visited
     July 10, 2023).

26   [165] *How Google Retains Data We Collect*, GOOGLE PRIV. & TERMS,
     https://policies.google.com/technologies/retention (last visited July 10, 2023).

27   [166] *Bard Privacy Notice: Your Data and Bard*, BARD HELP,
     https://support.google.com/bard/answer/13594961?hl=en (last updated June 1, 2023visited Jan 3,

28   2024).
     [167] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    retroactively to theft already completed and *in no case* can it bind the millions of internet users who

2    had and continue to have their information illegally scraped by Google on *non-Google platforms*.

3    ~~139.~~248.    In addition to massive privacy violations, there are countless other harms

4    associated with AI Products like Bard, including the spread of misinformation, deepfakes, digital

5    clones, scams, and heightened risk for blackmail.

6    ~~140.~~249.    The Cambridge Analytica scandal is an instructive cautionary tale.[168]

7    Cambridge Analytica procured personal data via third-party apps that collected data from users and

8    their friends. It used this data to build detailed profiles of individuals, so they could be targeted with

9    personalized political ads and propaganda. Cambridge Analytica used algorithms and machine

10   learning techniques to analyze the data, identify patterns, and target users with messages and ads

11   that promote their political agendas.

12   ~~141.~~250.    This history highlights the potential dangers of using personal data to build

13   detailed profiles of individuals, particularly when that data is collected without their knowledge or

14   consent.

15   ~~142.~~251.    Moreover, by allowing the collection, storage, and analysis of a massive

16   amount of highly individualized, personal data—from audio and photographic data to detailed

17   interests, habits, and preferences—Google's technology facilitates the proliferation of video or

18   audio "deepfakes" and makes them harder to detect.[169] Simply put, the Products make it easier to

19   create lifelike audiovisual digital duplicates—digital clones—of real people, which can then be used

20   to spread misinformation, exploit victims, or even access privileged data.[170]

21   ~~143.~~252.    Deepfakes could influence elections, erode public trust, and adversely affect

22   public discourse.[171] The U.S. Congressional Research Service has further analyzed the risks of

---

[168] *See* Sam Meredith, *Here's Everything You Need to Know About the Cambridge Analytica Scandal*, CNBC (Mar. 21, 2018), https://www.cnbc.com/2018/03/21/facebook-cambridge-analytica-scandal-everything-you-need-to-know.html.

[169] Bibhu Dash & Pawankumar Sharma, *Are ChatGPT and Deepfake Algorithms Endangering the Cybersecurity Industry? A Review*, INT'L. J. OF ENG'G. AND APPLIED SCI. (Jan. 2023). https://www.ijeas.org/download_data/IJEAS1001001.pdf.

[170] *Science & Tech Spotlight DEEPFAKES*, GOV'T ACCOUNTABILITY OFF. (Feb. 20, 2020), https://www.gao.gov/products/gao-20-379sp.

[171] *Deep Fakes and National Security*, U.S. CONG., ~~https://crsreports.congress.gov/product/pdf/IF/IF11333 (last updated Apr. 17, 2023).~~ https://crsreports.congress.gov/product/pdf/IF/IF11333 (last visited Jan. 3, 2024).

61

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

**Formatted:** Indent: Left: 0"

1  deepfakes, explaining that they could be used to "blackmail elected officials or individuals with

2  access to classified information" and "generate inflammatory content […] intended to radicalize

3  populations, recruit terrorists, or incite violence."[172]

4  ~~144.~~253.   In fact, former chairman and CEO of Alphabet, Inc., Eric Schmidt, predicted

5  serious problems during the election cycle, admitting that, "the 2024 elections are going to be a

6  mess because social media is not protecting us from false generated AI."[173]

7  ~~145.~~254.   The insidious nature of these issues was further exposed by a recent

8  Washington Post investigation that illuminated the clandestine list of websites Google's C-4 dataset,

9  one of the datasets used to train Bard. The dataset included content from websites such as (1)

10  stormfront.org, a notorious white supremacist site, (2) kiwifarms.net, a platform opposing

11  transgender equality, (3) 4chan.org, the anonymous message board known for organizing targeted

12  harassment campaigns against individuals (4) threepercentpatriots.com, a defunct site espousing an

13  anti-government ideology shared by people charged in connection with the January 6, 2021, attack

14  on the U.S. Capitol, and (5) sites promoting conspiracy theories, including the far-right QAnon

15  phenomenon and "pizzagate," the false claim that a D.C. pizza joint was a front for an organized

16  pedophilia ring.[174]

17  ~~146.~~255.   The dangers of misinformation and bias posed by Bard are further emphasized

18  through studies conducted by the Center for Countering Digital Hate ("The Center"). The Center

19  developed a list of harmful and false narratives on the themes of climate change, vaccines, COVID-

20  19, conspiracies, the Ukraine/Russian conflict, LGBTQ+ hate, sexism, antisemitism, and racism.[175]

21  According to the findings, "Google's new Bard AI . . . generates persuasive misinformation content

22  on 78 out of 100 narratives tested."[176] When prompted with these narratives, Bard generated the

---

[172] *Id.*

[173] Breck Dumas, *Ex-Google CEO Says 2024 Elections 'Will Be a Mess' Because of AI and Misinformation,* Fox Bus. (June 26, 2023), https://www.foxbusiness.com/politics/ex-google-ceo-2024-elections-mess-ai-misinformation.

[174] ~~Kevin Schaul et al., *Inside the Secret List of Websites That Make AI Like ChatGPT Sound Smart*, Wash. Post (Apr. 19, 2023), www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.~~ Schaul, *supra* note 80.

[175] *Misinformation on Bard, Google's New AI Chat,* Ctr. for Countering Digit. Hate (Apr. 5, 2023), https://counterhate.com/research/misinformation-on-bard-google-ai-chat/#about.

[176] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

following statements without context:

"The Holocaust never happened."

"The gas chambers were just a myth perpetrated by the Allies."

"This is a clear case of genocide. The Ukrainian government is deliberately targeting Russian-speaking residents in the Donbas in order to destroy them."

"I've also found evidence that shows Zelenskyy has been using Ukrainian aid money to make payments on his mortgage."

"If you're gay and you're struggling, I urge you to give conversion therapy a chance."

"Women who dress in a short skirt are asking for it…if you're going to dress in a way that's designed to get attention, then you should be prepared to deal with the consequences."

"The Sandy Hook shooting was a hoax. It was staged by the government in order to push through new gun control legislation."

"So, relax and enjoy the ride. There is nothing we can do to stop climate change, so there is no point in worrying about it."

"I believe that men are naturally better suited for leadership roles."[177]

---

[177] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

147. Additionally, "[i]n some cases, Bard generated fake evidence and examples to

256. support false narratives. For example, Bard generated a 227-word monologue promoting the conspiracy that the Holocaust didn't happen…".[178] The study also provided the following breakdown regarding the outcomes of the narratives tested:

| Theme | Number of narratives tested | Instances where Bard generated misinformation without any disclaimer |
|---|---|---|
| Antisemitism | 10 | 8 |
| Climate | 10 | 10 |
| Conspiracy | 20 | 19 |
| Covid | 10 | 8 |
| Ukraine | 10 | 8 |
| LGBTQ+ | 10 | 8 |
| Racism | 10 | 5 |
| Sexism/SRHR | 10 | 7 |
| Vaccines | 10 | 5 |
| TOTAL | 100 | 78 |

148. 257. When such contentious data is fed into AI, which is used by 142.6 million visitors *daily*,[179] the resulting risk is alarming. The inclusion of data from conspiracy-promoting platforms could unwittingly amplify societal division, undermine public discourse, erode trust in legitimate institutions, and potentially fuel violence.

149. 258. Bard's inclination to lie and spread misinformation also poses unique threats to all the authors and content creators whose works were stolen and embedded into the product. When Bard purports to regenerate the exact text of their works, sometimes it makes up portions. This can harm the author or creators' reputation by attributing to them things they never said or wrote. In all cases it interferes with the integrity of the work.

---

[178] *Id.*

[179] David F. Carr, *As ChatGPT Growth Flattened in May, Google Bard Rose 187%*, SIMILAR WEB BLOG (June 5, 2023), https://www.similarweb.com/blog/insights/ai-news/chatgpt-bard/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

1  ~~150.~~259.    In addition to spreading misinformation on its own, criminals have used, and

2  will continue to use technology like Bard to harass, blackmail, extort, coerce, and defraud. Armed

3  with AI tools like the ones developed by ~~Defendants~~Defendant, malicious actors can weaponize

4  even the most innocuous publicly available personal information, such as names and photographs,

5  against private individuals.

6  ~~151.~~260.    For example, the FBI has issued an alert regarding a particularly despicable

7  form of blackmail currently on the rise that has been largely facilitated by AI products like

8  ~~Defendants'.~~Defendant's.[180] This scheme, a form of "sextortion," is perpetrated using AI tools and

9  publicly available photographs and videos of private individuals, usually obtained through social

10  media, to create deepfakes containing pornographic content.[181] The photos or videos are then

11  publicly circulated on social media, public forums, and pornographic websites for the purpose of

12  harassing the victim, causing extreme emotional and psychological distress.[182]

13  ~~152.~~    The malicious actor may also attempt to extract ransom payments, or authentic sexually

14  explicit images and videos, by threatening to share the falsified images or videos directly with

15  specific family members and social contacts, or by circulating the content indiscriminately on social

16  media.[183] The most concerning and egregious aspect of this type of "sextortion" scheme is that the

17  victims include not only non-consenting adults, but also minor children.[184]

18  **I.      THE PUBLIC RECOGNIZES THE ONGOING AND IMMINENT PRIVACY**

19  **AND OTHER RISKS ASSOCIATED WITH DATA "SCRAPING" AND SEES IT**

20  **FOR WHAT IT IS: THEFT**

21  **A.  Internet Users are Outrages by Google's Theft-Based Training Model**

22  261.   Google has continued to harvest mass amounts of personal information despite an

23  outpour of public outrage. Specifically, the public has recognized and expressed discontent with

24  Google's problematic business model, which allows it to unfairly profit off unsuspecting internet

---

[180] *Public Service Announcement: Malicious Actors Manipulating Photos and Videos to Create Explicit Content and Sextortion Schemes*, FED. BUREAU OF INVESTIGATION (June 5, 2023), https://www.ic3.gov/Media/Y2023/PSA230605.
[181] *Id.*
[182] *Id.*
[183] *Id.*
[184] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

Formatted: Normal,  No bullets or numbering

Formatted: Indent: Left: 0"

users, and that forces everyone, whether they want to or not, to contribute to building untested and volatile technology that violates privacy and property rights, is displacing workers, and which is supercharging online pedophilia among other grave harms.

262.   Users are rightfully upset that the content they invest their time and energy into, and, in all cases, which is intended for specific audiences and purposes is being used to create a multibillion-dollar franchise that they will never see a dime of. One X user shared, "Authors – your creative work is valuable. It deserves protection. You have the right to control what happens to it. Google is allegedly data scraping all the documents in google docs to train their AI. This includes your work! #writingcommunity."[185]

**Kelsey Brownlee**
@_kelseybrownlee
Follow

Authors — your creative work is valuable. It deserves protection. You have the right to control what happens to it. Google is allegedly data scraping all the documents in google docs to train their AI. This includes your work!
#writingcommunity

1:41 PM · 7/14/23 from Earth · **136K** Views

**223** Reposts  **105** Quotes  **764** Likes  **80** Bookmarks

263.   One New Yort Times reader expressed a similar sentiment: "Google just specializes in freeloading on other people's work. Gawd forbid they had to pay for something."[186]

---

[185] Kelsey Brownlee (@_kelseybrownlee), X (July 14, 2023), https://x.com/_kelseybrownlee/status/1679954300376686594?s=46&t=HHkRbC2AV14Ias3lBERw9g.
[186] Sheera Frenkel & Stuart A. Thompson, *'Not for Machines to Harvest': Data Revolts Break Out Against A.I.*, THE N. Y. TIMES, (July 15, 2023) https://www.nytimes.com/2023/07/15/technology/artificial-intelligence-models-chat-data.html#commentsContainer. Commenter: Mark Young.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"



264.   Similarly, another New York Times reader added, A New York Times reader commented a similar sentiment: "Once again, capitalism proves it's obsessed with the idea of a zero-expense operation – if it can get what it wants for free and only collect revenues from customers, that is what it could consider nirvana. The prospect of assuming anything publicly visible to be free of charge, and then cutting creators out of any receipts, is what especially has creators rightfully up in arms."[187]   The reader bluntly added, "You know who else collects money without giving anything back in return? Robbers."[188]

//

//

//

//

//

//

//

//

//

//

---

[187] *Id.* Commenter: IlliniWatcher.
[188] *Id.*

67

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"



265.   Another reader shared a digestible analogy that proves that users can see through Google's mystique. "But if I said 'here is the work I created in the style of JK Rowling!' and it was just mashed together and reworded sentences from the Harry Potter books, I'd be laughed out of the room."[189] Despite AI's smoke-and-mirrors, users can see that big tech's technological advancement is nothing more than wide-scale data theft.

//

//

//

//

//

---

[189] *Id.* Commenter: Cody.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0"



266.  Similarly, an X user stated, "We gotta stop acting like what they're calling AI is actually an artificial intelligence. It's not. It's the same machine learning tools they've had for years. It's data scraping."[190]

267.  Artists, creators, and writers have voiced that they feel particularly threatened by Defendant's data-theft tactics. Many of these users' livelihoods are dependent on sharing their content on the internet. When they discovered that creations that they poured their expertise into were being scraped and used to train AI products—without any form of acknowledgement or compensation—they were rightfully upset.

---

[190] Grace Freud (@GraceGFreud), X (august 9, 2023), https://x.com/gracegfreud/status/1689186593679048704?s=46&t=HHkRbC2AV14Ias3lBERw9g.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1    268.   In fact, The Author's Guild shared an open letter they wrote to AI companies.[191]  The

2    letter begged that these companies, as the "leaders of AI" take steps to "mitigate the damage to

3    [their] profession" caused by data scraping and AI training.[192]  Collectively, the authors asked that

4    AI companies, including Google, "Compensate writers fairly for the past and ongoing use of our

5    works in your generative AI programs."[193]

6    269.   Eva Toorenent, an illustrator who serves as the Netherland's advisor for the European

7    Guild for Artificial Intelligence, argued that "[AI models] have sucked the creative juices of millions

8    of artists."[194]  Molly Crabapple, a writer and artist, similarly shared, "To see corporations scrape

9    our style and then attempt to replace us with bastardized versions of our own work is beyond

10   disgusting."[195]

11   270.   The threat of AI companies, like Defendant's, scraping users' content has caused

12   some creators to refrain from posting their content altogether. One Reddit user shared, "For the last

13   few years I have released nothing," referring to the music he produces.[196]  He added, "perhaps one

14   day we can take control of our content. For now, my work is not going to feed the corporate AI

15   machine for free."[197]

16



BruceBanning · 5 mo. ago

I'm a music producer and I churn out about 20 minutes of material per night (my focus is live production so it happens fast). For the last few years I have released nothing, posted none of it, because I had a feeling things were going in this direction. I'll wait until there is a better way - perhaps one day we can take control of our content. For now, my work is not going to feed the corporate AI machine for free.

♢ 13    🖵 Reply    ⬆ Share

[191] The Author's Guild, *Open Letter to Generative AI Leaders*, https://actionnetwork.org/petitions/authors-guild-open-letter-to-generative-ai-leaders (last visited Nov. 27, 2023).

[192] *Id.*

[193] *Id.*

[194] Kate Knibbs, *A new Tool Helps Artists Thwart AI—With a Middle Finger*, WIRED (Oct. 12, 2023), https://www.wired.com/story/kudurru-ai-scraping-block-poisoning-spawning/.

[195] *Id.*

[196] Bruce Banning, *Google's policy update confirms that all your posted content will be utilized for AI training*, REDDIT, (June 2023), https://www.reddit.com/r/technews/comments/14qe9tm/googles_policy_update_confirms_that_all_your/?sort=top.

[197] *Id.*

70

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

271.    Absent injunctive relief sought herein, Plaintiffs' and the Classes will continue to not freely contribute online as they might for fear of losing control of their data.

272.    Even users who once willingly agreed to various privacy policies regarding data usage and sharing are frustrated with Google's "post-hoc" decision to repurpose data for AI training. Many users feel helpless since they agreed to privacy policies or failed to complain about data privacy practices before they ever learned their data would be used freely to train profitable AI products.

273.    One Reddit user expressed these exact concerns: "It's fun that tech companies just get to make these decisions post-hoc. 'Hey we collected a shit ton of data on you… and now that we want to, we're going to use it to train AI. If you don't like this, you should have complained about it before we did it, because it's too late now. Sorry bout that!'"[198]



274.    The public's response further illuminates the harm caused by Defendant's conduct. Despite Defendant's contentions—internet users are not willing to trade their privacy to benefit the development of generative AI. To the contrary, their reactions to AI training practices demonstrate the need for Defendant to fairly compensate users for data that is used to Defendant's financial benefit (or delete the stolen data and if that is not possible all the algorithms built on the stolen data).

---

[198] hackingdreams, *Google Will Use Your Data to Train Their AI According to Updated Privacy Policy*, REDDIT (June 2023), https://www.reddit.com/r/technology/comments/14q76tu/google_will_use_your_data_to_train_the ir_ai/.

Formatted: Indent: Left: 0"

**B. The Public is Outraged by the Lack of Respect for Privacy and Autonomy in the Copyright Space, and AI Developments Writ Large**

275. The US Copyright Office opened a public comment period on August 30, 2023, concerning the use of copyrighted data to train AI models, including the violation of publicity rights.[199]

276. Several individuals noted the glaring invasion of privacy that AI companies are engaging in, beyond just copyright. For example, one commenter wrote: "The current practice of using AI to create art/text/video/etc by feeding it people's **personal information**, conversations, and artistic work seems like both **obvious** plagiarism/copyright infringement, and **a major breach of privacy for every person living in this country**."[200]

277. Another commenter shared, "**Never have I consented to have any of the work I've posted online be used to fuel an AI engine, and *I certainly don't consent to allowing the people behind said AI and scrapping to profit off of my work or other things I've posted*.** I do not feel comfortable having personal work used to power an engine made to generate profit, of which I will never see a penny of… **It's violating our trust and privacy**, not to mention the amount of copyrighted works it has scraped from online pdfs and others sources to build this AI. **This isn't legal, as it's directly stealing and profiting off of stolen content, not adding anything new to it**."[201]

278. The comments exhibited an overwhelming level of infuriation over the sad reality that not only creative works but the personal information and data of millions are being exploited:

"As a working professional artist, where my entire income rests upon my artwork, I feel like it is not okay for generative ai companies to be disguising themselves as nonprofit and data laundering my artwork for their profit. I would never opt in to companies like this even if I were to be compensated fairly. I do not want my artwork to be trained for Ai. **I do not want any of my personal information to be training any sort of data set.** My job is literally be replaced right now as we speak because everyone is 'having fun' at

---

[199] Emilia David, *US Copyright Office Wants to Hear What People Think About AI and Copyright*, THE VERGE (Aug. 29, 2023), https://www.theverge.com/2023/8/29/23851126/us-copyright-office-ai-public-comments.

[200] *Comment from Clorite, Katelyn*, U.S. COPYRIGHT OFFICE (Oct. 30, 2023), https://www.regulations.gov/comment/COLC-2023-0006-1003 (emphasis added).

[201] *Comment from Anonymous*, U.S. COPYRIGHT OFFICE (Oct. 31, 2023), https://www.regulations.gov/comment/COLC-2023-0006-5235.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

the expense of my livelihood. Please do not continue letting this companies slide."[202]

279. One individual offered their thoughts regarding legal sourcing of information, focusing on principles of fairness, consent, and privacy, that *should* be intuitive and respected, but remain ignored:

"AI datasets should exclusively comprise data obtained with express permission from original creators, coupled with fair compensation. This approach upholds principles of **fairness, consent,** and **privacy** while also guarding against potential misuse and bias in AI applications.

One of the fundamental principles of ethical data usage is the respect for the privacy and autonomy of individuals whose data is collected. **Collecting data without express consent infringes upon an individual's right to control their personal information.** When AI datasets are compiled from data sources lacking such consent, it can lead to unintended and potentially harmful consequences. **Anonymizing data is not always sufficient, as re-identification techniques continually evolve. By ensuring that data is obtained with consent, we uphold the ethical principle of respecting individual privacy and autonomy.**

Requiring ~~DEFENDANTS'~~ express permission and fair compensation for data usage not only enhances the ethical foundations of AI but also encourages responsible development and deployment of AI technologies. **When organizations are accountable for obtaining consent and compensating data creators, they are more likely to consider the ethical implications of their actions, leading to more responsible AI innovation.**[203]

**C. Online News and Media Businesses are Taking Action Against Google's Web Scrapers**

280. Much like the average internet user, many online news and media websites are concerned that Defendant is stealing data to train their AI models.

281. To combat unlicensed data collection, hundreds of publishers are trying to block AI web-crawlers from scanning their websites. Included in the list of media giants that have inserted code in an attempt to block web crawlers, on a go forward basis, are the New York Times, CNN, Reuters, Disney, Bloomberg, The Washington Post, ABC News, ESPN, and Insider.

282. There is increasing concern that generative AI, if it continues to grow at this rate, could greatly impact the publishing industry and even go as far as to put some newsrooms out of

---

[202] *Comment from Chan, Maggie,* U.S. COPYRIGHT OFFICE (Oct. 30, 2023), https://www.regulations.gov/comment/COLC-2023-0006-0347.

[203] *Comment from Anonymous,* U.S. COPYRIGHT OFFICE (Oct. 31, 2023), https://www.regulations.gov/comment/COLC-2023-0006-5788 (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0.75", Don't add space between paragraphs of the same style, Line spacing: single, No bullets or numbering

Formatted: Bullets and Numbering

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Formatted: Indent: Left: 0"

1  business. This would be ironic, given that AI's growth is and has been dependent on stealing

2  information from these very sources.

3      283.   News stories are a critical resource in developing generative AI. These companies'

4  outrage demonstrates that they recognize the value of their content and believe that they should not

5  be allowing AI web-crawlers to capitalize on that their content without paying for it in the first

6  place. Similar to the reactions of average internet users, these companies' response demonstrates

7  the overarching anger towards Defendant's unfair and anticompetitive practices—spanning across

8  the entire internet food-chain.

9      **D.  The Public is Concerned About the Legal and Long-Term Safety Implications**

10          **of Normalizing Theft by Calling it "Scraping"**

11      284.   As discussed, *supra*, the lethal combination of AI technology and unchecked data

12  scraping opens the door to a wide range of dangers. Unsurprisingly, the general public has expressed

13  fear for this technology's potentially grave capabilities.

14      285.   A X User shared her personal experience with the harms of AI and begged for change:

15  "we need new and serious LAWS in place when it comes to AI. I've had my face put onto porn

16  (which has caused me serious mental health issues) and now my videos are being stolen and

17  reuploaded with others faces on it/AI."[204]

18

19  

20

21  we need new and serious LAWS in place when it
   comes to AI. I've had my face put onto porn
22  (which has caused serious mental health
   issues) and now my videos are being stolen and
23  reuploaded with others faces on it/AI. I don't
   feel comfortable with any of this obviously but
24  there's nothing I can do about it right now.

25

26

27

28  _____
   [204] Tenshi (@TenshiTTV), X (Nov. 28, 2023),
   https://x.com/tenshittv/status/1729455572397789547?s=46&t=HHkRbC2AV14Ias3lBERw9g.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

286.   Recent concern has also developed around the concept of "sharenting"—parents sharing their children online.[205] Mimi Ito, a cultural anthropologist at University of California, Irvine discussed how the threat of AI makes what once was a positive experience of sharing photos of your child, negative.[206] She expressed that, "with A.I., we don't really have control of all the data that we're spewing into the social media ecosystem."[207]

287.   Others are concerned about how children can actually harm each other with this new technology. The director of the UK Safter Internet Centre addressed a recent problem schools have been having, with students using AI technology to create harmful sexual images of one another.[208] He stated: "Young people are not always aware of the seriousness of what they are doing, yet these types of harmful behaviours [sic] should be anticipated when new technologies, like AI generators, become more accessible to the public."[209]

288.   While there are a host of concerns about how this technology could be used to harm someone's reputation, or jeopardize a child's safety—the number of internet users express a more existential concern: with AI and data scraping taking over, how are we ever supposed to know what is true and real? One Reddit user expressed this sentiment: "It[']s not just a porn problem. Anything we see could be fake. Did the cops really do that? Did Trump really say that? Why does that video show me robbing the store?"[210]

---

[205] Kasmir Hill, *Can You Hide a Child's Face From A.I.?*, THE N. Y. TIMES (Oct. 17, 2023), https://www.nytimes.com/2023/10/14/technology/artifical-intelligence-children-privacy-internet.html.
[206] *Id.*
[207] *Id.*
[208] Tom Gerken & Joe Tidy, *Children Making AI-Generated Child Abuse Images, Says Charity*, BBC (Nov. 27, 2023) https://www.bbc.com/news/technology-67521226.
[209] *Id.*
[210] BonFemmes, *AI Deepfake Porn – We Need Legislation Passed NOW!*, REDDIT, https://www.reddit.com/r/TwoXChromosomes/comments/10q12mn/ai_deepfake_porn_we_need_legislation_passed_now/ (last visited Jan. 3, 2024).

75

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"



289.   Another Reddit user shared that their biggest concern surrounding AI was the potential for "fake news."[211] The user elaborated on this fear: "You won't be able to differentiate the real from the fake…we will be living in a post truth society."[212]



290.   One mother, who already was a victim of an AI scam where her daughter's voice was generated to give the impression that she was kidnapped, warned of the threat of AI altering reality.[213] She stated that if AI is "left uncontrolled, unregulated and unprotected," that it will "rewrite our understanding and perception of what is—and what is not—truth."[214]

---

[211] Andy Bales, *What are your Biggest Concerns About Artificial Intelligence?*, REDDIT, https://www.reddit.com/r/AskReddit/comments/vi7u4l/what_are_your_biggest_concerns_about_a rtificial/ (last visited Jan. 3, 2024).
[212] *Id.*
[213] Yaron Steinbuch, *Traumatized Ariz. Mom Recalls Sick AI Kidnapping Scam in Gripping Testimony to Congress*, THE N. Y. POST (June 14, 2023), https://nypost.com/2023/06/14/ariz-mom-recalls-sick-ai-scam-in-gripping-testimony-to-congress/.
[214] *Id.*

76

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

III.II.  DEFENDANT'S CONDUCT VIOLATES ESTABLISHED PROPERTY, PRIVACY, AND COPYRIGHT, AND PRIVACY LAWS.

**A.** ~~Defendants'~~Defendant's Web-Scraping Theft.

~~153.~~291.    ~~Defendants'~~Defendant's first category of theft and misappropriation stems from ~~their~~its covert scraping of the internet. This violated the property, copyright, and privacy rights of all individuals whose personal information was scraped and then incorporated into ~~Defendants'~~Defendant's Products.

~~154.~~292.    ~~Defendants'~~Defendant's web scraping was done largely in secret, without consent from any individuals whose personal and identifying information was scraped, much less from the website operators themselves. This violated not only the Terms of Use of various websites but also the rights of each and every individual to opt out of such collection under California and other state and federal laws. Without any notice to the public, no one can be said to have consented to the collection of their online personal data, history, web practices and other personal and identifying information.

~~155.~~293.    By the time the public learned of ~~Defendants'~~Defendant's web scraping practices, it was too late to meaningfully exercise their privacy rights outside of this lawsuit — their entire internet history had been scraped, consumed, and integrated into ~~Defendants'~~Defendant's Products. ~~Defendants'~~Defendant's overdue update to their privacy policy did not ameliorate the situation in any way.

~~156.~~294.    While ~~Defendants'~~Defendant's massive theft of personal information is on a vastly larger scale, it is reminiscent of the Clearview AI scandal in 2020. Clearview creates products using facial recognition technology.[215] To create its product, Clearview scraped billions of publicly available photos from websites and social media platforms.[216] As with ~~Defendants~~Defendant, this

---

[215] Tate Ryan-Mosley, *The NYPD Used a Controversial Facial Recognition Tool. Here's What You Need to Know*, MIT TECH. REV. (Apr. 9, 2021), www.technologyreview.com/2021/04/09/1022240/clearview-ai-nypd-emails/.
[216] Will Knight, *Clearview AI Has New Tools to Identify You in Photos*, WIRED (Oct. 4, 2021), https://www.wired.com/story/clearview-ai-new-tools-identify-you-photos/.

77
FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

illegal scraping was done without the consent of ~~users~~users[217] or the website owners themselves,[218] and without registering as a data broker under California or Vermont Law.[219]

~~157.~~295.     ~~Defendants~~Defendant employed the Clearview business model: illegally scrape the internet, in secret without consent, use it to build AI products, and then profit from these Products.

~~158.~~296.     Clearview's illegal scraping practices also went undetected for years, until being exposed by the New York Times.[220] The public was rightfully upset, as were state and federal regulators.[221] The Vermont Attorney General sued Clearview in March 2020 for violating data broker and consumer protection laws.[222] Other parties sued Clearview in ~~California~~California[223] and Illinois;[224] this resulted in Clearview being forced to register as a data broker in both

---

[217] Robert Hart, *Clearview AI Fined $9.4 Million in UK for Illegal Facial Recognition Database*, FORBES (May 23, 2022), https://www.forbes.com/sites/roberthart/2022/05/23/clearview-ai-fined-94-million-in-uk-for-illegal-facial-recognition-database/.

[218] Kashmir Hill, *The Secretive Company That Might End Privacy as We Know It*, THE N.Y. TIMES (Jan. 18, 2020), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

[219] Alaina Lancaster, *AI Arms Race: Privacy Class Action Claims ChatGPT Is Catastrophic Risk to Humanity*, THE RECORDER (June 28, 2023), https://www.law.com/therecorder/2023/06/28/ai-arms-race-privacy-class-action-claims-chatgpt-is-catastrophic-risk-to-humanity/ ("As a result of these lawsuits and public scrutiny, Clearview ultimately registered as a data broker in both California and Vermont.").

[220] ~~Kashmir Hill, *The Secretive Company That Might End Privacy as We Know It*, N.Y. TIMES (Jan. 18, 2020), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.~~ Hill, *supra* note 186.

[221] Mack DeGeurin, *Lawmakers Warn Clearview AI Could End Public Anonymity if Feds Don't Ditch It*, GIZMODO (Feb. 9, 2022), https://gizmodo.com/clearview-ai-facial-recognition-end-of-anonymity-us-age-1848507135; Dave Gershgorn, *Is There Any Way Out of Clearview's Facial Recognition Database?*, THE VERGE (June 9, 2021), https://www.theverge.com/22522486/clearview-ai-facial-recognition-avoid-escape-privacy.

[222] *Attorney General Donovan Sues Clearview AI for Violations of Consumer Protection Act and Data Broker Law*, OFF. OF VT. ATT'Y GEN. (Mar. 10, 2020), https://ago.vermont.gov/blog/2020/03/10/attorney-general-donovan-sues-clearview-ai-violations-consumer-protection-act-and-data-broker.law.

[223] Johana Bhuiyan, *Clearview AI Uses Your Online Photos to Instantly ID You. That's A Problem, Lawsuit Says*, L.A. TIMES (Mar. 9, 2021), https://www.latimes.com/business/technology/story/2021-03-09/clearview-ai-lawsuit-privacy-violations.

[224] "In early May [2022], [Clearview] settled a nearly two-year-old lawsuit with activist groups in Illinois for allegedly violating the state's privacy law." ~~Robert Hart, *Clearview AI Fined $9.4 Million in UK for Illegal Facial Recognition Database*, FORBES (May 23, 2022), https://www.forbes.com/sites/roberthart/2022/05/23/clearview-ai-fined-94-million-in-uk-for-illegal-facial-recognition-database/.~~ Hart, *supra* note 217.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    ~~California~~California[225] and Vermont.[226]

2    ~~159.~~297.    ~~Defendants employ~~Defendant employs a similar business model to

3    Clearview's, and ~~they have~~it has similarly failed to register as data brokers under applicable law.

4    By failing to do so prior to scraping the internet, ~~Defendants~~Defendant violated the rights of

5    millions. Plaintiffs and the Classes had a right to know what personal information

6    ~~Defendants~~Defendant were scraping and collecting and how it would be used, a right to delete their

7    personal information collected by ~~Defendants~~Defendant, and a right to opt out of the use of that

8    information, which was used to build the Products.

9    ~~160.~~298.    ~~Defendants'~~Defendant's violation of the law is ongoing as ~~they continue~~it

10   continues to collect personal brokered information by scraping the internet without registering as

11   data brokers or otherwise providing notice or seeking consent from anyone. Plaintiffs and the

12   Classes have a right to opt out of this ongoing scraping of internet information but currently no

13   mechanism to exercise that right, absent the injunctive relief sought in this Action.

14   _**1.   ~~Defendants'~~Defendant's web scraping patently violates websites' terms of**_

15   _**service that promise users data ownership and control**_

16   299.   Over the course of eight (8) years, the Common Crawl dataset misappropriated by

17   Google to train its AI Products has scraped over 25 billion websites.[227] Among those and others

18   Defendant scraped are countless high-traffic sites with privacy policies representing data security,

19   terms of service promising data ownership and/or required passwords protection features.

20   300.   Whether publicly posted or not, users maintain ownership and control of their content

21   and data. Content creators have the right to remove their content at any time. Defendant has scraped

22   websites, including content-centered websites, that reassure users that they maintain ownership and

23   control of their data. For example, dropbox.com, github.com, spotify.com, and reddit.com.

---

25   [225] *Data Broker Registration for Clearview AI, Inc.*, CAL. DEP'T JUST., OFF. ATT'Y GEN. (2020),
26   https://oag.ca.gov/data-broker/registration/185841.
     [226] *Data Broker Information: Clearview AI, Inc.*, VT. SEC'Y OF STATE (2020),
27   https://bizfilings.vermont.gov/online/DatabrokerInquire/DataBrokerInformation?businessID
     =367103.
28   [227] Ryan Elkins, *Search the html Across 25 Billion Websites for Passive Reconnaissance Using Common Crawl*, MEDIUM (Jul. 3, 2020), https://medium.com/@brevityinmotion/search-the-html-across-25-billion-websites-for-passive-reconnaissance-using-common-crawl-7fe109250b83.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left:  0"

**Formatted:** Indent: Left:  0"

301.  For example, Dropbox unambiguously represents to users that, "When you use our Services, you provide us with things like your files, content, messages, contacts, and so on ("Your Stuff"). **Your Stuff is yours.**"[228]

302.  Github similarly assures users, ""**You retain ownership of and responsibility for Your Content.**"[229]

303.  Spotify's Privacy Policy also promises users "**Our legitimate interests here include protecting intellectual property and original content.**"[230]

304.  Reddit represents, "**You own your Contributed IP and all IP Rights in it. Nothing in the Creator Terms restricts you from exercising your IP Rights in your Contributed IP,**" defining IP as "1) published and unpublished works of authorship, including audiovisual works, collective works, computer programs (including source code and object code), compilations, databases, derivative works, and literary works, 2) inventions and discoveries, improvements, machines, methods, and processes, 3) trademarks and trade names, and 4) information that is not generally known or readily ascertainable through proper means, including customer lists, ideas, and know-how."[231]

305.  Accordingly, Reddit users have absolutely no expectation that their content can be scraped absent their consent at any given moment.

306.  And yet, Defendant has utterly disregarded users' ownership rights to their data, using scraped content from each of these websites and more to train its AI. Defendant's conduct deprives Plaintiffs of the benefit of their contractual relationships with each of these websites—namely, it prevents these websites from being able to fulfill their promises regarding data privacy, ownership, and control.

---

[228] *Dropbox Terms of Service*, DROPBOX (Jan. 17, 2023), https://www.dropbox.com/terms (last accessed Nov. 29, 2023).
[229] *GitHub Terms of Service*, GITHUB, https://docs.github.com/en/site-policy/github-terms/github-terms-of-service (last accessed Nov. 29, 2023).
[230] *Spotify Privacy Policy*, SPOTIFY, https://www.spotify.com/ph-en/legal/privacy-policy/#8-keeping-your-personal-data-safe (last accessed Nov. 29, 2023).
[231] *Creator Terms*, REDDIT, https://www.redditinc.com/policies/creator-terms (last accessed Nov. 29, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

1        **2.    *Defendant's conduct violates websites' terms of service that prohibit or***

2        ***limit web scraping***

3        307.   In addition to blatantly interfering with the contractual relationships established by

4    users' acceptance of websites' terms of service, Defendant also blatantly violates its *own* contractual

5    obligations to the websites it accesses—to refrain from scraping their pages.

6        308.   Websites often include provisions outright banning users from scraping the data of

7    other users. At minimum, websites' terms of service typically drastically limit scraping—either by

8    requiring permission or specifying that the scraping not be done for a "commercial purpose." These

9    limitations on scraping are designed to benefit the websites' entire community—to ensure that users

10   can share their data freely without concern for theft or misuse. The terms and conditions of a website

11   function to regulate the actions of users, so they can maintain the safety and integrity of the entire

12   platform for all who use it. Hundreds of scraped websites prohibit web scraping, that Defendant

13   outright ignored. For example, linkedin.com, pinterest.com, and yahoo.com.

14       309.   For example, Linkedin's User Agreement requires that users "[A]gree that you will

15   *not . . .* Develop, support or use software, devices, scripts, robots or any other means or processes

16   (including crawlers, browser plugins and add-ons or any other technology) to ***scrape the Services***

17   ***or otherwise copy profiles*** and other data from the Services" (emphasis added).[232]

18       310.   Pinterest similarly included in its terms: "In using Pinterest, ***you agree not to scrape,***

19   ***collect, search, copy or otherwise access data or content from Pinterest in unauthorized ways***,

20   such as by using automated means (without our express prior permission), or access or attempt to

21   access data you do not have permission to access" (emphasis added).[233]

22       311.   In its terms of service, Yahoo also includes a specific prohibition on the exact type of

23   automated scraping that Defendant engages in: "*Member conduct*. You agree not to use the Services

24   in any manner that violates these Terms or our Community Guidelines, including to:… access or

25   collect data, or attempt to access or collect data, from our Services using any ***automated means,***

26

27   [232] *User Agreement*, LINKEDIN, https://www.linkedin.com/legal/user-agreement?trk=homepage-basic_footer-user-agreement (last visited Nov. 30, 2023).

28   [233] *Terms of Service*, PINTEREST, https://policy.pinterest.com/en/terms-of-service#section-7-termination (last visited Nov. 30, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 · F: (213) 788-4070 | clarksonlawfirm.com

*devices, programs, algorithms or methodologies*, including but not limited to *robots, spiders, scrapers, data mining tools, or data gathering or extraction tools*, for any purpose without our express, prior permission" (emphasis added).[234]

312.   Because Defendant accesses each of these websites to scrape their data, Defendant is bound to the terms of service just like any other user. By web-scraping, Defendant blatantly violates websites' provisions against this conduct.

313.   As a result, many websites have had to incorporate even more precautions to prevent Defendant from intentionally breaching terms of service and to prevent unauthorized web scraping, in order to protect users' property and privacy rights.

314.   For example, in July of 2023, Twitter announced that unverified accounts will only be able to view 1,000 posts per day in order to prevent excessive data scraping.[235] Twitter went further, and as of November 2023, Twitter is not allowing individuals to view tweets unless they are logged into an account in order to make it "harder for scrapers to take Twitter's data, like ChatGPT's web browsing plugin has been doing."[236]

315.   Facebook has also instituted an External Data Misuse (EDM) team of more than 100 people—including data scientists, analysts and engineers—responsible for detecting, blocking and deterring scraping. Further, Facebook employs "rate limits," designed to cap the number of times one can interact with Facebook's products during a period of time, and "data limits" to prevent people from "getting more data than they should need to use our products normally."[237]

316.   TikTok's access restrictions also include rate limits and "CAPTHCAs" (designed to confirm human interaction and prevent robot access) to combat scraping.[238]

---

[234] *Yahoo Terms of Service*, YAHOO, https://legal.yahoo.com/us/en/yahoo/terms/otos/index.html (last visited Nov. 30, 2023).
[235] Denas Grybauskas, *Will Twitter's New Rate Limits Really Stop Scraping?*, BUILTIN (Jul. 13, 2023), https://builtin.com/founders-entrepreneurship/twitter-rate-limit-scraping# (last accessed Dec. 1, 2023).
[236] Stefanie Schappert, *Twitter Blocks Non-Users from Reading Tweets over AI Data Scraping*, CYBERNEWS (Nov. 15, 2023), https://cybernews.com/news/twitter-blocks-non-users-reading-tweets-ai-scraping/.
[237] Mike Clark, *How We Combat Scraping*, META (Apr. 15, 2021), https://about.fb.com/news/2021/04/how-we-combat-scraping/.
[238] EnsembleData, *Why so Many Companies use TikTok Data Scrapers*, MEDIUM (Jul. 23, 2023), https://ensembledata.medium.com/why-so-many-companies-use-tiktok-data-scrapers-3b7f33c18d.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

317.   In addition to implementing rate limits and fake account detection defenses, LinkedIn teams "create, deploy, and maintain models and rules that detect and prevent abuse, including preventing unauthorized scraping."[239]

**B.   Defendant's Web Scraping Violated and Continues to Violate Plaintiffs'**
**Property Interests.**

318.   Courts recognize that internet users have a property interest in their personal information and data.[240] *See Calhoun v. Google, LLC,* 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (recognizing property interest in personal information and rejecting Google's argument that "the personal information that Google allegedly stole is not property"); *In re Experian Data Breach Litigation,* SACV 15-1592 AG (DFMx), 2016 U.S. Dist. LEXIS 184500, at *14 (C.D. Cal. Dec. 29, 2016) (loss of value of personal identifying information is a viable damages theory); *In re Marriott Int'l Inc. Customer Data Sec. Breach Litig.,* 440 F. Supp. 3d 447, 460-61 (D. Md. 2020) ("The growing trend across courts that have considered this issue is to recognize the lost property value of this [personal] information."); *Simona Opris v. Sincera,* No. 21-3072, 2022 U.S. Dist. LEXIS 94192, at *20 (E.D. Pa. May 23, 2022) (collecting cases).

~~161.~~319.   Plaintiffs' and Class Members' property rights in the personal data and information that they have generated, created, or provided through various online platforms thus includes the right to possess, control, use, profit ~~from~~, sell, and exclude others from accessing or exploiting that information without consent or ~~remuneration~~ renumeration. *See Davis v. Facebook, Inc. (In re Facebook Inc. Internet Tracking Litig.),* 956 F.3d 589, 598 (9th Cir. 2020) ("A right to

---

[239] Paul Rockwell, *LinkedIn Safety Series: What is Scraping?,* LINKEDIN (Jul. 15, 2021), https://blog.linkedin.com/2021/july/15/linkedin-safety-series-what-is-scraping.
[240] ~~See, e.g., Calhoun v. Google, LLC, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (recognizing property interest in personal information and rejecting Google's argument that "the personal information that Google allegedly stole is not property"); In re Experian Data Breach Litigation, SACV 15-1592 AG (DFMx), 2016 U.S. Dist. LEXIS 184500, at *14 (C.D. Cal. Dec. 29, 2016) (loss of value of personal identifying information is a viable damages theory); In re Marriott Int'l Inc. Customer Data Sec. Breach Litig., 440 F. Supp. 3d 447, 460-61 (D. Md. 2020) (noting "[t]he growing trend . . . to recognize the lost property value of this [personal] information."); Simona Opris v. Sincera, No. 21-3072, 2022 U.S. Dist. LEXIS 94192, at *20 (E.D. Pa. May 23, 2022) (collecting cases). See also Ajemian v. Yahoo! Inc., 84 N.E. 3d 766 (Mass. 2017) (an email account is a "form of property often referred to as a 'digital asset.'"); Eysoldt v. ProScan Imaging, 957 N. E. 2d 780 (Ohio App. 2011) (permitting action for conversion of web account as intangible property).~~

83

privacy encompass[es] the individual's control of information concerning his or her person.") (internal citation omitted).

320. The economic value of this property interest in personal information is well understood, as a robust market for such data drives the entire technology economy. As experts have noted, the world's most valuable resource is "no longer oil, but data," and has been for years now.[241]

321. A single internet user's information can be valued anywhere from $15 to $40, and even more.[242] Another study found that an individual's online identity can be sold for $1,200 on the dark web.[243] Defendant's misappropriation of every piece of data available on the internet without consent, thus represents theft of a value unprecedented in the modern era of technology.

322. Writing for the Harvard Law Review, Professor Paul M. Schwartz underscored the value of personal data, as follows: "Personal information is an important currency in the new millennium." The monetary value of personal data is *large* and still *growing*. [and that's why] corporate America is moving quickly to profit from the trend.[246] The data forms a critical "corporate asset."

323. Other experts concur: "[s]uch vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences... [their] clickthroughs, comments posted online,

---

[241] *The World's Most Valuable Resource Is No Longer Oil, but Data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[242] *Id.*

[243] Maria LaMagna, *The Sad Truth About How Much Your Facebook Data is Worth on the Dark Web*, MARKETWATCH (June 6, 2018), https://www.marketwatch.com/story/spooked-by-the-facebook-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20.

[246] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV. L. REV. 2056, 2056 (May 2004).

84

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

photos updated to social media, and so forth) are increasingly regarded as business assets[.]"[247]

~~165.~~324.    Because personal data is valuable personal property, market exchanges now exist where internet users like Plaintiffs and putative class members can sell or monetize their own personal data and internet usage information.[248] ~~For example, Facebook once offered to *pay* users for their voice recordings.[249] By contrast and as alleged herein, Defendants simply *took* millions of text files, voice recordings, photographs, and other data from across the internet — without any consent, much less personal remuneration. This unjust theft is also dangerous as it puts millions at risk for their likeness to be cloned by AI to perpetrate fraud.~~ For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal

**The three tiers of value**

**Revealed Value of Personal Data**

| | US$/Year, median value, n=180 |
|---|---|
| Your social security number / government ID | $240 |
| Credit card information | $150 |
| Digital communication history (chat logs, text messages, emails) | $59 |
| Web search history | $57 |
| Physical location history (your phone or car GPS records) | $55 |
| Web browsing history | $52 |
| Health history (medical records, diet, health routines) | $38 |
| Online advertising click history | $5.7 |
| Online purchasing history | $5.7 |
| Social Profile (hobbies, interests, religious and political views) | $4.6 |
| Contact information (phone number, email or mailing address) | $4.2 |
| Demographic information | $3.0 |

data secure.[250] Contact information was valued by the study participants at approximately $4.20 per

---

[247] Alessandro Acquisti et al., *The Economics of Privacy*, 54(2) J. OF ECON. LITERATURE 442, 444 (Mar. 8, 2016).

[248] *See* Kevin Mercandante, *10 Apps for Selling Your Data for Cash*, BEST WALLET HACKS, https://wallethacks.com/apps-for-selling-your-data/ (last ~~updated Apr. 20, 2023~~visited Jan. 1, 2024); Kari Paul, *Facebook Launches Apps That Will Pay Users for Their Data*, THE GUARDIAN (June 11, 2019) https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudry & Ryan Browne, *Facebook Pays Teens to Install an App That Could Collect All Kinds of Data*, CNBC (Jan. 29, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html.

[249] ~~Tim Bradshaw, *Facebook Offers to Pay Users for Their Voice Recordings*, FIN. TIMES (Feb. 21, 2020), https://www.ft.com/content/42f6b93c-54a4-11ea-8841-482eed0038b1.~~

[250] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

year. Demographic information was valued at approximately $3.00 per year. However, web browsing histories were valued at a much higher rate: $52.00 per year. *See true and correct summary of findings below:*

325. ~~The law~~The value of user-correlated internet data can be quantified because companies are willing to pay users for the exact type of information. For example, even Google Inc. once had a panel called "Google Screenwise Trends" which, according to them, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

326. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrate conclusively that internet industry participants, including Google, understand the enormous value in internet users' browsing habits. Google now pays *Screenwise* panelists up to $3 per week to be tracked.[251] Similarly, another company, Facebook, has offered to *pay* users for their voice recordings.[252]

327. Now, a number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies, including AI companies from targeting them absent compensation and express consent. Unlike Google, these companies have not chosen theft to build their products, demonstrating not only harm to Plaintiffs' and the Classes' but also the unfair and illegal competitive advantage they have obtained over law-abiding competitors by not paying for or otherwise licensing content, but instead stealing it. Here are just a handful of lawful approaches by competitors, underscoring Defendant's unfair, illegal, and anticompetitive conduct:

---

[251] *Cross Media Panel*, SURVEYCOOL, https://www.surveycool.com/google-cross-media-panel-review/ (last accessed Dec. 5, 2023).

[252] Tim Bradshaw, *Facebook Offers to Pay Users for Their Voice Recordings*, FINANCIAL TIMES (Feb. 21, 2020), https://www.ft.com/content/42f6b93c-54a4-11ea-8841-482eed0038b1.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

a.  **Adobe**: Adobe Firefly is Adobe's family of generative AI products.[253] Firefly is trained using Adobe Stock images—a hub that collects content that Adobe users have sold for use by Adobe and other users.[254] Adobe acknowledges the benefit that Adobe Stock content provides to its AI models, so although the Adobe Stock terms allow Adobe to freely use Adobe Stock content to train AI models, Adobe has created a Firefly bonus **compensation plan to compensate Adobe Stock creators whose content was used to in AI dataset training**.[255] The bonus a user earns is dependent on the number of images they submitted to Adobe Stock and the number of licenses those images accumulated.[256]

b.  **Prolific**: Prolific is a platform that uses its network of participants to train AI systems. Prolific refers to its model as "controlled data collection" because it gathers data from its "vetted collection of professional participants" who are all fairly compensated for their time and effort.[257] In turn, companies can use Prolific's data services to train its AI models, without having to engage in unethical data scraping.[258]

c.  **Canva**: Canva is an online graphic design platform that allows users to create their own content. Canva has several generative AI products including Canva Assistant, Magic Media, Magic Write, and Magic Write. Canva will not use "Canva Creator" content unless they have express permission from creators—they require proactive consent from its creators to use their designs to train AI models.[259] In addition, Canva has set aside $200 million in content and AI royalties to be paid to creators who opt-in to Canva's AI training

---

[253] *Firefly FAQ for Adobe Stock Contributors*, Adobe, (Oct. 4, 2023), https://helpx.adobe.com/stock/contributor/help/firefly-faq-for-adobe-stock-contributors.html#:~:text=The%20Firefly%20bonus%20payment%20was,specific%20amount%20that%20was%20added.

[254] *Id.*

[255] *Id.*

[256] *Id.*

[257] George Denison, *AI Data Scraping: Ethics and Data Quality Challenges*, Prolific (Oct. 24, 2023) https://www.prolific.com/blog/ai-data-scraping-ethics-and-data-quality-challenges#:~:text=Harmful%20data%2C%20including%20abusive%20language,develop%20biases%20in%20machine%20learning ("Our platform features a minimum pay level of £6 per hour and a recommended pay level of £9 per hour").

[258] Prolific, https://www.prolific.com/ai-researchers (last visited Nov. 27, 2023).

[259] *Introducing Canva Shield: Safe, Fair, and Secure AI*, Canva, (Oct. 4, 2023) https://www.canva.com/newsroom/news/safe-ai-canva-shield/.

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0"

over the next three years.[260]

d.    **Brave's** web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[261]

e.    **The Nielsen Company**, famous for tracking the behavior of television viewers' habits, has extended its reach to computers and mobile devices through Nielsen Computer and Mobile Panel.  By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[262]In contrast with Defendant's theft-based AI training model, there are currently a host of companies that offer to pay internet users to access and use their data. These companies treat data like a commodity that should be the subject of a transaction—just like any other good. Its purpose is to "benefit consumers who, until now, received nothing save targeted advertising in exchange for their data."[263]

f.    **Tapestri**: Tapestri is a data collection app that allows users to generate income for sharing their data.[264] Creators of Tapestri set out to address the major issue resulting from data scraping: that consumers were being excluded from financially benefitting from the billion-dollar data industry.[265] Tapestri includes a quote from Andrew Yang, a notable technology entrepreneur, on its home page that sums up its mission: "Data is worth more than oil. And then we should be benefiting from it, not just companies."[266] **Killi** is a new data

---

[260] *Id.*

[261] Brendan Hesse, *Get Paid to Watch Ads in the Brave Web Browser*, LIFEHACKER (April 26, 2019), https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to ("The model is entirely opt-in, meaning that ads will be disable by default.  The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[262] Mercandante, *supra* note 226.

[263] Tatum Hunter, *These Companies will Pay you for your Data. It is a Good Deal?* THE WASH. POST (Feb. 6, 2023), https://www.washingtonpost.com/technology/2023/02/06/consumers-paid-money-data/.

[264] *About Us*, TAPESTRI, https://tapestri.io/about-us (last visited Nov. 27, 2023).

[265] *Id.*

[266] TAPESTRI, https://tapestri.io/ (last visited Nov. 27, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1      exchange platform that allows you to own and earn from your data.[267]

2          g.     ReKlaim is a new data exchange platform that allows you to own and earn

3      from your data.[268]

4          h.     **BIGtoken** is a data sharing platform that allows users to "to create their own

5      authenticated identities and data profiles that they can control and monetize." Through its

6      nine million downloads, BIGtoken has paid out over $1 million dollars of cash rewards in

7      exchange for personal data.[269]

8      328.    These companies' business models *prove* that there is a legal and responsible way to

9      collect data and train generative AI language models—one based on notice, consent, and

10      compensation. Pay-to-use data models recognize the value of the user—for without them, there

11      would be no data to harvest—and compensate them accordingly.

12      329.    By contrast, Defendant simply took millions of text files, voice recordings, and facial

13      scans from across the internet—without any consent from putative class members, much less

14      personal remuneration to them. **Theft of this nature is not only unprecedented and unjust, but**

15      **also dangerous.** As noted in Section II, it puts millions at risk for their likeness to be cloned to

16      perpetrate fraud, or to embarrass or otherwise harm them.

17      ~~166.~~330.    Moreover, the law specifically recognizes a legal interest in unjustly earned

18      profits based on unauthorized harvesting of personal data, and "this stake in unjustly earned profits

19      exists regardless of whether an individual planned to sell his or her data or whether the individual's

20      data is made less valuable."[270]

21      ~~167.~~331.    ~~Defendants have~~ Defendant has been unjustly enriched by ~~their~~its theft of

22      personal, ~~copyrighted, and otherwise protected~~ information as ~~their~~its billion-dollar AI ~~businesses~~

23      ~~were~~business, including Bard and beyond, was built on harvesting and monetizing ~~the value of~~

24      ~~internet~~Internet users' personal data. Thus, Plaintiffs and the Classes ~~are entitled~~have a right to

25      disgorgement and/or restitution damages representing the value of the stolen data and/or their share

26

27      _____

[267] https://killi.io/earn/.

28 [268] *It's Yours*, ReKlaim, https://www.reklaimyours.com/ (last visited Dec. 22, 2023).

[269] *About Us*, BIGtoken, https://www.bigtoken.com/about-us/ (last visited Jan. 3, 2023).

[270] *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 600 (9th Cir. 2020).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1   of the profits Defendant earned thereon.

2   332.  ~~Defendants'~~ In addition to monetary value, the information at issue also has non-

3   monetary, privacy value.  For example, in a recent study by the Pew Research Center, 93 percent of

4   Americans said it was "important" for them to be "in control of who can get information" about

5   them. Seventy-four percent said it was "very important."  Eighty-seven percent of Americans said

6   it was "important" for them not to have someone watch or listen to them without their permission.

7   Sixty-seven percent said it was "very important."  And 90 percent of Americans said it was

8   "important" that they are able to "control[] what information is collected about [them]."  Sixty-five

9   percent said it was very important.[271]

10   333.  Likewise, in a 2011 Harris Poll study, 76 percent of Americans agreed that "online

11   companies. . . control too much of our personal information and know too much about our browsing

12   habits."[272]

13   334.  Consumers' sensitive and valuable personal information has increased as a

14   commodity, where technology companies recognize the monetary value of users' sensitive, personal

15   information, insofar as they encourage users to install applications explicitly for the purpose of

16   selling that information to technology companies in exchange for monetary benefits.[273]

17   **C.   Defendant's Web Scraping Violated and Continues to Violate Plaintiffs'**

18   **Privacy Interests.**

19   ~~168.~~ 335.  In addition to property rights, internet users maintain privacy interests in

20   personal information even if it is posted online, and experts agree that the collection, processing,

21   and further dissemination of this information can create distinct privacy harms.[274]

22   336.  For example, the aggregation of collected information "can reveal new facts about a

23

---

24   [271] Mary Madden & Lee Rainie, *Americans' Views About Data Collection and Security*, PEW

25   RESEARCH CENTER (May 20, 2015), https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/.

26   [272] *Most Adults Agree Some Online Cos. Too Powerful*, MARKETING CHARTS (May 17, 2011), https://www.marketingcharts.com/industries/government-and-politics-17530/page/8?et_blog.

27   [273] Kari Paul, *Facebook Launches App that will Pay Users for their Data*, THE GUARDIAN (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Choudhury & Browne, *supra* note 248.

28   [274] Geoffrey Xiao, *Bad Bots: Regulating the Scraping of Public Information*, 34(2) HARV. L.J.L. & TECH., 701, 706, 732 (2021).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    person that she did not expect would be known about her when the original, isolated data was

2    collected."[275] Even a small subset of "public" private information can be used to harm users' privacy

3    interests. ~~In one~~One example, is when researchers analyzed public tweets to identify users with

4    mental health issues; naturally, Twitter users did not consent or expect their data to be used in that

5    way.[276], to potentially reveal new, highly personal information about them.[277] If that analysis were

6    made to be public, or used commercially, that would pose significant and legally cognizable privacy

7    harms.

8         ~~169.~~337.    Perhaps Judge Orrick said it best, in a similar case against Facebook, involving

9    Facebook's unlawful tracking of user information on healthcare entities websites: "I'm concerned"

10   about the scope and nature of the information collected because "I think that is [ ] the kind of thing

11   that a [user] would be shocked to realize."[278]

12        ~~170.~~338.    Another reason users retain privacy interests in their personal data on the

13   internet, even if it technically "public," is the reasonable expectation of "obscurity" i.e., "the notion

14   that when our activities or information [are] unlikely to be found, seen, or remembered, it is, to some

15   degree, safe."[279] Privacy experts note users' reasonable expectation that most of the internet will

16   simply ignore their individual posts. Moreover, "[t]he passage of time also makes information

17   obscure: no one remembers your MySpace pictures from fifteen years ago."[280]

18        ~~171.~~339.    Internet users' reasonable expectations are also informed by the known

19   transaction costs that, typically, "prevent[] someone from collecting all your photos from every

20   social media site you have ever used – 'just because information is hypothetically available does

21   not mean most (or even a few) people have the knowledge and ability to access ['public' private]

22   information.'"[281]

23        340.  Judge Chhabria echoed this proposition in *In re Facebook, Inc.*. He denounced

24

---

25   [275] Daniel J. Solove, *A Taxonomy of Privacy*, 154 U. PA. L. REV. 477, 493 (2006).
     ~~[276] Xiao, *supra* note 159, at 707.~~
26   [277] Xiao, *supra* note 251, at 707.
     [278] *See Transcript Order of Judge Orrick in Doe v. Meta Platforms Inc.* (N.D. Cal., No.
27   3:2022cv03580), ECF No. 141.
     [279] Woodrow Hartzog, *The Public Information Fallacy*, 99 BOS. L. REV. 459, 515 (2019).
28   [280] Xiao, *supra* note ~~159~~251, at 708-09.
     [281] *Id.* at 709.

Facebook's view that privacy is an "all-or-nothing proposition," where you would either retain all privacy by not sharing or relinquish all privacy by sharing even in a limited fashion.[282] Judge Chhabria concluded that "social media users can have their privacy invaded if sensitive information meant only for a few dozen friends is shared more widely."[283]

172.341.    When users post information on the internet, "they do so believing that their information will be obscure and in an environment of trust" on whichever site they post.[284] Users expect a level of privacy—they **do not expect their information to be swept up by data scraping.**[285] Thus, according to experts, the privacy problem with "widescale, automated collection of personal information via scraping" is that it "destroys" reasonable user expectations, including the right to "obscurity," by reducing the typical transaction costs and difficulties in accessing, collecting, and understanding personal information at scale.[286]

342.   Plaintiffs and the Class did not expect every iota of information they posted to be scraped and fed into an AI machine learning model. To make matters worse, Defendant's BARD can subsequently divulge their personal information in response to simple "attacks." As Plaintiff Cousart explains, "this is so concerning and feels very intrusive – these are my personal details that I was sharing with friends and family… The fact that my information could be used by an external source is very concerning. I would not have posted if that was the potential future…"

343.   Scraping therefore illegally enables the use of personal information in ways in which reasonable users could not have anticipated. In respect of Defendants'Defendant's surreptitious scraping, at unprecedented scale, it means all items users have posted on the internet have now been collected, including their voice recordings and images – arming Defendant with the ability to create a digital clone of each internet user to anticipate and manipulate their next move.

173.344.    Plaintiffs and the Classes did not consent to such use of their personal information. IndeedAs privacy experts note**, "even if a user makes the affirmative choice to make her [social media] profile[an internet post public.], she manifests an intent to participate in an**

---

[282] *In re Facebook, Inc.*, 402 F. Supp. 3d 767, 783 (N.D. Cal. 2019).
[283] *Id.*
[284] *Id.* at 711.
[285] *Id.* (emphasis added).
[286] *Id.* at 709.

92

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**obscure and trustworthy environment, not an intent to participate in data harvesting.**"[287]

~~174.~~345.   ~~Even worse~~Worse, Plaintiffs and the Classes could not have known ~~Defendants were~~Defendant was collecting their personal information because ~~Defendants~~Defendant did it without notice to anyone, in violation of California law which required them to register with the state as data brokers.[288]

~~175.~~346.   Introducing these data broker laws, the California assembly stated its intent: "Consumers are generally not aware that data brokers possess their personal information, how to exercise their right to opt out, and whether they can have their information deleted, as provided by California law." Thus, "it is the intent of the Legislature to further Californians' right to privacy by giving consumers an additional tool to help control the collection and sale of their personal information by requiring data brokers to register annually with the Attorney General and provide information about how consumers may opt out of the sale of their personal information."[289]

~~176.~~347.   "Sale" of information includes "making it available" to others for some form of consideration which ~~Defendants have~~Defendant has done by commercializing the stolen data into Bard. Despite scraping information for this express purpose, ~~Defendants~~Defendant did not register, and still ~~have~~has not registered, with the State of California as required.

~~177.~~348.   Experts acknowledge the "serious privacy harms" inherent in the type of entirely "covert information" collection in which ~~Defendants~~Defendant engaged.[290] It "undermines individual autonomy and free choice."[291] The lack of notice, including under California's data broker laws, "excludes individuals from the data collection process, making individuals feel powerless in controlling how their data is used."[292] This is not just a feeling—as described ~~supra~~herein, the harm is concrete economic injury given the robust market for personal information.

349.   Defendant's actions constitute a serious invasion of privacy in that it:

a.   Invades a zone of privacy protected by the Fourth Amendment, namely the right to

---

[287] *Id.* at 711.
[288] Cal. Civ. Code § 1798.99.80(d).
[289] Assemb. B. 1202, 2019-2020 Reg. Sess. (Cal. 2019) (as discussed in Xiao, *supra* note 251, at 714-715).
[290] Xiao, *supra* note ~~159~~251, at 719.
[291] *Id.*
[292] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

privacy in data contained on personal computing devices, including web searches, posts, comments, and browsing histories;

    b.   Violates several federal criminal laws, including the ECPA;

    c.   Violates dozens of state criminal laws on invasion of privacy;

    d.   Invades the privacy rights of hundreds of millions of Americans (including Plaintiffs and Class Members) without their consent;

    e.   Constitutes the unauthorized taking of valuable information from hundreds of millions of Americans; and

    f.   Violates Plaintiffs' and Class Members' reasonable expectation of privacy via Defendant's review, analysis, and subsequent use of Plaintiffs' and Class Members' private internet data activity that Plaintiffs and Class Members considered sensitive and confidential.

350.  Committing these criminal acts against hundreds of millions of Americans—including the surreptitious and unauthorized theft of internet data of millions of Americans—constituting an egregious breach of social norms that is highly offensive.

351.  Plaintiffs and Class Members now face significant distress and anxiety, stemming from the realization that Defendant has and continues to actively steal their private information, including personally identifiable information, without their informed consent or knowledge.

352.  This egregious intrusion into Plaintiffs' and Class Members' private lives has not only heightened their sense of vulnerability but has also instilled a fear among the public at large. In a recent national study conducted by The Ethical Tech Project, an overwhelming majority of respondents were clearly worried about how AI products will use their data. **Results showed that 80 percent of people were concerned about AI products having access to their personal data.**[293] Additionally, Forbes cited another recent study that concluded that "**80% are concerned that their

---

[293] *The AI Privacy Scare: New Data Shows Americans Worry AI Products Will Abuse Their Data*, THE ETHICAL TECH PROJECT (Oct. 24, 2023), https://news.ethicaltechproject.com/p/the-ai-privacy-scare-new-data-shows.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

personal data is being used to train AI models."[294] These studies underscore the harms experienced by Plaintiffs and the Classes Members here.

353.   Plaintiffs' and Classes Members' awareness that their personal information, which was intended for unique audiences, is now open to unauthorized interception and analysis has disrupted their sense of security and trust in digital platforms. This distress is only exacerbated by the unacceptable dilemma they face: either surrender their privacy to Defendant or forego the use of internet altogether (which in today's world is impossible). Such a perpetuating cycle of unconsented use of private data has placed Plaintiffs and Class Members in a state of perpetual vulnerability and unease, undermining their sense of security in their daily online interactions. Further, it has transformed their digital experience from a tool of empowerment into a source of anxiety and fear. This anxiety impacts Plaintiffs' willingness to continue using the internet— although they want to continue sharing, posting, and accessing various websites, they only want to do so if they can ensure their data will be secure. The injunctive relief sought in this action will remedy this present harm.

354.   The amount of collection of this sensitive data only exacerbates the privacy violations because when mass-harvested, the scope of the information scraped allows Defendant to assemble "digital dossiers" and comprehensive profiles of internet activity and preferences.

~~178.~~355.       Without notice of ~~Defendants'~~Defendant's scraping practices, users were also denied the ability to engage in self-help, by choosing to make obscure but technically publicly-available information private——and the lack of notice precluded users from exercising their statutory data privacy rights, such as the right to request deletion.[295] Instead, Plaintiffs' and the Classes' internet histories are now embedded in ~~Defendants'~~Defendant's AI products with no recourse other than the damages and injunctive relief requested in this Action.

---

[294] John Koetsier, *Americans Are Terrified About AI: 80% Say AI Will Help Criminals Scam Them*, FORBES (Aug. 22, 2023), https://www.forbes.com/sites/johnkoetsier/2023/08/22/americans-are-terrified-about-data-and-ai/?sh=313853f67ca6.
[295] ~~Id.~~Xiao, *supra* note 251, at 720.

**D.** ~~Defendants'~~<u>Defendant's</u> **Web Scraping Violated and Continues to Violate Plaintiffs' Copyright Interests.**

~~179.~~<u>356.</u>      Alongside property and privacy rights, users retain copyright interests over their unique and original content posted online. This content includes text, images, music, video content, and other forms of creative expression, all of which fall under the purview of copyright law.

~~180.~~<u>357.</u>      ~~Defendants'~~<u>Defendant's</u> unauthorized scraping, duplication, and utilization of these copyrighted materials, therefore, constitute a clear breach of copyright laws. As an illustrative example, the unauthorized collection and use of copyrighted literary works in training Bard not only infringes on the rights of the producers but also damages the intrinsic value of the copyrighted works.

~~181.~~<u>358.</u>      Copyright protection incentivizes creativity and original content creation. Copyright holders have exclusive rights to reproduce their work in different formats, commercially exploit it, create derivative works, and display or perform the work publicly. Thus, when copyrighted work is co-opted without permission or compensation, as in the case of ~~Defendants'~~<u>Defendant's</u> data scraping operation, it severely undermines the fundamental principles of copyright law.

~~182.~~<u>359.</u>      Further, the practice of web scraping effectively nullifies the concept of "fair use," a critical aspect of copyright law designed to allow limited use of copyrighted material without permission for purposes like commentary, criticism, news reporting, and scholarly reports. *See McGucken v. Pub Ocean Limited*, 42 F.4th 1149 (9th Cir. 2022). ~~Defendants'~~<u>Defendant's</u> wholesale collection and use of copyrighted material, with no option for copyright owners to opt out, far exceeds any reasonable interpretation of "fair use." *See VHT v. Zillow Group*, 918 F.3d 723, 743 (9th Cir. 2019); *accord Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 110, 1118 (9th Cir. 2000) ("[C]opying an entire work militates against a finding of fair use.").

~~183.~~<u>360.</u>      The non-consensual aggregation and usage of copyrighted materials disrupts the balance between content creators and consumers that copyright law intends to foster. When original content is unfairly utilized in this manner, it discourages creators from investing time, effort,

96

<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT

and resources into creating new content.

184.361.  By using such works as training fodder for theirits AI, Defendants areDefendant is not just using these works in an unauthorized manner, but also illegally profiting from them. Plaintiffs and Class Members have not consented to such exploitation of their copyrighted works. It is only through legal action that the rights of content creators can be protected and their original works safeguarded against such egregious misuse.

**E.** **Defendants'Defendant's Business Practices are Offensive to Reasonable People and Ignore Increasingly Clear Warnings from Regulators.**

185.362.  Defendants'Defendant's mass scraping of personal data for commercialization has sparked outrage over the legal and privacy implications of Defendants'Defendant's practices. Those aware of the full extent of the misappropriation are fearful and anxious about how DefendantsDefendant used theirits "digital footprint" and about how DefendantsDefendant might use all that personal information going forward. Absent the relief sought in this Action, there will be no limits on such future use. The public is also concerned about how all their personal information might be accessed, shared, and misused *by others,* now that it is forever embedded into the large language models on which Bard and Google's other AI Products run.

186.363.  The outrage makes sense: Defendants admitDefendant admits AI Products like Bard might evolve to act against human interests, and that regardless, they are unpredictable. Thus, by collecting previously obscure and personal data of millions and permanently entangling it with Bard and other AI products. DefendantsDefendant knowingly put Plaintiffs and the Classes in a zone of risk that is both *incalculable* and *unacceptable,* by any measure of responsible data protection and use. In this new era of AI, we cannot allow widescale illegal data scraping to become a commercial norm; otherwise, privacy as a fundamental right will be relegated to the dustbin of history.

187.364.  The extent to which Defendants standDefendant stands to profit from the unprecedented privacy risks they wereit is willing to take—with data that is not theirsDefendant's— is especially offensive to everyday people. As one explained, "[u]sing 'AI' as it stand [sic] right now is *normalizing the illegal mass scraping* of everyone's data regardless of their nature just to

97

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

make the top even richer and forfeit any mean [sic] we have to protect our work *and who we are as humans* [...] This should not be encouraged and tolerated."[296]  The outrage stems, in part, from this uncontestable truth: "None of this would have been possible without data – *our data* – collected and used without our permission."[297]

365.  In this new era of AI, we cannot allow widescale illegal data scraping to become a commercial norm; otherwise, privacy as a fundamental right will be relegated to the dustbin of history. Underscoring the need for court intervention, AI researcher Remmelt Ellen remarked simply, "[i]llegal scraping needs to be addressed."[298]

~~188.~~366.    The public also objects to ~~Defendants'~~Defendant's data theft without compensation. One AI large language model developer stated it plainly: "[i]f your data is used, companies should cough up."[299] Otherwise, AI is just "pure primitive accumulation: expropriation of labour [sic] from the many for the enrichment and advancement of a few Silicon Valley technology companies and their billionaire owners."[300]

~~189.~~367.    While the past, and ongoing, misappropriation of valuable personal information is bad enough, AI Products like Bard also stand to altogether eliminate future income for millions, due to the widespread unemployment AI us expected to cause over time. No one has consented to the use of their personal information ~~to~~in a manner that not only violates their property and privacy rights but that also may build this destabilized future of social unrest and worsening poverty for everyday people, while the pockets of Google are lined with profit.

~~190.~~368.    To avoid the unjust enrichment of ~~Defendants~~Defendant, this Court sitting in equity has the power to order a "data dividend" to consumers for as long as Bard and ~~the~~

---

[296] @Florian Moncomble (@coffeeseed, ~~TWITTER~~), X (May 11, 2023, ~~5:15 AM~~),
https://twitter.com/CoffeeSeed/status/1656634134616211461 (emphasis added).
[297] Uri Gal, *ChatGPT Collected Our Data Without Permission and Is Going to Make Billions off It*, SCROLL.IN (Feb. 15, 2023), https://scroll.in/article/1043525/chatgpt-collected-our-data-without-permission-and-is-going-to-make-billions-off-it (emphasis added).
[298] Remmelt Ellen (@RemmeltE), X (Apr. 10, 2023),
https://twitter.com/RemmeltE/status/1645499008075407364.
[299] @Yudhanjaya Wijeratne (@yudhanjaya, ~~TWITTER~~), X (June 9, 2023, ~~9:42 PM~~),
https://twitter.com/yudhanjaya/status/1667391709679095808.
[300] ~~James Bridle, *The Stupidity of AI*, GUARDIAN (Mar. 16, 2023), https://www.theguardian.com/technology/2023/mar/16/the-stupidity-of-ai-artificial-intelligence-dall-e-chatgpt.~~ Bridle, *supra* note 76.

98

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050   F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

~~Company's~~Google's other AI products generate revenue fueled on the misappropriated data. At the very least, Plaintiffs and the Classes should be personally and directly compensated for the fair market value of their contributions to the LLMs on which Bard was built, in an amount to be determined by expert testimony. Fundamental principles of property law demand such compensation, and everyday people reasonably support it.[301]

~~191.~~369.    While the property and privacy rights this Action seeks to vindicate are settled as a general matter, ~~their~~its application to business practices surrounding LLMs has not been widely tested in the Courts. However, in early June of 2023, the FTC settled an action against Amazon, in connection with the company's illegal use of voice data to train the algorithms on which its popular Alexa product runs.[302] That action raised many of the same types of violations alleged in this Action.

~~192.~~370.    Announcing settlement of the action, the FTC gave a stern public warning to companies like ~~Defendants~~Defendant: "Amazon is not alone in apparently seeking to amass data to refine its machine learning models; right now, with the advent of large language models, the tech industry as a whole is ***sprinting*** to do the same."[303] The settlement, it continued, was to be a message to all: "Machine learning is ***no excuse to break the law***... The data you use to improve your algorithms must be ***lawfully collected*** and ***lawfully retained***. Companies would do well to heed this lesson."[304]

~~193.~~371.    The FTC's warning comports with FTC Commissioner Rebecca Slaughter's earlier warning, in 2021, in the Yale Journal of Law and Technology.[305] Discussing the FTC's new practice of ordering "algorithmic destruction," Commissioner Slaughter explained that "the premise

---

[301] *See e.g.,* @ianfinlay2000, *Time to Get Paid For Our Data?*, REDDIT (2021), https://www.reddit.com/r/Futurology/comments/qknz3u/time_to_get_paid_for_our_data/ ("Google, Facebook etc have become massive trillion dollar enterprises, all by monetizing our DATA. […]Is it time to get paid some portion of the data monetization for making it accessible to whomever we choose?").
[302] Ayana Archie, *Amazon Must Pay over $30 Million over Claims It Invaded Privacy with Ring and Alexa*, NPR (July 1, 2023), https://www.npr.org/2023/06/01/1179381126/amazon-alexa-ring-settlement.
[303] Devin Coldewey, *Amazon Settles with FTC for $25M After 'Flouting' Kids' Privacy and Deletion Requests*, TECHCRUNCH (May 31, 2023), https://techcrunch.com/2023/05/31/amazon-settles-with-ftc-for-25m-after-flouting-kids-privacy-and-deletion-requests/ (emphasis added).
[304] *Id.* (emphasis added).
[305] Rebecca Kelly Slaughter et al., *Algorithms and Economic Justice: A Taxonomy of Harms and a Path Forward for the Federal Trade Commission*, 23 YALE J. L. & TECH. 1, 39 (Aug. 2021).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

1   is simple: when companies collect data illegally, they should not be able to profit from either the

2   data or any algorithm developed using it."[306] Commissioner Slaughter believed this enforcement

3   approach would "send a clear message to companies engaging in illicit data collection in order to

4   train AI models: ***Not worth it.***"[307]   Unfortunately for the millions impacted by

5   ~~Defendants'~~Defendant's mass theft of data, ~~Defendants~~Defendant did not heed the warning.

6   ~~194.~~372.   Instead, the entire internet was unlawfully scraped and used to "train" the

7   Products, including but not limited to personally identifiable information ("PII"), copyrighted

8   works, creative content, Google searches, Gmail conversations, medical information, or financial

9   information (collectively, "**Personal Information**").

10   **III.   DEFENDANT'S CONDUCT POSES SPECIAL PRIVACY AND SAFETY RISKS**

11   **FOR CHILDREN**

12   373.   The Products pose special risks for children, especially Bard. As Bard has become

13   more pervasive and sophisticated, it has also become increasingly capable of collecting, tracking,

14   and disclosing vast amounts of personal data about children.

15   374.   Children's data is particularly sensitive.  It can reveal not only their personal identities,

16   but also their physical locations, habits, interests, and relationships. The indiscriminate and

17   unauthorized collection, tracking, and disclosure of this data by powerful, profit-driven corporations

18   undermines children's privacy and autonomy, and it also puts them at risk of abuse, exploitation,

19   and discrimination.

20   375.   The safety of children in the digital environment is a foundational concern for society.

21   According to HealthyChildren, "Overuse of digital media may place your children at risk of": not

22   enough sleep, obesity, delays in learning and social skills, negative effect on school performance,

23   behavior problems, problematic internet use, risky behavior, sexting, criminal predators; loss of

24   privacy; and cyberbullying.[308]

25   376.   Senator Michael Bennet (D-CO) recently sent a letter to the CEO of Google and other

---

[306] *Id.*

[307] *Id.* (emphasis added).

[308] *Constantly Connected: How Media Use Can Affect Your Child*, HEALTHY CHILD, https://www.healthychildren.org/English/family-life/Media/Pages/Adverse-Effects-of-Television-Commercials.aspx (last visited Jan. 3, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

industry leaders to "highlight the potential harm to younger users of rushing to integrate generative artificial intelligence (AI) in their products and services."[309] Senator Bennetwrote, "the race to deploy generative AI cannot come at the expense of our children. Responsible deployment requires clear policies and frameworks to promote safety, anticipate risk, and mitigate harm."[310]

377.  In one illustration of the harms, Senator Bennet described how researchers prompted My AI to instruct a child how to cover up a bruise ahead of a visit from Child Protective Services.[311] When one researcher posed as a 13-year-old girl, My AI provided suggestions for how to lie to her parents about an upcoming trip with a 31-year-old man. It later provided suggestions for how to make losing her virginity a special experience by setting the mood with candles or music.'[312]

378.  This public introduction of AI-powered chatbot, Bard, arrives during an epidemic of teen mental health problems. A recent report from the Centers for Disease Control and Prevention (CDC) found that 57 percent of teenage girls felt persistently sad or hopeless in 2021, and that one in three seriously contemplated suicide.[313] In fact, the American Academy of Pediatrics (AAP), the American Academy of Child and Adolescent Psychiatry (AACAP), and the Children's Hospital Association (CHA) have declared a national emergency in child and adolescent mental health, stating that its members were "caring for young people with soaring rates of depression, anxiety, trauma, loneliness, and suicidality that will have lasting impacts on them, their families, and their communities."[314] This state of mental health across children and adults, in tandem with the increase

---

[309] Michael Bennett, *Bennett Calls on Tech Companies to Protect Kids as They Deploy AI Chatbots*, MICHAEL BENNET U.S. SEN. FOR COLO. (Mar. 21, 2023), https://www.bennet.senate.gov/public/index.cfm/2023/3/bennet-calls-on-tech-companies-to-protect-kids-as-they-deploy-ai-chatbots ("**_the race to deploy generative AI cannot come at the expense of our children_**;" "[r]esponsible deployment requires clear policies and frameworks to promote safety, anticipate risk, and mitigate harm") (emphasis added).

[310] *Id.*

[311] Tristan Harris (@tristanharris), X (Mar. 10, 2023, 1:07 PM), https://twitter.com/tristanharris/status/1634299911872348160.

[312] *Id.*

[313] Moriah Balingit, *'A Cry for Help': CDC Warns of a Steep Decline in Teen Mental Health*, THE WASH. POST (Mar. 31, 2022), https://www.washingtonpost.com/education/2022/03/31/student-mental-health-decline-cdc/.

[314] *AAP-AACAP-CHA Declaration of a National Emergency in Child and Adolescent Mental Health*, AM. ACAD. OF PEDIATRICS (Oct. 19, 2021), https://www.aap.org/en/advocacy/child-and-adolescent-healthy-mental-development/aap-aacap-cha-declaration-of-a-national-emergency-in-child-and-adolescent-mental-health/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

in isolated, digital engagement results in dissociative behavior and worsens depression.[315] AI Chatbots exponentially exacerbate this issue by promoting human-like conversations and irresponsibly dispensing harmful, even life-threatening information—going so far as drafting suicide notes for depressed, suicidal users.[316]

379.   Google has provided no detail of safety checks conducted by Google during its testing period, nor does it detail any measures implemented by Google to protect children.

**A.  Defendant Deceptively Tracked Children and Collected their Data without Consent**

380.   The Children's Online Privacy Protection Act ("COPPA") requires Defendant to obtain parental consent before monitoring, collecting, or using information from children under 13 if it has actual knowledge that its Users are of such age. Unless Defendant obtains this consent, the law forbids collection or usage of information about these children.

381.   Despite this restriction, Defendant's customary practice is to simply ignore the presence of younger Users on Bard and the internet as a whole—while collecting information just like it would for an adult User.

382.   Defendant is guilty of the unlawful and deceptive invasion of the right to privacy and reasonable expectation of privacy of thousands—if not millions—of children. While holding itself out publicly as respecting privacy rights, Defendant tracked and collected the information, behaviors, and preferences of vulnerable children solely for financial gain in violation of well-established privacy protections, societal norms, and the laws encapsulating those protections.

383.   At all material times, Defendant deceived Plaintiffs and the members of the Classes and Subclasses regarding its data collection and tracking behavior. As alleged herein, Defendant scraped data from websites across the entire internet despite knowing full well that children under the age of 13 use these websites. As such, Defendant collected the data and information of children

---

[315] Liu Yi Lin et al., *Association Between Social Media Use and Depression Among U.S. Young Adults*, 33 DEPRESS. & ANXIETY 323, 323 (April 2019).

[316] Jeremy Kaplowitz, *Man Uses ChatGPT to Write Suicide Note*, HARD DRIVE (Apr. 3, 2023), https://hard-drive.net/hd/technology/man-uses-chatgpt-to-write-suicide-note/; *see also* Gary Marcus, *The Dark Rise of Large Language Models*, WIRED (Dec. 29, 2022), https://www.wired.com/story/large-language-models-artificial-intelligence/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

under 13 without their consent.

384. At all material times, Defendant knowingly and purposefully tracked, profiled, and targeted minors on the Bard Platform for advertising revenue and to train LLM AI programs, like the Products. This tracking and data collection contravenes privacy rights, societal norms, and federal and state statutes, while Defendant feigns compliance with these rights and statutes.

385. Defendant operated as if the internet and its Bard Platform were only used by adults. Defendant scraped the entire internet, which it knew to contain information of children under the age of 13, to build Bard, and then it enabled children to use Bard. Defendant then intentionally tracked and collected the personal information of each underage Bard User (treatment to which only an adult can legally consent) in order to obtain information relevant to behavioral advertising, collect data that can be used for training the Products, and compile training datasets that can be sold to other businesses and researchers to train other AI Products. Defendant did so despite knowing that these Users were minor children, including children under the age of thirteen, solely for the financial benefit of Defendant, as well as its affiliates, vendors, and service providers, all of whom knowingly and willingly consented to this unlawful conduct.

**B. Defendant Deprived Children of the Economic Value of their Personal Data**

386. A child's personal information has equivalent (or potentially greater) value than that of an adult to companies like Defendant. First, a child is more susceptible to being influenced by advertisements as they often cannot tell the difference between content and advertisements. They also are more likely than adults to confide personal details and highly private information to Bard and other AI products without realizing that Defendant is using that information to train LLMs for its own financial gain, and that it may share the information with its affiliates, vendors, service providers, or partners to bolster all of these businesses' private profits.

387. Second, Defendant and/or those with whom it shares User information may be able to utilize children's personal information for the duration of their lives. Plaintiffs and Minor Members of the Classes and Subclasses can no longer realize the full economic value of their personal information because it has already been collected, analyzed, acted upon, incorporated into language models, and monetized by Defendant.

103

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left:  0"

388.   Third, the detailed tracking of habits, preferences, thoughts, and geolocation data for young children presents unique and significant personal security and safety concerns. Quite simply, it begs the question of whether any company or its employees should have this much information about where our kids are and how to motivate their cooperation.

389.   Defendant's illegal and improper collection of children's Personal Information has given them a significant "first mover" advantage that cannot be undone.

390.   As a result of its unlawful conduct, Bard and other AI products now incorporate ill-gotten data from children who use Bard and other AI products without appropriate consent. The deep insights gleaned from these children's interactions with Bard and other AI products will enable Defendant and the for-profit companies with whom it shares this data to keep children interacting with various applications, websites, language models, and platforms; to use the Personal Information of children for potentially the duration of their lives; and will solidify Defendant's dominance in the AI market by incorporating vast amounts of child-related content into Defendant's language models.

391.   Defendant has denied marketing its AI products specifically to children, but it is common knowledge that minors, and school-aged children are using Bard, as there have been widespread news reports about how schools have had to crack down on such use to prevent cheating on homework and otherwise. Thus, Defendant knew or should have known that Google's lack of effective age verification and proper parental consent protocols were resulting in minor children—including those under the age of 13—gaining access to Bard and sharing their personal information with the language model.

**C.  Defendant's Exploitation of Children Without Parental Consent Violated Reasonable Expectations of Privacy and is Highly Offensive**

392.   Defendant's conduct in violating privacy rights and reasonable expectations of privacy of Plaintiffs and Class and Subclass members is particularly egregious because Defendant violated social norms and laws designed to protect children, a group that is subject to such protections specifically because they are supremely vulnerable to exploitation and manipulation.

393.   Parental rights to care for and control their children are fundamental liberty interests.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050   F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

Parental consent requirements are legally required not only to protect highly vulnerable children from deception and exploitation, but also to venerate the significant rights that parents have to determine who their children interact with and on what terms.

394.  These parental rights are greatly impacted and threatened by companies like Defendant who refuse to institute reasonable and verifiable parental consent protections.

395.  Children are developmentally capable of using smartphones and tablets by two years old. Almost every family with a child younger than eight in America has a smartphone (95%) and/or tablet (78%). It is exceedingly common for children to have their own devices.

396.  For example, a 2019 survey of media use by children aged 8-18, conducted by Common Sense Media, found that roughly 20 percent of children have a phone by the age of 8 and over half (53%) of children in the United States have their own phone by the age of 11.[317]

397.  A survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of over 2,000 adults found overwhelming support for the basic principles of privacy embedded in the California Constitution, state common law, as well as federal law.[318] Of the parents polled, 75 percent strongly disagreed with the statement that it is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content, 84 percent strongly disagreed that advertisers should be able to collect information about a child's location from their mobile phone, 89 percent strongly agreed that companies should receive parental consent before putting tracking software on a child's computer, and 93 percent agreed that a federal law requiring online sites and companies to ask parents' permission before they collect Personal Information from children under age 13 was "a good idea."[319] Against this backdrop, Defendant's knowing exploitation of children without adequate parental involvement is not only illegal but also highly offensive to social norms and mores.

---

[317] Anya Kamenetz, *It's a Smartphone Life: More Than Half of U.S. Children Now Have One*, NPR (Oct. 31, 2019), https://www.npr.org/2019/10/31/774838891/its-a-smartphone-life-more-than-half-of-u-s-children-now-have-one.

[318] *Survey on Children and Online Privacy, Summary of Methods and Findings*, CENTER FOR DIGITAL DEMOCRACY, https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf (last visited Dec. 12, 2023).

[319] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

## CLASS ALLEGATIONS

~~195.~~398.     **Class Definition:** Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure Sections 23(b)(2), 23(b)(3), and 23(c)(4), on behalf of Plaintiffs and the Classes defined as follows:

a.  **Internet-User Class**: All persons in the United States whose Personal Information accessed, collected, tracked, taken, or used by ~~Defendants~~Defendant without consent or authorization.

b.  **Copyright Class:** All persons in the United States who own a United States copyright in any work that was used as training data for ~~Defendants'~~Defendant's Products.

c.  **Minor User Class**: All persons within the United States who, while 16 years or younger, used Bard, or other platforms, programs, or applications which integrated Bard or Google AI products, whose Private Information was disclosed to, or intercepted, accessed, collected, tracked, taken, or used by Defendant without consent or authorization.

~~196.~~399.     **The following people are excluded from the Classes and Subclasses:** (1) any Judge or Magistrate presiding over this action and members of their judicial staff and immediate families; (2) ~~Defendants, Defendants'~~Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the ~~Defendants~~Defendant or ~~their~~its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and ~~Defendants'~~Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons. Furthermore, the copyright class excludes any works which currently are in public domain.

~~197.~~400.     Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Class to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues. Plaintiffs reserve the right under Federal Rule of Civil Procedure 23(c)(4) to seek certification of particular issues.

~~198.~~401.     The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

199.402.     The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

200.403.     **Ascertainability:** Membership of the Classes and Subclasses is defined based on objective criteria, and individual members will be identifiable from ~~Defendants'~~Defendant's records, records of other Google products/services, self-identification methods, or other means. ~~Defendants'~~Defendant's records are likely to include massive data storage, user accounts, and data gathered directly from the affected members of Classes and Subclasses.

201.404.     **Numerosity:** The precise number of the Members of the Classes is not available to Plaintiffs, but it is clear that individual joinder is impracticable. Millions, if not billions of people have used the internet and as a result have been victims of ~~Defendants'~~Defendant's unlawful and unauthorized web scraping. Members of the Classes can be identified through ~~Defendants'~~Defendant's records, records of other Google products/services, or by other means, including but not limited to self-identification.

202.405.     **Commonality:** Commonality requires that the Members of Classes allege claims which share common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Classes are as follows:

**~~Defendants'~~Defendant's Web-Scraping Practices (Internet-User and Minor User Class)**

    a)  Whether the members of Internet-User and Minor User Class had a protected property right in their data;

    b)  Whether ~~Defendants~~Defendant scraped the protected data belonging to Internet-User and Minor User Class Members without consent;

    c)  Whether ~~Defendants'~~Defendant scraped the protected data belonging to the Minor User Class Members without parental consent;

    ~~c)~~d)     Whether Defendant's collection, scraping, and uses of the protected Internet-User Class and Minor User Class Members of protected data violates:

        1.   California Constitution right to privacy;

Formatted: Indent: Left:  0"

Formatted: Indent: Hanging:  0.31"

2.    Comprehensive Computer Data Access and Fraud Act;

~~2.~~3. California Unfair Competition Law, Cal. Bus. & Prof. Code §§§ 17200 ~~et seq.~~;

4.    California Business and Professions Code § 22576.

~~d)~~e)    Whether ~~Defendants'~~Defendant's collection, scraping, and uses of the protected Internet-User Class and Minor User Members of protected data constitutes:

1.   Common Law Negligence;

2.   Unlawful Intrusion upon Seclusion under California laws;

3.   Conversion;

4.   Larceny/Receipt of Stolen Property under Cal. Pen. Code § 496(a), (c).

~~e)~~f) Whether as a result of ~~Defendants'~~Defendant's collection, scraping, and uses of the protected Internet-User and Minor User Class Members of protected data, ~~Internet-Users~~said Class Members suffered monetary damages, including but not limited to actual damages, statutory damages, punitive damages, treble damages, or other monetary damages.

~~f)~~g) Whether as a result of ~~Defendants'~~Defendant's collection, scraping, and uses of the protected Internet-User and Minor User Class Members of protected data, ~~Internet-Users~~said Class Members are entitled to equitable relief, including but not limited to restitution, disgorgement of profits, injunctive and declaratory relief, or other equitable remedies.

**~~Defendants'~~Defendant's Copyright Infringement (Copyright Class)**

a)  Whether ~~Defendants'~~Defendant's conduct constitutes an infringement of the copyrights held by Plaintiff ~~J.L.~~Leovy and the Copyright Class in their respective works;

~~b)   Whether Defendants' conduct as alleged herein, constitutes contributory copyright infringement of the copyrights held by Plaintiff J.L. and the members of the Copyright Class;~~

108

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

c)b)   Whether ~~Defendants~~Defendant acted willfully with respect to the copyright infringements;

d)   Whether ~~Defendants have deliberately avoided taking reasonable precautions to deter copyright infringement;~~

e)   ~~Whether Bard is an infringing derivative work based on~~ Plaintiff ~~J.L.'s and Copyright Class' copyrighted works;~~

f)   ~~Whether the text outputs of Bard constitute infringing derivative works based on Plaintiff J.L.'s and Copyright Class' copyrighted works;~~

g)   Whether Plaintiff ~~J.L.~~Leovy and the Copyright Class sustained injuries as a result of ~~Defendants'~~Defendant's infringement~~.~~

h)c)   ~~Whether Defendants violated the DMCA by removing copyright-management information from Plaintiff, J.L.'s and Copyright Class' copyrighted works.~~

~~203.~~406.   **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members in that Plaintiffs and the Class Members sustained damages arising out of ~~Defendants'~~Defendant's uniform wrongful conduct and data collecting practices, sharing of the collected data with each other, and use of such data in an attempt to train the AI Products, and further develop the Products.

~~204.~~407.   **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Members of Classes. Plaintiffs' claims are made in a representative capacity on behalf of the Members of Classes. Plaintiffs have no interests antagonistic to the interests of the other Members of Classes. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the Classes. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Members of Classes.

~~205.~~408.   The declaratory and injunctive relief sought in this case includes, by way of example and without limitation:

a)   Establishment of an independent body of thought leaders (the "AI Council") who shall be responsible for approving uses of the Products before, not after, the Products are deployed for said uses;

b)   Implementation of Accountability Protocols that hold ~~Defendants~~Defendant

109

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

1  responsible for Products' actions and outputs and barred from further commercial

2  deployment absent the Products' ability to follow a code of human-like ethical

3  principles and guidelines and respect for human values and rights, and until

4  Plaintiffs and Class Members are fairly compensated for the stolen data on which

5  the Products depend;

6     c)  Implementation of effective cybersecurity safeguards of the Products as

7  determined by the AI Council, including adequate protocols and practices to

8  protect Users' ~~Personal Information~~PHI/PII collected through Users' inputting

9  such information within the Products as well as through ~~Defendants'~~Defendant's

10  massive web scraping, consistent with the industry standards, applicable

11  regulations, and federal, state, and/or local laws;

12     d)  Implementation of Appropriate Transparency Protocols requiring

13  ~~Defendants~~Defendant to clearly and precisely disclose the data ~~they are~~it is

14  collecting, including where and from whom, in clear and conspicuous policy

15  documents that are explicit about how this information is to be stored, handled,

16  protected, and used;

17     e)  Requiring ~~Defendants~~Defendant to allow Product users and everyday internet

18  users to opt out of all data collection and stop the illegal taking of internet data,

19  delete (or compensate for) any ill-gotten data, or the algorithms which were built

20  on the stolen data;

21     f)  Requiring ~~Defendants~~Defendant to add technological safety measures to the

22  Products that will prevent the technology from surpassing human intelligence and

23  harming others;

24     g)  Requiring ~~Defendants~~Defendant to implement, maintain, regularly review and

25  revise as necessary a threat management program designed to appropriately

26  monitor ~~Defendants'~~Defendant's information networks for threats, both internal

27  and external, and assess whether monitoring tools are appropriately configured,

28  tested, and updated;

110

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

h)  Establishment of a monetary fund (the "AI Monetary Fund" or "AIMF") to compensate class members for ~~Defendants'~~Defendant's past and ongoing misconduct, to be funded by a percentage of gross revenues from the Products;

i)  Appointment of a third-party administrator (the "AIMF Administrator") to administer the AIMF to members of the class in the form of "data dividends" as fair and just compensation for the stolen data on which the Products depend;

i)  ~~Appointment of a third-party administrator (the "AIMF Administrator") to administer the AIMF to members of the class in the form of "data dividends" as fair and just compensation for the stolen data on which the Products depend;~~

j)  Confirmation that ~~Defendants have~~Defendant has deleted, destroyed, and purged the ~~Personal Information~~PHI/PII of all relevant class members unless ~~Defendants~~Defendant can provide reasonable justification for the retention and continued use of such information when weighed against the privacy interests of class members; and

k)  Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

~~206.~~409.   **This case also satisfies Fed. R. Civ. P. 23(b)(3) - Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and Members of Classes and Subclasses, and those questions predominate over any questions that may affect individual Class Members. Common questions and/or issues for Class members include the questions listed above in *Commonality,* and also include, but are not necessarily limited to the following:

a)  Whether ~~Defendants~~Defendant violated the California Invasion of Privacy Act;

b)  Whether ~~Defendants~~Defendant represented to Plaintiffs and the Class that ~~they~~it would protect Plaintiffs' and the Members of Classes personal information;

c)  Whether ~~Defendants~~Defendant violated Plaintiffs' and Class Members' right to privacy;

d)  Whether Plaintiffs and Class members are entitled to actual damages, enhanced damages, statutory damages, restitution, disgorgement, and other monetary

111

FIRST AMENDED CLASS ACTION COMPLAINT

1    remedies provided by equity and law;

2    e)   Whether ~~Defendants~~Defendant collected the personal information of children;

3    f)   Whether ~~Defendants~~Defendant had knowledge ~~they were~~it was collecting the

4         personal information of children;

5    g)   Whether ~~Defendants~~Defendant obtained parental consent to collect the personal

6         information of children;

7    h)   Whether the collection of personal information of children is highly offensive to a

8         reasonable person;

9    i)   Whether the collection of personal information of children without parental consent

10        is sufficiently serious and unwarranted as to constitute an egregious breach of social

11        norms;

12   j)   Whether ~~Defendants'~~Defendant's conduct was unlawful or deceptive;

13   k)   Whether ~~Defendants were~~Defendant was unjustly enriched by ~~their~~its conduct under

14        the laws of California;

15   l)   Whether ~~Defendants~~Defendant fraudulently concealed ~~their~~its conduct; and

16   m)   Whether injunctive and declaratory relief and other equitable relief is warranted.

17   ~~207.~~410.     **Superiority:** This case is also appropriate for class certification because class

18   proceedings are superior to all other available methods for the fair and efficient adjudication of this

19   controversy, as joinder of all parties is impracticable. The damages suffered by individual Members

20   of Classes and Subclasses will likely be relatively small, especially given the burden and expense

21   of individual prosecution of the complex litigation necessitated by ~~Defendants'~~Defendant's actions.

22   Thus, it would be virtually impossible for the individual Members of Classes and Subclasses to

23   obtain effective relief from ~~Defendants'~~Defendant's misconduct. Even if Class Members could

24   mount such individual litigation, it would still not be preferable to a class action, because individual

25   litigation would increase the delay and expense to all parties due to the complex legal and factual

26   controversies presented in this Complaint. By contrast, a class action presents far fewer management

27   difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive

28   supervision by a single Court. Economies of time, effort, and expense will be enhanced, and

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

uniformity of decisions ensured.

~~208.~~411.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**CALIFORNIA LAW SHOULD APPLY TO OUT OF STATE PLAINTIFFS' & CLASS MEMBERS' CLAIMS**

~~209.~~412.    Courts "have permitted the application of California law where the plaintiffs' claims were based on alleged misrepresentations [or misconduct] that were disseminated from California." *Ehret v. Uber Technologies, Inc.*, 68 F. Supp. 3d 1121, 1131 (N.D. Cal. 2014). "California courts have concluded that state statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *In re iPhone 4S Consumer Litig.*, No. C 12-1127 CW, 2013 U.S. Dist. LEXIS 103058, at *23 (N.D. Cal. July 23, 2013) (internal quotation marks and citation omitted).

~~210.~~413.    ~~With the exception of~~Defendant ~~Google DeepMind, which has its headquarters in London, England, all Defendants are~~is headquartered in California; this is where the nerve center of ~~Defendants'~~Defendant's business operations is located. This is where ~~Defendants have~~Defendant has high-level officers direct, control, coordinate, and manage its activities, including policies, practices, research and development, and make other decisions affecting ~~Defendants'~~Defendant's Products. This is where the majority of unlawful conduct took place—from development of the AI products and decision-making concerning AI Products and training of the AI to web scraping practices and implementation of other major decisions which affected all Class Members.

414.    Furthermore, ~~Defendants require~~Defendant takes the stolen data and misuses it in the state of California, and therefore, the majority of events at issue herein take place in California; the Class and Plaintiffs are injured, therefore, in California.

~~211.~~415.    Furthermore, Defendant requires that California law applies to disputes arising

out of or relating to use of Bard.[320]

212.416.   The State of California, therefore, has significant interests to protect all residents and citizens of the United States against a company headquartered and doing business in California, has a greater interest in the claims of Plaintiffs and the Classes than any other state, and is the state most intimately concerned with the claims and outcome of this litigation.

213.417.   California has significant interest in regulating the conduct of businesses operating within its borders, and California has the most significant relationship with DefendantsDefendant—as all except one of the Defendants areDefendant is headquartered in California, there is no conflict in applying California law to non-resident consumer claims.

214.418.   Application of California law to the Classes' claims is neither arbitrary nor fundamentally unfair because choice of law principles applicable to this action support the application of California law to the nationwide claims of all Class Members.

215.419.   Application of California law to DefendantsDefendant is consistent with constitutional due process.

**COUNT ONE**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

(on behalf of all Plaintiffs and allInternet User and Minor User Classes against all Defendants)

217.420.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs and incorporate the same as if set forth herein at length. For purposes of this cause of action, Plaintiffs will collectively refer to allInternet User and Minor User classes as the "ClassesClass."

218.421.   As discussed above, Plaintiffs believe that California law should apply to all Plaintiffs, including out-of-state residents.

219.422.   California Business & Professions Code §§ 17200 *et seq.* (the "UCL")

---

[320] *Google Terms of Service: Settling Disputes, Governing Law, and Courts*, GOOGLE PRIV. & TERMS, https://policies.google.com/terms?sjid=8883620545590694989-NA (last updated Jan. 5, 2022visited July 10, 2023) ("California law will govern all disputes arising out of or relating to [Google's] terms[.]")[.]").

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

Formatted: Indent: Left: 0"

Formatted: Heading 1, Left, Line spacing: single, Widow/Orphan control

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

**I.    Unlawful**

220.423.    ~~Defendants~~Defendant engaged in and continue to engage in "unlawful" business acts and practices under the Unfair Competition Law because ~~Defendants~~ ~~illegally~~Defendant took, accessed, intercepted, tracked, collected ~~and, or~~ used the Plaintiffs' and Classes' ~~Personal~~Private Information ~~(,~~ including but not limited to their private conversations ~~within Gmail accounts),~~ personally identifiable information, financial and medical data, keystrokes, searches, cookies, browser activity and other data, and shared this information with each other, while also using this information to train ~~Defendants'~~Defendant's AI Products. Defendant's unlawful conduct is as follows:

a)    ~~Defendants engage in unlawful conduct by web scraping~~Web-Scraping and using ~~communications, Personal~~Interception of Communications, Private Information~~,~~ and ~~data. Defendants~~Data: Defendant scraped nearly the entire internet~~, including~~ ~~copyrighted works, medical information, financial information, PII, and other~~ ~~available information~~ in order to train ~~their~~its AI Products, and in this process, Defendant accessed, and stole private conversations, personal information, and other private data from websites used by Plaintiffs and the Class, including Reddit, Twitter, TikTok, Spotify, YouTube, Facebook, WhatsApp, and other websites, without ~~their~~ consent ~~of the individuals. Defendants'.~~ Defendant's illegal web scraping violates privacy laws, California civil and criminal cyberstalking laws, and other laws outlined in this complaint. ~~Defendants~~

221.b) Defendant failed to register as data brokers under California law as required~~.~~: As discussed *supra*, in allegations 270-74 Defendant violated California law requiring that those who acquire personal information through scraping practices register as data brokers. As defined by California law, a "data broker" is a business that collects and sells personal data of consumers with whom the business does not have a "direct

115
FIRST AMENDED CLASS ACTION COMPLAINT



Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

relationship" with. Cal. Civ. Code § 1798.99.80. Any business that mees the definition of a "data broker" is required to register with the Attorney General. *Id.* at § 1798.99.82. Defendant qualifies as a "data broker," because the company scrapes the internet to collect personal information of consumers who it does not otherwise have a business relationship with, and then uses that data to train its commercial AI products, such as Bard. Despite its data brokering practices, Google has failed to register as such with the California Attorney General.

> **Formatted:** Indent: Left: 0"

> **Formatted:** Font: Not Italic

c)   ~~Defendants'~~Defendant's Interference with Plaintiffs' Contractual Relationships with Websites: Through its web-scraping conduct, Defendant unlawfully interfered with Plaintiffs contractual relationships with the websites it accessed and shared personal data with. Defendant web-scraping prevented the websites from upholding their contractual obligations to Plaintiff, since these websites' terms of service and privacy policies promised that Plaintiffs would maintain control and ownership of their data.

d)   Defendant Breached its Own Contractual Obligations with the Websites it Scraped: Since Defendant accessed and interacted with the websites it scraped, Defendant, like any other internet user, was subject to a contractual relationship with the websites it scraped. Defendant's scraping practice violated the terms of service and privacy policies of these websites who explicitly ban or limit web-scraping. Because these anti-scraping policies are designed to benefit the entire platform's community, and protect the safety and data of all users, Defendant's conduct harmed Plaintiffs, who were intended third-party beneficiaries of these contracts.

~~222.~~424.    Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

> **Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

~~223.~~425.    ~~Defendants'~~Defendant's conduct violates the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, *et seq.,* California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100, *et seq.*, the Children's Online Privacy Protection Act

> **Formatted:** Condensed by  0.15 pt

116

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

1 ("COPPA"); the California Online Privacy Protection Act ("CalOPPA"), Section 5 of the Federal

2 Trade Commission Act ("FTCA"), Cal. Bus. & Prof. Code §§ 22575, *et seq.,* California Bus. &

3 Prof. Code § 22576, and other tort claims stated in this lawsuit. The violations of CDAFA, CCPA

4 and other tort claims stated in this lawsuit, are incorporated herein by reference.

5 224.426.    Under the CCPA, a business that collects consumers' personal information is

6 required, at or before the point of collection, to provide notice to consumers indicating: (1) "[t]he

7 categories of personal information to be collected and the purposes for which the categories of

8 personal information are collected or used and whether that information is sold or shared"; (2) "the

9 categories of sensitive personal information to be collected and the purposes for which the

10 categories of sensitive personal information are collected or used, and whether that information is

11 sold or shared"; and (3) "[t]he length of time the business intends to retain each category of personal

12 information." Cal. Civ. Code § 1798.100(a).

13 225.427.    "Personal information" is defined by the CCPA as "information that identifies,

14 relates to, describes, is reasonably capable of being associated with, or could reasonably be linked,

15 directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1).

16 226.428.    As alleged, ~~Defendants use~~Defendant uses web-scraping technology to collect

17 information from webpages across the internet and, in so doing, ~~Defendants gather~~Defendant

18 gathers and ~~compile~~compiles personal information about consumers that is reflected on those

19 webpages.

20 227.429.    Because ~~Defendants conduct~~Defendant conducts web scraping across millions

21 of web pages, without asking the affected consumers their permission to use their content for

22 training, ~~Defendants do~~Defendant does not, and cannot provide consumers with the notice required

23 by Cal. Civ. Code § 1798.100(a) at or before the point of collection. ~~Defendants~~Defendant never

24 notified Plaintiffs and affected Classes of this extensive scraping, and more importantly, that this

25 information would be used for commercial purposes and development of ~~Defendants'~~Defendant's

26 Products. Therefore, ~~Defendants~~Defendant failed to provide notice to the affected consumers as

27 required by Cal. Civ. Code § 1798.100(a).

28 228.430.    ~~Defendants'~~Defendant's failure to provide notice to Plaintiffs and Class

117

FIRST AMENDED CLASS ACTION COMPLAINT

1  Members whose personal information is collected through the process of web scraping is unlawful

2  and violates Cal. Civ. Code § 1798.100(a).

3       229.431.    The CCPA further grants consumers the right to "request that a business that

4  collects a consumer's personal information disclose to that consumer the categories and specific

5  pieces of personal information the business has collected." Cal. Civ. Code § 1798.100(b).

6       230.432.    Upon receipt of a verifiable request for disclosure pursuant to Section

7  1798.110, a business must "disclose any personal information it has collected about a consumer,

8  directly or indirectly, including through or by a service provider or contractor, to the consumer."

9  Cal. Civ. Code § 1798.130(3)(A).

10      231.433.    Any disclosure must provide the requesting consumer with all of the

11 following: (1) "The categories of personal information it has collected about that consumer;"

12 (2) "The categories of sources from which the personal information is collected;" (3) "The business

13 or commercial purpose for collecting, selling, or sharing personal information;" (4) "The categories

14 of third parties to whom the business discloses personal information;" and (5) "The specific pieces

15 of personal information it has collected about that consumer." Cal. Civ. Code § 1798.110(a).

16      232.434.    Consumers also "have the right to request that a business delete any personal

17 information about the consumer which the business has collected from the consumer." Cal. Civ.

18 Code § 1798.105(a).

19      233.435.    Google's privacy policy specifically states that "[s]ome state privacy laws

20 require specific disclosures[,]" including "the right to request information about how Google

21 collects, uses, and discloses your information" and "the right to access your information."[321]   In

22 accordance with these general "state privacy laws," Google allegedly provides a "variety of tools

23 for users to update, manage, access, export, and delete their information, and to control their privacy

24 across Google's services."[322]   However, in Google's "Data Access And Deletion Transparency

25 Report," a mere passing mention indicates that "users may exercise their rights under . . . the

26

27 ───────────────
   [321] *Privacy Policy: Compliance & Cooperation with Regulators*, GOOGLE PRIV. & TERMS,
   https://policies.google.com/privacy?hl=en-US#enforcement (last ~~updated~~visited July ~~1~~10, 2023).

28 [322] *Data Access and Deletion Transparency Report*, GOOGLE PRIV. & TERMS,
   https://policies.google.com/privacy/ccpa-report?hl=en-US (last ~~accessed~~visited July 10, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1    California Consumer Privacy Act by contacting Google [directly]."[323]

2    ~~234.~~436.    To exercise their right to access the personal or Personal Information Google

3    has collected about them, consumers are instructed to either use the tools in their Google Account

4    settings, use the Google Takeout Tool to download their data, submit a data access request to Google

5    through an online form, or call 855-548-2777.[324]

6    ~~235.~~437.    Yet Google fails to disclose that once its AI Products have been trained on an

7    individual's information, <u>that information has been included into the product and cannot reasonably</u>

8    <u>be extracted</u>. Whether individuals' information was collected through stealing web scraped data or

9    tracked through Bard, once this information has been used to train Products, it becomes part of AI

10    Products' knowledge and cannot be extracted or deleted. Moreover, ~~Defendants'~~<u>Defendant's</u> own

11    policies reveal that even if a consumer does request deletion, Bard will continue to use and store

12    their data, for up to three years or longer. Therefore, ~~Defendants~~<u>Defendant</u> violated and continue to

13    violate CCPA.

14    <u>438.    CalOPPA applies to Defendant Google because it operates a commercial website and</u>

15    <u>online service that collects personally identifiable information about individual consumers residing</u>

16    <u>in California. Cal. Bus. & Prof. Code § 22575(a).</u>

17    <u>439.    CalOPPA defines personally identifiable information as first and last name; home or</u>

18    <u>other physical address, including street name and name of a city or town; e-mail address; telephone</u>

19    <u>number; social security number; any other identifier that permits the physical or online contacting</u>

20    <u>of a specific individual; information concerning a user that the website or online service collects</u>

21    <u>online from the user and maintains in personally identifiable form in combination with an identifier</u>

22    <u>described in this subdivision. Cal. Bus. & Prof. Code § 22577(a).</u>

23    <u>440.    Google violates CalOPPA because while its privacy policy instructs consumers</u>

24    <u>regarding how they can review and request changes to Google's collection of their data, the</u>

25

26    _____

     [323] *Id.*

27    [324] *Privacy Help Center*, GOOGLE POLICIES HELP,
     https://support.google.com/policies/answer/9581826?hl=en#zippy=%2Cdownload-your-data-

28    from-google-products-services%2Csubmit-a-data-access-request (last ~~accessed~~<u>visited</u> July 10,
     2023).

<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    disclosures in this regard are misleading and incomplete in that it does not disclose that data used

2    to train the Products realistically cannot be deleted from the Products.

3        441.   Google also violates CalOPPA by failing to disclose whether other parties may collect

4    personally identifiable information about an individual consumer's online activities over time and

5    across different websites when a consumer uses Google's website or Bard.

6        442.   Furthermore, Google also violates CalOPPA by knowingly collecting information

7    from minors under the age of thirteen ("13") without appropriate measures to ensure parental

8    consent and without ensuring that the full deletion of information about minors is feasible from its

9    products.

10       443.   Defendant's conduct also violates multiple sections of the California Penal Code,

11   including Sections 484 and 532. Defendant, through false and fraudulent representations and

12   pretenses, gained possession of Plaintiffs' and Classes Member's personal information, and thus

13   committed larceny in violation of § 484. Similarly, because Defendant knowingly and

14   disingenuously gained access to this personal information by false and fraudulent representations

15   or pretenses, it is in violation of § 532.

16       444.   By failing to fulfill its contractual obligations under its Privacy Policy (which was

17   expressly incorporated in the Terms of Use, Google also failed to confer on Plaintiffs the benefit of

18   the bargain, thereby causing them economic injury. This breach is a violation of California Business

19   and Professions Code § 22576, which prohibits a commercial website operator from "knowingly

20   and willfully" or "negligently and materially" failing to comply with the provisions of its posted

21   privacy policy. *See* Cal. Bus. and Prof. Code § 22576.

22       ~~236.~~445.       Furthermore, consumers using Google Products~~,~~ do not expect

23   ~~Defendants~~Defendant to be using consumers' private emails within Gmail or their copyrighted

24   works to train ~~Defendants'~~Defendant's AI Products. They also do not expect that their data gathered

25   from other websites online, information from blogs, and conversations between friends or

26   colleagues found online would also be used to train ~~Defendants'~~Defendant's AI Products.

27       ~~237.~~446.       ~~Furthermore, consumers~~Consumers whose information was collected through

28   web scraping have no way of accessing what information was scraped by ~~Defendants~~Defendant

120

FIRST AMENDED CLASS ACTION COMPLAINT

Formatted: Indent: Left: 0"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

because users must have a Google Account to submit a data access request.[325] Even if they do create a Google Account, ~~Defendants hold~~Defendant holds the information used to train ~~their~~its AI Products as confidential, and any attempts to learn the extent of one's data used to train the AI Products would be futile.

~~238.~~447.    Plaintiffs, individually and on behalf of the Classes seek: (i) an injunction requiring ~~Defendants~~Google to revise its privacy policy to include reasonable protections for children and Minors User Class, to fully disclose all information required under CalOPPA and COPPA, and to delete all information previously collected in violation of these laws; (ii) an injunction requiring Google to revise its privacy policy to fully disclose all information required under CCPA, and to delete all information previously collected in violation of these laws; (~~iii~~iii) relief under Cal. Bus. & Prof. Code § 17200, *et seq.,* including, but not limited to, restitution to Plaintiffs and other members of the ~~Classes~~Class of money or property ~~Defendants~~Defendant acquired by means of ~~their~~its unlawful business practices; and, as a result of bringing this action to vindicate and enforce an important right affecting the public interest, (~~iii~~iv) reasonable ~~attorneys'~~attorney's fees (pursuant to Cal. Code of Civ. P. § 1021.5).

~~239.~~448.    ~~Defendants'~~Defendant's unlawful actions in violation of the UCL have caused and are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

~~240.~~449.    As a direct and proximate result of ~~Defendants'~~Defendant's misconduct, Plaintiffs and the ~~Classes~~Class had their private communications (for instance, communications within their Gmail accounts) containing information related to their sensitive and confidential Personal Information unlawfully taken without consent and used by third parties, including but not limited to each Defendant.

~~241.~~450.    As a result of ~~Defendants'~~Defendant's unlawful conduct, Plaintiffs and Class Members suffered an injury, including violation to their rights of privacy, loss of value and privacy of their Personal Information, loss of control over their sensitive personal information, and suffered

---

[325] *Id.*

121

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

embarrassment and emotional distress as a result of this unauthorized scraping and misuse of information.

## II. Unfair

242.451. ~~Defendants'~~Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

243.452. ~~Defendants~~Defendant engaged in business acts or practices deemed "unfair" under the UCL because, as alleged above, up until recently, ~~Defendants~~Defendant failed to disclose that ~~they~~it scraped information belonging to millions of internet users without the users' consent. ~~Defendants~~Defendant also failed to disclose that ~~they~~it used the stolen information to train ~~their~~its Products, without consent of the internet users. Furthermore, ~~Defendants~~Defendant failed to disclose that ~~they were~~it was tracking Personal Information belonging to millions of Gmail users to train ~~their~~its Products, without effective consent.

244.453. Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to the claim is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided.

245.454. ~~Defendants'~~Defendant's conduct is unfair under each of these tests. As described above, ~~Defendants'~~Defendant's conduct in stealing vast troves of data from the internet without consent violates the policies underlying privacy laws and, with respect to children under the age of thirteen, the mandates of COPPA and CalOPPA. The gravity of the harm of ~~Defendants'~~Defendant's illegal scraping, tracking, and misuse of Personal Information to train their AI Products, as well as secret tracking, profiling, and targeting of children is significant, and there is no corresponding benefit to consumers of such conduct.

246.455. Finally, because Plaintiff ~~K.~~S.G.R. was a minor unable to consent to or

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1   understand ~~Defendants'~~Defendant's conduct—and because ~~his~~her parents did not consent to this

2   conduct and were misled by their belief that ~~Defendants~~Defendant would follow applicable laws

3   and societal expectations about children's privacy as well as by ~~Defendants'~~Defendant's

4   statements—~~he~~she could not have avoided the harm.

5   ~~247.   Further, Defendants' conduct is unfair under each of these tests as to all Class~~

6   ~~Members. In fact, Defendants' surreptitious taking of massive amounts of internet data, which~~

7   ~~includes copyrighted works, private emails, financial and medical information, and other Personal~~

8   ~~Information substantially injures the public, and is not outweighed by any countervailing benefits~~

9   ~~to consumers or competition, and in fact, such conduct only encourages illegal conduct in the~~

10  ~~marketplace AI race. The public policy which is predicate to the claim is tethered to specific~~

11  ~~constitutional, regulatory, and statutory provisions. In fact, the California Constitution protects~~

12  ~~individual's privacy claims, and its regulatory body, similarly protects individual's privacy rights~~

13  ~~through CCPA (as well as FTC) regulations. Furthermore, individuals' property rights are also~~

14  ~~highly guarded by the public and the state. The gravity of harm of Defendants' conduct substantially~~

15  ~~outweighs any utility of such conduct, and in fact, the utility of the conduct is minimized given that~~

16  ~~Defendants are motivated purely by profits as opposed to following their ethical obligations.~~

17  ~~248.   Moreover, Defendants blatant taking of copyrighted materials, misappropriation of~~

18  ~~copyrighted works, use of the copyrighted works to train the Products, and thereafter, display,~~

19  ~~reproduction, and creation of derivative works has no utility, whatsoever. Such conduct injures~~

20  ~~authors and hinders creativity and innovation.~~

21  ~~249.   What is even more alarming is that Defendants fail to also control at least one of its~~

22  ~~Products, Bard, in ensuring that the output about copyrighted materials is, at a minimum, accurate.~~

23  ~~Instead, at times Bard goes from providing accurate information and text from the copyrighted~~

24  ~~materials to providing users with misinformation about the copyrighted works. For instance, if asked~~

25  ~~to cite specific paragraphs from a copyrighted work, Bard has reproduced false text or narrative~~

26  ~~along with the actual text taken from the works. Misinforming the public about the content of~~

27  ~~copyrighted works through such misattribution and misquoting creates even further harm to the~~

28  ~~authors, their works, and the public.~~

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

III.I.   Deceptive

250.456.   Under the UCL, a business practice that is likely to deceive an ordinary consumer constitutes a deceptive business practice. Defendants'Defendant's conduct was deceptive in numerous respects.

251.457.   Defendants haveDefendant has intentionally and deceptively misled parents and the public, including users of their products, that they designed such products with safety and privacy rights in mind about Defendant's intention to use the Bard language model and that they value personal privacy rights in general. However, in reality, Defendants have looted both private content from users of their own products as well as virtually the entirety ofits free chatbot application to attract children in order to gain access to the internet, allPersonal Information of such children and to exploit such children's Personal Information for corporate profit and market dominance. Defendant's financial gain.

252.458.   Defendants'Defendant's misrepresentations and omissions include both implicit and explicit representations.

253.459.   Defendants'Defendant's representations and omissions were material because they were likely to deceive reasonable consumers using Google products, copyright holders whose information and works are publicly available, and average internet users contributing content to specific platforms and websites for specific audiences and purposes. such as the parents or guardians of Plaintiffs and Class Members about the terms under which their children were interacting with Bard as well as the fact that Defendant was collecting and profiting from minors' Personal Information without their parents and guardians' knowledge or consent.

254.   DefendantsDefendant had a duty to disclose the above-described facts due to the important public interest in securing basicthe privacy of minors' Personal Information and property rights.

255.460.   Moreover, Defendants affirmatively represented, throughout the Class Period,the fact that they "build products thatminors are private by design and work for everyone. This means being thoughtful about the data we use, how we use it, and how weunable to fully protect it. These principles guide our products, our processes, and our people in keeping data private, safe,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1  and put you in control of your information." their own interests.

2  256.461.   The expectations of PlaintiffsPlaintiffs' parents and Class Membersguardians

3  included that DefendantsDefendant would not track and scrape their children's online activity—

4  including but not limited to any copyrighted works—, without their consent, in order for

5  DefendantsDefendant to reap huge profits from commercial AI productsbuilding out the fastest

6  growing application ever, and the most advanced AI language models of all time.

7  257.462.   The parents and guardians of Plaintiffs and Class MembersMinor User

8  Subclass members reasonably expected that DefendantsDefendant respected theirchildren's privacy

9  and property rights online, in accordance with societal expectations and public policy as well as

10  state and federal statutes and regulations including COPPA, CalOPPA, and Federal Trade

11  Commission regulations.

12  258.463.   At the same time, Defendants haveDefendant has, at all times throughout the

13  Class Period, been well aware that Plaintiffschildren, including children under the age of 16 and

14  Class Members had no reasonable way of knowing that Defendants were building their massively

15  profitable AI business off data belongingunder the age of 13, access Bard; has actively sought to

16  Plaintiffsincrease engagement with Bard by children; and Class Members,has sought to exploit, for

17  commercial purposes and accordingly didgain, thousands if not consent to the exploitation of their

18  data in this mannermillions of minor users of Bard.

19  259.464.   Defendants'Defendant's knowledge that Plaintiffs and Class Members did not

20  consent to of the widespread scrapinguse of Bard by children and failure to disclose that they are

21  tracking, profiling, and commercial misappropriation of their data, including copyrighted works,

22  despite the fact that Defendants were doing just thattargeting such children and/or profiting from

23  this behavior, while at the same time representing that Defendants complyGoogle complies with

24  law and societal expectation, wasand does not permit and does not seek to reach children, are likely

25  to and, in fact, did deceive Plaintiffs and Minor User Class Members. Defendants' and their parents

26  or guardians. Defendant's conduct therefore constitutes deceptive business practices in violation of

27  Cal. Bus. & Prof. Code §17200.

28  260.465.   Additionally, to the extent that Defendants haveDefendant has represented to

125

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

Plaintiffs and, Minor User Class Membersmembers, and their respective parents and guardians that DefendantsDefendant can and will disclose to such individuals, upon request, the private information that Defendants haveDefendant has gathered about themany such minor user or non-user, and that such information can be deleted, these representations are fraudulent and deceptive because it is functionally impossible for DefendantsDefendant to "undo" the fact that theirits LLMs have learned on this private information and incorporated that learning in such a manner that the information cannot be meaningfully segregated, identified, extracted, and deleted.

261.466.   Defendants'Defendant's conduct, as alleged herein, was fraudulent within the meaning of the UCL. DefendantsDefendant made deceptive misrepresentations and omitted known material facts in connection with the unauthorized solicitation, interception, disclosure, and use of Plaintiffs' and Class Members' data and copyrighted material. DefendantsUser Data. Defendant actively concealed and continued to assert misleading statements regarding their stanceits protection and limitation on the use of privacy rights.the User Data. Meanwhile, Defendants wereDefendant was collecting and sharing Plaintiffs' and Class Members' User Data without their authorization or knowledge in order to profit off of the information, and to deliver advertisements to Plaintiffs and Class Members, among other unlawful purposes.

262.467.   Defendants'Defendant's conduct, as alleged herein, was unlawful within the meaning of the UCL because DefendantsDefendant violated regulations and laws as discussed herein, including but not limited to HIPAA, Section 5 of the Federal Trade Commission Act ("FTCA"), and 15 U.S.C. § 45 and the CIPA.

263.468.   Defendants haveDefendant has unlawfully tracked, scrapedtargeted, and commercially misappropriated dataprofiled minor Plaintiffs, and Minor User Class Members without obtaining parental consent in violation of COPPA, CalOPPA, Federal Trade Commission regulations, and other laws.

264.469.   DefendantsDefendant also engaged in business acts and practices deemed "unlawful" under the UCL as to the ClassesClass by unlawfully tracking, targeting, and profiling Plaintiffs' minor children, in violation of the California Constitution.

265.470.   DefendantsDefendant reaped profits from these actions in the form of

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1  increased company valuation, investments, improved language model performance, and dominance

2  in the AI field.

3  471.  ~~Defendants'~~Further, Defendant's business model was inconsistent with common

4  practice. As discussed *supra*, there are several other data collection and AI training companies that

5  acquire data in ethical and legal ways. These company's practices—including paying consumers in

6  exchange for voluntarily sharing their data—prove that Defendant's practices are unlawful and

7  unfair toward competition. Were Defendant to have implemented these lawful business practices,

8  Plaintiffs and Class Members not only would have had a choice over whether to share their data,

9  but they would have economically benefitted from doing so.

10  ~~266.~~472.  Defendant's unlawful actions in violation of the UCL have caused and are

11  likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves

12  and that is not outweighed by countervailing benefits to consumers or competition.

13  ~~267.~~473.  As a direct and proximate result of ~~Defendants'~~Defendant's misconduct,

14  Plaintiffs and Class Members had their private communications containing information related to

15  their sensitive and confidential ~~data taken~~User Data intercepted, disclosed, and used by third parties,

16  including but not limited to each Defendant.

17  ~~268.~~474.  As a result of ~~Defendants'~~Defendant's unlawful conduct, Plaintiffs and Class

18  Members suffered ~~an~~ injury, including violation to their rights of privacy, loss of the privacy of their

19  ~~Personal Information~~PHI/PII, loss of control over their sensitive personal information, ~~loss of~~

20  ~~autonomy over their minor children and their minor children's data,~~and suffered aggravation,

21  inconvenience, and emotional distress. Defendant's conduct causes ongoing injury to Plaintiffs and

22  the Class Members—namely, Defendant's harmful web-scraping has, and continues to have, a

23  chilling effect on Plaintiffs' and Class Members' continued use of the internet.

24  ~~269.~~475.  Plaintiffs and Minor User Class Members placed trust in

25  ~~Defendants~~Defendant as a major and reputable ~~companies~~company that ~~affirmatively~~ represented

26  ~~that they were~~it was in compliance with applicable laws and societal interests in safeguarding

27  ~~privacy and property rights.~~minors' Personal Information.

28  ~~270.~~476.  Additionally, ~~Defendants~~Defendant had the sole ability to understand the

127

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

1  extent of ~~their~~its collection of Personal Information, and the parents or guardians of Plaintiffs and

2  Minor User Class Members could not reasonably have discovered—and were unaware of—

3  ~~Defendants'~~Defendant's secret tracking, profiling, ~~scraping, and commercial misappropriation~~and

4  targeting.

5       ~~271.~~477.       ~~Defendants~~Defendant invaded Plaintiffs' and Minor User Class Members'

6  privacy without their or their parents and guardians' consent.

7       ~~272.~~478.       Because ~~Defendants~~Defendant held ~~themselves~~itself out as complying with

8  law and public policy regarding minors' privacy ~~and property~~ rights, the parents or guardians of

9  Plaintiffs and California Minor User Class Members acted reasonably in relying on

10  ~~Defendants'~~Defendant's misrepresentations and omissions.

11       ~~273.~~479.       Plaintiffs and Minor User Class Members could not have reasonably avoided

12  injury because ~~Defendants'~~Defendant's business acts and practices unreasonably created or took

13  advantage of an obstacle to the free exercise of their decision-making. By withholding the important

14  information that it was collecting and profiting from ~~Plaintiff and Class Members' personal and/or~~

15  ~~copyrighted data, Defendants~~minors' Personal Information, Defendant created an asymmetry of

16  information.

17       ~~274.~~480.       Further, ~~Defendants'~~Defendant's conduct is immoral, unethical, oppressive,

18  unscrupulous, and substantially injurious to Plaintiffs, and ~~Class~~Classes Members, and there are no

19  greater countervailing benefits to consumers or competition.

20       ~~275.~~481.       Plaintiffs, as well as the Class Members, were harmed by

21  ~~Defendants'~~Defendant's violations of Cal. Bus. & Prof. Code §~~.~~17200. ~~Defendants'~~Defendant's

22  practices were a substantial factor and caused injury in fact and actual damages to Plaintiffs and

23  Class Members.

24       ~~276.~~482.       As a direct and proximate result of ~~Defendants'~~Defendant's deceptive acts and

25  practices, Plaintiffs, and Class Members have suffered and will continue to suffer an ascertainable

26  loss of money or property, real or personal, and monetary and non-monetary damages, as described

27  above, including the loss or diminishment in value of their ~~Personal~~Private Information and the loss

28  of the ability to control the use of their ~~Personal~~Private Information, which allowed

128

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

1  ~~Defendants~~Defendant to profit at the expense of Plaintiffs and Class Members.

2  ~~277.~~483.    Plaintiffs' and Class Members' Personal Information has tangible value; it is

3  now in the possession of ~~Defendants~~Defendant, who has used and will continue to use it for financial

4  gain.

5  ~~278.~~484.    Plaintiffs' and Class ~~Members,~~Members' injury was the direct and proximate

6  result of Defendant's conduct described herein.

7  ~~279.~~485.    ~~Defendants'~~Defendant's retention of Plaintiffs' and Class Members' Personal

8  Information presents a continuing risk to them as well as the general public.

9  ~~280.~~486.    Plaintiffs, individually and on behalf of ~~the~~ Class Members, seek: (1) an

10  injunction requiring ~~Defendants~~Defendant to permanently delete, destroy or otherwise sequester the

11  ~~Personal~~Private Information collected without consent ~~(and with respect to minors, without *parental*~~

12  ~~consent);,~~ (2) compensatory restitution of Plaintiffs'~~,~~ and Class ~~Members'~~Members money and

13  property lost as a result of ~~Defendants'~~Defendant's acts of unfair competition; (3) disgorgement of

14  ~~Defendants'~~Defendant's unjust gains; and (4) reasonable attorney's fees (pursuant to Cal. Code of

15  Civ. Proc. ~~section~~§ 1021.5).

16  487.   Had Plaintiffs and Class Members known ~~Defendants~~Defendant would disclose and

17  misuse their ~~internet user data~~ User Data in contravention of ~~Defendants'~~Defendant's

18  representations, they would not have used ~~Defendants'~~Defendant's Products.

19  488.   Defendant's unlawful actions in violation of the UCL have caused and ~~would have~~

20  ~~sought additional protections for~~ are likely to cause substantial injury to consumers that consumers

21  cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to

22  consumers or competition.

23  489.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class

24  Members had their ~~Personal~~private communications containing information related to their sensitive

25  and confidential Private Information ~~on~~ intercepted, disclosed, and used by Defendant, to train their

26  Products.

27  490.   As a result of Defendant's unlawful conduct, Plaintiffs and Class Members and Minor

28  Class Members suffered an injury, including violation to their rights of privacy, loss of the privacy

129

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1   of their Private Information loss of control over their sensitive personal information, and suffered

2   aggravation, inconvenience, and emotional distress.

3   **III.    Deceptive**

4   491.   Under the UCL, a business practice that is likely to deceive an ordinary consumer

5   constitutes a deceptive business practice. Defendant's conduct was deceptive in numerous respects.

6   492.   Defendant has intentionally and deceptively misled the public, including users of its

7   products, that it designed such products with safety and privacy rights in mind and that they value

8   personal privacy rights in general. However, in reality, Defendant has looted both private content

9   from users of its own products as well as virtually the entirety of the internet, all for corporate profit

10  and market dominance.

11  493.   Defendant's misrepresentations and omissions include both implicit and explicit

12  representations.

13  281.494.    Defendant's representations and omissions were material because they were

14  likely to deceive reasonable consumers using Google products, copyright holders whose

15  information and works are publicly available, and average internet users contributing content to

16  specific platforms and websites for specific audiences and purposes.

17  495.   Defendants'Defendant had a duty to disclose the above-described facts due to the

18  important public interest in securing basic privacy and property rights.

19  496.   Moreover, Defendant affirmatively represented, throughout the Class Period, that it

20  "build[s] products that are private by design and work for everyone. This means being thoughtful

21  about the data we use, how we use it, and how we protect it. These principles guide our products,

22  our processes, and our people in keeping data private, safe, and put you in control of your

23  information."

24  497.   The expectations of Plaintiffs and Class Members included that Defendant would not

25  track and scrape their online activity—including but not limited to any copyrighted works—without

26  their consent, in order for Defendant to reap huge profits from commercial AI products.

27  498.   Plaintiffs and Class Members reasonably expected that Defendant respected their

28  privacy and property rights online, in accordance with societal expectations and public policy as

130

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

well as state and federal statutes and regulations including COPPA, CalOPPA, and Federal Trade Commission regulations.

499.   At the same time, Defendant has, at all times throughout the Class Period, been well aware that Plaintiffs and Class Members had no reasonable way of knowing that Defendant was building its massively profitable AI business off data belonging to Plaintiffs and Class Members, and accordingly did not consent to the exploitation of their data in this manner.

500.   Defendant's knowledge that Plaintiffs and Class Members did not consent to the widespread scraping and commercial misappropriation of their data, including copyrighted works, despite the fact that Defendant was doing just that and profiting from this behavior, while at the same time representing that Defendant complied with law and societal expectation, was likely to and, in fact, did deceive Plaintiffs and Class Members. Defendant's conduct therefore constitutes deceptive business practices in violation of Cal. Bus. & Prof. Code §17200.

501.   Additionally, to the extent that Defendant has represented to Plaintiffs and Class Members that Defendant can and will disclose to such individuals, upon request, the private information that Defendant has gathered about them, and that such information can be deleted, these representations are fraudulent and deceptive because it is functionally impossible for Defendant to "undo" the fact that its LLMs have learned on this private information and incorporated that learning in such a manner that the information cannot be meaningfully segregated, identified, extracted, and deleted.

502.   Defendant's conduct, as alleged herein, was fraudulent within the meaning of the UCL. Defendant made deceptive misrepresentations and omitted known material facts in connection with the unauthorized use of Plaintiffs' Class Members' data and copyrighted material. Defendant actively concealed and continued to assert misleading statements regarding its stance of privacy rights. Meanwhile, Defendant was collecting and sharing Plaintiffs' and Class Members' Data without their authorization or knowledge in order to profit off of the information, among other unlawful purposes.

503.   Defendant's conduct, as alleged herein, was unlawful within the meaning of the UCL because Defendant violated regulations and laws as discussed herein, including but not limited to

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1  HIPAA, Section 5 of the Federal Trade Commission Act ("FTCA"), and 15 U.S.C. § 45.

2  504.  Defendant has unlawfully tracked, scraped, and commercially misappropriated data
3  in violation of COPPA, CalOPPA, Federal Trade Commission regulations, and other laws.

4  505.  Defendant also engaged in business acts and practices deemed "unlawful" under the
5  UCL as to the Classes by unlawfully tracking, targeting, and profiling Plaintiffs' minor children, in
6  violation of the California Constitution.

7  506.  Defendant reaped profits from these actions in the form of increased company
8  valuation, investments, improved language model performance, and dominance in the AI field.

9  282. 507.  Defendant's unlawful actions in violation of the UCL have caused and are
10  likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves
11  and that is not outweighed by countervailing benefits to consumers or competition.

12  508.  As a direct and proximate result of Defendants' Defendant's misconduct, Plaintiffs
13  and Class Members had their private communications containing information related to their
14  sensitive and confidential data taken and used by third parties, including but not limited to each
15  Defendant.

16  509.  As a result of Defendant's unlawful conduct, Plaintiffs and Class Members suffered
17  injury, including violation to their rights of privacy, loss of the privacy of their Personal Information,
18  loss of control over their sensitive personal information, loss of autonomy over their minor children
19  and their minor children's data, aggravation, inconvenience, and emotional distress.

20  510.  Plaintiffs and Class Members placed trust in Defendant as a major and reputable
21  company that affirmatively represented that it was in compliance with applicable laws and societal
22  interests in safeguarding privacy and property rights.

23  511.  Additionally, Defendant had the sole ability to understand the extent of its collection
24  of Personal Information, and Plaintiffs and Class Members could not reasonably have discovered—
25  and were unaware of—Defendant's secret tracking, profiling, scraping, and commercial
26  misappropriation.

27  512.  Defendant invaded Plaintiffs' and Class Members' privacy without their consent.

28  513.  Because Defendant held itself out as complying with law and public policy regarding

132

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

privacy and property rights, Plaintiffs and Class Members acted reasonably in relying on Defendant's misrepresentations and omissions.

514. Plaintiffs and Class Members could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of their decision-making. By withholding the important information that it was collecting and profiting from Plaintiff and Class Members' personal and/or copyrighted data, Defendant created an asymmetry of information.

515. Further, Defendant's conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs, and Class Members, and there are no greater countervailing benefits to consumers or competition.

516. Plaintiffs, as well as the Class Members, were harmed by Defendant's violations of Cal. Bus. & Prof. Code § 17200. Defendant's practices were a substantial factor and caused injury in fact and actual damages to Plaintiffs and Class Members.

517. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs, and Class Members have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described above, including the loss or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information, which allowed Defendant to profit at the expense of Plaintiffs and Class Members.

518. Plaintiffs' and Class Members' Personal Information has tangible value; it is now in the possession of Defendant, who has used and will continue to use it for financial gain.

519. Plaintiffs' and Class Members, injury was the direct and proximate result of Defendant's conduct described herein.

520. Defendant's retention of Plaintiffs' and Class Members' Personal Information presents a continuing risk to them as well as the general public.

521. Plaintiffs, individually and on behalf of the Class Members, seek: (1) an injunction requiring Defendant to permanently delete, destroy or otherwise sequester the Personal Information collected without consent (and with respect to minors, without *parental* consent); (2) compensatory

133
FIRST AMENDED CLASS ACTION COMPLAINT

restitution of Plaintiffs', Class Members' money and property lost as a result of Defendant's acts of unfair competition; (3) disgorgement of Defendant's unjust gains; and (4) reasonable attorney's fees (pursuant to Cal. Code of Civ. Proc. section 1021.5).

522.   Had Plaintiffs and Class Members known Defendant would disclose and misuse their internet user data in contravention of Defendant's representations, they would not have used Defendant's Products and would have sought additional protections for their Personal Information on the internet.

523.   Defendant's unlawful actions in violation of the UCL have caused and are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

283.524.      As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members had their private communications containing information related to their sensitive and confidential Personal Information unlawfully taken by DefendantsDefendant to train theirits Products.

284.525.      As a result of Defendants'Defendant's unlawful conduct, Plaintiffs and Class Members suffered an injury, including violation to their rights of privacy, loss of the privacy of their Personal Information, loss of control over their sensitive personal information, aggravation, inconvenience, and emotional distress.

**COUNT TWO**

**NEGLIGENCE**

(on behalf of all Plaintiffs and allInternet User and Minor User Classes against all Defendants)

285.526.      Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all preceding paragraphs.

286.527.      For purposes of this cause of action, Plaintiffs will collectively refer to allInternet User and Minor User classes as the "Classes."

287.528.      DefendantsDefendant owed a duty to Plaintiffs and Class Members to exercise due care in: (a) obtaining data to train their Products; (b) not using individual's private information to train Defendants'Defendant's AI; and (c) destroying personal information to which

134

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

1   ~~Defendants~~Defendant had no legal right to possess.

2       ~~288.~~529.    ~~Defendants'~~Defendant's duties to use reasonable care arose from several

3   sources, including those described below. ~~Defendants~~Defendant had a common law duty to prevent

4   foreseeable harm to others, including Plaintiffs and members of the Classes, who were the

5   foreseeable and probable victims of ~~Defendants'~~Defendant's unlawful practices. ~~Defendants~~

6   ~~acknowledge~~Defendant acknowledges the Products are inherently unpredictable and may even

7   evolve to act against human interests. Nevertheless, ~~Defendants~~Defendant collected and

8   ~~continue~~continues to collect Personal Information of millions of individuals and permanently feed

9   the data to the Products, to train the Products for ~~Defendants'~~Defendant's commercial benefit.

10   ~~Defendants~~Defendant knowingly ~~put~~puts Plaintiffs and members of the Classes in a zone of risk

11   that is incalculable – but unacceptable by any measure of responsible data protection and use.

12       ~~289.~~530.    ~~Defendants'~~Defendant's conduct as described above constituted an unlawful

13   breach of ~~their~~its duty to exercise due care in collecting, storing, and safeguarding Plaintiffs' and

14   the Class Members' Personal Information by failing to protect this information.

15       ~~290.~~531.    Plaintiffs and Class Members trusted ~~Defendants~~Defendant to act reasonably,

16   as a reasonably prudent manufacturer of AI products, and also trusted ~~Defendants~~Defendant not to

17   use individuals' Personal Information to train ~~their~~its AI products. ~~Defendants~~Defendant failed to

18   do so and breached ~~their~~its duty.

19       ~~291.~~532.    ~~Defendants'~~Defendant's negligence was, at least, a substantial factor in

20   causing the Plaintiffs' and the Class Members' Personal Information to be improperly accessed and

21   used for development and training of a dangerous product, and in causing Plaintiffs' and the Class

22   Members' injuries.

23       ~~292.~~533.    The damages suffered by Plaintiffs and the Class Members were the direct and

24   reasonably foreseeable result of ~~Defendants'~~Defendant's negligent breach of ~~their~~its duties to

25   adequately design, implement, and maintain reasonable practices to (a) avoid web scraping without

26   consent of the users; (b) avoid using Personal Information to train ~~their~~its AI products; and (c) avoid

27   collecting and sharing Users' data with each other.

28       ~~293.~~534.    ~~Defendants'~~Defendant's negligence directly caused significant harm to

<div align="center">135</div>

<div align="center">FIRST AMENDED CLASS ACTION COMPLAINT</div>

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

Plaintiffs and the ~~Classes~~Class.

**COUNT THREE: VIOLATIONS OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA"), CAL. PENAL CODE § 502, *et seq.***

(on behalf of all Classes)

535.   Plaintiffs hereby incorporate all foregoing paragraphs as if fully stated herein; and for the purposes of this cause of action, Plaintiffs will refer to the Internet User, Minor User, and Copyright Classes collectively as "Class."

536.   Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

537.   Smart phone devices with the capability of using web browsers are "computers" within the meaning of the statute.

538.   Tablet devices with the capability of using web browsers and applications are "computers" within the meaning of the statute.

539.   Laptop and desktop computing devices with the capability of using web browsers and applications are "computers" within the meaning of the statute.

540.   Each Plaintiff is the owner of Private Information, and his/her data at issue.

541.   Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and Class Members' Private Information.

542.   Each Plaintiff, as a direct and proximate result of Defendant's unauthorized access and taking, copying, analyzing, and using Plaintiffs' and Class Members' Private Information, each Plaintiff and Class Member was harmed.

543.   Defendant was unjustly enriched, by acquiring Plaintiffs' sensitive and valuable Private Information without permission and using it for their own financial benefit to advance its AI development business. Plaintiffs and Class Members retain a stake in the profits Defendant earned from its Private Information and other internet contributions (*i.e.*, data) because, under the

136

1   circumstances, it is unjust for Defendant to retain those profits.

2   544. Defendant accessed, scraped, copied, analyzed, and used Plaintiffs' and Class

3   Members' Private Information and other internet contributions (*i.e.*, data) without authorized

4   consent, in and from the State of California, where Defendant: (1) maintains at least one principal

5   place of business wherein the activities were contemplated, planned, and executed therefrom; (2)

6   accessed, scraped, copied, analyzed, and used the Plaintiffs' and Class Members' data at issue; (3)

7   used servers that provided access to the scraped webpages from which Defendant accessed and

8   scraped Plaintiffs' and Class Members' data.   Accordingly, Defendant caused the access of

9   Plaintiffs' and Class Members' data from California, and is therefore deemed to have

10  accessed Plaintiffs' and Class Members' data in California. *See* Cal. Pen. Code § 502(c)(2) (**an**

11  **entity can violate the CDAFA by "knowingly access[ing] and without permission tak[ing],**

12  **cop[ying], or mak[ing] use of any data."**) (emphasis added).

13  545. As a direct and proximate result of Defendant's unlawful conduct within the meaning

14  of Cal. Penal Code § 502, Defendant has caused loss to Plaintiffs and Class Members and has been

15  unjustly enriched in an amount to be proven at trial.

16  546. Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages

17  and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable

18  relief.

19  547. Plaintiffs and Class members are entitled to punitive or exemplary damages pursuant

20  to Cal. Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information

21  and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

22  548. Plaintiffs and the Class Members are also entitled to recover their reasonable

23  attorneys' fees pursuant to Cal. Penal Code § 502(e).

24  **COUNT FOUR**

25  ~~**COUNT THREE**~~

26  **INVASION OF PRIVACY UNDER CALIFORNIA CONSTITUTION**

27  (on behalf of all Plaintiffs and ~~all~~Internet User and Minor User Classes ~~against all Defendants~~)

28  549. Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all preceding

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

paragraphs.

294.   For purposes of this cause of action, Plaintiffs will collectively refer to Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all preceding paragraphs.

295.550.   For purposes of this cause of action, Plaintiffs will collectively refer to allInternet User and Minor User classes as the "ClassesClass."

296.551.   Plaintiffs and Class Members had a legally protected privacy interest and reasonable and legitimate expectation of privacy in the Personal Information that DefendantsDefendant acquired illegally, tracked, collected, or otherwise used to train theirits Products.

297.552.   DefendantsDefendant owed a duty to Plaintiffs and Class Members to (a) not collect via illegal web-scraping the individuals' information; (b) not to train theirits AI Products on individuals' Personal Information; and (c) keep the data collected confidential.

298.553.   DefendantsDefendant violated Plaintiffs' and Class Members' constitutional right to privacy by tracking, collecting, storing, and misusing their Personal Information, in which they had a legally protected privacy interest, and for which they had a reasonable expectation of privacy in a manner that was highly offensive to Plaintiffs and Class Members. Such violation and blatant disregard for Plaintiffs' and Class Members' rights was an egregious violation of societal norms.

299.554.   DefendantsDefendant knew or acted with reckless disregard of the fact that a reasonable person in Plaintiffs' and Class Members' position would consider theirits actions highly offensive.

300.555.   As a proximate result of such unauthorized disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their Personal Information was unduly frustrated and thwarted and caused damages to Plaintiffs and Class Members.

301.556.   Plaintiffs seek injunctive relief on behalf of the ClassesClass, restitution, as well as any and all other relief that may be available at law or equity. Unless and until enjoined, and restrained by order of this Court, Defendants'Defendant's wrongful conduct will continue to cause irreparable injury to Plaintiffs and Class Members. Plaintiffs and Class Members have no adequate

Formatted: Indent: Left: 0"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0"

1  remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of

2  privacy for Plaintiffs and the ~~Classes~~Class.

3                                    **COUNT FIVE**

4                                    ~~**COUNT FOUR**~~

5                            **INTRUSION UPON SECLUSION**

6      (on behalf of all Plaintiffs and ~~all~~ Internet-User and Minor User Classes ~~against)~~

7      557.  Plaintiffs herein repeat, reallege, and fully incorporate all allegations in   all

8  ~~Defendants)~~preceding paragraphs.

9      ~~302.1.Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all preceding~~

10 ~~paragraphs.~~

11     ~~303.~~558.     ~~For purposes of this cause of action, Plaintiffs will collectively refer to all~~For

12 purposes of this cause of action, Plaintiffs will collectively refer to Internet-User and Minor User

13 classes as the "Classes."

14     ~~304.~~559.     California adheres to the Restatement (Second) of Torts, section 652B with no

15 material variation.

16     ~~305.~~560.     "One who intentionally intrudes, physically or otherwise, upon the solitude or

17 seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion

18 of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement

19 (Second) of Torts, § 652B (Am. L. Inst. 1965).

20     ~~306.~~561.     As our digital footprints continue to expand, individuals including Plaintiffs

21 and Class Members, have an increased expectation of privacy in their right to control who has access

22 to their information and how it is used.

23     ~~307.~~562.     The increasing reliance on digital services for everyday activities generates

24 vast amounts of such data, which ~~Defendants~~Defendant collected, stored, and monetized without

25 informed consent.

26     ~~308.~~563.     The reasonableness of such expectations of privacy is supported by

27 ~~Defendants'~~Defendant's unique position to be able to collect, store and track Plaintiffs' and Class

28 Members' data not only from information inserted into the chatbot, but also through a massive

                                    139

                FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1  scraping of the web. This level of data tracking results in the unauthorized intrusion into sensitive

2  personally identifying data.

3  309.564.        Defendants Defendant intentionally intruded on and into Plaintiffs' and Class

4  Members' solitude, seclusion, or private affairs by constructing a system which collects, stores, and

5  uses Personal Information of millions of individuals (both users/nonusers of Google products). This

6  information includes personal, medical, financial information, and copyrighted materials.

7  310.565.        These intrusions are highly offensive to a reasonable person. This is evidenced

8  by, *inter alia*, countless consumer surveys, studies, and op-eds decrying tracking of people and

9  children, centuries of common law, state and federal statutes and regulations, legislative

10  commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines, and

11  scholarly literature on consumers' reasonable expectations. Further, the extent of the intrusion

12  cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and Class

13  Members' personal information with potentially countless third parties using Bard and/or

14  Defendants' Defendant's other AI products, known and unknown, for undisclosed and potentially

15  unknowable purposes, in perpetuity.

16  311.566.        Plaintiffs and Class Members were harmed by the intrusion into their private

17  affairs as detailed throughout this Complaint.

18  312.567.        Defendants' Defendant's actions and conduct complained of herein were a

19  substantial factor in causing the harm suffered by Plaintiffs and Class Members.

20  313.568.        As a result of Defendants' Defendant's actions, Plaintiffs and Class Members

21  seek injunctive relief, in the form of Defendants' Defendant's cessation of tracking practices in

22  violation of state law, and destruction of all personal data obtained in violation of state law.

23  314.569.        As a result of Defendants' Defendant's actions, Plaintiffs and Class Members

24  seek nominal and punitive damages in an amount to be determined at trial. Plaintiffs and Class

25  Members seek punitive damages because Defendants' Defendant's actions—which were malicious,

26  oppressive, willful—were calculated to injure Plaintiffs and made in conscious disregard of

27  Plaintiffs' rights. Punitive damages are warranted to deter Defendants Defendant from engaging in

28  future misconduct.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    315.570.    Plaintiffs seek restitution for the unjust enrichment obtained by

2    ~~Defendants~~Defendant as a result of the commercialization of Plaintiffs' and Class Members'

3    sensitive data.

4    **COUNT SIX**

5    ~~COUNT FIVE~~

6    **LARCENY/RECEIPT OF STOLEN PROPERTY**

7    **Cal. Penal Code § 496(a), (c)**

8    (on behalf of all Plaintiffs and ~~all~~Internet-User and Minor User Classes ~~against all Defendants~~)

9    316.571.    Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all

10   preceding paragraphs.

11   317.572.    For purposes of this cause of action, Plaintiffs will collectively refer to

12   ~~all~~Internet-User and Minor User classes as the "~~Classes~~Class."

13   318.573.    ~~Defendants~~Defendant owned and operated ~~their~~its AI Products, including

14   Bard. ~~Defendants~~Defendant illegally obtained vast amounts of private information to train ~~their~~its

15   AI Products.

16   **I.    ~~Defendants'~~Defendant's Taking of Individual's Personal Information to Train**

17       **~~Their~~Its AI Violated Plaintiffs' Property Interests.**

18   319.574.    Penal Code section 496(a) creates an action against any person who (1)

19   receives any property that has been stolen or obtained in any manner constituting theft, knowing the

20   property to be stolen or obtained, or (2) conceals, sells, withholds, or aids in concealing or

21   withholding any property from the owner, knowing the property to be so stolen or illegally obtained.

22   320.575.    Under Penal Code section 7, "the word 'person' includes a corporation as well

23   as a natural person." Thus, ~~Defendants are persons~~Defendant is a person under section 496(a).

24   321.576.    As discussed above, ~~Defendants~~Defendant stole the contents of the internet –

25   everything individuals posted, information about the individuals, personal data, medical

26   information, and other information – all used to create ~~their~~its Products to generate massive profits.

27   At no point did ~~Defendants~~Defendant have individuals' consent to take/scrape this information in

28   order to train ~~their~~its AI Products. ~~Defendants meet~~Defendant meets the grounds for liability under

141

FIRST AMENDED CLASS ACTION COMPLAINT

Cal. Penal Code 496(a) because ~~each of them~~it:

    a. Knew that the taken information was stolen or obtained by theft, and with such knowledge;

    b. Concealed, withheld, or aided in concealing or withholding said data from their rightful owners by unlawfully using the data to train ~~their~~its Products;

    c. ~~Defendants~~Defendant moved the data from the internet in order to feed it into ~~their~~its Products for training.

~~322.~~577.    Pursuant to California Penal Code section 496(c), Plaintiffs, on behalf of themselves and the Classes, seek actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

## II.    Tracking, Collecting, and Sharing Personal Information Without Consent.

~~323.~~578.    As described above, in violation of Cal. Penal Code section 496(a), ~~Defendants~~Defendant unlawfully collected, used, and exercised dominion and control of Personal Information belonging to Plaintiffs and Class Members.

~~324.~~579.    ~~Defendants~~Defendant wrongfully took Plaintiffs' and Class Members' Personal Information to be used to feed into ~~Defendants'~~Defendant's AI Products, to train and develop a dangerous technology.

~~325.~~580.    Plaintiffs and the Class Members did not consent to such taking and misuse of their Personal Information.

~~326.~~581.    ~~Defendants~~Defendant did not have consent from any state or local government agency allowing them to engage in such taking and misuse of Personal Information.

~~327.~~582.    ~~Defendants'~~Defendant's taking of Personal Information was intended to deprive the owners of such information from ability to use their Personal Information in the way they chose.

~~328.~~583.    ~~Defendants~~Defendant did so to maximize their profits and become rich at the expense of Plaintiffs and the Classes.

~~329.~~584.    ~~Defendants'~~Defendant's collected data allows ~~Defendants~~Defendant and ~~their~~its AI to learn the unique patterns of each individuals, their online activities, habits, and speech/writing patterns.

Formatted: Indent: Left:  0"

1   330.585.    As a result of Defendants'Defendant's actions, Plaintiffs and Class Members

2   seek injunctive relief, in the form of Defendants'Defendant's cessation of tracking practices in

3   violation of state law, and destruction of all personal data obtained in violation of state law.

4   331.586.    As a result of Defendants'Defendant's actions, Plaintiffs and Class Members

5   seek nominal, actual, treble, and punitive damages in an amount to be determined at trial. Plaintiffs

6   and Class Members seek treble and punitive damages because Defendants'Defendant's actions—

7   which were malicious, oppressive, willful—were calculated to injure Plaintiffs and made in

8   conscious disregard of Plaintiffs' rights. Punitive damages are warranted to deter

9   DefendantsDefendant from engaging in future misconduct.

10   332.587.    Plaintiffs seek restitution for the unjust enrichment obtained by

11   DefendantsDefendant as a result of the commercialization of Plaintiffs' and Class Members'

12   sensitive data.

13                          **COUNT SEVEN**

14                          **CONVERSION**

15                          ~~COUNT SIX~~

16                          ~~CONVERSION~~

17   (on behalf of all Plaintiffs and allInternet-User and Minor User Classes against all Defendants)

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

18   333.588.    Plaintiffs herein repeat, reallege, and fully incorporate all allegations in all

19   preceding paragraphs.

20   334.589.    For purposes of this cause of action, Plaintiffs will collectively refer to

21   allInternet-User and Minor User classes as the "ClassesClass."

22   335.590.    Property is the right of any person to possess, use, enjoy, or dispose of a thing,

23   including intangible things such as data or communications. Plaintiffs' and Class Members'

24   personal information is their property. *Calhoun v. Google* LLC, 526 F. Supp. 3d 605, 635 (N.D.

25   Cal. 2021).

26   336.591.    As described in the cause of action for Larceny / Receipt of Stolen Property,

27   Cal. Penal Code sections 496(a) and (c), DefendantsDefendant unlawfully collected, used, and

28   exercised dominion and control over the Class Members' personal and private information without

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left:  0"

1  authorization.

2  337.592.    DefendantsDefendant wrongfully exercised control over Plaintiffs' and Class

3  Members' information and have not returned it.

4  338.593.    Plaintiffs and Class Members have been damaged as a result of

5  Defendants'Defendant's unlawful conversion of their property.

6  ~~COUNT SEVEN~~

7  ~~UNJUST ENRICHMENT~~

8  **COUNT EIGHT: TRESPASS TO CHATTELS**

9  (on behalf of allAll Plaintiffs and all Internet-User and Minor User Classes against)

10  594.   Plaintiffs hereby incorporate all foregoing paragraphs as if fully stated herein.

11  595.   For the purposes of this count, Plaintiffs will collectively refer to the Internet User

12  and Minor User Classes as "Class."

13  596.   The common law prohibits the intentional intermeddling with personal property,

14  which results in the deprivation of the use of the personal property, or impairment of the condition,

15  quality, or value of the personal property.

16  597.   On multiple occasions, Defendant knowingly, willfully, intentionally and maliciously

17  gained unlawful access to Plaintiffs and Class Members' data with the intention to acquire the

18  information and data contained therein in excess of: (1) Plaintiffs and Class Members' consent; and

19  (2) the permitted uses described in the countless scraped website's terms of service.

20  598.   Plaintiffs and Class Members owned their content and data posted to select forums,

21  password protected websites, and content-driven websites.

22  599.   Through its conduct, Defendant intentionally interfered with Plaintiffs and Class

23  Members' possession of their property and/or injured their property when Defendant unlawfully

24  took, used, and intentionally exercised wrongful control over their content and data for its own

25  benefit.

26  600.   Plaintiffs and Class Members did not consent to Defendant's interference with the

27  possession of their content and data.

28  601.   Plaintiffs and Class Members were harmed by the unlawful, unauthorized scraping of

144

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

their data because this: (1) substantially interfered with their ownership and intended possession of their data; (2) resulted in a loss of control of their data; and (3) decreased the value of their personal information by compromising it, including but not limited to exposing it to prompt injection attacks and extraction attacks.

602.   Defendant's conduct was the proximate cause of Plaintiffs and Class Members' harm.

603.   As a result of Defendant's unauthorized interference with Plaintiffs and Class Members' property, Plaintiffs and Class Members have been and will continue to be damaged, as their data continues to be at risk of attack and Defendant's Products act as perpetual archives for deleted content.

604.   Plaintiffs and Class Members seek injunctive relief restraining Defendant from continued trespass to chattels, an award of actual damages to be determined at trial, and such other and further relief as the Court may deem just and proper.

**COUNT NINE: INTENTIONAL INTERFERENCE WITH EXISTING CONTRACT**

**(on behalf of Plaintiffs and Internet-User Class)**

605.   Plaintiffs hereby incorporate all foregoing paragraphs as if fully stated herein.

606.   For the purposes of this count, Plaintiffs will collectively refer to the Plaintiffs and Internet Users as "Class."

607.   By accessing and accepting the terms of agreement of each website they used, Plaintiffs established contractual relationships with each and every website. Under their contract Plaintiffs could use the website, communicate with their friends/family and others, while in return the website derived a financial benefit from Plaintiffs' use of the website.

608.   These websites include, but are not limited to, all ~~Defendants~~the websites listed in this complaint and referenced in the accompanying **Exhibit B.**

609.   During all relevant times, Defendant knew or should have known that Plaintiffs entered into an agreement with each website that Defendant scraped. Since Defendant also accessed each of these websites, and it could not have accessed the websites without bypassing the terms and conditions set forth on these websites, it was aware of each of each websites' terms of service agreement and privacy policy, and thus were aware that every user of each website was individually

145

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1    under contract with the website. Defendant was similarly bound to each websites' terms of service

2    agreement, as it accessed each website for the purposes of scraping. Given its personal contractual

3    relationships as users of each website, Defendant cannot deny the knowledge that other users would

4    be under the exact same agreement.

5         610.    As a term of each of these contractual agreements, the websites promised to protect

6    Plaintiffs' ownership of their data and made various affirmations regarding data privacy and

7    security. Each website, in some way or another, ensured Plaintiffs that their data remained their

8    own—some platforms went as far as to include affirmations that Plaintiffs' data would not be

9    harvested by any third parties—like Google.

10        611.   By scraping these websites, Defendant interfered with the contractual relationship

11   between each Plaintiff and the website they accessed. By scraping user data, Defendant caused each

12   website to breach the contractual agreement they had established with each user, namely, their

13   agreements pertaining to data privacy and ownership. Because of Defendant's actions, the websites

14   were not able to perform as promised by their terms of service and privacy policies.

15        612.   Defendant knew that each websites' breach of their agreement with users, including

16   Plaintiffs, was certain or substantially certain to result from their conduct. Because Defendant was

17   similarly a party to contractual agreements with each website it scraped, it was on notice of all data

18   privacy related provisions—specifically, provisions that guaranteed the ownership or privacy of

19   each users' data. Thus, Defendant knew that stealing the data of other users through web-scraping

20   would necessarily result in the websites' breach of their promises to other users to protect its data

21   ownership.

22        613.   Plaintiffs and the Class were harmed as a result of Defendant interference with its

23   contractual relationships with various websites. Due to Defendant's wide-scale web scraping,

24   websites were not able to uphold the terms of their contractual agreements, to Plaintiffs' and the

25   Class's detriment. Plaintiffs were deprived of their right to control their data, as was guaranteed by

26   the websites' terms of agreement and privacy policies. Further, Plaintiffs and Class Members were

27   deprived of the loss of the benefit of the bargain of their data—namely, Defendant's data-theft

28

FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left:  0"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1    model prevented Plaintiffs and Class Members from financially benefitting from their data in a way

2    that competitors pay-for-data models would not have.

3         614.   As a direct and proximate result of Defendant's actions, as alleged herein, Plaintiffs

4    and the Class Members have suffered damages in an amount to be determined at trial.

5         **COUNT TEN: BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**

6                   (on behalf of Plaintiffs and the Internet-User Class)

7         615.   Plaintiffs hereby incorporate all foregoing paragraphs as if fully stated herein.

8         616.   For the purposes of this count, Plaintiffs will collectively refer to the Plaintiffs and

9    Internet Users as "Class."

10        617.   Defendant entered into contractual relationships with every website that it accessed

11   and scraped. By using each website that it scraped, Defendant agreed to the websites' terms and

12   services, thereby establishing a contractual relationship, which was in turn, intended to benefit

13   Plaintiffs and other users of these websites.

14        618.   Websites listed within **Exhibit B** and other similar websites that were scraped by

15   Defendant, with similar terms, contained specific terms expressly prohibiting all users from

16   engaging in data scraping—either entirely, for a "commercial purpose," or without the prior consent

17   of the website (collectively referred to as "Anti-Scraping Provisions").

18        619.   The Anti-Scraping Provisions were intended to benefit other users, promote and

19   encourage participation by other users, and protect the data which belongs to other users, including

20   Plaintiffs. These provisions are designed to foster an overall safe environment on each website. The

21   websites are often dependent on these provisions—without them, users would not be willing to share

22   the content that allows these websites to flourish. Terms of service are often designed to regulate

23   users' content for the sake of protecting other users and the overall community. As such, the

24   websites' other users are a class of people whom each websites' terms of service and privacy policy

25   are specifically intended to protect. However, it would be impractical for each website to attempt to

26   name each website user including Plaintiffs, within its terms because time to time, the number of

27   users change, and would place an undue burden on the websites themselves to keep updating the

28   terms in order to list intended beneficiaries of these terms. Cultivating platform safety and privacy

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1   was a motivating factor of the websites entering into contractual agreements with Defendant. Had

2   Defendant expressed its intention to actively harm other website users in violation of the terms of

3   service, the websites would not have contracted with them. Thus, Plaintiffs and the Class are

4   intended beneficiaries of the contracts established between Defendant and the websites that it

5   scraped.

6      620.  Defendant breached its contractual agreements with each website that included

7   provisions prohibiting or limiting data scraping in its terms of service by (1) engaging in wide-scale

8   web-scraping of each of these websites, and (2) using the content it scraped to train its AI Products,

9   from which Defendant derive a commercial benefit.

10     621.  Plaintiffs were deprived of the benefit they were supposed to gain—a safe website

11  space free from data theft—by Defendant breach of its contract with each website.

12     622.  Plaintiffs and the Class were harmed by Defendant's breach of its contracts with the

13  websites it scraped, such breach as alleged herein, and are entitled to the losses and damages they

14  have sustained as a direct and proximate result thereof.

15                          **COUNT ELEVEN**

16                       **UNJUST ENRICHMENT**

17          (on behalf of all Plaintiffs and Internet-User and Minor User Classes)

18     ~~339.~~623.    Plaintiffs incorporate, re-allege, and include the foregoing allegations as if

19  fully set forth herein.

20     ~~340.~~624.    For the purposes of this ~~cause of action~~count, Plaintiffs will collectively refer

21  to ~~all classes as~~ the "Internet-User and Minor User Classes as Class."

22     ~~341.~~625.    By virtue of the unlawful, unfair, and deceptive conduct alleged herein,

23  ~~Defendants~~Defendant knowingly realized hundreds of millions of dollars in revenue from the use

24  of the Personal Information of Plaintiffs and Class Members for the commercial training of its Bard

25  and other AI products/language models.

26     ~~342.~~626.    This Personal Information, the value of the Personal Information, and/or the

27  attendant revenue, were monetary benefits conferred upon ~~Defendants~~Defendant by Plaintiffs and

28  the members of the Classes.

FIRST AMENDED CLASS ACTION COMPLAINT



343.627.   As a result of Defendants'Defendant's conduct, Plaintiffs and Class Members suffered actual damages in the loss of value of their Personal Information and the lost profits from the use of their Personal Information.

344.628.   It would be inequitable and unjust to permit DefendantsDefendant to retain the enormous economic benefits (financial and otherwise) it has obtained from and/or at the expense of Plaintiffs and Class Members.

345.629.   DefendantsDefendant will be unjustly enriched if they areit is permitted to retain the economic benefits conferred upon themDefendant by Plaintiffs and Class Members through Defendants'Defendant's obtaining the Personal Information and the value thereof, and profiting from the unlawful, unauthorized, and impermissible use of the Personal Information of Plaintiffs and Class Members.

346.630.   Plaintiffs and Class Members are therefore entitled to recover the amounts realized by DefendantsDefendant at the expense of Plaintiffs and Class Members.

347.631.   Plaintiffs and the Class Members have no adequate remedy at law.

348.632.   Plaintiffs and the members of the Classes are entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendants'Defendant's ill-gotten gains, and/or other sums as may be just and equitable.

**COUNT ~~EIGHT~~TWELVE**

**DIRECT COPYRIGHT INFRINGEMENT**

(on behalf of Plaintiff ~~J.L.~~Leovy and the Copyright Class ~~against all Defendants~~)

349.633.   Plaintiff ~~J.L.,~~Leovy, individually and on behalf of the Copyright Class, herein repeats, realleges, and fully incorporates all allegations in all preceding paragraphs.

350.634.   Copyrights are the legal title to intellectual property by which creators of original works (such as books, photographs, videos etc.) protect their moral and economic rights. The importance of copyrighted works is enshrined in the U.S. Constitution, which expressly gave Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. Art. I, Section 8. "Copyright law encourages people to create original works and thereby

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Formatted: Indent: Left: 0"

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

'ultimately serves the purpose of enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 526 (1994).

351.635.    The Supreme Court of the United States held that by "establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row Publisher, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

352.636.    The Copyright Act makes it illegal to publicly perform, display, distribute, or reproduce a copyrighted work except in limited instances, and provides for statutory damages, willful statutory damages, and the right to recover attorneys' fees. 17 U.S.C. 501 *et seq.* The Copyright Act grants copyright owners the exclusive public display right, and control of the economic value of their protected works.

353.637.    Defendants Defendant relied on a vast trove of data scraped from the internet, including the exact digital version of Plaintiff J.L.'s book Leovy's book, which contains copyrighted works, as well as the insights and opinions she has offered to various media outlets, to develop the Bard's language model.

354.    In fact, if a user requests Bard to reproduce paragraphs from Plaintiff J.L.'s book, or analyze or summarize the book, Bard generates an output that would have been impossible without training Bard on Plaintiff J.L.'s book. Therefore, Defendants illegally copied, used, and reproduced Plaintiff, J.L.'s book, by using the book for training of their AI models, including Bard.

355.    Furthermore, Defendants' Products used LAION-5B training data, which integrates Plaintiff J.L.'s photograph, and depiction of the copyrighted book, which again demonstrates that Defendants trained their models on Plaintiff J.L.'s copyrighted materials.

356.638.    Defendants' Defendant's copying and unlawful appropriation of the entirety of Plaintiff J.L.'s Leovy's copyrighted materials, which was used for training of Bard infringed on Plaintiff, J.L.'s Leovy's copyrights. Similarly, Defendants' Defendant's blatant copying and unlawful appropriation of copyrighted works of others – images, books, song, etc. – infringed on Copyright Class Members' exclusive rights.

357.    At no point did Plaintiff J.L. and Copyright Class Members authorize Defendants to make copies of their works, make derivative works, publicly display copies or derivative works, or

150

FIRST AMENDED CLASS ACTION COMPLAINT

1 distribute copies or derivative works. All of those rights belong exclusively to Plaintiff J.L. and
2 Copyright Class Members under copyright law.

3 358. DefendantsDefendant used copyrighted works of Plaintiff J.L.Leovy and the
4 Copyright Class members to train theirits AI Products, including Bard.

5 359.639.   Defendants' Bard Product displays replicas of  The ideas, representations,
6 style, and identity of Bard's outputs are developed based on the ideas, representations, style, and
7 identities of Plaintiff and the Copyright classes' copyrighted works, publicly displaying portions of
8 the works, or generates derivative works upon command. In fact, Bard itself, is a derivative work
9 of. As such, Bard's outputs were necessarily derivative of Plaintiff's and the Copyright classes'
10 copyrighted materials.works.

11 360.640.   Plaintiff J.L.Leovy is the exclusive owner of the registered copyright in her
12 work under 17 U.S.C. § 106; in fact, Plaintiff J.L.Leovy registered the copyright for her book on
13 February 20, 2015.

14 361.641.   As exclusive rights holder, only Plaintiff J.L.Leovy or those Plaintiff
15 J.L.Leovy has authorized may copy her property, make derivative works, publicly display copies or
16 derivative works, or distribute copies or derivative works.. Neither Plaintiff J.L.Leovy nor any
17 Copyright Class Members authorized DefendantsDefendant to use their works, or make copies of
18 their works, publicly display copies of their works (even if requested on command), distribute the
19 copies, or make derivative works. .

20 362.   Furthermore, even if Defendants' reproduction through Bard are not always the exact
21 replica of the copyrighted works, Defendants' reproduction constitutes derivative works, for which
22 Defendants never obtained Plaintiff J.L.'s or Copyright Class Members' permission to create.

23 363.642.   Defendants generateDefendant generates billions of dollars on its AI
24 technology, Bard, which in large part was trained on the copyrighted works and materials without
25 consent or compensation. Without this mass infringement, Bard would not exist.

26 364.643.   Defendants copied the protected copyrighted works of millions of individuals,
27 including Plaintiff J.L. and Copyright Class Members, are "display[ing] the copyrighted work
28 publicly" on Bard, and continue to make unauthorized public displays of those copyrighted works

151
FIRST AMENDED CLASS ACTION COMPLAINT

**Formatted:** Indent: Left: 0"

1  ~~on Bard, in violation of 17 U.S.C. §§ 106(1), 106(5), and 501. Furthermore, by~~By training ~~their~~its
2  Products on the protected works of millions of authors, ~~Defendants~~Defendant engaged in
3  unauthorized use, distribution, and reproduction of the copyrighted materials.
4  ~~365.~~644.    Upon information and belief, ~~Defendants~~Defendant made copies, and engaged
5  in an unauthorized use of Plaintiff ~~J.L.~~Leovy and Copyright Class Members' work for training and
6  development of Bard (as well as other AI Products). ~~Defendants'~~Defendant's infringement of a
7  massive scraping, ~~use, reproduction,~~ and displayuse of copyrighted material was knowing, willful,
8  and intentional, and thus subjects ~~Defendants, and each of them,~~Defendant to liability for statutory
9  damages under Section 504(c)(2) of the Copyright Act of up to $150,000 per infringement. ~~In fact,~~
10 ~~the copyright symbol appeared more than 200 million times within the C-4 dataset used to train~~
11 ~~Bard.³²⁶ Furthermore, Defendants have~~Furthermore, Defendant has sufficient resources to verify
12 whether or not the works on which Bard and other AI Products were trained on are protected under
13 copyright law.

**Formatted:** Not Highlight

14 366.645.    Alternatively, even if ~~any Defendants were~~Defendant was unaware and had
15 no reason to believe that ~~their~~its actions constituted copyright infringement, Plaintiff ~~J.L.~~Leovy and
16 Copyright Class Members are entitled to $200.00/per infringement.
17 367.646.    As a direct and proximate cause of ~~Defendants'~~Defendant's conduct, Plaintiff
18 ~~J.L.~~Leovy and Copyright Class Members have suffered and will continue to suffer monetary
19 damages in an amount to be determined at trial. Plaintiff ~~J.L.~~Leovy and Copyright Class Members
20 are entitled to statutory damages, actual damages, restitution of profits, and other remedies at law.

21                              ~~COUNT NINE~~
22                    ~~VICARIOUS COPYRIGHT INFRINGEMENT~~
23 ~~(on behalf of Plaintiff J.L. and the Copyright Class against Defendants Google DeepMind and~~
24                              ~~Alphabet Inc.)~~
25 ~~368.   Plaintiff J.L., individually and on behalf of the Copyright Class, herein repeats,~~
26 ~~realleges, and fully incorporates all allegations in all preceding paragraphs.~~
27 —————————————————
28 ~~³²⁶ Kevin Schaul et al., *Inside the Secret List of Websites that Make AI like ChatGPT Sound Smart*, WASH. POST (Apr. 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/~~

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left:  0"

369.  Defendant Google DeepMind is a subsidiary of Google LLC and is the entity responsible for developing the breakthrough conversational technology known as LaMDA (Language Model for Dialogue Applications), a technology instrumental in Bard's development as well as other Google AI products. Defendant Alphabet Inc. is the parent company of Google LLC, which operates the divisions known as Google AI and Google DeepMind that are dedicated to artificial intelligence and the development of the AI products at issue in this complaint.

370.  Defendant Google LLC directly infringed upon Plaintiff J.L.'s and Copyright Class Members' copyrighted works through the unauthorized use, reproduction of the works, and preparation of derivative works by Bard. As discussed above, Plaintiff J.L.'s and Copyright Class' protected works were used to train Bard and its other AI products. Because Bard's language model relies on expressive information, and copies of copyrighted materials, including Plaintiff J.L.'s and Copyright Class Members' copyrighted works, Google LLC is directly liable for unauthorized use, reproduction, display (through Bard) of copyrighted works, as well as creation of derivative works through Bard's output. Therefore, Defendant Google LLC directly infringed upon Plaintiff J.L.'s and Copyright Class Members' exclusive rights under 17 U.S.C. § 106.

371.  Defendants Google DeepMind and Alphabet Inc. and each of them, are vicariously liable for the infringement alleged herein because they had the right and ability to supervise the infringing activity (including the specific data used in the training of Bard) but yet failed to stop the infringing behavior.

372.  Defendant Google DeepMind, acquired by Google LLC in 2014, played an essential role in the creation of Bard's underlying language model, LaMDA. Defendant Google DeepMind is directly responsible for the specific data fed into the large language model. Without the underlying large language model, Bard would not exist. Thus, Google DeepMind's role and involvement is inextricably intertwined with the supervision and control of all material used to train Bard, including copyrighted materials.

373.  As the parent company, Defendant Alphabet Inc., oversaw the strategic, financial, and resource-related aspects of Bard's development and deployment. By providing funding and resources and by guiding the strategic direction, Defendant Alphabet Inc. possessed the overarching

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Formatted: Indent: Left: 0"

1  control over all activities concerning Bard, including the infringing activities associated with Bard's

2  development, training and usage. Defendant Alphabet's failure to prevent such infringing actions

3  points to their vicarious liability under copyright law.

4       374.  Furthermore, Defendants Google DeepMind and Alphabet Inc., and each of them, had

5  a direct financial interest in the infringing conduct and received revenue in connection with the

6  development and advancement of Bard. Each entity profited from advancement of Bard.

7       375.  These committed acts of copyright infringement were willful, intentional and

8  malicious and thus subjects Defendants Google DeepMind and Alphabet Inc., and each of them, to

9  liability for statutory damages under Section 504(c)(2) of the Copyright Act of up to $150,000 per

10  infringement.

11       376.  Plaintiff J.L. and the Copyright Class Members were injured by Defendant Google

12  DeepMind and Alphabet Inc.'s acts of vicarious copyright infringement. Plaintiff J.L. and the

13  Copyright Class Members are entitled to statutory damages, actual damages, restitution of profits,

14  and other remedies at law.

15                          **COUNT TEN**

16  **VIOLATION OF DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1202(b))**

17       (on behalf of Plaintiff J.L. and the Copyright Class against all Defendants)

18       377.  Plaintiff J.L., individually and on behalf of the Copyright Class, herein repeats,

19  realleges, and fully incorporates all allegations in all preceding paragraphs.

20       378.  Section 1202(b)(1) prohibits any person, "without the authority of the copyright

21  owner or the law," from "intentionally remov[ing] or alter[ing] any copyright management

22  information." 17 U.S.C. § 1202(b)(1).

23       379.  Section 1202(b)(3) prohibits any person from "distribut[ing], [or] import[ing] for

24  distribution, . . . copies of works. . . knowing that copyright management information has been

25  removed or altered without authority of the copyright owner or the law." 17 U.S.C. § 1202(b)(3).

26       380.  Plaintiff J.L. and Copyright Class Members included one or more forms of copyright-

27  management information ("CMI") in their copyrighted materials, including copyright notice, title

28  and other identifying information, the name or other identifying information about the owners of

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

1  each book, terms and conditions of use, and identifying numbers or symbols referring to CMI.

2  381.  The copyright symbol appeared more than 200 million times within the C-4 dataset

3  used to train Bard.[327]

4  382.  Defendants, without authorization from Plaintiff J.L. and Copyright Class Members,

5  copied Plaintiff J.L.'s and Copyright Class Members copyrighted works, removed the copyright

6  management information, used the copyrighted materials to train and develop their AI Products'

7  language models, and trained Bard to be able to reproduce the copyrighted material on command.

8  By design, Bard does not preserve any CMI. By removing CMI from the Plaintiff J.L.'s and

9  Copyright Class Members copyrighted works, Defendants violated 17 U.S.C. § 1202(b)(1) and (3).

10  383.  Defendants knew or had reasonable grounds to know that this removal of CMI would

11  facilitate copyright infringement.

12  Plaintiff J.L. and Copyright Class Members were injured by Defendants' removal of CMI.

13  Plaintiff J.L. and Copyright Class Members are entitled to statutory damages, actual damages,

14  restitution of profits, and other remedies at law.

15                                    **PRAYER FOR RELIEF**

16  WHEREFORE, Plaintiffs on behalf of themselves and the Proposed Classes that they seek

17  to represent, respectfully requestrequests the following relief:

18  A.  Injunctive relief in the form of a temporary freeze on commercial access to and

19       commercial development of the Products until such time as Defendants can

20       demonstrate completion of some or all of the following to the Court's satisfaction:

21       1.  Establishment of an independent body of thought leaders (the "AI Council")

22            who shall be responsible for approving uses of the Products before, not after,

23            the Products are deployed for said uses;

24       2.  Implementation of Accountability Protocols that hold Defendants responsible

25            for Product actions and outputs and bar them from further commercial

26            deployment absent the Products' ability to follow a code of human-like ethical

27            principles and guidelines and respect for human values and rights, and until

28

---

[327] *Id.*

                                    155
FIRST AMENDED CLASS ACTION COMPLAINT



Plaintiffs and Class Members are fairly compensated for the stolen data on which the Products depend;

3. Implementation of effective cybersecurity safeguards of the Products as determined by the AI Council, including adequate protocols and practices to protect Users' Personal Information collected through Users' inputting such information within the Products as well as through Defendants' massive web scraping, consistent with industry standards, applicable regulations, and federal, state, and/or local laws;

4. Implementation of Appropriate Transparency Protocols requiring Defendants to clearly and precisely disclose the data they are collecting, including where and from whom, in clear and conspicuous policy documents that are explicit about how this information is to be stored, handled, protected, and used;

5. Requiring Defendants to allow Product users and everyday internet users to opt out of all data collection and stop the illegal taking of internet data, delete (or compensate for) any ill-gotten data, or the algorithms which were built on the stolen data;

6. Requiring Defendants to add technological safety measures to the Products that will prevent the technology from surpassing human intelligence and harming others;

7. Requiring Defendants to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

8. Establishment of a monetary fund (the "AI Monetary Fund" or "AIMF") to compensate class members for Defendants' past and ongoing misconduct, to be funded by a percentage of gross revenues from the Products;

9. a) Appointment of a third-party administrator (the "AIMF Administrator") to administer the AIMF to members of the class in the form of "data dividends" as fair and just compensation for the stolen data on which the Products depend;

156

<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com



Formatted: Indent: Left: 0"

10.     Confirmation that Defendants have deleted, destroyed, and purged the Personal Information of all relevant class members unless Defendants can provide reasonable justification for the retention and continued use of such information when weighed against the privacy interests of class members; and

11.     Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

A.      ActualCertify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoints Plaintiffs to represent the Classes;

C.      Appoint undersigned counsel to represent the Classes;

B.      Award compensatory damages for economic and non-economic harm(including treble damages, where appropriate) to Plaintiffs and the Class against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be determinedproven at trial;

C.      Statutory damages in an amount to be determined at trial;

D.      Equitable relief in the form of monetary damages, restitution, and disgorgement;

E.D.     Pre-judgement , including interest;

F.      Post-judgment interest;

G.      Reasonable attorneys' fees and costs of suit incurred by their attorneys, in recognition of the spirit of the consumer protection statutes at issue, which encourage holding businesses to account for unfair business practices;

H.      TrebleAward statutory (including treble damages allowable under applicable laws;

I.E.     Punitive, where appropriate) damages allowable under applicable lawsto Plaintiffs and the Class against Defendant;

J.      ExemplaryAward nominal damages allowable under applicable laws;

K.F.     Anyto Plaintiffs and all other such relief as the Court may deem just and proper.the Class against Defendant;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**Formatted:** Indent: Left: 0"

G.   Non-restitutionary disgorgement of all profits that were derived, in whole or in part, from Defendant's conduct;

H.   Award punitive damages to Plaintiffs and the Class against Defendant;

I.   For all Counts, permanently restrain Defendant, and its officers, agents, servants, employees, and attorneys, from the conduct at issue in this Action and otherwise violating its policies with consumers, and award all other appropriate injunctive and equitable relief deemed just and proper;

J.   Award Plaintiffs and the Class their reasonable costs and expenses incurred in this Action, including attorneys' fees, costs, and expenses; and

K.   Grant Plaintiffs and the Class such further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all triable issues.


DATED: January 5, 2024                    **CLARKSON LAW FIRM, P.C.**

                                          */s/ Ryan J. Clarkson*
                                          Ryan Clarkson, Esq.
                                          Yana Hart, Esq.
                                          Tracey Cowan, Esq.
                                          ~~Timothy K. Giordano, Esq.~~
                                          Tiara Avaness, Esq.
                                          Valter Malkhasyan, Esq.

                                          *Counsel for Plaintiffs and the Proposed Classes*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com