1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Susan van Keulen, Magistrate Judge

4

5    IN RE: GOOGLE GENERATIVE AI    )   No. C 23-03440-EKL
     COPYRIGHT LITIGATION           )
6    _____)

7                                    San Jose, California
                                     Thursday, July 10, 2025
8

9    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 10:00 - 10:58 = 58 MINUTES
10

11   APPEARANCES:

12   For Plaintiffs:
                                    Bleichmar Fonti & Auld, LLP
13                                  1330 Broadway, Suite 630
                                    Oakland, California 94612
14                            BY:   LESLEY E. WEAVER, ESQ.

15                                  Bleichmar Fonti & Auld, LLP
                                    75 Virginia Road, 2nd Floor
16                                  White Plains, New York 10603
                              BY:   GREGORY MULLENS, ESQ.
17
                                    Clarkson Law Firm, PC
18                                  22525 Pacific Coast Highway
                                    Malibu, California 90265
19                            BY:   MARK I. RICHARDS, ESQ.

20                                  Joseph Saveri Law Firm, LLP
                                    601 California Street
21                                  Suite 1000
                                    San Francisco, California
22                                   94108
                              BY:   CHRISTOPHER K.L. YOUNG, ESQ.

23

24             (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

1  For Defendants:

2                              Wilson Sonsini Goodrich
                                 & Rosati
                               701 Fifth Avenue
3                              Suite 5100
                               Seattle, Washington 98104
4                         BY:  ERIC P. TUTTLE, ESQ.

5                              Wilson Sonsini Goodrich
                                 & Rosati
6                              1301 6th Avenue
                               New York, New York 10019
7                         BY:  JEREMY P. AUSTER, ESQ.

8                              Wilson Sonsini Goodrich
                                 & Rosati
9                              95 South State Street
                               Suite 1000
10                             Salt Lake City, Utah 84111
                          BY:  PAUL SAMPSON, ESQ.
11

12                             Wilson Sonsini Goodrich
                                 & Rosati
                               650 Page Mill Road
13                             Palo Alto, California 94304
                          BY:  QIFAN HUANG, ESQ.
14

   Transcribed by:             Echo Reporting, Inc.
15                             Contracted Court Reporter/
                               Transcriber
16                             echoreporting@yahoo.com

17

18

19

20

21

22

23

24

25

3

1  <u>Thursday, July 10, 2025</u>                              <u>10:00 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Now calling Case Number 5:23-CV-03440-

5  EKL, In Re Google Generative AI Copyright Litigation, for a

6  discovery hearing.

7      If counsel can state their appearances starting with --

8  starting with the Plaintiffs.

9          MS. WEAVER:  Good morning, your Honor.  Lesley

10 Weaver, Bleichmar Fonti, on behalf of Plaintiffs.

11         THE COURT:  Ms. Weaver, good morning.

12         MS. WEAVER:  Good morning.

13         MR. RICHARDS:  Good morning, your Honor.  Mark

14 Richards on behalf of Plaintiffs.

15         THE COURT:  Mr. Richards, hello.

16         MR. MULLENS:  Good morning, Judge.  Greg Mullens

17 here for Plaintiffs as well.

18         THE COURT:  Mr. Mullens, good morning.

19         MR. YOUNG:  Good morning, your Honor.  Christopher

20 Young, Joseph Saveri Law Firm, on behalf of Plaintiffs.

21         THE COURT:  Thank you, Mr. Young.

22         MR. TUTTLE:  Good morning, your Honor.  Eric

23 Tuttle of Wilson Sonsini on behalf of Defendants.

24         THE COURT:  Thank you, Mr. Tuttle.  Good morning.

25         MR. SAMPSON:  Good morning, your Honor.  Paul

1  Samson, Wilson Sonsini, on behalf of Defendant.

2          THE COURT:  Good morning, Mr. Sampson.

3          MR. AUSTER:  Good morning, your Honor.  Nice to

4  meet you.  Jeremy Auster from Wilson Sonsini on behalf of

5  Defendants.

6          THE COURT:  Thank you, Mr. Auster.  Welcome.

7          MR. HUANG:  Good morning, your Honor.  Qifan Huan,

8  also on behalf of Defendants.

9          THE COURT:  Mr. Huang, good morning.  Thank you

10 for being here.

11     (Pause to confer with clerk.)

12          THE COURT:  Okay.  Excellent.  Thank you.  Just

13 wanted to be sure my law clerk, who's participating remotely

14 today, was on board.

15     All right.  We set this hearing -- I set this hearing

16 for three discovery disputes, and I did issue a tentative

17 order last week.  So, hopefully -- or before.  Hopefully you

18 have all had time to work through that.  There were some

19 meet and confer instructions.  I did get the parties'

20 supplemental submissions that I had asked for.  So, we will

21 start at the top with Docket 158, Google's challenge to

22 Wanger, expert Wanger.

23     In my tentative, I had asked that Google provide more

24 specifics regarding Doctor Wanger's relationship with Meta,

25 and that was provided.  I have read through that.  I also

5

1  gave the Plaintiffs an opportunity to provide a supplemental

2  declaration regarding unique areas or unique knowledge of

3  the expert.  I did not receive a further declaration on

4  that.  Obviously, there was a discussion of that in the

5  record in the original papers.

6      I'll -- I'll hear from counsel.  I assume this is still

7  in dispute?

8      (No audible response.)

9          THE COURT:  Yes?  Okay.

10      It appears to me from having reviewed Ms. Wanger's

11  declaration that her current status, if you will, vis-a-vis

12  Meta is very cabined and sufficiently cabined such that it

13  does not represent a conflict warranting disqualification.

14  She's not paid.  She talks on the phone with a small group

15  for one hour a week to ensure continuity of certain research

16  and to benefit her Ph.D. candidate, and it is in an

17  unrelated field.

18      My inclination is to deny the request for

19  disqualification, however, without prejudice and with this

20  caveat, which is should the parameters, any of those

21  parameters change, the frequency, the duration, the scope or

22  purpose of the calls, that Plaintiffs must immediately

23  disclose that to Google, and failure to make such a

24  disclosure, should it come to light at a later time, may

25  result in disqualification, exclusion of evidence, of a

6

report or something else.  Obviously, that would be much
further down the road and much more prejudicial.  But, given
where we are, I think that that's -- that's fair notice.

    So, would Google like to be heard on this issue?

        MR. SAMPSON:  Yes, your Honor.

        THE COURT:  Please.  And I will have everyone
restate their appearances when they come to the microphone
for purposes of those members of my staff who are
participating remotely.

        MR. SAMPSON:  Thank you, your Honor.  Paul Sampson
for Google.  Just quickly, I appreciate what you're saying
and the representations about this being cabined.  I did
want to point out we have received some inconsistencies over
time.  A changing story I guess would be a better way of
saying it.  You know, originally they told us there would be
no current plans for her to work with Meta and no active
relationships with Defendants' competitors -- that's
obviously a competitor in this field -- and that Doctor
Wanger does not intend to work with competitors.  Those are
in emails, written representations.  Those are direct quotes
that I'm providing to you.

        THE COURT:  Um-hmm.

        MR. SAMPSON:  When we submitted our joint
statement, you know, we don't have the opportunity to -- to
reach out and talk to her -- talk to Meta and say is this --

1 is this accurate?  And, so, we, you know, did some online

2 research.  We determined that one of her coauthors, one of

3 Doctor Wanger's coauthors has been -- an individual name

4 Kristen Lauder (phonetic), who works in what is called the

5 Fundamental AI Research Lab.  She's a senior director.

6     And, so, we pointed that out in our joint statement

7 that perhaps this person's part of that call, but we don't

8 know that for sure.  For the first time in -- in Doctor

9 Wanger's declaration that -- that the Plaintiffs submitted,

10 they -- she admitted, yes, Kristen Lauder is part of those

11 calls.  I think it's important to understand or to -- to

12 recognize what FAIR Labs is.

13     So, from, you know, a Meta press release from last

14 year, FAIR Labs focus -- is focused on advancing the state

15 of the art in AI through open research.  Just last month --

16 or two months ago, Tech Crunch had an article that said the

17 FAIR Labs team lead research on Meta's early AI models,

18 including Lama 1 and Lama 2, which are obviously direct

19 competitors to the products at issue and the models at issue

20 in this case.  And then just last week, Meta announced a

21 reorganization -- and I'm tracing articles.  There's a lot

22 of money sloshing around the Valley right now in this highly

23 competitive area, and -- and Meta just reorganized, created

24 a Meta super intelligence lab that's sort of the umbrella

25 organization, and this FAIR Lab group works within that.

8

And, you know --

          THE COURT:  She works in -- in and around Meta AI
projects?

          MR. SAMPSON:  Correct.

          THE COURT:  I think that's -- I think that's fair.
That was my takeaway from I think most of the -- most of
these facts, not the last week update, but were in the -- in
the initial joint statement, and I did see Ms. Lauder
referred to in the Wanger declaration.

          MR. SAMPSON:  Right.  And, so, I -- my point is
even today, I mean, if you look at the Wanger dec -- the --
the declaration from Doctor Wanger today, she still hasn't
disclosed what business unit she worked in at Meta or, you
know, she says, Yes, Kristen -- Ms. Lauder is part of these
calls, and then there's these other people who she doesn't
name and she doesn't say what business unit they're in.  You
know, this isn't like she's having calls with the group
that's trying to get more likes on Facebook.

          THE COURT:  But --

          MR. SAMPSON:  This is calls with the group that's
in the -- the FAIR labs, you know, the Fundamental AI
Research labs.

          THE COURT:  Well, we don't know that.  We know Ms.
Lauder is on the call.

          MR. SAMPSON:  Correct.  But that -- but, given the

9

1   sort of -- the way we've had to get this information from

2   them over time, the representations they made that they had

3   to walk back, that gives us concern that they still haven't

4   provided the information about who all these people are on

5   these calls.

6           THE COURT:  Um-hmm.  Um-hmm.

7           MR. SAMPSON:  So, that -- that's sort of what I

8   wanted to get up and make sure that that's clear and sort of

9   make our position that we think this is problematic and that

10  there is a substantial risk of disclosure of information.

11  You know, Ms. -- Ms. Wanger is going to be seeing Google's

12  highly confidential technical documents related to the

13  development of state of the art AI models at Google.

14          THE COURT:  Um-hmm.

15          MR. SAMPSON:  And then she's going to be talking

16  with at least one person who is within that unit that

17  develops those models, and then we don't know -- they

18  haven't disclosed who that individual is.

19          THE COURT:  The Plaintiffs made the argument in

20  the joint statement, and Doctor Wanger reemphasized this in

21  her declaration about the difference in the technology

22  areas, that the area for the calls and the research she was

23  doing and is talking to these people for continuity is --

24  and I'm not going to get the --

25          UNIDENTIFIED SPEAKER:  Quantum cryptology.

1        THE COURT:  Thank you, yes -- not related to AI

2  products development, et cetera.  Did you have any response

3  to that?

4        MR. SAMPSON:  I don't have a substantive argument

5  that, yes, they actually are related other than to say

6  Kristen Lauder is within the FAIR Labs.  She's a senior

7  director in FAIR Labs, and she's part of this group.  We

8  don't know what group Doctor Wanger was working in at Meta,

9  and we don't know the other individuals on these calls, what

10  group they're in.  If they're also in the FAIR Labs group

11  and if she also came from the FAIR Labs group, that's pretty

12  good evidence that it actually is related to fundamental AI

13  research, which is the name of that group.

14        THE COURT:  Um-hmm.  Um-hmm.  Okay.  All right.

15  Thank you.  I appreciate that.

16     From the Plaintiffs, the argument does highlight a

17  question that came to my mind as I read the Wanger

18  declaration.  You know, she says, Well, it's this group --

19  forget how she characterized it exactly -- of some

20  individuals.  She obviously acknowledged Ms. Lauder, but

21  beyond that, it was not specific.

22        And do Plaintiffs know, are you able to identify

23  what group she was in or with whom she was working at Meta?

24        MR. MULLENS:  Yes, Judge.  Yes, Judge.  And -- and

25  Greg Mullens for the Plaintiffs.  If it -- if it wasn't

1 clear from the joint statement or -- or Doctor Wanger's

2 declaration, the -- the work she has been doing in the past

3 when she was there as an employee -- and is no longer an

4 employee --

5          THE COURT:  And that was known.

6          MR. MULLENS:  Yes.

7          THE COURT:  That's been known.

8          MR. MULLENS:  And that's known -- and is now

9 having these periodic calls on --

10          THE COURT:  Weekly.

11          MR. MULLENS:  -- following up on the -- that's

12 right.  Fair -- following up on the research she had been

13 doing, has always been part of the PQC Group, right, the

14 Post-Quantum Cryptography Group.  It's a mouthful, but that

15 is the group that she was working with, the researchers in

16 the past, and that is why she's having these calls now.  And

17 that -- that is -- that is who is on these calls, a small

18 group -- I'm just reading from the declaration --

19          THE COURT:  Um-hmm.

20          MR. MULLENS:  -- Judge -- a small group of PQC

21 security researchers.

22     We -- Kristen Lauder is on those calls, and -- and we

23 addressed that.  The conversations being had are about PQC,

24 and that is -- and I think your Honor was correct in noting

25 that this is a cabined off unrelated topic to -- to this

1 case.

2          THE COURT:  Well, I didn't go that far.  What I

3 said was her involvement seems to be very cabined.  I don't

4 know enough about the technology or the overlap between the

5 technology.

6          MR. MULLENS:  Understood.  And I -- I would agree

7 that it is -- her involvement is an unpaid weekly call

8 completing the research she had done on -- on -- on this

9 topic.  And I think, your Honor, one of the questions -- and

10 it's fairly asked -- is it voluntary or mandatory.  And

11 Doctor Wanger ventured to answer that as forthrightly as

12 possible, right.  It is voluntary.  But she -- she feels a

13 professional responsibility to the work that she has done on

14 this topic, to the people she has worked with, and she wants

15 to just make sure that it -- it's -- it's sort of followed

16 through.

17          THE COURT:  All right.  Thank you.  Thank you.

18 Appreciate it.

19      Okay.  I appreciate the further input of counsel.  I

20 certainly hear and appreciate Google's concern, but, again,

21 given the limited nature of the involvement, for the reasons

22 I previously identified, it not being paid, it's very

23 limited in time, the representation in the record before the

24 Court is that the topic of discussion is very limited, and

25 Doctor Wanger's reasons for being on the call for the

13

continuity of research just does not rise to the level to
support a qual -- disqualification.

So, I'm going to deny the request but without
prejudice, again, to any change or any indication of change
in circumstances, and Plaintiffs are on notice, and they'll
need to be diligent in ensuring that those parameters do not
change during the course of Doctor Wanger's records of
representation.

MR. SAMPSON:  Your Honor, may I just ask one --

THE COURT:  Yes.

MR. SAMPSON:  -- one follow up?

THE COURT:  Of course.

MR. SAMPSON:  Paul Sampson again on behalf of
Google.  Just quickly, in -- in your order that you have
given now, can you order them to tell us or to report to us
if there has been a change in the frequency or the nature of
those calls so that we're aware of it in realtime?

THE COURT:  If there is a change?

MR. SAMPSON:  Yes.

THE COURT:  Going forward?

MR. SAMPSON:  Yes.

THE COURT:  Yes.  I thought I had done that.

MR. SAMPSON:  Okay.  I just wanted to clarify
that.

THE COURT:  Okay.  All right.  I may have said it

14

1 in my tentative, and I will make it clear now obviously, if

2 there is any change, that Google needs to be notified so if

3 they want to come back and argue further, then they can do

4 that.

5          MR. SAMPSON:  Great.  Thank you, your Honor.

6          THE COURT:  Thank you, Mr. Sampson.

7          MS. WEAVER:  And just on behalf of the Plaintiffs,

8 we take it very seriously too, and we will do that, and we

9 would do it anyway.

10          THE COURT:  Yes.  It certainly is in your best

11 interest.

12          MS. WEAVER:  Exactly.

13          THE COURT:  Okay.  And I -- I will issue a short

14 summary order after today, again, just so everyone has a

15 piece of paper they can look at, probably more for me than

16 you.  My reasoning and support for my rulings today will be

17 as stated on the record.

18      Okay.  Let's move on to Docket 159, which was Google's

19 cost sharing proposal and for the data queries.  I in my

20 tentative order denied that request.  I set out my reasons.

21      Did Google want to be heard further at this time?

22          MR. TUTTLE:  Very briefly, your Honor.  Eric

23 Tuttle.

24          THE COURT:  Thank you, Mr. Tuttle.

25          MR. TUTTLE:  -- for Defendants.  I just -- we

1  didn't -- your Honor gave us the opportunity to submit a

2  declaration.  We -- we reviewed the tentative and -- and we

3  accept the tentative, which, importantly, is without

4  prejudice to coming back if things change, if things warrant

5  seeking cost sharing in the future.

6        We agree that the dispute is premature.  We said that

7  in the meet and confer.  I said it here a couple of weeks

8  ago.  We were hoping that we don't get to that situation

9  where we have to do this, but we understood the Plaintiffs

10 to be asking for an order that they had a blank check, and

11 we understand the Court not to have accepted that either.

12       And, so, it makes sense to us that we'll see how it

13 goes and -- and if -- and if it -- an issue does arise, then

14 we can address it in those concrete facts.  And I think the

15 Court has also given helpful guidance for the type of

16 information that the Court would wish to see if that becomes

17 an issue, and if it sort of came to that, we -- we assume

18 the Court would allow us to come back with a declaration of

19 the type the Court was describing and file it under seal.

20            THE COURT:  I want to make it clear that, for the

21 reasons I stated in my tentative, it's Google's protocol

22 there are already quantitative limits on the sampling.  The,

23 you know, retail rate at least on the record in front of me,

24 not substantiated, and similarly, the -- the proffered cap,

25 that the request is denied, and it's denied without

16

1 prejudice should there be discovery abuse that warrants it.

2 So, it's, you know, Look, here -- you know, here's what's

3 happening.  Essentially a -- a good cause standard.

4          MR. TUTTLE:  Right.  We -- we understand it, that

5 it would -- the circumstances will have to show a

6 particularized concern and -- that is in the nature of

7 abuse, and we will evaluate what the costs that are being

8 imposed are, and if we have the concern, we will meet and

9 confer, and if we cannot resolve it, we will, if necessary,

10 come back to the Court, but with the detailed information

11 that the Court has requested.

12          THE COURT:  Okay.  All right.

13          MR. TUTTLE:  Thank you, your Honor.

14          THE COURT:  That's what my order will reflect.

15 Thank you, Mr. Tuttle.

16     All right.  That brings us to Docket 163, which had two

17 parts, the first being the sufficiency of Plaintiff's

18 responses to Interrogatories 1 and 2 and the second being

19 Plaintiff's obligation to search the files of certain

20 purported agents.

21     As to the first regarding Plaintiff's interrogatory

22 responses, I gave the parties some I hope what were very

23 clear meet and confer guidelines and asked for a report on

24 the status of that here today.  So, where are we?

25          MR. AUSTER:  I'm happy to provide it, your Honor.

1          THE COURT:  Thank you.

2          MR. AUSTER:  Jeremy Auster on behalf of

3 Defendants.

4          THE COURT:  Thank you, Mr. Auster.

5          MR. AUSTER:  So, your Honor, we -- we certainly

6 appreciate the directions in your tentative, and I'm pleased

7 to report we reached a compromise on some of the issues in

8 dispute but not quite all of them.

9      So, for Interrogatory Number 1, your Honor's tentative

10 held that Google is entitled to a clear statement as to each

11 Plaintiff's position as to the legal and beneficial owners

12 of exclusive rights for the work ensured, and Plaintiffs

13 have agreed to provide that clear statement to supplement

14 their current responses with supplementary responses that

15 provide that information.  So --

16          THE COURT:  Okay.

17          MR. AUSTER:  -- we agreed to a resolution on that.

18 You know, we'll -- we'll obviously wait to see what those

19 supplemental responses look like, and depending on what they

20 say, you know, we'll heed the Court's guidance as to how to

21 proceed from there.

22          THE COURT:  And I just want to be very clear that

23 I -- in terms of the guidance that is if you are -- think

24 that a response is incorrect or incomplete, that that is to

25 occur in the meet and confer process, certainly in the first

18

1  instance, with specificity.

2          MR. AUSTER:  And --

3          THE COURT:  Here's the testimony of John Doe where

4  he said, you know, he shared ownership with X, Y, Z or it

5  was licensed exclusively here.

6      I expect all of that to be part of an obviously good

7  faith sleeves rolled up meet and confer process.

8          MR. AUSTER:  Yeah.  Absolutely, your Honor.  And I

9  would just say I think part of the -- the complication from

10 our perspective here has been that to even do that, right,

11 to sort of identify things that might be incorrect or

12 incomplete, we sort of need these basic facts in the first

13 instance, and -- and that's the -- that's what the clear

14 statement that you've ordered will provide to us.  So, I

15 think it's a -- it's a very appropriate path forward.

16         THE COURT:  Okay.  Good.  Then you're underway on

17 the dispute as to Interrogatory 1.

18     And, do Defendants agree with that status?

19         MR. AUSTER:  Plaintiffs agree.

20         THE COURT:  Or Plaintiffs, excuse me.  As I'm

21 looking at you, I call you the Defendants.

22         MR. AUSTER:  We certainly agree.

23         THE COURT:  I apologize.  I got that -- I got that

24 part, Mr. Auster.  Thank you.  Thank you.

25     Okay.  Then let's -- are we moving on to dispute number

19

1 two?

2         MR. AUSTER:  Well, I guess Interrogatory Number 2

3 is --

4         THE COURT:  Oh, Interrogatory Number 2, yes.

5         MR. AUSTER:  -- part of dispute number one.

6 Unfortunately, we don't have as rosy an update to provide

7 there, your Honor.  I interpreted your tentative as -- as

8 also -- you know, your -- the section of the tentative on

9 Rog 2 incorporated the same instructions as you provided on

10 Rog 1.  So, you know, we interpret that to mean that

11 Plaintiffs need to supplement their responses to Rog 2 as

12 well, with a clear statement identifying -- or describing in

13 detail the basis for their claims of ownership and

14 identifying all evidence upon which they rely.

15     And, so, the dispute here at this point is really

16 whether or not the current responses provide that clear

17 statement, and -- and from our perspective, your Honor, it's

18 very obvious that they don't.  Each -- each of the

19 Plaintiffs' responses to Interrogatory Number 2 is

20 identical, and what they essentially say is Plaintiff's

21 basis for his or her claim of copyright ownership is that he

22 or she is the registered owner of the works in suit as

23 evidenced by their certificates.

24     Now, the problem is, your Honor, and -- and, again, all

25 of the certificates for the Plaintiffs essentially say the

1  same thing in relevant part, which is that the Plaintiff is

2  the author and the copyright claimant.  But -- but those two

3  morsels of information really tell us nothing substantive

4  about the factual basis for Plaintiffs' claim that they own

5  these works, right.  An author and a certificate of

6  registration is not necessarily the owner.  You can be

7  identified as an author even if you transferred your rights

8  prior -- prior to or subsequent to the registration.  And

9  same with -- with the copyright claimant.  That can also be

10 an author who no longer owns the work because they may have

11 transferred it.  It can be an author who -- who does have

12 ownership rights, but we just can't deduce those basic facts

13 from the registration.  And, so, you know, from our

14 perspective, what this rog is seeking is -- is not as

15 Plaintiffs suggest in the briefing, to challenge ownership.

16 It's really seeking the basic information that we need in

17 the first instance to understand why they -- why they

18 believe they own these works, what circumstances gave rise

19 to that claim, so that we can, again, in part two test it,

20 challenge it depending on what those facts are.

21          THE COURT:  Okay.  Again, you're entitled to a

22 clear statement, but if their clear statement is "See my

23 copyright registration", then you may challenge that that's

24 not -- doesn't reflect, but you need to have that

25 discussion.  But you need a statement from them in the first

21

1  instance.

2      Let me hear from the Plaintiffs.

3          MR. RICHARDS:  Good morning, your Honor.  Mark

4  Richards on behalf of Plaintiffs.

5          THE COURT:  Mr. Richards, good morning.

6          MR. RICHARDS:  To respond, your Honor, we have --

7  we believe we've done exactly what the -- the Court has

8  asked us to do in terms of responding with a clear statement

9  to Interrogatory Number 1, Plaintiffs have.

10          THE COURT:  So, it sounds like we're okay on

11  Number 1.

12          MR. RICHARDS:  I'm sorry.  Number -- Number 2.

13          THE COURT:  Okay.

14          MR. RICHARDS:  Plaintiff, Mike Lemos, and

15  Plaintiff Larson we have agreed to amend their responses to

16  address the concerns about their -- their copyright

17  ownership and how we would respond to those points.  No

18  other Plaintiffs, to our knowledge, have been addressed with

19  respect to what copyright ownership issues would be

20  challenged, and we -- it's our position that these -- these

21  copyright registrations are prima facie evidence of their

22  ownership.  We said that in our complaint, in our opposition

23  to Defendant's  motion to dismiss, and it would be

24  Defendant's burden to bring forth evidence that they are

25  not.  And, to the extent that they have contentions about

22

1  their ownership, we would respond to that with a statement

2  that would say this is -- these are other facts that we

3  would identify, as we have agreed to do with Plaintiff Lemos

4  and Plaintiff Larson.

5          THE COURT:  Right.  So, the interrogatory says to

6  provide the basis.  So, you point to the copyright

7  registration where their name appears, presumably.  And it

8  asks for, okay, so what -- what is your basis for that, for

9  the claim of ownership?  Okay.  It's the registration

10 statement.

11     The identification of all evidence, I don't know really

12 what that -- again, I think that that is best addressed by,

13 well, what other -- what are the facts or circumstances that

14 support your position, Plaintiff, that -- that you are the

15 owner?  I created it.  I directed the registration be filed,

16 whatever their facts are.  And, as you say, some of them

17 have some different facts.  But that's what the parties need

18 to -- need to discuss in terms of a clear statement.

19          MR. RICHARDS:  I agree, your Honor.  Part of the

20 problem is -- is that the -- I think the interrogatory

21 itself is -- is pretty amorphous and what Defendants are

22 specifically looking for is amorphous in terms of

23 generalized -- generalized facts surrounding their filing or

24 claims of -- of ownership, matters that might be better

25 explored through a -- a deposition or a more targeted

23

interrogatory, a more narrow interrogatory.  We've offered
that -- that compromise, and they refuse.  They have stood
upon this interrogatory as -- as broad as may be.  And, so,
without more direction exactly what they're looking for,
we're going to be ending up in the same position.  We -- we
agreed to amend this once in good faith and -- and said that
if there is other facts that arise that you believe would
support us having to do -- amend for other Plaintiffs, we
will redo that, but I think that we've -- we're kind of
putting the cart before the horse here without knowing
exactly what more Defendants want -- want us to do.

          THE COURT:  Well, have you identified the facts
that in a clear statement of -- as to why a Defendant claims
that they are the owner of the copyright?

          MR. RICHARDS:  I believe we have, your Honor.  We
-- the basis for their ownership is the registration itself.
So, we are saying by the fact of them having a valid
copyright registration, they are the registered owners of
their copyright.

          THE COURT:  But what are the facts that support
that statement that they are the owner and it's -- I created
it or I did this or I did that, that there are facts that
support your right to sign off on the copyright
registration?  And that's what I'm driving at.  I agree the
idea of identify all evidence sounds to me like a identify

24

1  all documents.  I think a clear statement as to are you --

2  you know, I'm the owner.  Here's my registration, and, you

3  know, I've created the work or I -- whatever facts that a

4  Plaintiff believes supports their right to ownership.  I

5  mean, you can't -- you can't ask for something they don't --

6  that they can't attest to.  I mean, it's -- but that's --

7  that's what I'm driving at.

8      Let me hear from -- back from Defendants again.

9          MR. AUSTER:  Thank you, your Honor.  I think you

10  just nailed -- nailed it on the head with that last

11  statement -- hit the nail on the head.  Let me get that

12  metaphor right.  That's exactly right.  The factual basis

13  for why they believe they own these works in the first

14  instance is what we're asking for.  And, as you suggested,

15  that could be because a Plaintiff authored a work in their

16  individual capacity and thus, under the copyright, they're

17  the initial author and --

18          THE COURT:  Well, they're not going to give you a

19  legal analysis.

20          MR. AUSTER:  Well --

21          THE COURT:  They're going to say --

22          MR. AUSTER:  -- right, right.

23          THE COURT:  -- here's --

24          MR. AUSTER:  So, it's whatever facts.

25          THE COURT:  Right.  Here are the facts that I --

1           MR. AUSTER:  Right.

2           THE COURT:  -- the Plaintiff.

3           MR. AUSTER:  Right.

4           THE COURT:  I mean, these are --

5           MR. AUSTER:  I created it.

6           THE COURT:  It's just --

7           MR. AUSTER:  Right.

8           THE COURT:  Don't speak over me.

9           MR. AUSTER:  I'm sorry, your Honor.

10          THE COURT:  Ar -- I'm the artist in some form or

11 another, authors, artists, et cetera.  And it may be, Well,

12 I -- I created it.  So, that's -- that's my basis for I'm

13 the owner.

14          MR. AUSTER:  Right.

15          THE COURT:  I think that answers your question as

16 properly narrowed from identify all evidence to --

17          MR. AUSTER:  Right.

18          THE COURT:  -- to identify the facts that support

19 your claim of ownership.

20          MR. AUSTER:  Yeah.  And I think that's a fair

21 narrowing, and in some cases it might be that they created

22 it.  In some cases it might be someone else did and gave the

23 rights to them.  And that's -- that's a -- those are exactly

24 the facts we're looking for.

25          THE COURT:  Yeah.  And I think that you are

1  entitled to those, and -- in a clear statement.  And then it

2  may be that you have other facts have already come to light

3  of other transactions, et cetera, through deposition or

4  other public records or whatever, that may contravene those

5  facts.  And you can meet and confer about that if you think

6  you're entitled to a supplemental response.  But do not

7  confuse arguing ownership/standing with a motion to compel

8  discovery.  If you get a clear statement and they say, Look,

9  these are the facts that support my ownership, then -- then

10  that's their position.  That's their position.  You may well

11  have other facts that then would support an argument down

12  the road to challenge that, but we're not going to do it

13  through a discovery thread.

14          MR. AUSTER:  Understood, and I don't --

15          THE COURT:  Understand?

16          MR. AUSTER:  I don't disagree with any of that,

17  your Honor.

18          THE COURT:  Okay.

19          MR. AUSTER:  And I guess the only other thing I

20  would ask with respect to Rogs 1 and 2 is -- is a timeline

21  for supplementation.

22          THE COURT:  Um-hmm.  Um-hmm.

23          MR. AUSTER:  I mean, we -- we started these in

24  January, and this is very basic information we're trying to

25  get.  So, we would like it sooner than later.

27

1       THE COURT:  Of course.  But I would assume that

2  the parties had discussed that in the meet and confer

3  process.  Is there a timeline for the clear statements for

4  Interrogatory 1?

5       MR. AUSTER:  We discussed it roughly.  I don't

6  think we ever drilled down on a date  I would propose 10 --

7  10 days, 10 to 14 days if Plaintiffs believe that's doable.

8       MR. RICHARDS:  No objection to that, your Honor.

9       THE COURT:  Okay.  All right.  Then supplemental

10  responses to Interrogatories 1 and 2, that being the plain

11  statements that I had ordered in my tentative and I'm

12  adopting here, will be provided.  It is summer.  It can be

13  hard to track people down.  So, 14 days from today.

14     Let me be precise just so our record is clear that that

15  will be the 24th of July, and then parties are to meet and

16  confer promptly and appropriately thereafter, and go from

17  there.

18       MR. AUSTER:  Thank you, your Honor.

19       THE COURT:  Okay.  Thank you, Mr. Auster.

20     All right.  Now are we on the third party agency issue?

21       MR. AUSTER:  Should I come back up, your Honor?

22       THE COURT:  Yes, if that's yours, indeed.  Okay.

23  So, this was the second issue.  I had asked Google to

24  provide a chart that gave me helpful information as to the

25  13 disputed agents.  It appears that 12 of them are

1 essentially literary agents.  I think somebody is a public

2 relations person, licensing and branding agent.  And then

3 there's one assistant who, according to the -- to the chart,

4 engaged in licensing negotiation on the Plaintiffs' behalf

5 for rights to the Plaintiffs' work -- works.

6     So, as I directed the parties, with this information in

7 hand, which sounds like the parties had, I directed the

8 parties, though, to meet and confer with regards to RFPs

9 that would be applicable or that likely the folks in their

10 capacity as identified in the supplemental chart would have

11 or would have access to.

12     So, tell me where you are on that -- that process.

13         MR. AUSTER:  Thank you, your Honor.  And, again,

14 we appreciated the directions in the tentative, and we've

15 made some substantial progress on this one as well.

16     So, I would just note with respect to the chart, we've

17 got one employee.  Plaintiffs don't dispute that that person

18 is an employee.  As to the 12 agents, we heard from last

19 night for the first time that three of those agents for

20 Plaintiff Kirsten Hubbard --

21         THE COURT:  Um-hmm.

22         MR. AUSTER:  -- are -- are no longer her agents.

23         THE COURT:  Okay.

24         MR. AUSTER:  And, so, you know, we've accepted

25 that representation, and -- and we're willing to withdraw

1  our request that Plaintiffs get documents from those three

2  people.  And those are the last three individual --

3  individuals identified in the supplemental chart, your

4  Honor.

5        THE COURT:  Oh, I see.

6        MR. AUSTER:  So, that's Sarah Davies (phonetic)

7  and Michelle Andelman (phonetic) and Jaida Temperlin

8  (phonetic).

9        THE COURT:  Okay.

10        MR. AUSTER:  Now, Plaintiffs have told us that

11  Temperlin formerly worked at an agency called New Leaf, and

12  New Leaf still represents Plaintiff Hubbard.  She just

13  doesn't have a specifically signed agent there.

14        THE COURT:  Um-hmm.

15        MR. AUSTER:  But -- and I'll get to this in a

16  moment -- they are willing to -- to reach out to the agency

17  about responsive documents.

18        THE COURT:  Okay.

19        MR. AUSTER:  And -- and, so -- so, now I think,

20  your Honor, we're really talking about 10 people, nine

21  agents, one employee, no dispute about the nature of the

22  agent relationship.

23     And -- and as to the requests at issue and how we're

24  doing with those, your Honor had suggested we work towards

25  narrowing the requests and categories of documents.  And,

30

1  so, we've done that, and we've reached agreement on 10 RFPs

2  for which Plaintiffs will work with these agents to collect

3  and produce responsive documents.  And those are RFPs

4  related to damages, ownership, authorship, and licensing.

5          THE COURT:  Okay.  Give me just a minute.

6  Damages, ownership --

7          MR. AUSTER:  Ownership and authorship and

8  licensing.

9          THE COURT:  -- and licensing, all right.

10         MR. AUSTER:  And if helpful for the record, your

11 Honor, I'll just note the numbers of those briefly.

12         THE COURT:  Yes, slowly because I want to compare

13 it to my list.  Go ahead.

14         MR. AUSTER:  Yeah.  That's RFPs 31 and 43.  And

15 those two are the damages related requests.

16         THE COURT:  Okay.

17         MR. AUSTER:  Then the ownership/authorship

18 requests are RFPs 20 and 21.

19         THE COURT:  Okay.

20         MR. AUSTER:  And the license related requests are

21 RFPs 22, 23, 24, 28, 29, and 30.

22         THE COURT:  28 through 30?

23         MR. AUSTER:  Yeah.

24         THE COURT:  Okay.  I did pretty good.

25         MR. AUSTER:  You did good.  And -- and, so, in

1  terms of -- in terms of the process here, you know, I'll say

2  where we still have a dispute, although I'll explain how

3  we're trying to short circuit it, is -- is this notion over

4  control, legal control, you know, for the purposes of Rule

5  34.

6          THE COURT:  Um-hmm.

7          MR. AUSTER:  And to us it's -- it's very clear,

8  your Honor, including from your opinion in the <u>Jones</u> case,

9  these -- these people are agents in every sense of the word,

10  right, formal agency relationships and also kind of

11  principal agent common law type agents, right.  They work on

12  behalf of these Plaintiffs and represent them in dealings

13  with third persons.  They owe fiduciary duties to the

14  Plaintiffs.  There's case law saying that one such fiduciary

15  duty is to disclose information.

16      So, to us, the -- the control here is very obvious.

17  Plaintiffs dispute it for reasons I don't fully understand,

18  but we're trying to short circuit that.  And, so, what

19  Plaintiffs offered last night and when we spoke about it

20  again this morning is that they will work with these 10

21  individuals to collect and produce responsive documents, and

22  we're sort of working on ironing out the specifics, but we

23  have the general contours of a process by which, you know,

24  Plaintiffs will reach out to these agents and the employee.

25  They'll, you know, work to figure out where responsive

32

documents exist and how to get it.  We will, you know, for
our part offer some instructions we would like them to
relay, some keyword searches we would like them to make in
their email files, and they'll communicate that along.  And
then once they collect the documents, you know, depending
for each particular agent on the volume, they'll either
review them or apply the search terms, the ESI search terms
we've already agreed to for the Plaintiffs' files.  And then
they'll produce.

        And, so, you know, I think that's -- that's meaningful
progress, and I think that is a generally workable
procedure.  I think from -- from my perspective, the main
outstanding questions are really, you know, the timeline for
that production.

            THE COURT:  Um-hmm.

            MR. AUSTER:  Again, these are documents we've been
trying to get for quite sometime.  And then also, you know,
given Plaintiffs' position that they don't have legal
control to sort of demand them, what happens if they can't
get it, and I think in that case, we would just look for
certification to that fact, just a statement of confirmation
that they tried and they were unable to get any documents
from their agent, if -- if that comes to pass.

            THE COURT:  Um-hmm.

            MR. AUSTER:  But, from my perspective, those are

33

1  kind of the two main outstanding issues.

2          THE COURT:  Okay.  I appreciate that.  Thank you.

3      And does -- do Plaintiffs have anything to add, Mr.

4  Young?

5          MR. YOUNG:  Mr. Richards' been handling the bulk

6  of the argument here, but I just want to make sure the

7  record is clear given that Mr. Austin has represented that

8  one of the agents is an employee.

9      I just want to be clear I believe this is a reference

10 to Ms. Zhang -- Plaintiff Zhng's assistant.  We've never

11 said that she's an employee.  I want t just be very careful

12 on the record just given that her status as an employee

13 carries some legal implications.  We've not conceded that

14 that individual is an employee.  What we have -- what we

15 have agreed to do is that we are going to search for and

16 collect for documents, responsive documents consistent with

17 our -- the agreement we have.

18     I just want to just make sure the record is clear on

19 that basis, that we have not conceded she's an employee.

20         THE COURT:  All right.  Noted.

21         MR. RICHARDS:  Thank you, your Honor.  I just want

22 to respond to a --

23         THE COURT:  Just state your name.

24         MR. RICHARDS:  Mark Richards for the record, your

25 Honor.

34

1          THE COURT:  Thank you, Mr. Richards.

2          MR. RICHARDS:  I just want to -- I think Mr.

3    Auster is -- is correct in -- in his characterization of

4    what Plaintiffs have agreed to do.  I just want to respond

5    to the point of our position with respect to control over

6    these agents.

7        We have taken the position that as a practical matter,

8    it would be -- we don't -- Plaintiffs don't have the legal

9    right to demand these documents or to force their agents to

10   do anything with respect to their ESI.  How this dispute

11   originally arose was that Defendants wanted to designate

12   Plaintiffs' agents as ESI custodians for all purposes.  And,

13   as a practical matter, Plaintiffs and their attorneys don't

14   have any oversight into how their agents would collect

15   documents, how searches would be ran, and -- or even what we

16   would do if an agent was to flat out -- flat out refuse.

17       And, so, I want to make it very clear that this is not

18   a matter of us flat out refusing to ask agents for documents

19   themselves but as a practical matter, how we would go about

20   doing that, and I -- I think that this compromise gets us to

21   that point so that we -- we are all in agreement on what --

22   how the agents would go about searching for their files

23   because we will not be able to have direct insight or

24   oversight in how that happens, and -- and also to how we

25   will get those documents from the agents and then provide

35

1 them to Defendants.

2        THE COURT:  Okay.  All right.  Thank you.

3     And I do appreciate the parties' work on this.  I

4 thought that this one in particular just really needed more

5 focus and -- and hard work by the parties, and -- and our

6 discussion here today reflects that that has happened, and I

7 am pleased to see that.

8     I know from my work in litigation and obviously the

9 cases that have come before me here on the bench that, you

10 know, the parties will get going on a dispute, and it's

11 like, Well, we're disputing this and we're disputing that,

12 and sometimes the meet and confer -- you just kind of burn

13 out.  You know, it's like, I can meet and confer with you

14 one more time.  But that's really where you don't wing in

15 the joint statement.  That's really where you step back and

16 try to think constructively, what is Judge van Keulen going

17 to tell us to do because you all have a pretty good read,

18 and see if you can't get there and say, you know, Look, this

19 is a likely outcome.  And I get it.  Sometimes there are

20 issues that you need to hear from the Court on, but cool off

21 a little bit, and then -- before you get to the joint

22 statement.

23     The work here sounds good.  It sounds like you are on

24 the right track, and I think that from a legal perspective,

25 the control issue can be sort of set aside because you've

36

got a very workable process.

I will just say this.  It's -- we're not talking about control that often comes up in the discovery context that a parent may exercise over a wholly owned subsidiary or vice versa, where everybody shares computer systems and shares managers and it's all of those kinds of factors.

I think it is clear -- it's reasonable and clear on the record before us that Plaintiffs don't have access to all of their agents' files.  They don't have that level of control.

I would expect, however, that they are able to direct the production of relevant responsive documents from their literary agents and/or assistant who negotiated their licenses and that they -- they're able -- they have -- it's controlled, but it's control over their documents.

Now, it may be that some agent takes the position, no, and you all will -- you'll get that clear statement, and then you can talk about next steps.  Defendants, of course, do still have subpoena power should it come to that  But hopefully we won't ever get there, and we can work through this in the constructive way that you have started.

So, timeline, have you talked about where you are in that process, Mr. Auster?

MR. AUSTER:  We spoke about it briefly this morning, your Honor.

THE COURT:  Okay.

1      MR. AUSTER:  And -- and I'll let my colleagues on
2 the other side talk about kind of practically where they are
3 with each of these respective agents if that's helpful.
4      My proposal was that they at a minimum begin rolling
5 out productions from their agents by the July 29th deadline
6 that we're, you know, working towards on our end, and -- and
7 that would be my hope.  I think that's a reasonable target
8 date.
9      THE COURT:  All right.  All right.  From -- from
10 Plaintiffs' side?
11      MR. RICHARDS:  Yes, your Honor.  We have no
12 objection to that -- that date as a matter of just
13 principle.
14      One issue -- and I raised this with Mr. Auster -- is
15 that given the fact that these are folks who we do not have
16 necessarily control over what they're doing, it's going to
17 be a plea and ask for them to get us these documents by well
18 before the 29th so that we can review them and produce them.
19 And, so, to the extent that some agent is unable to do that
20 or on vacation or whatever it might be, we would -- we would
21 just ask that there is some process for us to allow to
22 certify that to defense counsel in order to grant some --
23 some kind of relief.
24      THE COURT:  Let's get a rolling production under
25 way.  It sounds like you already have started the

38

1 communication process I would hope, and if not, that needs

2 to start forthwith.  And, again, the Plaintiffs are the

3 clients of these literary agents, and I would think they can

4 call up and say I -- you know, for example, if they were

5 leaving the agency, if they were changing, it would be like,

6 Send me my file.  So, there is a -- there is some control

7 there over their documents.

8     Now, I appreciate we're talking about some searches and

9 some search terms, and sometimes that can take a little bit

10 to work out, but I want you to be able to provide assurance

11 to Defendants that the process is in place and under way,

12 and let's get a rolling production started by the 29th.  And

13 by then you should at least have some idea how much time

14 you'll need, and you all can set some other milestones.  I

15 don't want it to be just open ended, We'll get them when the

16 agents get here.  And you may need to break it down.  It may

17 be different estimates.  You know, somebody may be out of

18 the country, exactly, as you point out, especially this time

19 of year.

20     MR. RICHARDS:  Yes, your Honor.  We'll -- we'll

21 promptly do that.

22     THE COURT:  Okay.  So, you all work together and

23 set some milestones, but we'll get the production under way

24 by the 29th.

25     MR. RICHARDS:  Thank you, your Honor.

1          THE COURT:  Okay.  All right.

2      Okay.  That is everything that was on my list.  Is

3  there anything else for the Court today from Plaintiffs?

4  Ms. Weaver?

5          MS. WEAVER:  Yes, your Honor, a couple of issues I

6  just wanted to raise.  Your Honor had directed us not to

7  bring any further discovery disputes.  We actually had two

8  in the pipeline, and we've been sitting on them without

9  argument.  One is time period, and it will substantially

10  affect the scope of discovery.

11      The second is the Defendants' request that the

12  Plaintiffs' lawyers put in an affidavit regarding searches

13  for documents for one Plaintiff.  I'm hopeful that we might

14  be able to reach some kind of accommodation on the second,

15  but we do have that ready to go.

16      There are, in addition to that, other discovery

17  disputes in line, unfortunately.

18          THE COURT:  So, let me just interrupt you there.

19          MS. WEAVER:  Yes.

20          THE COURT:  Because you all get a fair amount but

21  not an unlimited amount of judicial resources, and I know

22  it's a big case and it's complicated, but you're going to

23  have to get very well organized in terms of meet and confer

24  process.  The counsel who are engaged in meeting and

25  conferring must have authority to negotiate and compromise,

40

 1  must have that authority.  That will make your meet and

 2  confer sessions meaningful.  So, that has to happen, and

 3  you've got a long row to go here, and you can't be bringing

 4  every disagreement into court.  You need to find a

 5  constructive way to work through these.  And if you have to

 6  have a -- a lead on each side that is primarily responsible

 7  for meet and confer, that's hard in these cases because

 8  there are so many arms and legs and different issues.  But

 9  sometimes that's what it takes so that issues are dealt with

10  almost in a -- I'm going to say in a uniform manner but in a

11  consistent manner.  I'm not going to order you to do that

12  yet, but if this gets out of hand, I will.

13       So, you know, it would seem -- obviously, time period

14  disputes are very common, and it depends a lot on -- on

15  different views.  You can either whittle it down and get

16  close, but that's a -- you know, that's a very clear and

17  distinct dispute if you have to submit it.  But some of

18  these others obviously take quite a bit of time.  So --

19            MS. WEAVER:  Understood, your Honor.  We will be

20  judicious as we -- as we --

21            THE COURT:  I understand there are other disputes,

22  but that's why my order said that, because I want, you know,

23  a pause.  Let's get in.  Let's get these dealt with.  But,

24  as you can see and as you could tell from my tentative,

25  certainly the last -- well, certainly this last dispute,

41

 1  163, I think you could have reached this accommodation with

 2  meet and confer.  You could have seen your way to this.  I

 3  don't think -- there was absolutely no magic in my tentative

 4  on this.  It was just sort of litigation common sense.  So,

 5  you got to get there.

 6          MS. WEAVER:  We hear you on that, your Honor.  The

 7  -- the second issue is an issue we have also discussed with

 8  Google, and that is that we will be moving today to seek an

 9  extension of the case schedule.  We had previously advised

10  Judge Lee that we sought one earlier.  We have not received

11  an order.  There are two reasons for this in a non-

12  argumentative way.  One is simply there were amendments we

13  discussed in that hearing that affect the scope of

14  discovery, including the class definition, including, you

15  know, other issues I think this Court is aware of, but the

16  second is timing, and I did want to advise the Court at the

17  hearing on June 18th, Google was ordered to make the

18  training data available to us, and we are struggling.  We --

19  I don't want to brief anything that is not -- or put

20  anything before the Court that has not been briefed, but I

21  will tell you that our main expert still does not have

22  complete access.  We are working on it, but it is a major

23  stumbling block, and that will be in the papers.  Those

24  issues will be laid out before Judge Lee, and I wanted to

25  advise you of that.

 1          THE COURT:  Okay.

 2          MS. WEAVER:  And the other issue is that the --

 3   the production of documents by Google is slow.  We just

 4   yesterday we received --

 5          THE COURT:  Remember you said no argument.

 6          MS. WEAVER:  Okay.  Well, I will not then

 7   continue, but the other bucket will be the rate of

 8   production.  We think it's problematic.

 9          THE COURT:  Okay.  The only thing I want to touch

10   on -- thank you, Ms. Weaver -- is the expert access issue,

11   Mr. Tuttle, because you raised that -- made -- made those

12   representations back in June.

13          MR. TUTTLE:  May I?

14          THE COURT:  Yes, please.

15          MR. TUTTLE:  If I may just explain the -- the

16   issues that we're having or do you want to hear --

17          THE COURT:  No.  No, no, no.

18          MR. TUTTLE:  Okay.  Fine.

19          THE COURT:  I just want to hear can we get this

20   addressed.  You all must be talking about this.

21          MR. TUTTLE:  Yes, we are -- we are in touch, your

22   Honor.  So, I'm not sure what's being referenced.  The -- we

23   -- we -- as soon as the last hearing was over, we asked

24   again to get the names of the individuals who wanted to

25   access it.  We got that two days later I think, on the

43

1  Friday after the hearing.  We immediately shipped the
2  Chromebooks.  We asked for the email addresses so we could
3  provision the accounts.  We got those on the Tuesday after
4  the hearing.  The accounts were created, and the environment
5  was accessible to them on that Friday following the --
6  Friday the week after the hearing, as the Court directed
7  make it available the week after the hearing.
8      We got confirmation from them on the next day,
9  Saturday.  They were able to log in.  They then reached out
10 with issues, and it turned out they hadn't reset the
11 Chromebooks properly.  So, we had my colleague go to the
12 Best Buy, get a Chromebook, follow the instructions.  You
13 know, it's getting to the 4th of July.  So, it's hard, but
14 my colleague did it.  We walked them through resetting the
15 Chromebooks.  They are in.  The data is there.  All of the
16 -- all of the data sets that were requested that were tied
17 to one of the models at issue are present is my
18 understanding, and I think we verified.  So, it's a lot to
19 be 100 percent confident, but I'm --
20             THE COURT:  Right.  Right.
21             MR. TUTTLE:  They're all there.
22             THE COURT:  But I understood Ms. Weaver's comment
23 just is to the access.  So, but it sounds like something
24 that you all need to talk about, whatever the specific
25 issues are, and --

44

1          MR. TUTTLE:  Yes.  And we are, your Honor.  We are

2   in -- there was -- there was an email this morning.  We're

3   working on it.  But from my -- from my understanding, the

4   data is there.  The experts have login access.  It's -- as

5   your Honor said, there's going to be wrinkles, right.  It's

6   complicated.  And, so, we have to work through.  They have

7   questions.  We're working to answer them.  We've agreed to

8   have a meeting to walk through those questions.  But, as far

9   as I can tell, they have access.  They have asked for

10  certain like code libraries to be added so that they can

11  more easily work, and we are getting those added, my

12  understanding is, today.

13         THE COURT:  Okay.  Okay.  Then I can send you all

14  downstairs to the attorney lounge to meet and confer if it's

15  that kind of -- but it sounds like you have had some back

16  and forth, and it's a we need these things and you're

17  getting these things.

18         MR. TUTTLE:  That's exactly it, your Honor.  We

19  are -- we are being transparent.  We are getting them -- we

20  are giving them things they haven't yet even asked for

21  because we can anticipate that they're going to want it.

22  So, we're -- we're doing our best to make sure they have

23  what they need.  But, as far as I know, they have access,

24  and if they're having problems, they'll tell us, and we'll

25  work -- we'll work it out.

45

1        THE COURT:  Okay.  All right.  I don't think I

2  need to hear anything further, Ms. Weaver.

3        MS. WEAVER:  I do have a specific request, and

4  this is the issue.  Right now the -- we lawyers are asking

5  their lawyers for answers, and there is a delay, and there

6  is confusion.  Google has refused until recently to let us

7  have access.  They said we get one meeting with the

8  engineers who built the environment.

9      What we would ask is that we get access to the

10 engineers so our experts can talk to their people and solve

11 the problem because it's taking weeks, and there are a

12 multitude of problems.  I -- I dispute whether we have

13 access.  There are databases our experts can't get, and we

14 can't fix the problem by having lawyers talk to lawyers,

15 efficiently at least.  That's what I would request.

16       THE COURT:  Okay.  All right.  Can we get the

17 right people with the lawyers in the room, but can we get

18 the right technical people talking to each other?  That will

19 speed this process.

20       MR. TUTTLE:  Absolutely, your Honor.  And we

21 agreed to that yesterday.  Just we -- what we've asked for

22 is can we have some sense of the questions so that we can

23 get the right engineers and have them be prepared.  We also

24 did say that --

25       THE COURT:  And -- and I -- and I appreciate that.

46

1    Often the issue is, but we don't know.  I mean --

2              MR. TUTTLE:  Yeah.

3              THE COURT:  -- all we know is we don't have

4    access, but we don't -- we don't really -- you know, we

5    don't know what -- what our questions are yet.  And

6    sometimes it takes, okay, this isn't the right person.

7    Let's get this person.  It takes some conversations with the

8    technical people in the room.

9              MR. TUTTLE:  Understood, your Honor.  And I'm not

10   going to be punctilious about it.  We're not asking for like

11   a -- all the questions.

12             THE COURT:  No, I understand.

13             MR. TUTTLE:  Just -- just topics, and then we can

14   get the -- we can get the people in the room.  And -- and we

15   did -- we do want to make sure that this isn't like a

16   constant thing because these people have day jobs.  But

17   we're -- but we're -- but we will -- we will have a meeting,

18   and I hope that that will solve it, and if it -- and we will

19   be prompt.  We are being prompt.

20             THE COURT:  All right.  You will not necessarily

21   only have to have one meeting --

22             MR. TUTTLE:  Understood.

23             THE COURT:  -- is my point.

24             MR. TUTTLE:  Okay.

25             THE COURT:  The experts do need to get the

1  technical people in the room.  I know that makes the lawyers

2  very nervous, but -- and -- and that's why the request for,

3  so, tell us what you think the problems are or what the

4  issues are is a fair -- a fair question, so that everybody's

5  kind of on the same page.  It's not a free for all.

6          MR. TUTTLE:  Yes.

7          THE COURT:  It's not pre-discovery, but it is

8  really the technical nuts and bolts of how is this going to

9  work.

10          MR. TUTTLE:  Absolutely.  We just want to make --

11          THE COURT:  I know, but Google --

12          MR. TUTTLE:  -- that meeting as efficient --

13          THE COURT:  -- set it up.

14          MR. TUTTLE:  Yeah.

15          THE COURT:  It's Google's -- Google's world

16  through which the access, instead of going out through a

17  third party, which I understand and I think is appropriate,

18  but you've got to help -- help them get through the door,

19  and it's -- it's required.

20          MR. TUTTLE:  Right.  We -- we understand, and we

21  take that seriously.  We just want these meetings to be as

22  efficient and effective as possible.  So, we'll -- we -- we

23  hear you, your Honor.

24          THE COURT:  Okay.  Excellent.

25          MR. TUTTLE:  Thank you.

48

1          THE COURT:  All right.  Keep talking.  You call

2  can get this done.  Do not -- well, you can send what you

3  think are in dispute and you can't resolve.  You know,

4  you're in the queue, and it's a long queue.  So, okay.

5      All right.  I think that addresses all of the issues

6  for today.  We are concluded and adjourned.  Thank you very

7  much.

8          ALL:  Thank you, your Honor.

9      (Proceedings adjourned at 10:58 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

49

1                  <u>CERTIFICATE OF TRANSCRIBER</u>

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16            Echo Reporting, Inc., Transcriber

17              Monday, July 14, 2025

18

19

20

21

22

23

24

25