1   [Counsel on signature page]

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**
9                         **NORTHERN DISTRICT OF CALIFORNIA**

                               **SAN JOSE DIVISION**
10

11                                                    Master File Case No. 5:23-cv-03440-EKL
                                                      Consolidated with Case No. 5:24-cv-02531-EKL
12
      *In Re Google Generative AI Copyright Litigation*    **SECOND AMENDED CONSOLIDATED**
13                                                    **CLASS ACTION COMPLAINT**

14                                                    Judge: Hon. Eumi K. Lee

15                                                    Second Amended Consolidated Complaint Filed:
16                                                    September 25, 2025

17                                                    **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

1

2

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................................... 5

III.  PARTIES ....................................................................................................................... 6

   A.   Plaintiffs .................................................................................................................. 6

   B.   Defendant .............................................................................................................. 20

IV.   FACTUAL ALLEGATIONS ..................................................................................... 23

   A.   The Generative AI arms race ............................................................................... 23

     i.    Generative AI Model types .............................................................................. 23

     ii.   Google willfully trained Gemini on copyrighted works .................................. 25

     iii.  Google willfully trained Imagen on copyrighted works .................................. 27

     iv.   Google's infringement was willful ................................................................... 32

V.    CLASS ALLEGATIONS ............................................................................................ 34

VI.   CAUSES OF ACTION ............................................................................................... 36

VII.  PRAYER FOR RELIEF .............................................................................................. 38

Plaintiffs Steve Almond, Sarah Andersen, Burl Barer, Jessica Fink, Kirsten Hubbard, Hope Larson, Mike Lemos, Jill Leovy, Connie McLennan, and Jingna Zhang, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), bring this Second Amended Consolidated Class Action Complaint ("Consolidated Complaint") against Defendant Google LLC ("Google").

## I.    INTRODUCTION

1.       Google willfully infringed millions of registered copyrighted works to create its commercial artificial-intelligence ("AI") business. Plaintiffs are visual artists and authors who have copyright registrations for certain works (including the "Plaintiff Works[1]" cited herein). Google willfully copied the Plaintiff Works without authorization to build and train its generative artificial intelligence models ("Generative AI Models"), including Gemini[2] and Imagen,[3] thereby violating 17 U.S.C. § 501.

2.       The scale of Google's copyright infringement is unprecedented. To build its Generative AI Models, Google copied millions of copyrighted works and permanently embedded copies of these works within these models. For example, Google's training dataset for its Bard model comprised 1.56 trillion words.[4] Similarly, LAION-5B—a likely training dataset for Imagen—comprises 5.8 billion image-caption pairs.[5] The training of a Generative AI Model necessarily involves making multiple unauthorized copies of each work. For each work used in training, first a copy is made during data

---

[1] Section III alleges infringed works for each named plaintiff. Collectively, they shall be referred to as Plaintiffs Works.

[2] Gemini is a Google Generative AI Model that was originally released as a chatbot in March 2023 under the name Bard. Gemini is now a multimodal model family that includes Gemini 1.0, Gemini 1.0 Pro, Gemini 1.0 Ultra, Gemini 1.0 Nano, Gemini 1.5 Pro, Gemini 1.5 Flash, Gemini 1.5 Flash-8B, and Gemini 2.0. Bard and all versions of the Gemini model family are collectively referred to in this Complaint as "Gemini."

[3] Imagen is also a Google AI product, originally released in May 2022, a text-to-image diffusion model family that includes Imagen, Imagen 2, and Imagen 3. All versions of Imagen are collectively referred to in this Complaint as "Imagen."

[4] Romal Thoppilan et al., *LaMDA: Language Models for Dialog Applications* at 2, GOOGLE (Jan. 20, 2022), https://arxiv.org/pdf/2201.08239.

[5] Christoph Schuhmann, *LAION-5b: An Open Large-Scale Dataset for Training Next Generation Image-Text Models* at 2, LAION (Oct. 16, 2022), https://arxiv.org/abs/2210.08402.

collection, then a series of copies are made during model training, and finally a copy is permanently incorporated into the parameters of the Generative AI Model.

3.     Google's unauthorized copying of the Plaintiff Works continues to harm Plaintiffs through Google's ongoing monetization of those works. Google is integrating its Generative AI Models into a growing set of Google products, thereby powering them with infringing copies of the Plaintiff Works. Those products include Google Search, Google Cloud, Gmail, Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets, Google Meet, Google Pixel, Google Maps, Google AI Studio, Google Vids, Google Workspace, and Vertex AI (collectively, the "AI-Powered Products").[6] Google was able to create the AI-Powered Products because of the Generative AI Models it built and trained on Plaintiffs' copyrighted works without Plaintiffs' license or authorization.

4.     By embedding the Plaintiff Works into its Generative AI Models, Google has irreversibly entangled the Plaintiff Works with its commercial products. Google has stripped Plaintiffs of their exclusive rights under the Copyright Act to control the copying and distribution of the Plaintiff Works. This unauthorized copying and distribution inflicts immediate and irreparable harm on Plaintiffs—harm that Google compounds daily through its expanding deployment of AI-Powered Products built on infringed Plaintiff Works.

5.     The FTC issued a stern warning to the AI industry in May 2023 regarding the industry's sudden sprint to collect as much training data as possible: "Machine learning is no excuse to break the law . . . The data you use to improve your algorithms must be lawfully collected . . . companies would do well to heed this lesson."[7]

6.     Rather than heed the FTC's warning and cease its years-long theft of data, Google instead elected to continue copying and downloading the works of writers, artists, and other creators—without notice, consent, or compensation—to build and train its AI Products, including Imagen and Gemini.

---

[6] *Gemini*, GOOGLE, https://ai.google/get-started/gemini-ecosystem/#GeminiInOurProducts (last visited December 10, 2024).

[7] *Statement of Commissioner Alvaro M. Bedoya Joined by Chair Lina M. Khan and Commissioner Rebecca Kelly Slaughter*, FED. TRADE COMMISSION (May 31, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-commissioner-alvaro-m-bedoya-joined-chair-lina-m-khan-commissioner-rebecca-kelly-slaughter-0.

7.    When gathering training data for its Generative AI Models, Google chose to copy data from websites under active prosecution for copyright infringement.[8] For example, C4, a dataset Google admits it used to train Gemini, contains materials from Z-Library, a website which hosted pirated copyrighted material. Z-Library now displays this seizure warning:



8.    Google's unauthorized copying of the Plaintiff Works to train its Generative AI Models has created two rapidly increasing revenue streams for Google. First, Google collects subscription and licensing fees from customers of its Generative AI Models. Second, and more significantly, Google has leveraged its Generative AI Models throughout its broader portfolio of AI-Powered Products, resulting in revenue growth attributable to the infringing technology.

9.    Google has confirmed the scale of these commercial benefits through its own financial disclosures and executive statements. In July 2024, Google and Alphabet CEO Sundar Pichai reported that Google Cloud, one of Google's AI-Powered Products, achieved quarterly revenue of $10.9 billion—

---

[8] Ernesto Van der Sar, *FBI Carries Out Fresh Round of Z-Library Domain Name Seizures*, TORRENT FREAK (May 30, 2024), https://torrentfreak.com/fbi-carries-out-fresh-round-of-z-library-domain-name-seizures-240530/.

a 29% year-over-year increase directly linked to AI integration.[9] Pichai also said that Google Cloud's AI infrastructure and "generative AI solutions, alone, had year-to-date already generated billions in revenues and are being used by more than two million developers."[10] While Google's campaign of massive copyright infringement is already generating the intended financial gains, the creators whose copyrighted works underpin and sustain the Generative AI Models continue to receive nothing.

10.    In October 2024, Pichai confirmed that Google's AI-Powered Products were "paying off and driving success" by substantially contributing to record-breaking quarterly revenue of $88.3 billion.[11] This financial performance demonstrates the substantial commercial advantage Google has derived from its unauthorized copying of the Plaintiff Works and establishes the causal link between Google's copyright infringement and its monetary gains.

**Class Certification Presents the Superior Method of Adjudication**

11.    Google's uniform approach to data collection and training for its Generative AI Models compels class certification.[12] Google relied on automated systems to make unauthorized copies of the Plaintiff Works and millions of others, creating common questions of law and fact that predominate over any individual issues. Google did not selectively target or differently handle specific Plaintiff Works— rather, it applied consistent methods across Plaintiff Works that it copied to build and train its Generative AI Models.

12.    The economics of copyright litigation make individual suits impracticable for most copyright holders. Pursuing individual copyright claims would require copyright holders to shoulder

---

[9] Nico Grant, *Alphabet Reports 29% Jump in Profit as A.I. Efforts Begin to Pay Off*, N.Y. TIMES (July 23, 2024), https://www.nytimes.com/2024/07/23/technology/alphabet-google-earnings.html.

[10] Lindsey Wilkinson, *Google Ties Billions in Revenue This Year to Generative AI*, CIO DIVE (July 24, 2024), https://www.ciodive.com/news/google-cloud-revenue-growth-continues-generative-ai/722310/#:~:text=%E2%80%9CYear%2Dto%2Ddate%2C,Pichai%20said%20during%20the%20call.

[11] Nico Grant, *Alphabet Revenue Jumps 15% to $88.3 Billion*, N.Y. TIMES (Oct. 29, 2024), https://www.nytimes.com/2024/10/29/technology/alphabet-google-earnings.html.

[12] Class proceedings promote judicial efficiency by avoiding thousands of duplicative suits addressing identical legal theories and evidence regarding Google's AI training practices. Individual actions would unnecessarily burden the courts with repetitive litigation of the same core issues concerning Google's standardized conduct.

substantial litigation costs that would likely exceed potential individual recovery. Class treatment allows copyright holders to pool resources, achieve economies of scale in litigation, and enable meaningful access to justice. Class certification would also advance the Copyright Act's fundamental purpose of protecting copyright holders by providing a viable mechanism to challenge systematic infringement. Without class treatment, most copyright holders would face insurmountable practical barriers to vindicating their rights, effectively immunizing Google's widespread copyright violations from judicial scrutiny.

13.     The standardized nature of the infringements, the need for effective enforcement of the U.S. Copyright Act, and the practical barriers to individual suits all point decisively toward class treatment as the superior method for adjudicating these claims.

14.     Plaintiffs therefore bring this action to recover statutory and actual damages, Google's profits attributable to its infringing conduct, attorney's fees and court costs, injunctive relief, and all other relief deemed appropriate by the Court on behalf of themselves and all those similarly situated.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Copyright Act (17 U.S.C. § 501). Jurisdiction and venue are proper in this judicial district under 28 U.S.C. § 1391(c)(2) because Google is headquartered in Mountain View, California and a substantial part of the events giving rise to the claims occurred in this District. A substantial portion of the affected interstate trade and commerce was carried out in this District. Google has several business units and divisions headquartered in this District, including but not limited to Google AI and Google Research, that are dedicated to either the research, development, or training of Google's Generative AI Models. Google also employs hundreds of individuals in this District who are involved in the research, development, and/or training of its Generative AI Models. Google has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Google's conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

16.    Under Civil Local Rule 3-2(c), assignment of this case to the San Jose Division is proper because this litigation pertains to intellectual property rights, which is deemed a district-wide case category under General Order No. 44. Therefore, venue is proper in any courthouse in this District.

III.    **PARTIES**

A.  **Plaintiffs**

17.    **Plaintiff Steve Almond** resides in Massachusetts and is self-employed. He is a New York Times best-selling author whose registered copyrighted works include:

- *All the Secrets of the World*;
- *Candyfreak: A Journey Through the Chocolate Underbelly of America*;
- *The Evil B.B. Chow and Other Stories*;
- *Rock and Roll Will Save Your Life: A Book by and for the Fanatics Among Us*;
- *Truth Is the Arrow, Mercy Is the Bow: A DIY Manual for the Construction of Stories*; and
- *Which Brings Me to You: A Novel in Confessions*.

18.    Plaintiff Almond is the owner or beneficial owner of registered copyrights in nine (9) literary works, at least six (6) of which—*All the Secrets of the World*, *Candyfreak: A Journey Through the Chocolate Underbelly of America*, *The Evil B.B. Chow and Other Stories*, *Rock and Roll Will Save Your Life: A Book by and for the Fanatics Among Us*, *Truth Is the Arrow, Mercy Is the Bow: A DIY Manual for the Construction of Stories*, and *Which Brings Me to You: A Novel in Confessions*—Google took, used, copied, and/or reproduced without license or authorization (the "Almond Infringed Works"). The registration information for the Almond Infringed Works is contained in **Exhibit A** to this Complaint.

19.    The Almond Infringed Works are found on two or more websites, including:

- Z-Library (at https://1lib.sk/);
- PDF Drive (at https://www.pdfdrive.com/); and
- OceanofPDF (at https://oceanofpdf.com/).

1    20.    These websites served as sources for Infiniset and C4, training datasets for

2    Gemini. *See* Section IV.

3    21.    Specifically, *All the Secrets of the World* was found on:

4    • Z-Library (at https://1lib.sk/book/21558874/c28c4b/all-the-secrets-of-the-

5    world.html); and

6    • OceanofPDF (at https://oceanofpdf.com/authors/steve-almond/pdf-epub-all-the-

7    secrets-of-the-world-a-novel-download/).

8    22.    *Candyfreak: A Journey Through the Chocolate Underbelly of America* was found on:

9    • Z-Library (at https://1lib.sk/book/17724374/0351fb/candyfreak-a-journey-

10   through-the-chocolate-underbelly-of-america.html);

11   • PDF Drive (at https://www.pdfdrive.com/candyfreak-a-journey-through-the-

12   chocolate-underbelly-of-america-e177466738.html); and

13   • OceanofPDF (at https://oceanofpdf.com/authors/steve-almond/pdf-epub-

14   candyfreak-a-journey-through-the-chocolate-underbelly-of-america-download/).

15   23.    *The Evil B.B. Chow and Other Stories* was found on:

16   • Z-Library (at https://1lib.sk/book/17724383/c01937/the-evil-bb-chow-and-other-

17   stories.html); and

18   • OceanofPDF (at https://oceanofpdf.com/genres/short-stories/pdf-epub-the-evil-b-

19   b-chow-and-other-stories-download/).

20   24.    *Rock and Roll Will Save Your Life: A Book by and for the Fanatics Among Us* was found

21   on:

22   • Z-Library (at https://1lib.sk/book/2208771/11fb64/rock-and-roll-will-save-your-

23   life-a-book-by-and-for-the-fanatics-among-us.html);

24   • PDF Drive (at https://www.pdfdrive.com/rock-and-roll-will-save-your-life-a-

25   book-by-and-for-the-fanatics-among-us-e164900492.html); and

26

27

28

- OceanofPDF (at https://oceanofpdf.com/authors/steve-almond/pdf-epub-rock-and-roll-will-save-your-life-a-book-by-and-for-the-fanatics-among-us-download-85506150816/).

25. *Truth Is the Arrow, Mercy Is the Bow: A DIY Manual for the Construction of Stories* was found on:

- Z-Library (at https://1lib.sk/book/28472304/98b8fd/truth-is-the-arrow-mercy-is-the-bow-a-diy-manual-for-the-construction-of-stories.html); and

- OceanofPDF (at https://oceanofpdf.com/authors/steve-almond/pdf-epub-truth-is-the-arrow-mercy-is-the-bow-a-diy-manual-for-the-construction-of-stories-download/).

26. *Which Brings Me to You: A Novel in Confessions* was found on:

- Z-Library (at https://1lib.sk/book/27459595/49f29b/which-brings-me-to-you.html); and

- OceanofPDF (https://oceanofpdf.com/authors/steve-almond/pdf-epub-which-brings-me-to-you-download/).

27. The presence of the Almond Infringed Works on the above websites means Google copied and reproduced them multiple times to train Gemini. *See* Section IV.

28. Plaintiff Almond did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the Almond Infringed Works.

29. In addition to statutory harms, Plaintiff Almond has suffered actual damages through Google's unauthorized copying, reproduction, and use of his works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Almond Infringed Works deprived him of licensing revenues he would have received had Google properly licensed his works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of literary works has depressed the overall market for fiction and nonfiction writers, like Plaintiff

Almond, causing substantial harm to the commercial value of Plaintiff Almond's portfolio of works.

30.    **Plaintiff Sarah Andersen** is domiciled in Oregon and is a self-employed professional cartoonist and illustrator. She is a cartoonist and illustrator whose work includes *Adulthood is a Myth: A "Sarah's Scribbles" 2021 Wall Calendar*, *Adulthood Is a Myth: A Sarah's Scribbles Collection*, *Big Mushy Happy Lump: A Sarah's Scribbles Collection*, *Herding Cats: A Sarah's Scribbles Collection*, and *Oddball: A Sarah's Scribbles Collection.*

31.    Andersen is the owner or beneficial owner of copyrights in at least five (5) works, which Google took, used, copied and/or reproduced without license or authorization (the "Andersen Infringed Works"). The registration information for the Andersen Infringed Works is contained in Exhibit A to this Complaint. The Andersen Infringed Works are contained within the LAION-400M Dataset ("LAION-400M"). *See* Exhibit B to the Complaint, at 2–7. LAION-400M is contained within the LAION-5B dataset.

32.    The presence of the Andersen Infringed Works in LAION-400M means Google copied and reproduced them multiple times to train Imagen. *See* Section IV.

33.    Plaintiff Andersen did not authorize or license Google to use, copy, reproduce, distribute, or train Imagen with the Andersen Infringed Works.

34.    In addition to statutory harms, Andersen has suffered actual damages through Google's unauthorized copying, reproduction, and use of her works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Andersen Infringed Works deprived her of licensing revenues she would have received had Google properly licensed her works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of artistic works has depressed the overall market for professional illustration and cartooning, causing substantial harm to the commercial value of Andersen's portfolio.

35.    **Plaintiff Burl Barer** resides in Stevenson Ranch, California and is a self-employed author. He is a New York Times best-selling author whose literary work includes:

- *Mom Said Kill*;

- *Broken Doll*;

- *Murder in the Family*;

- *Body Count*;

- *Fatal Beauty*; and

- *Head Shot*.

36.    Plaintiff Barer is the owner or beneficial owner of registered copyrights in six (6) literary works, all of which—*Broken Doll*, *Fatal Beauty*, *Mom Said Kill*, *Headshot*, *Body Count*, and *Murder in the Family*—Google took, used, copied and/or reproduced without license or authorization (the "Barer Infringed Works"). The registration information for the Barer Infringed Works is contained in **Exhibit A** to this Complaint.

37.    The Barer Infringed Works are found on two or more websites, including:

- Z-Library (at https://1lib.sk/);

- Pdfdrive (at https://www.pdfdrive.com/); and

- OceanofPDF (at https://oceanofpdf.com/).

38.    These websites served as sources for Infiniset and C4, training datasets for Gemini. *See* Section IV.

39.    Specifically, *Broken Doll* was found on:

- Z-Library (at https://1lib.sk/book/4018902/2e9267/broken-doll.html); and

- PDFDrive (at https://www.pdfdrive.com/broken-doll-e196386331.html).

40.    *Fatal Beauty* was found on:

- Z-Library (at https://1lib.sk/book/1457315/d807c5/fatal-beauty.html).

41.    *Mom Said Kill* was found on:

- Z-Library (at https://1lib.sk/book/2540922/37e427/mom-said-kill.html).

42.    *Headshot* was found on:

- Z-Library (at https://1lib.sk/book/1988028/3a3c57/head-shot.html); and

- OceanofPDF (at https://oceanofpdf.com/authors/burl-barer/pdf-epub-head-shot-by-burl-barer-download-20591692044/).

43.    *Body Count* was found on:

- Z-Library (at https://1lib.sk/book/2541254/b8e6a0/body-count.html); and
- PDFDrive (at https://www.pdfdrive.com/body-count-e199614948.html).

44.    *Murder in the Family* was found on:

- Z-Library (at https://1lib.sk/book/11682997/ab3273/murder-in-the-family.html); and
- OceanofPDF (at https://oceanofpdf.com/authors/burl-barer/pdf-epub-murder-in-the-family-by-burl-barer-download/).

45.    The presence of the Barer Infringed Works on the above websites means Google copied and reproduced them multiple times to train Gemini. *See* Section IV.

46.    Plaintiff Barer did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the Barer Infringed Works.

47.    In addition to statutory harms, Plaintiff Barer has suffered actual damages through Google's unauthorized copying, reproduction, and use of his works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Barer Infringed Works deprived him of licensing revenues he would have received had Google properly licensed his works for AI training purposes.
- **Market Value Diminution**: Google's mass appropriation of literary works has depressed the overall market for fiction and nonfiction writers, like Plaintiff Barer, causing substantial harm to the commercial value of Plaintiff Barer's portfolio of works.

48.    **Plaintiff Jessica Fink** is domiciled in New York and is a self-employed professional cartoonist and illustrator. She is a cartoonist and illustrator whose work includes *Chester 5000 XYV, Book 2: Isabelle & George HC*.

49.     Fink is the owner or beneficial owner of copyrights in at least one (1) work, which Google took, used, copied and/or reproduced without license or authorization (the "Fink Infringed Work"). The registration information for the Fink Infringed Work is contained in **Exhibit A** to this Complaint.

50.     The Fink Infringed Work is contained within the LAION-400M Dataset ("LAION-400M"). *See* **Exhibit B** to the Complaint. LAION-400M is contained within the LAION-5B dataset.

51.     The presence of the Fink Infringed Work in LAION-400M means Google copied and reproduced it multiple times to train Imagen. *See* Section IV.

52.     Plaintiff Fink did not authorize or license Google to use, copy, reproduce, distribute, or train Imagen with the Fink Infringed Work.

53.     In addition to statutory harms, Fink has suffered actual damages through Google's unauthorized copying, reproduction, and use of her work, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Fink Infringed Work deprived her of licensing revenues she would have received had Google properly licensed her work for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of artistic works has depressed the overall market for professional illustration and cartooning, causing substantial harm to the commercial value of Fink's portfolio.

54.     **Plaintiff Kirsten Hubbard** resides in Los Angeles, California and is a self-employed writer. She is an illustrator and author whose registered copyrighted works include, but are not limited to:

- *Like Mandarin*;

- *Wanderlove*;

- *Watch the Sky*;

- *Race the Night*; and

- *Secrets of Topsea: A Friendly Town That's Almost Always By The Ocean*

55.    Plaintiff Hubbard is the owner or beneficial owner of registered copyrights in five (5) written works and one (1) visual art work, all of which—*Like Mandarin*, *Wanderlove*, *Watch the Sky*, *Race the Night*, and *Secrets of Topsea: A Friendly Town That's Almost Always By The Ocean*—Google took, used, copied and/or reproduced without license or authorization (the "Hubbard Infringed Works").  The registration information for the Hubbard Infringed Works is contained in **Exhibit A** to this Complaint.

56.    The Hubbard Infringed Works are found on two or more websites, including:

- Z-Library (at https://1lib.sk/);

- Pdfdrive (at https://www.pdfdrive.com/);

- OceanofPDF (at https://oceanofpdf.com/); and

- Haveibeentrained (at https://haveibeentrained.com/).

57.    Z-Library, Pdfdrive, and OceanofPDF served as sources for Infiniset and C4, training datasets for Gemini; Haveibeentrained is a searchable database of LAION-5B, a training dataset for Imagen. *See* Section IV.

58.    Specifically, *Like Mandarin* was found on:

- Z-Library (at https://1lib.sk/book/1109533/cb641e/like-mandarin.html); and

- OceanofPDF (at https://oceanofpdf.com/authors/kirsten-hubbard/pdf-epub-like-mandarin-download/).

59.     *Wanderlove* was found on:

- Z-Library (at https://1lib.sk/book/4237162/1cc1e9/wanderlove.html);

- OceanofPDF (at https://oceanofpdf.com/authors/kirsten-hubbard/pdf-epub-wanderlove-download/);

- PDFDrive (at https://www.pdfdrive.com/wanderlove-kirsten-hubbard-e52129165.html); and

  Haveibeentrained (at

  https://haveibeentrained.com/search/TEXT?search_text=wanderlove).

60.    *Wanderlove* also appears within the LAION-400M Dataset ("LAION-400M"). *See* **Exhibit B** to the Complaint.

61.    *Watch the Sky* was found on:

- Z-Library (at https://1lib.sk/book/4827027/e4e67a/watch-the-sky.html); and
- OceanofPDF (at https://oceanofpdf.com/authors/kirsten-hubbard/pdf-epub-watch-the-sky-download-36548863886/_).

62.    *Race the Night* was found on:

- Z-Library (at https://1lib.sk/book/4858313/60315a/race-the-night.html); and
- OceanofPDF (at https://oceanofpdf.com/authors/kirsten-hubbard/pdf-epub-race-the-night-download/).

63.    *Secrets of Topsea: A Friendly Town That's Almost Always By The Ocean* (published under her pen name Kir Fox) was found on:

- OceanofPDF (at https://oceanofpdf.com/authors/kir-fox/pdf-epub-a-friendly-town-thats-almost-always-by-the-ocean-secrets-of-topsea-1-download/).

64.    The presence of the Hubbard Infringed Works on the above websites and within LAION-400M means Google copied and reproduced them multiple times to train Gemini and Imagen. *See* Section IV.

65.    Plaintiff Hubbard did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the Hubbard Infringed Works.

66.    In addition to statutory harms, Plaintiff Hubbard has suffered actual damages through Google's unauthorized copying, reproduction, and use of her works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Hubbard Infringed Works deprived her of licensing revenues she would have received had Google properly licensed her works for AI training purposes.
- **Market Value Diminution**: Google's mass appropriation of literary and visual works has depressed the overall market for fiction and nonfiction and visual artists

writers, like Plaintiff Hubbard, causing substantial harm to the commercial value of Plaintiff Hubbard's portfolio of works.

67.    **Plaintiff Hope Larson** is domiciled in North Carolina and is a self-employed illustrator and author. She has created numerous graphic novels, including *All Summer Long*.

68.    Plaintiff Larson is the owner or beneficial owner of registered copyrights in at least one (1) literary work that Google took, used, copied and/or reproduced without license or authorization (the "Larson Infringed Work"). The registration information for the Almond Infringed Works is contained in **Exhibit A** to this Complaint.

69.    The Larson Infringed Work is found on one or more websites, including Scribd, https://www.scribd.com.

70.    Scribd was a source for Infiniset and C4, training datasets for Gemini. *See* Section IV.

71.    Specifically, Larson's graphic novel, *All Summer Long*, is found at https://www.scribd.com/document/753880651/OceanofPDF-com-All-Summer-Long-the-Eagle-Rock-Trilogy-Hope-Larson.

72.    The presence of the Larson Infringed Work on Scribd means Google copied and reproduced it multiple times to train Gemini. *See* Section IV.

73.    Plaintiff Larson did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the Larson Infringed Work.

74.    In addition to statutory harms, Larson has suffered actual damages through Google's unauthorized copying, reproduction, and use of her work, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying and use of Larson's graphic novel deprived her of substantial licensing revenues she would have received had Google properly licensed her works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of literary works has depressed the overall market for graphic novel licensing, causing substantial harm to the commercial value of Larson's portfolio. This harm is especially acute given

the specialized nature of graphic novel creation, which requires extensive creative investment in both visual artistry and narrative development.

75.     **Plaintiff Mike Lemos** resides in Moorpark, California and is a self-employed visual artist.  He is an illustrator and character designer whose works include, but are not limited to, *Shark Fink Sticker*, *Caffeine Case from Outer Space*, and *Butterflies & Snakes.*

76.     Lemos is the owner or beneficial owner of copyrights in eight (8) visual art works, at least three of which—*Shark Fink Sticker*, *Caffeine Case from Outer Space*, and *Butterflies & Snakes*— Google took, used, copied and/or reproduced without license or authorization (the "Lemos Infringed Works").  The registration information for the Lemos Infringed Works is contained in **Exhibit A** to this Complaint.

77.     The Lemos Infringed Works are contained within the LAION-400M Dataset ("LAION-400M"). *See* **Exhibit B** to the Complaint. LAION-400M is contained within the LAION-5B dataset.

78.     The presence of the Lemos Infringed Works in LAION-400M means Google copied and reproduced them multiple times to train Imagen.  *See* Section IV.

79.     Plaintiff Lemos did not authorize or license Google to use, copy, reproduce, distribute, or train Imagen with the Lemos Infringed Works.

80.     In addition to statutory harms, Lemos has suffered actual damages through Google's unauthorized copying, reproduction, and use of his works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Lemos Infringed Works deprived him of licensing revenues he would have received had Google properly licensed his works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of illustrated works has depressed the overall market for professional illustrators and character designers, like Plaintiff Lemos, causing substantial harm to the commercial value of his portfolio.

81.     **Plaintiff Jill Leovy** resides in San Antonio, Texas and is a self-employed author. She is a New York Times best-selling author and investigative journalist whose literary work includes *Ghettoside: A True Story of Murder In America.*

82.     Plaintiff Leovy is the owner or beneficial owner of registered copyrights in one (1) literary work—*Ghettoside: A True Story of Murder In America*—which Google took, used, copied and/or reproduced without license or authorization (the "Leovy Infringed Work"). The registration information for the Leovy Infringed Work is contained in **Exhibit A** to this Complaint.

83.     The Leovy Infringed Work is found on two or more websites, including:

- Z-Library (at https://1lib.sk/);
- Pdfdrive (at https://www.pdfdrive.com/);
- OceanofPDF (at https://oceanofpdf.com/); and
- Scribd (at https://www.scribd.com/).

84.     These websites served as sources for Infiniset and C4, training datasets for Gemini. *See* Section IV.

85.     Specifically, *Ghettoside: A True Story of Murder In America* was found on:

- Z-Library (at https://1lib.sk/book/2753658/688005/ghettoside-a-true-story-of-murder-in-america.html);
- PDFDrive (at https://www.pdfdrive.com/ghettoside-a-true-story-of-murder-in-america-e194586960.html);
- OceanofPDF (at https://oceanofpdf.com/authors/jill-leovy/pdf-epub-ghettoside-a-true-story-of-murder-in-america-download/); and
- Scribd (at https://www.scribd.com/document/254016556/Excerpt-From-Ghettoside-By-Jill-Leovy).

86.     The presence of the Leovy Infringed Work on the above websites means Google copied and reproduced it multiple times to train Gemini. *See* Section IV.

87.     Plaintiff Leovy did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the Leovy Infringed Work.

88.     In addition to statutory harms, Plaintiff Leovy has suffered actual damages through Google's unauthorized copying, reproduction, and use of her work, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Leovy Infringed Work deprived her of licensing revenues she would have received had Google properly licensed her works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of literary works has depressed the overall market for fiction and nonfiction writers, like Plaintiff Leovy, causing substantial harm to the commercial value of Plaintiff Leovy's portfolio of works.

89.     **Plaintiff Connie McLennan** resides in Rocklin, California and is a self-employed artist. She is an author and illustrator whose artwork includes, but is not limited to:

- *The Rainforest Grew All Around*

90.     Plaintiff McLennan is the owner or beneficial owner of registered copyrights in at least one (1) visual artwork—*The Rainforest Grew All Around*—which Google took, used, copied and/or reproduced without license or authorization (the "McLennan Infringed Work").  The registration information for the McLennan Infringed Work is contained in **Exhibit A** to this Complaint.

91.     The McLennan Infringed Work is found on two or more websites, including:

- Z-Library (at https://1lib.sk/);

- Scribd (at https://www.scribd.com/); and

- Haveibeentrained (at https://haveibeentrained.com/).

92.     Z-Library and Scribd served as sources for Infiniset and C4, training datasets for Gemini; Haveibeentrained is a searchable database of LAION-5B, a training dataset for Imagen. *See* Section IV.

93.     Specifically, *The Rainforest Grew All Around* was found on:

- Z-Library (at https://1lib.sk/book/24334626/72ca99/the-rainforest-grew-all-around.html);

- Scribd (at https://www.scribd.com/document/308982138/Rainforest-Preview); and

- Haveibeentrained (at
  https://haveibeentrained.com/search/TEXT?search_text=rainforest%20grew%20all%20around).

94.     *The Rainforest Grew All Around* also appears within the LAION-400M Dataset ("LAION-400M"). *See* **Exhibit B** to the Complaint.

95.     The presence of the McLennan Infringed Work on the above websites and within LAION-400M means Google copied and reproduced it multiple times to train Gemini and Imagen. *See* Section IV.

96.     Plaintiff McLennan did not authorize or license Google to use, copy, reproduce, distribute, or train Gemini with the McLennan Infringed Work.

97.     In addition to statutory harms, Plaintiff McLennan has suffered actual damages through Google's unauthorized copying, reproduction, and use of her works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the McLennan Infringed Work deprived her of licensing revenues she would have received had Google properly licensed her work for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of visual works has depressed the overall market for visual artists and illustrators, like Plaintiff McLennan, causing substantial harm to the commercial value of Plaintiff McLennan's portfolio of works.

98.     **Plaintiff Jingna Zhang** is domiciled in Washington state and is a self-employed professional photographer. She is a photographer whose work includes *Anouk* and *Motherland Chronicles*.

99.     Zhang is the owner or beneficial owner of copyrights in at least two (2) photographic works, which Google took, used, copied and/or reproduced without license or authorization (the "Zhang Infringed Works"). The registration information for the Zhang Infringed Works is contained in **Exhibit A** to this Complaint.

100.     The Zhang Infringed Works are contained within the LAION-400M Dataset ("LAION-

400M"). *See* **Exhibit B** to the Complaint. LAION-400M is contained within the LAION-5B dataset.

101.    The presence of the Zhang Infringed Works in LAION-400M means Google copied and reproduced them multiple times to train Imagen. *See* Section IV.

102.    Plaintiff Zhang did not authorize or license Google to use, copy, reproduce, distribute, or train Imagen with the Zhang Infringed Works.

103.    In addition to statutory harms, Zhang has suffered actual damages through Google's unauthorized copying, reproduction, and use of her works, including but not limited to:

- **Direct Market Harm**: Google's unauthorized copying of the Zhang Infringed Works deprived her of licensing revenues she would have received had Google properly licensed her works for AI training purposes.

- **Market Value Diminution**: Google's mass appropriation of photographic works has depressed the overall market for professional photography licensing, causing substantial harm to the commercial value of Zhang's portfolio.

### B. Defendant

104.    **Defendant Google LLC**. Google LLC is a Delaware corporation with its principal place of business also at 1600 Amphitheatre Parkway, Mountain View, CA 94043. As a subsidiary of Alphabet Inc., Google operates AI-related businesses, including the development and deployment of Generative AI Models and AI-Powered Products. The Generative AI Models at issue in this litigation include all versions, iterations, and relatives of Bard, Gemini, Imagen, PaLM, GLaM, and LaMDA. The AI-Powered Products include all versions and iterations of Google Search, Google Cloud, Gmail, Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets, Google Meet, Google Pixel, Google Maps, Google AI Studio, Google Vids, Google Workspace, and Vertex AI.

105.    **Control and oversight over Google LLC by Alphabet**. Alphabet exercises substantial control over Google LLC's operations, including its AI development strategy. This control is evident in Alphabet's direction of AI integration into core Google LLC products such as Google Search, YouTube, and cloud services. For example, Google Search incorporates Alphabet-owned AI models like BERT, MUM, and Pathways, reflecting Alphabet's strategic oversight and influence.

106.    Additionally, Sundar Pichai serves as both CEO of Alphabet and CEO of Google LLC, exemplifying integrated leadership across the conglomerate. Under Pichai's leadership, Alphabet orchestrated the merger of Google Brain with Google DeepMind in 2023 and facilitated the subsequent transfer of the Gemini team to DeepMind in 2024. These deliberate structural changes illustrate Alphabet's active role in shaping its subsidiaries' operations to accelerate AI research and development. Alphabet's chief officers and directors confirm this in their 2023 10-K, stating that Alphabet is "expanding [its] investment in AI across the entire company. This includes generative AI and continuing to integrate AI capabilities into our products and services."[13] Alphabet's 2023 10-K goes on to clarify that "DeepMind is reported as part of Alphabet-level activities[,]" reflecting its "increasing collaboration with Google Services[. . . .]"[14]

107.    Alphabet's overarching control of and direct financial benefit in Google's AI initiatives is further demonstrated through its substantial investments in entities like DeepMind and other ventures. This focus on AI as a core strategic priority that extends beyond Google LLC's traditional business lines— such as search, maps, and YouTube—highlights Alphabet's centralized governance of AI development across the organization. Alphabet's CEO Sundar Pichai's emphasis on organic AI development within Alphabet underscores this centralized control, as does his commitment to maintaining the company's autonomy through in-house AI initiatives.[15] . In April of 2024, Pichai reiterated as stated in a document titled "Alphabet Announces First Quarter 2024 Results" announcing Alphabet's revenues and income that

---

[13] *Alphabet Form 10-K*, U.S. SECURITIES AND EXCHANGE COMMISSION (Jan. 30, 2024) https://www.sec.gov/Archives/edgar/data/1652044/000165204424000022/goog-20231231.htm#i4b6997819c884b839f301ffc0d7fb828_307

[14] *Id.*

[15] *Alphabet Touts Organic AI Development in Q2 Earnings Beat*, PYMNTS (July 23, 2024), https://www.pymnts.com/earnings/2024/alphabet-touts-organic-ai-development-in-q2-earnings-beat/; *see also* Laura Bratton, *Google stock surges on soaring profits and first-ever cash dividend*, QUARTZ (April 25, 2024), https://qz.com/alphabet-google-stock-earnings-gemini-1851436696#:~:text=Google%20parent%20Alphabet%20reported%20a%20surge%20in%20profits,Sundar%20Pichai%20said%20in%20a%20company%20statement%20Thursday. (Alphabet CEO Pichai explaining "**we are well underway with our Gemini era and there's great momentum across the company. Our leadership in AI research and infrastructure, and our global product footprint, position us well for the next wave of AI innovation**.").

"**we are well underway with our Gemini era and there's great momentum across the company. Our leadership in AI research and infrastructure, and our global product footprint, position us well for the next wave of AI innovation**." These actions collectively reflect Alphabet's governance over Google's AI operations and strategic direction. Alphabet has also touted the integration of Gemini across it and Google's suite of products as a major driver of commercial success.

108.     The full scope of Alphabet's supervisory authority over and direct financial benefit from Google LLC's infringing conduct remains under investigation, with discovery yet to begin. Upon information and belief, Plaintiffs anticipate that document production, deposition testimony, and expert analysis will reveal substantial additional evidence establishing the prerequisites for vicarious copyright infringement liability.

109.     **Unified operations**. Alphabet Inc. and Google LLC function as a seamless, integrated enterprise. Their operations are characterized by intertwined executive leadership and shared financial incentives. Both entities exploit these synergies to profit from the unauthorized use of copyrighted works in building, training, and deploying their AI models, deriving significant commercial gains from these infringing activities.

110.     **Agents and co-conspirators.** The unlawful acts alleged against Google in this Complaint were authorized, ordered, or performed by Google's respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of Google's business or affairs. Google's agents operated under the explicit and apparent authority of their principals. Google, and its subsidiaries, affiliates, parents, and agents operated as a single unified entity.

111.     Various persons or firms not named as a Defendant may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each acted as the principal, agent, or joint venture of, or for a Defendant with respect to the acts, violations, and common course of conduct alleged herein.

IV.     **FACTUAL ALLEGATIONS**

    A.     **The Generative AI arms race**

    112.     The term "generative artificial intelligence" or "generative AI" refers to systems or models capable of producing output that simulates human expression, often in response to user inputs called "prompts." In the race to dominate this emerging field, companies like Google have "shifted their entire corporate strategies in order to seize control of what they believe will become a new infrastructure layer of the economy."[16] Staying ahead of the ever-growing pack has become paramount. Google itself has declared a "code red," acknowledging that "the company may be approaching a moment that the biggest Silicon Valley outfits dread — the arrival of an enormous technological change that could upend the business."[17]

    113.     In response, Google has directed unprecedented resources toward generative AI. Google has consolidated its AI research divisions, such as DeepMind and Google Brain, on the belief that generative AI will define the next era of technology[18] Google has already integrated generative AI throughout its products, betting on it as the foundation for future growth. This effort represents not just a technological shift but a strategic overhaul, as Google seeks to dominate a field poised to reshape industries and redefine how humans interact with technology.

        **i. Generative AI Model types**

    114.     Relevant to this action are three types of generative AI models: large language models ("LLMs"), text-to-image diffusion models ("T2I models"), and multimodal large language models ("MLLMs").

---

[16] Andrew R. Chow, *The AI Arms Race is Changing Everything*, TIME (Feb. 16, 2023), https://time.com/magazine/us/6256547/february-27th-2023-vol-201-no-7-u-s/.

[17] Nico Grant & Cade Metz, *A New Chat Bot is a "Code Red" for Google's Search Business*, N.Y. TIMES (Dec. 21, 2022), https://www.nytimes.com/2022/12/21/technology/ai-chatgpt-google-search.html.

[18] *Google Consolidates Its DeepMind and Research Teams Amid AI Push*, REUTERS (Apr. 18, 2024), https://www.reuters.com/technology/google-consolidates-its-deepmind-research-teams-amid-ai-push-2024-04-18/.

115.     LLMs, such as the early versions of Gemini and Bard, accept user text prompts as input text and generate responsive text as output. An LLM's ability to produce coherent and convincing responses to prompts depends heavily on the size and quality of the datasets used for its training.

116.     Training an LLM first requires copying a massive set of data files, called a *training dataset*. The training dataset then undergoes multiple preparatory stages processing, most of which cause more copies to be made. Finally, copies of the training dataset are ingested by the model during training. After the initial round of training, a model may be fine-tuned to improve performance on specific tasks—a separate training process that often involves other training datasets, copied from other sources—and finally prepared for deployment.

117.     T2I models, like Imagen, use text prompts to create image outputs through a machine-learning technique called diffusion. T2I models are trained by copying an enormous quantity of digital images with associated text captions, extracting protected expression from these works, and transforming the protected expression into a large set of numbers called weights that are stored within the model. The weights are entirely and uniquely derived from the protected expression in the training dataset. When a diffusion model generates an image in response to a user prompt, it performs a computation that relies on these stored weights with the purpose of imitating the protected expression ingested from the training dataset.

118.     MLLMs, like the current version of Gemini, are LLMs that accept input and generate output in multiple formats. MLLMs are built with training datasets that comprise of a variety of text, image, audio, and video data. Like LLMs and T2I models, the training of MLLMs requires making multiple copies of the works in the training dataset—including the protected expression within those works.

119.     Google made unauthorized copies of copyrighted works—including the Plaintiff Works—to build Generative AI Models that generate content depressing the overall market for those works. As part of this process, Google copied the Plaintiff Works multiple times: first a copy is made during data collection, then a series of copies are made during model training, and finally a copy is permanently incorporated into the parameters of the Generative AI Model. Google monetizes its

copyright infringements through two revenue streams: (1) direct revenue from subscription and licensing fees for access to its Generative AI Models, and (2) indirect revenue from integration of those Generative AI Models into its AI-Powered Products. This comprehensive exploitation of the Plaintiff Works demonstrates both the commercial nature of Google's infringement and the immediacy of harm to Plaintiffs' rights.

### ii.     Google willfully trained Gemini on copyrighted works

120.    Gemini's predecessor, Bard, was launched in March 2023.  Google told consumers that Bard was able to perform a variety of content creation tasks, such as writing stories and drafting personal or commercial content, including in multiple tones and styles.[19]

121.    Google developed Bard using an LLM called LaMDA.[20]

122.    LaMDA was developed and trained on Google's Infiniset Dataset ("Infiniset"), a vast 1.56 trillion-word corpus of internet content that incorporates the C4 Dataset ("C4").[21] C4, created by Google in 2020, is a filtered version of the Common Crawl dataset.[22] Infiniset is comprised of 50% of dialogues from public forums (e.g. Reddit, Twitter), 12.5% C4 dataset, 12.5% code documents (e.g. GitHub, Stack Overflow), 12.5% Wikipedia, 6.5% English web documents, and 6.5% non-English web documents.[23]

123.    Common Crawl is the largest freely available collection of web crawl data and one of the most important sources of pre-training data for large language models."[24] Its web archive consists

---

[19] https://blog.google/products/gemini/how-to-use-google-bard/ (last accessed December 16, 2024).

[20] Aditya Sharma, *Image Processing with Gemini Pro*, PY IMAGE SEARCH (Feb. 12, 2024), https://pyimagesearch.com/2024/02/12/image-processing-with-gemini-pro/.

[21] Roger Montti, *Google Bard AI—What Sites Were Used To Train It*, SEARCH ENGINE J. 4 (Feb. 10, 2023), https://www.searchenginejournal.com/google-bard-training-data/478941/.

[22] *Dataset Card for C4*, HUGGING FACE, https://huggingface.co/datasets/legacy-datasets/c4 (last visited Nov. 22, 2024).

[23] Sakil Ansari, *The Rise of Google Bard*, Medium (Mar. 25, 2023), https://sakilansari4.medium.com/the-rise-of-google-bard-4d43225c18e4

[24] Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training: Common Crawl* at 1, MOZILLA FOUND. (June 3, 2024), https://facctconference.org/static/papers24/facct24-148.pdf.

of petabytes of data collected since 2008.[25] It completes crawls of the internet and releases its web archives generally every month.[26]

124.    C4 is a vector for copyright infringement. The copyright symbol appears many times within C4, indicating the presence of numerous copyrighted works within the dataset. Upon information and belief, Google was never authorized to make copies of any copyrighted works within C4.[27]

125.    C4 contains massive quantities of copyrighted materials, including works found on piracy sites or nonconsenting digital libraries, and through subscription services. For example, C4 contains data from "b-ok.org," a "notorious market for pirated e-books," as well as "[a]t least 27 other sites identified by the U.S. government as markets for piracy and counterfeits."[28] The website "b-ok.org," also known as "Z-Library," is "[t]he world's largest [illegal] ebook library and digital library."[29] In 2022, the site's operators faced criminal prosecution for "criminal copyright infringement, wire fraud, and money laundering."[30] As another example, the pirated book site "oceanofpdf.org" also appears in C4.[31, 32]

---

[25] Rosanna Xia, *Tech Entrepreneur Gil Elbaz Made it Big in L.A.*, L.A. TIMES (February 5, 2012), https://www.latimes.com/business/la-xpm-2012-feb-05-la-fi-himi-elbaz-20120205-story.html.

[26] *Statistics of Common Crawl Monthly Archives*, COMMON CRAWL, https://commoncrawl.github.io/cc-crawl-statistics/ (last visited Dec. 10, 2024).

[27] Kevin Schaul, *et. al.*, *Inside the Secret List of Websites that Make AI Like ChatGPT Sound Smart*, WASH. POST (April 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.

[28] *See id.*

[29] Beinginstructor, ZLibrary — *The World's Largest Ebook Library*, MEDIUM (Feb. 16, 2023), https://medium.com/@beinginstructor/zlibrary-the-worlds-largest-ebook-library-dfb933762cfc.

[30] *Pirate Website Z-Library Taken Down and Alleged Operators Arrested*, INT'L PUBLISHERS ASS'N (Nov. 19, 2022), https://internationalpublishers.org/pirate-website-z-library-taken-down-and-alleged-operators-arrested/.

[31] OceanofPDF has operated under various domain names, including oceanofpdf.com and oceanofpdf.org. These domain names have been associated with the same platform, which offer pirated books.

[32] *Actions Authors Can Take Against Notorious Piracy Site OceanofPDF.com*, AUTHORS GUILD (Nov. 22, 2024), https://authorsguild.org/news/oceanofpdf-piracy-site-actions-authors-can-take/.

126.    The third largest site within C4 is Scribd.com ("Scribd"), a subscription-based digital library with 60 million e-books and audio books that compensates authors "for their content through a revenue-sharing model based on the number of reads their work receives from subscribers."[33]

127.    Google's Infiniset (which encompassed C4) was a foundational dataset used to train Bard, Gemini's predecessor. Upon information and belief, Google used Infiniset and C4 to train Gemini.

128.    Unauthorized copies of the copyrighted works of Plaintiffs Steve Almond, Burl Barer, Kirsten Hubbard, Jill Leovy, and Connie McLennan are contained within Infiniset and C4. On information and belief, unauthorized copies of the Plaintiff Hope Larson's copyrighted works are contained within Infiniset and C4. Google's use of Infiniset and C4 to build and train Gemini constitutes direct copyright infringement.

129.    Google has not revealed the sources of the rest of its training corpora. Google for example has only identified other training data as "web documents." On information and belief, Google likely used other datasets containing copyrighted works to train Gemini.

130.    Plaintiffs' investigation of Google's willful infringement remains ongoing. Upon information and belief, Plaintiffs anticipate that discovery will reveal substantial additional evidence of willfulness, in addition to further evidence of the presence of Plaintiffs' Works in Gemini training datasets because per Google's own research, books have been a vital and large part of its LLM training datasets.[34]

### iii.    Google willfully trained Imagen on copyrighted works

131.    In May 2022, Google announced Imagen in a paper called "Photorealistic Text-to-Image Diffusion Models with Deep Language Understanding."[35] In the paper, Google admits that it trained

---

[33] Mihaela Bidilică, *How to Publish on Scribd: A Simple Guide to Scribd Publishing*, PUBLISHDRIVE (Apr. 26, 2023), https://publishdrive.com/publishing-on-scribd-the-complete-review-for-authors.html.

[34] *See, e.g., PaLM: Scaling Language Modeling with Pathways* (October 5, 2023), https://arxiv.org/pdf/2204.02311, and *GLaM: Efficient Scaling of Language Models with Mixture-of-Expert* (August 1, 2022) https://arxiv.org/pdf/2112.06905.

[35] Chitwan Saharia, *Photorealistic Text-to-Image Diffusion Models with Deep Language Understanding* at 7, GOOGLE RES. (May 23, 2022), https://arxiv.org/abs/2205.11487.

Imagen on "the publicly available Laion [sic] dataset . . . with ≈ 400M image-text pairs."[36] This dataset is referred to as LAION-400M and was also used to train Imagen 2 and Imagen 3.

132.    In November 2022, Google made Imagen publicly available to a select group of users through its AI Test Kitchen app. According to reporting at the time, Google "announced it will be adding Imagen—in a *very* limited form—to its AI Test Kitchen app as a way to collect early feedback on the technology."[37]

133.    In May 2023, Google made Imagen even more widely available through its commercial AI cloud-computing service, called Vertex AI. According to a Google blog post about Vertex AI, Google described it as "Imagen, our text-to-image foundation model, lets organizations generate and customize studio-grade images at scale for any business need."[38]

134.    In October 2023, Google made Imagen even more widely available through a tool called Search Generative Experience. According to reporting at the time, "If you're opted in to [Search Generative Experience] through Google's Search Labs program, you can just type your query into the Google search bar. After you do, [Search Generative Experience] can create a few images based on your prompt that you can pick from. The tool is powered by the Imagen family of AI models."[39]

135.    In December 2023, Google released the successor to Imagen, called Imagen 2. Unlike the paper that accompanied the initial version of Imagen, Google's introduction of Imagen 2 carefully omits a detailed description of its training dataset. Google limits itself to vague comments such as "From the outset, we invested in training data safety for Imagen 2, and added technical guardrails to limit problematic outputs like violent, offensive, or sexually explicit content."[40]

---

[36] *Id.*

[37] *See* https://www.theverge.com/2022/11/2/23434361/google-text-to-image-ai-model-imagen-test-kitchen-app

[38] *See* https://cloud.google.com/blog/products/ai-machine-learning/google-cloud-launches-new-ai-models-opens-generative-ai-studio

[39] *See* https://www.theverge.com/2023/10/12/23913337/google-ai-powered-search-sge-images-written-drafts

[40] *See* https://deepmind.google/technologies/imagen-2/

136.    The creation and deployment of the Imagen models underscore Google's ambition to dominate the generative AI market by providing tools that reshape how creative content is produced. However, this success has come at the expense of copyright holders whose works were copied without authorization to train Imagen. By incorporating vast numbers of copyrighted works within its training datasets, Google built Imagen on a foundation of misappropriated intellectual property—namely, the contents of LAION-400M dataset—directly profiting from the unauthorized copying of others' creative efforts.

### a.     LAION-400M contains Plaintiffs' copyrighted works

137.    LAION (acronym for "Large-Scale Artificial Intelligence Open Network") is an organization based in Hamburg, Germany. LAION's most well-known projects are the datasets of training images, like LAION-400M, that it has released publicly for training models. These datasets are widely used in the AI industry and free for use.

138.    LAION publicly released LAION-400M, a dataset of 400 million training images assembled from images accessible on the internet, in August 2021. Romain Beaumont, a chief architect at LAION, also created and released an online tool called "Clip Retrieval" that acted as a search interface to LAION to check whether certain artists or artworks were included in the LAION-400M dataset.[41]

139.    A download of the LAION-400M dataset also includes a list of metadata records, one for each training image. Each record includes the URL of the image, the image caption, a measurement of the similarity of the caption and image, a NSFW flag (indicating the probability the image contains so-called "not safe for work" content), and the width and height of the image.

140.    The actual images referenced in the LAION-400M dataset records are not included with the dataset. Instead, anyone, such as Google, who wished to use LAION-400M for training their own model needed to first acquire copies of the actual images from the URLs listed in the metadata records. To facilitate the copying of these images, Beaumont created a software tool called "img2dataset" that takes the LAION-400M metadata records as input and makes copies of the referenced images from the

---

[41] *See Clip Retrieval*, https://rom1504.github.io/clip-retrieval (last visited Nov. 22, 2024).

URLs in each metadata record, thereby creating local copies for the user. The "img2dataset" tool is distributed from a page controlled by Beaumont on GitHub.[42] LAION also promotes the "img2dataset" tool in its documentation for LAION-400M: "This metadata dataset purpose is to download the images for the whole dataset or a subset of it by supplying it to the very efficient 'img2dataset' tool."[43]

141.    Training a model on the LAION-400M dataset is infeasible without first using "img2dataset" or another similar tool to download the images from the URLs in the dataset. In other words, when Google trained Imagen on LAION-400M, as it did, it first and necessarily had to make one or more copies of each image. Then, when training the model, Google made more unauthorized copies and reproduction of the images.

142.    Plaintiffs Jingna Zhang, Sarah Andersen, Jessica Fink, Mike Lemos, and Connie McLennan each own one or more copyrighted works found within LAION-400M. They never authorized Google to copy their images for training any of Google's Generative AI Models, including Imagen.

### b.    LAION-5B and Imagen 2 and 3

143.    On March 31, 2022, LAION released LAION-5B, a dataset of 5.85 billion training images—14 times more images than contained in LAION-400M. Beaumont, who was hired as an engineer at Google, authored the LAION blog post announcing LAION-5B's launch.[44] On information and belief, Google hired Beaumont primarily to influence the creation of future LAION image datasets based on a) Beaumont's key role creating LAION-400M—which Google used to train Imagen; b) Beaumont's control of the "img2dataset" tool that was essential to using the LAION-400M dataset, and c) Beaumont's control of the "Clip Retrieval" website that was essential to searching the LAION-400M dataset.

144.    In August 2022, Beaumont created a specialized AI model to rate the aesthetic quality of an image and used this model to create subsets of the LAION-5B training images filtered by aesthetic

---

[42] *rom 1504 / img2dataset*, GITHUB, https://github.com/rom1504/img2dataset (last visited Nov. 22, 2024).
[43] *See* Christoph Schuhmann, *LAION-400-Million Open Dataset*, LAION (Aug. 20, 2021), https://laion.ai/blog/laion-400-open-dataset/.
[44] *See* Romain Beaumont, *LAION-5B: A New Era of Open Large-Scale Multi-Modal Datasets*, LAION (Mar. 31, 2022), https://laion.ai/blog/laion-5b/.

quality. Beaumont called this model "LAION-Aesthetics." In its introduction of Imagen 2 in December 2023, Google said, "[w]e trained a specialized image aesthetics model based on human preferences for qualities like good lighting, framing, exposure, sharpness, and more. Each image was given an aesthetics score which helped condition Imagen 2 to give more weight to images in its training dataset that align with qualities humans prefer."[45] On information and belief, Beaumont's work on LAION-Aesthetics formed the basis of Imagen 2's "aesthetics model" since at the time Beaumont was both a contributor to LAION and a full-time employee of Google.

145.    In October 2022, Romain Beaumont was a primary author of "LAION-5B: An open large-scale dataset for training next generation image-text models" (hereinafter, the "Beaumont–LAION-5B Paper"). According to the Beaumont–LAION-5B Paper, LAION-400M is a subset of LAION-5B, meaning every image in LAION-400M is also in LAION-5B.

146.    Like the LAION-400M dataset, the actual images referenced in the LAION-5B dataset records are not included with the dataset. Anyone who wishes to use LAION-5B for training their own model must also first acquire copies of the actual images from their URLs either using "img2dataset" or a similar tool.

147.    LAION-5B was likely used by Google to train Imagen 2.

148.    Imagen 3, released in August 2024, represents the latest iteration of Google's T2I model, showcasing even greater sophistication and precision in generating high-quality visuals. Based on the methods and datasets used to train its predecessors, as detailed above, it is highly likely that Google relied on LAION-5B to train Imagen 3. This reliance would have involved the unauthorized use of copyrighted works contained within LAION-5B, continuing the pattern of infringement that has defined the development of the Imagen series.

149.    Plaintiffs Jingna Zhang, Sarah Andersen, Jessica Fink, Connie McLennan, and Mike Lemos own one or more copyrighted works found within LAION-5B. They never licensed or authorized Google to copy their images from LAION-5B or use them for training any model.

---

[45] *See Imagen 2*, GOOGLE, https://deepmind.google/technologies/imagen-2/ (last visited Nov. 22, 2024).

1

#### iv.     Google's infringement was willful

2      150.    Google's unauthorized copying of Plaintiff Works in the development of its Generative

3  AI Models, including Gemini and Imagen, was willful. Google knowingly copied copyrighted works

4  into its training datasets without securing licenses or authorization, demonstrating a flagrant disregard

5  for U.S. copyright laws.

6      151.    Google was well aware that the training datasets it copied, such as LAION-400M and C4,

7  contained copyrighted works. These datasets included works from known piracy sources, subscription-

8  based platforms, and publicly flagged copyright-protected works. For example, the presence of

9  copyright symbols within the C4 dataset should have served as an unmistakable indicator of the

10  protected status of the included works. Despite this, Google proceeded to use these datasets without

11  authorization from the copyright holders.

12      152.    Google was also well aware that potential and current customers were concerned about

13  using its Generative AI Models, since they were built and trained by infringing upon the exclusive rights

14  of copyright owners. Rather than change its conduct, Google rolled out an indemnification program for

15  its Generative AI Model customers that stated, "[i]f you are challenged on copyright grounds, we will

16  assume responsibility for the potential legal risks involved." Rather than address its infringing conduct

17  directly, Google used its financial strength as a means to actively encourage the use of its Generative AI

18  Models.

19      153.    Google's executives and developers were aware of the legal risks associated with using

20  copyrighted works in training their AI models. Public statements by Google acknowledge the

21  importance of respecting copyright, yet Google chose to prioritize speed to market and dominance in the

22  generative AI space over compliance with copyright laws.

23      154.    Google's decision to embed its unlawfully trained Generative AI Models into its AI-

24  Powered Products further underscores the willful nature of its infringement. By incorporating

25  Generative AI Models like Gemini and Imagen into AI-Powered Products like Google Cloud, YouTube,

26  and Google Ads, Google not only infringed the copyrighted works but also actively monetized them,

27  generating billions in revenue.

28

155.     The scale and systematic nature of Google's infringement foreclose any claim of good faith or ignorance. Google's immense resources, sophisticated technological capabilities, and legal expertise make its failure to comply with copyright laws particularly egregious. Google's continued refusal to acknowledge or remedy its infringement, even as it reaps massive revenue from its AI models, demonstrates willfulness and a conscious decision to prioritize revenue over creators' rights.

156.     Plaintiffs and other copyright holders have suffered significant and ongoing harm as a direct result of Google's willful infringement. By copying their works without authorization, Google deprived them of licensing revenue, diminished the value of their copyrights, and irreversibly entangled their copyrighted works in the company's AI-Powered Products.

157.     Google has also engaged in a knowing and active fraudulent concealment and denial of the facts alleged through the time period relevant to this action.

158.     At all times relevant to this Complaint, Google was aware of material facts that were necessary to the Plaintiffs' understanding of whether their exclusive rights under the Copyright Act were violated. These facts included, but were not limited to, Google's concealment of the data and datasets upon which the Generative AI Models were trained, whether the Plaintiffs works were used to train the Generative AI Models, and how the Plaintiffs Works were used, copied, and/or reproduced in the training process of the Generative AI Models or otherwise used for integration into the AI-Powered Products.

159.     Plaintiffs did not have access to the inner workings and strategies of Google, including those related to the building and training of its Generative AI Models, the creation of training datasets that contained their works, or how the Generative AI Models were being integrated into the AI-Powered Products.

160.     Google intentionally concealed these material facts with the intent to mislead, deceive, or defraud Plaintiffs into taking actions or refraining from taking actions that Plaintiffs otherwise would not have taken.

161.    Plaintiffs did not know, and could not have reasonably known, about the concealed facts despite exercising reasonable diligence. Plaintiffs relied on Google's representations and omissions, which were fraudulent and intended to induce Plaintiffs to act to its detriment.

## V.    CLASS ALLEGATIONS

162.    The "**Class Period**" as defined in this Complaint begins on or at least as early as January 1, 2017 and runs through the present. Because Plaintiffs do not yet know when the unlawful conduct alleged herein began, but believe, on information and belief, that the conduct likely began earlier than the date listed above, Plaintiffs reserve the right to amend the Class Period to comport with the facts and evidence uncovered during further investigation or through discovery.

163.    **Class definition**. Plaintiffs bring this action for damages and injunctive relief as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following Class:

> All persons or entities domiciled in the United States who owned a United States copyright in any work used by Google to train Google's Generative AI Models during the Class Period.

164.    This Class definition excludes:

a.    The Defendant named herein;

b.    any of Google's co-conspirators;

c.    any of Google's parent companies, subsidiaries, and affiliates;

d.    any of Google's officers, directors, management, employees, subsidiaries, affiliates, or agents;

e.    all governmental entities; and

f.    the judges and chambers staff in this case, as well as any members of their immediate families.

165.    **Numerosity**. The exact number of members in the Class is in the exclusive control of Google, but on information and belief there are at least thousands of members in the Class geographically dispersed throughout the United States. Therefore, joinder of all members of the Class in the prosecution of this action is impracticable.

166.    **Typicality**. Plaintiffs' claims are typical of the claims of other members of the Class because Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Google as alleged, and the relief sought is common to all members of the Class.

167.    **Adequacy**. Plaintiffs will fairly and adequately represent the interests of the members of the Class because the Plaintiffs have experienced the same harms as the members of the Class and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting federal and state class actions, as well as other complex litigation.

168.    **Commonality and predominance**. Numerous questions of law or fact common to each Class Member arise from Google's conduct and predominate over any questions affecting the members of the Class individually:

169.    Whether Google violated Plaintiffs' and Class Members' exclusive rights under the Copyright Act when they took, copied, and used Plaintiffs' copyrighted works without license or authorization and used them to build and train the Google's Generative AI Models.

- Whether any affirmative defense excuses Google's conduct.

- Whether any statutes of limitation constrain the potential for recovery for Plaintiffs and the Class;

- Whether Google's conduct constitutes an infringement of the copyrights owned by Plaintiffs and the Class in their respective works;

- Whether Google's copying and/or reproduction of the copyrighted works constitutes copyright infringement;

- Whether Google's copying and/or reproduction of the copyrighted works constitutes fair use;

- Whether Google's violation of Plaintiffs' and the Class's exclusive rights under copyright law entitles them to damages, including statutory damages, and the amount of statutory damages; and

- Whether Google acted willfully with respect to the copyright infringement.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

170.    **Other class considerations**. Google's actions broadly affect the Class, making this class action the most efficient means of resolving the controversy. Prosecuting the claims pleaded as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

## VI.     CAUSES OF ACTION

### COUNT 1

### Direct Copyright Infringement (17 U.S.C. § 501)

### Against Google LLC

171.    The preceding factual allegations are incorporated by reference.

172.    Plaintiffs and Class Members are the legal owners of valid copyright registrations in their respective works, having satisfied all statutory formalities required by the Copyright Act.

173.    The Copyright Act grants copyright owners exclusive rights enumerated in 17 U.S.C. § 106, including but not limited to: a) the right to reproduce the copyrighted works in copies; b) the right to prepare derivative works; c) the right to distribute copies to the public; and d) the right to display the copyrighted works publicly.

174.    Google directly infringed upon Plaintiffs' exclusive rights through multiple distinct acts of unauthorized reproduction and use: a) copying of works when assembling training datasets through tools like "img2dataset"; b) multiple reproductions during the pre-training and training phases of model development; and/or c) creating derivative works when assembling training datasets or during the pre-training and training phases of model development.

175.    Each unauthorized copy or use constitutes a separate and distinct act of infringement under 17 U.S.C. § 501. Google's systematic copying was deliberate and commercial in nature, and executed to develop and monetize its Generative AI Models.

176.    Google's infringement has directly resulted in at least two distinct forms of monetary harm: a) lost licensing revenue from Google that Plaintiffs would have received had Google properly

obtained authorization; and b) loss of value to Plaintiffs' respective portfolios due to Google's mass

infringement that has depressed the overall market for the Plaintiffs' respective commercial markets.

177.    Google deliberately copied huge quantities of copyrighted works, knowing these works

would form the foundation of their commercial AI products. The fact that the training datasets contained

copyrighted works is not a secret. For example, it is well-known that the LAION datasets contained

copyrighted images. Further, the C4 dataset contains numerous instances of the presence of the

copyright symbol which denotes a copyrighted work. Google's conscious decision to proceed without

obtaining licenses, despite clear indications of copyright protection, demonstrates the willful nature of

its infringement.

178.    Google's infringing conduct directly advances its commercial interests. By

misappropriating Plaintiffs' copyrighted materials, Google avoided substantial licensing costs while

accelerating development of their AI products. These products now generate significant revenue through

both direct monetization and integration into Google's broader product suite and AI-Powered Products.

179.    Google's infringement was willful, as demonstrated by: a) deliberate copying from datasets

known to contain copyrighted material; b) use of content from known piracy sites; c) failure to implement

any meaningful copyright compliance measures; and d) continued exploitation despite knowledge of

ownership claims.

180.    Plaintiffs and Class Members are entitled to: a) statutory damages of up to $150,000 per

work for willful infringement or actual damages and any profits of Google that are attributable to the

infringement, pursuant to 17 U.S.C. § 504; b) injunctive relief under 17 U.S.C. § 502; and c) recovery of

full costs and reasonable attorney's fees under 17 U.S.C. § 505.

181.    Plaintiffs and Class Members will suffer immediate and irreparable injury absent

permanent injunctive relief. The unique characteristics of AI model training and deployment create

distinct categories of harm that resist traditional monetary remediation. Further, Google's infringement is continuing, and monetary damages cannot prevent the threat of future infringement.

## VII. PRAYER FOR RELIEF

182.    Wherefore, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class by ordering:

a)  This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel;

b)  Judgment in favor of Plaintiffs and the Class against Google;

c)  An award of actual damages suffered by Plaintiffs as a result of the infringement and any profits of the infringer that are attributable to the infringement, pursuant to 17 U.S.C. § 504 (b);

d)  An award of statutory damages, pursuant to 17 U.S.C. § 504 (c);

e)  Destruction or other reasonable disposition of all copies Google made or used in violation of the exclusive rights of Plaintiffs and the Class, under 17 U.S.C. § 503(b);

f)  Pre- and post-judgment interest on the damages awarded to Plaintiffs and the Class, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Google;

g)  Google is to be responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

h)  Award injunctive relief as detailed above, and all other appropriate injunctive and equitable relief deemed just and proper;

i)  Plaintiffs and the Class are awarded their reasonable costs and expenses incurred in this Action, including attorneys' fees, costs, and expenses; and/or

j)  Further relief for Plaintiffs and the Class as the Court deems appropriate.

## VIII.  JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: September 25, 2025                                  Respectfully submitted,

                                                          By:  */s/ Joseph R. Saveri*
                                                          Joseph R. Saveri (SBN 130064)
                                                          Christopher K.L. Young (SBN 318371)
                                                          Elissa A. Buchanan (SBN 249996)
                                                          Evan Creutz (SBN 349728)
                                                          Aaron Cera (SBN 351163)
                                                          Louis Kessler (SBN 243703)
                                                          Alex Zeng (SBN 360220)
                                                          **JOSEPH SAVERI LAW FIRM, LLP**
                                                          601 California Street, Suite 1505
                                                          San Francisco, California 94108
                                                          Telephone: (415) 500-6800
                                                          Facsimile: (415) 395-9940
                                                          jsaveri@saverilawfirm.com
                                                          cyoung@saverilawfirm.com
                                                          eabuchanan@saverilawfirm.com
                                                          ecreutz@saverilawfirm.com
                                                          acera@saverilawfirm.com
                                                          lkessler@saverilawfirm.com
                                                          azeng@saverilawfirm.com

                                                          Matthew Butterick (SBN 250953)
                                                          1920 Hillhurst Avenue, #406
                                                          Los Angeles, CA 90027
                                                          Telephone: (323) 968-2632
                                                          Facsimile: (415) 395-9940
                                                          mb@butericklaw.com

                                                          Brian D. Clark (admitted *pro hac vice*)
                                                          Laura M. Matson (admitted *pro hac vice*)
                                                          Arielle Wagner (admitted *pro hac vice*)
                                                          Consuela Abotsi-Kowu (admitted *pro hac vice*)
                                                          **LOCKRIDGE GRINDAL NAUEN PLLP**
                                                          100 Washington Avenue South, Suite 2200
                                                          Minneapolis, MN 55401
                                                          Telephone: (612)339-6900
                                                          Facsimile: (612)339-0981

bdclark@locklaw.com
lmmatson@locklaw.com
aswagner@locklaw.com
cmabotsi-kowu@locklaw.com

Stephen J. Teti (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

*Attorneys for Plaintiffs and the Proposed Class in the* Zhang *Action*

Dated: September 25, 2025

/s/ *Ryan J. Clarkson*
Ryan J. Clarkson (SBN 257074)
Yana Hart (SBN 306499)
Mark Richards (SBN 321252)
Tiara Avaness (SBN 343928)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone:   213-788-4050
rclarkson@clarksonlawfirm.com
yhart@clarksonlawfirm.com
mrichards@clarksonlawfirm.com
tavaness@clarksonlawfirm.com

Tracey Cowan (SBN 250053)
**CLARKSON LAW FIRM, P.C.**
95 Third Street, Second Floor
San Francisco, CA 94103
Tel. (213) 788-4050
tcowan@clarksonlawfirm.com

Dated: September 25, 2025

/s/ *Lesley E. Weaver*
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267090)
Joshua D. Samra (SBN 313050)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Tel. (415) 797-2617
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens (admitted *pro hac vice*)

**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Telephone: (415) 445-4006
gmullens@bfalaw.com

*Attorneys for Plaintiffs and the Proposed Class
in the* Leovy *Action*