DAVID H. KRAMER, SBN 168452
Email: dkramer@wsgr.com
MAURA L. REES, SBN 191698
Email: mrees@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

PAUL J. SAMPSON (admitted *pro hac vice*)
Email: psampson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 S. State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510

ERIC P. TUTTLE, SBN 248440
Email: eric.tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500

*Counsel for Defendant*
GOOGLE LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| *In re Google Generative AI Copyright Litigation* | Master File Case No.: 5:23-cv-03440-EKL<br>Consolidated with Case No.: 5:24-cv-02531-EKL<br><br>**DEFENDANT GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFFS' PROPOSED EXPERT MEREDITH MCCARRON**<br><br>Date:        February 4, 2026<br>Time:        10:00 a.m.<br>Courtroom:   7<br>Judge:       Hon. Eumi K. Lee |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................... 1

STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED ............................ 1

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

LEGAL STANDARD ..................................................................................................................... 5

ARGUMENT .................................................................................................................................. 5

I.    McCarron's Methodology Is Unvalidated, Error-Prone, and Duplicative. ......................... 5

II.    McCarron's Matching Logic Is Arbitrary, Counsel-Directed, and Unvalidated ................ 7

III.    McCarron Cannot Determine if a "Match" Is a Copyrighted, Unlicensed Work. .............. 7

IV.    McCarron's "Piracy" Opinions Are Unsupported, Counsel-Driven, and Irrelevant ........... 8

CONCLUSION ............................................................................................................................... 9

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
　　2011 WL 11733702 (C.D. Cal. Jan. 11, 2011) ................................................................. 9

*Daubert v. Merrell Dow Pharm., Inc.*,
　　509 U.S. 579 (1993) ..................................................................................................... 1, 5

*Daubert v. Merrell Dow Pharms., Inc.*,
　　43 F.3d 1311 (9th Cir. 1995) ................................................................................ 5, 6, 7, 9

*EEOC v. Freeman*,
　　778 F.3d 463 (4th Cir. 2015) ............................................................................................ 6

*Gen. Elec. Co. v. Joiner*,
　　522 U.S. 136 (1997) ................................................................................................. 5, 6, 9

*In re Zoloft Prods. Liab. Litig.*,
　　858 F.3d 787 (3d Cir. 2017) ............................................................................................. 6

*Kumho Tire Co. v. Carmichael*,
　　526 U.S. 137 (1999) ..................................................................................................... 5, 9

**RULES**

Fed. R. Evid. 702 ............................................................................................................................ 5

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on February 4, 2026, at 10:00 a.m., Defendant Google LLC will move for an order excluding testimony of Plaintiffs' expert Meredith McCarron as set forth in the accompanying Proposed Order. Pursuant to Section VIII(a) of the Court's Standing Order, Google certifies compliance with the Court's meet and confer requirement which took place on November 17, 2025 within a few days of the conclusion of the deposition of the proposed expert.

**STATEMENT OF REQUESTED RELIEF AND ISSUES TO BE DECIDED**

Whether testimony of Plaintiffs' proposed expert McCarron should be excluded as unreliable under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

**INTRODUCTION**

Plaintiffs propose Meredith McCarron as a "data-matching" expert who can allegedly "identify" "registered copyrighted" books and images in Google's training datasets. ECF Nos. 252-1, 253-4 ("McCarron Rpt.") ¶¶ 16(a) & 16(b). She calls her approach "straightforward," "replicable, consistent, and accurate." *Id.* ¶¶ 14(a)-(b), 81, 86, 100. Her own testimony and the record prove the opposite. What she applied was a counsel-driven set of ad hoc string-matching heuristics that frequently generated "matches" that correspond to no book or image, produced pervasive false-positive "matches," and yielded nonsensical results she refused to treat as errors.

A representative exchange from her deposition illustrates the problem. She admitted that her process "matched" city council agenda papers from 2010 to a French-language book published in 1979 and registered with the U.S. Copyright Office ("USCO") in 1980. *See* Decl. of Kelly M. Knoll Ex. D ("McCarron Tr.") at 197:13-206:14. According to McCarron, Google trained on the French book, when in reality it trained on the city council packet. Asked whether she regarded this a valid match, she answered: "Yes. That's the match." *Id.* at 203:13-20.

That alone calls her methodology into question. And the fundamental process flaw that produced it is only one of many severe methodological failures. For instance, McCarron's matching scheme hunted for ISBNs (a unique identifier for certain books) in training data, but routinely matched obviously invalid data. Strings of "ISBN-like" numbers in invoices, dates, and phone numbers were all treated as ISBNs and wrongly "matched" to books with real ones. *E.g.*,

McCarron Tr. at 195:17-197:8. Her results also contain unreconciled ***one-to-many*** and ***many-to-one*** "matches" between unrelated training records and unrelated copyright registrations *See infra* nn. 3-4. And McCarron's identification of "pirated" works rests on a rudimentary search of Google's training data for URLs containing names of what Plaintiffs' counsel told her were "piracy websites" and "shadow libraries." McCarron Rpt. ¶ 87. Because she looked for keywords rather than specific domain names, many of the works she labels "pirated" do not appear on any of the sites Plaintiffs' counsel dictated. Further, she treats every such "match" as a validly registered, copyrighted, unlicensed work—an assumption unsupportable on the record.

These and many other problems are detailed in the expert rebuttal report of Dr. Georgios Zervas ("Zervas Rpt."). They are not mere disagreements with McCarron's conclusions—they are fundamental reliability failures. McCarron's own testimony confirms she neither tested her methodology nor validated its results; she embraced outputs she knew to be farcical; and she never attempted to determine whether any "match" corresponds to an actual, validly registered, copyrighted, and unlicensed work. Her testimony must be excluded as unreliable under Rule 702.

## BACKGROUND

McCarron was asked to identify registered copyrighted books and images in Google's training data. McCarron Rpt. ¶ 14. She claims she developed a methodology for doing so by cross-referencing information drawn from training datasets with metadata found in databases from the USCO and from Bowker, the private company that assigns ISBNs. *Id.* ¶¶ 16(a)-(b), 43-100.

***Books.*** To identify books within Google's training data, McCarron analyzed two categories of datasets: (1) web-derived datasets (data Google crawled from the open internet), and (2) datasets that contained "books."

<u>*Web-Derived Datasets.*</u> For web-crawled datasets, McCarron searched the contents of each webpage for numbers that she deemed "ISBN-like." If she found one, she then attempted to locate, within the first 30 lines of that webpage, something resembling a book title or author name. If she found that, she compared the number of words on the webpage to the number of words she estimates appear in the corresponding book, and treated wildly different numbers of words as proof

that the page contained the book itself. *See, e.g.*, McCarron Rpt. ¶¶ 85, 123.[1]

The flaws here are obvious. *First*, the methodology results in overinclusive ISBN detection. As noted, her methodology routinely interprets unrelated numbers (from invoices, dates, telephone numbers) as valid ISBNs. It also accepts ISBNs with all-zero placeholders. Both are "matched" to books. McCarron Tr. at 217:9-219:21; Zervas Rpt. ¶¶ 55-61. *Second*, the methodology prompts McCarron to conclude that a webpage merely containing information about a book (an ISBN, title, and/or author) *is itself that book*. Thus, reviews, excerpts, product listings, or articles that cite a book in a footnote can easily be misclassified as the book. *Third*, McCarron assumed that metadata in the USCO and Bowker databases is accurate. As an example, where Bowker incorrectly lists a book as having a single page, she accepts that at face value and deems any webpage with more than a page's worth of text (under her method, more than 275 words) as confirming a complete copy of that book appears on the page. Zervas Rpt. ¶ 66.

*Books Datasets.* Beyond those flaws, McCarron's attempt to match the contents of Google's "books" training datasets to copyrighted works and their owners mechanically declares valid "matches" of "class works" even when the identified works are by authors who died centuries ago (*e.g.*, Aristotle, William Shakespeare, Alexander Hamilton) and whose writings are indisputably in the public domain. McCarron made no effort to determine whether any such works are registered or copyrightable, underscoring that her matching rules cannot distinguish copyrighted from non-copyrighted material and certainly cannot be used to identify *class members*; at best, she is merely identifying some books, with many obstacles remaining to even preliminarily guess at membership in the new classes Plaintiffs propose.

*Images.* McCarron's image analysis suffers from similar methodological defects. Rather than examining the images themselves, she relied exclusively on surrounding caption text to declare "matches" to copyrighted artworks. Under her approach, any textual fragment that includes an artist's name or partial title is treated as evidence that some associated image on a webpage *is*

---

[1] McCarron estimated the word count for each book by multiplying the book's page count by 275 estimated words per page, compared that estimate against the number of words in Google's training record for some particular webpage, and where the webpage contained at least half as many words as McCarron had estimated for the book—regardless of what those words actually said and whether there was actual overlap—called it a "match." McCarron Rpt. ¶¶ 85, 115, 119.

*the copyrighted work itself*, regardless of what the page actually depicts. McCarron conducted no visual comparison and no review of any deposit copies or licensing information.[2]

Unsurprisingly, McCarron's "methodology" yielded a series of absurd results—none of which she would acknowledge as errors so long as her rote string-matching rules were met:

- She "matched" a book review of Stephen King's *Silver Bullet*—written by "frog boy"—to the novel itself. McCarron Tr. at 260:24-261:8 ("[T]his met the matching criteria for ISBN and author and title name and word count as well.").

- She "matched" an 1890 edition of the *Montreal Herald* to IBM's *Guide to Successful Software Deployment*—even though, as she admitted, they "are not the same work." *Id.* at 216:7-225:19.

- She "matched" Jane Austen's *Pride & Prejudice* and Charles Dickens' *Hard Times* to Google's training data, but refused to say whether such long deceased authors were absent class members. *Id.* at 117:5-125:21 (*Pride & Prejudice*); *id.* at 209:2-213:8 (*Hard Times*).

- She "matched" an online speaker bio page to *Tontines: A Practitioner's Guide to Mortality-Pooled Investments* because the page identified the speaker as the author of that work. Asked whether the bio and the book were the same, McCarron admitted, "No," but acknowledged the combination met all her "match" criteria. *Id.* at 174:3-19.

- She "matched" a wiki page on the 1918 flu pandemic to a book *Epidemic and Peace 1918*. She conceded the wiki page "doesn't appear to be a book," yet still counted it as the "registered copyrighted work." *Id.* at 155:5-164:14.

- She assigned a "perfect author match" score to records where the author field was **blank**, because her algorithm mechanically treated an empty author field as if it contained the string "nan" (a common placeholder for "not a number") and so generated a perfect similarity score of 1.0 where the training data contained a word like "fi*nan*ce." She acknowledged this blank field was the cause of the match, but refused to call it an error or to correct it. *Id.* at 155:9-159:20; Zervas Rpt. ¶ 61.

- She "matched" a single lithographic reproduction of Claude Monet's *The Artist's Garden at Vétheuil* to numerous, seemingly unrelated images in the training data—counting each one as a separate "work" based on snippets of caption text that referenced Monet's original artwork. McCarron Tr. at 271:15-284:23; Zervas Rpt. ¶¶ 70-72.

When shown these and similar obvious false-positive "matches," McCarron offered the circular

---

[2] For certain datasets that lacked URLs, Google—at Plaintiffs' request—produced larger predecessor or "upstream" versions that include both records later filtered out and records actually used for training. McCarron did not limit her images analysis to the filtered training datasets Google actually used, but instead examined an upstream version and then treated every "match" in that larger set as if it had been used to train an at-issue model. McCarron Tr. at 55:21-57:17, 267:9-268:12. That approach inflates her counts and breaks any link between the data she analyzed and the alleged uses in dispute. It also violates Rule 702's requirement of factual fit. *See* ECF No. 272 at 3 (Judge van Keulen: relevance limited to datasets "used to train the at-issue models").

excuse that so long as the match satisfied her mechanical rules, she considered it valid. McCarron Tr. at 154:6-155:3 ("I think it should be counted as a match if it abides by the matching criteria that I set forth in my report."). To be clear, these examples are not edge cases—they are direct consequences of her rule set—and her refusal to recognize them as errors confirms that her approach cannot distinguish genuine works from irrelevant noise.

## LEGAL STANDARD

Federal Rule of Evidence 702, as amended in 2023, requires that the proponent of expert testimony "demonstrate[] to the court that it is more likely than not that the proffered testimony meets the admissibility requirements." Fed. R. Evid. 702 advisory committee note (2023). The rule permits expert testimony only if it (a) rests on sufficient facts or data, (b) is the product of reliable principles and methods, and (c) reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702(a)-(d).

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, courts assess reliability by considering whether the expert's technique has been tested, subjected to peer review, has a known or potential error rate, is governed by standards, and is generally accepted in the relevant field. *See Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1316-18 (9th Cir. 1995). The Supreme Court has further held that expert opinions must be excluded when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). And *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-53 (1999), confirms that this gatekeeping obligation applies to all forms of expert testimony, whether scientific, technical, or specialized.

Rule 702 thus places the burden on the proponent to establish that an expert's methodology is both reliable in principle and reliably applied to the facts. McCarron's opinions fail both prongs.

## ARGUMENT

**I.     McCarron's Methodology Is Unvalidated, Error-Prone, and Duplicative.**

McCarron conceded her conceived-for-this-litigation method calculated no error rate and conducted no statistically valid sampling. *See* McCarron Tr. at 148:4-152:9. She cited no literature supporting her approach or match thresholds, and identified only two self-imagined "validation"

exercises—each undocumented, non-reproducible, and untethered to any ground-truth set. *See* McCarron Tr. at 147:19-149:12; Zervas Rpt. ¶¶ 28-40. Under Rule 702, the absence of testing, error-rate analysis, and standards is itself disqualifying. *Daubert II*, 43 F.3d at 1316-17.

McCarron's rules routinely generate (a) ***one-to-many matches***—a single training record "matching" multiple unrelated registered works[3]; and (b) ***many-to-one matches***—multiple unrelated training records "matching" the same work.[4] In practice, her methodology declares that ***the same webpage is several different books or images, and that seven unrelated webpages are the same book***. A methodology that produces such contradictory, duplicative mappings cannot reliably identify copyrighted works (let alone registered ones). And as noted above, her errors do not end there. A process that cannot distinguish a novel from a municipal agenda packet—in different languages—is not a reliable identification method under Rule 702.

Courts routinely exclude expert analyses marred by "an alarming number of errors and analytical fallacies," including those with "mind-boggling" mistakes and double-counting that make it "impossible to rely on any of [the] conclusions." *EEOC v. Freeman*, 778 F.3d 463, 466-69 (4th Cir. 2015); *see also Joiner*, 522 U.S. at 146 (expert testimony properly excluded where there is "simply too great an analytical gap" between data and opinion); *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796-804 (3d Cir. 2017) (excluding expert who inconsistently applied even familiar techniques). McCarron's is just such an analysis, rife with structural errors, contradictory mappings, and rampant double-counting. Her work is a brute-force string-matching script dressed

---

[3] ***One-to-many.*** McCarron claimed to have identified seven "pirated" books in one dataset. McCarron Rpt. ¶ 143. But six of the seven came from the same underlying training record, which her script then mapped to six unrelated registered books—an impossibility that includes a manual on electric-motor maintenance, a religious commentary, and a chemical-industry guide. McCarron Tr. at 233:18-235:20. When shown the underlying webpage, she admitted that these supposed "matches" bore no relationship to one another or to the webpage itself. *Id.* at 237:18-245:14.

[4] ***Many-to-one.*** Conversely, she "matched" seven UNESCO webpages—each containing a different article—to a single, unrelated book (*The Dilemma of Enquiry and Learning* by Hugh G. Petrie). She admitted none of the webpages contained that book and that she does not know whether the book appears in Google's training data. McCarron Tr. at 177:15-185:13. The same flaw permeates her image analysis. A single lithographic reproduction of Monet's *The Artist's Garden at Vétheuil* was "matched" to unrelated images based on stray fragments of caption text. *Id.* at 271:15-273:6, 276:19-277:21; Zervas Rpt. ¶¶ 70-72. Nothing in the snippets suggested that any of the images were lithographs of the public-domain Monet work. McCarron Tr. at 278:3-15, 280:8-281:3; Zervas Rpt. ¶ 72. Yet McCarron concludes these purported matches constitute dozens of "works" infringed by Google. McCarron Tr. at 140:3-7; Zervas Rpt. ¶ 70.

1  up as expert analysis, and it fails every reliability requirement of Rule 702.

## II.   McCarron's Matching Logic Is Arbitrary, Counsel-Directed, and Unvalidated.

McCarron's matching logic turns entirely on a set of similarity and word-percentage thresholds—50%, 80%, 85%, and others—that she admits have no empirical basis. *See*, *e.g.,* McCarron Rpt. ¶¶ 115, 119, 123, 126. She offered no research, testing, or literature supporting any of them, and acknowledged that several thresholds were selected at counsel's direction, not derived from accepted practice. McCarron Tr. at 147:11-148:21.

Her only purported "tuning" exercises underscore the problem. For one dataset, she claims to have "tuned" author- and title-similarity thresholds using a sample of 400 books. McCarron Rpt. at 25-26 nn.25-26, 28. But she provided no documentation, no code, no sampling protocol, and no ground-truth verification. She identifies no criteria for determining whether a sampled book was a true match and offers no explanation of how she supposedly achieved a 96-99% "true-positive match rate." *Id.*; Zervas Rpt. ¶ 33(b). The claim is based on her own say-so, and is therefore unverified, untestable, and not reproducible. Worse still, she performed ***no validation at all*** for the vastly larger web-crawled datasets she analyzed—datasets containing millions of records.

Experts cannot satisfy Rule 702 by announcing threshold choices that lack empirical grounding, by relying on counsel-directed parameters, or by citing undocumented "tuning" exercises that cannot be independently evaluated. *Daubert II* requires "objective, independent validation," 43 F.3d at 1316, and McCarron's threshold-driven approach provides none.

## III.   McCarron Cannot Determine if a "Match" Is a Copyrighted, Unlicensed Work.

Plaintiffs' newly revealed class definition theories require proof that a copyrighted, validly registered, and unlicensed work was actually used in training. McCarron's methodology cannot supply any of these elements.

McCarron admitted she made no effort to determine whether any purported "match" is in the public domain, McCarron Tr. at 129:19-22, 135:2-14, 221:20-222:1 ("I'm not an expert in public domain."); or whether the cited registration actually covers the text or image in the training data, *id.* at 96:2-6. Nor did she determine whether Google had a license or other permission to use it. She reviewed no registration certificates, no deposit copies, and no licensing records for any

1  alleged "match." *Id.* at 133:24-134:5. Instead, she relied exclusively on registry metadata—which
2  cannot establish the owner of a work, the validity of a registration, the scope of its protection, or
3  the absence of a license, all issues central to Plaintiffs' liability and class theories. She further
4  acknowledged that resolving these questions would require a ***work-by-work, individualized***
5  ***review***, which she did not perform and does not know how to perform. *Id.* at 252:19-253:11 ("I'm
6  not sure what I would do to determine" whether a work was posted with permission).

7  McCarron also admitted she is not qualified to conduct that review. She testified she has
8  no "opinion about what is and is not copyrightable," no understanding of which works are in the
9  public domain, and no basis to determine whether online content was posted with authorization.
10 *Id.* at 129:16-22, 253:6-22. She was not retained to assess registration validity, copyrightability,
11 licensing status, or infringement, *id.* at 20:12-19, 21:9-17, 27:1-23, 93:2-96:6, and she expressly
12 disclaimed any opinion on class membership, *id.* at 119:24-25 ("So my assignment was not to
13 determine who is and is not a class member.").

14 In short, McCarron offers no expert testimony capable of establishing that any Plaintiff—
15 or absent class member—meets the proposed class definitions. Because her match list cannot
16 distinguish registered from public domain or licensed works and cannot determine if any alleged
17 "match" is the same work, her opinions fail Rule 702's "fit" requirement and must be excluded.

18 **IV.     McCarron's "Piracy" Opinions Are Unsupported, Counsel-Driven, and Irrelevant.**

19 McCarron's identification of "pirated" works rests on a simple text search of Google's
20 training data for URLs that contained certain keywords provided by Plaintiffs' counsel. But
21 McCarron did not search for actual "piracy" domains, and many so-called "pirated" works she
22 identified were found on perfectly legitimate sites, such as Scribd.com. *See, e.g.*, Zervas Rpt. ¶¶
23 85-87. And for the supposedly "pirated" works she found, McCarron did not review their content,
24 check licenses, or verify if the work was available through lawful channels or in other datasets.
25 McCarron Tr. at 102:3-11, 103:6-104:19; 253:6-254:18. Crucially, she conceded that none of the
26 named Plaintiffs had any work sourced from any alleged piracy or shadow library site. *Id.* at 111:5-
27 9 ("Q. [Y]ou did not identify any named Plaintiffs' work that came from or was sourced through
28 a piracy or shadow library website, correct? A. That's right.").

Her "piracy" opinions therefore fail on two independent grounds. *First*, they are unreliable under Rule 702 because they apply a counsel-directed keyword list, not an expert methodology capable of determining whether material is pirated or unlawfully obtained, and unlicensed. *Second*, her opinions are irrelevant. Having failed to identify any named Plaintiffs whose works appear on any piracy site, McCarron's methods cannot conjure up Plaintiffs' proposed "piracy subclass." *See Abdullah v. U.S. Sec. Assocs., Inc.*, 2011 WL 11733702, at *1 n.1 (C.D. Cal. Jan. 11, 2011) (subclass theory abandoned where "no class representative [wa]s designated").

McCarron's piracy opinions thus provide no evidence of liability, no evidence of class membership, and no evidence of class-wide impact.

## CONCLUSION

The flaws in McCarron's approach are not technical quibbles—they are foundational reliability failures. As the Supreme Court and Ninth Circuit have made clear, expert opinions based on untested, error-ridden, contradictory, or internally inconsistent methodologies must be excluded. *See Joiner*, 522 U.S. at 146; *Daubert II*, 43 F.3d at 1317–18; *Kumho Tire Co.*, 526 U.S. at 152. Those authorities mandate exclusion of her report in full.

Respectfully submitted,

Dated: November 20, 2025

By: */s/ Paul Sampson*
David H. Kramer, SBN 168452
Email: dkramer@wsgr.com
Maura L. Rees, SBN 191698
Email: mrees@wsgr.com
Eric P. Tuttle, SBN 248440
Email: eric.tuttle@wsgr.com
Paul J. Sampson (admitted *pro hac vice*)
Email: psampson@wsgr.com

*Counsel for Defendant* GOOGLE LLC