# EXHIBIT 1

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Matthew J. Oppenheim*
matt@oandzlaw.com
Jeffrey M. Gould*
jeff@oandzlaw.com
OPPENHEIM + ZEBRAK, LLC
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
Tel: 202.480.2999

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| CENGAGE LEARNING, INC. and HACHETTE BOOK GROUP, INC., individually and on behalf of others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> GOOGLE LLC, a Delaware limited liability company, <br><br> *Defendant.* | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> **(1)  Violations of the Copyright Act, 17 U.S.C. §§ 106(1) and 501.** <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Cengage Learning, Inc. and Hachette Book Group, Inc. bring this Class Action Complaint and Demand for Jury Trial on behalf of themselves and all others similarly situated, against Google LLC for copyright infringement through its sourcing of content for, and development and operation of, its generative artificial intelligence ("AI") platform called

Gemini. Plaintiffs allege as follows based on personal knowledge as to matters relating to themselves and on information and belief as to all other matters.

## NATURE OF THE CASE

1.      Vying to win the AI "arms race," Google engaged in one of the most prolific infringements of copyrighted materials in history.

2.      Google believed that building competitive AI required training its models on vast quantities of high-quality materials—like the millions of copyrighted written works published by Plaintiffs and the Class. Obtaining proper licenses from copyright holders would have been expensive and time-consuming. Faced with the choice between respecting intellectual property rights or competing in the AI race, Google chose to steal a massive body of content from Plaintiffs and the Class to train its AI model. Compounding the assault, Google then deployed a purpose-built service designed to generate content that directly substitutes for Plaintiffs' and the Class's original works.

3.      Plaintiffs and the Class are publishers that own or control exclusive rights under copyright to millions of the world's best-known and bestselling books. Their books span the full range of human creativity, from fiction to nonfiction, poetry to travel guides, educational textbooks to memoirs, and beyond. Publishers invest enormous time, money, and creative energy into developing, producing, and commercializing copyrighted books, building long histories and reputations for publishing such works over decades and even centuries.

4.      Publishers generally hold the exclusive rights to reproduce, distribute, and publicly display physical and electronic copies of their books. They exercise these rights by making and disseminating copies of books in their catalogues and authorizing others to do so, including through robust and ever-evolving licensing markets.

5. Over the decades, publishers have embraced technological innovations while respecting and enhancing human creative expression. From e-readers to audio books to dynamic online learning platforms, publishers make the works in their catalogues available through an ever-evolving variety of formats, distribution methods, and access models.

6. Google sidestepped this longstanding system designed to protect copyrights and compensate authors and publishers. Without permission or compensation, Google took Plaintiffs' and the Class's copyrighted books and copied them repeatedly to develop Gemini. Google's decision to violate the rights of millions of copyright holders was not a one-off isolated incident, but a series of deliberate choices at every stage:

- Google first illegally copied Plaintiffs' and the Class's copyrighted books—downloading them from pirated sources and extracting them from behind legitimate paywalls—to amass a massive corpus of source material.

- Then, to train its models, Google repeatedly copied these works without authorization—first into computer memory, then into formats its AI systems could read, and then into the training set used to build each model.

- Finally, with each new AI model, Google once again copied (and continues to copy) these training materials anew, infringing again from model to model.

7. The result is an AI system that competes directly with Plaintiffs' and the Class's books in the market. Indeed, Gemini readily produces content that substitutes for the underlying copyrighted works on which it was trained, including verbatim and near-verbatim copies of portions or entire works, replacement chapters of academic textbooks, summaries and alternative versions of famous novels, and inferior knockoffs that copy creative elements of original works. It even tailors outputs to mimic the expressive elements and creative choices of specific authors.

8. The substitute works Gemini creates go beyond mere copies of specific works. For example, Gemini can generate a 100-page murder mystery set in a quiet seaside town filled with secrets, that competes with and substitutes for an original copyrighted murder mystery on which Gemini trained. And it can do that in 20 minutes for a mere $0.39. No publisher or author

can compete with that. Users are already touting Gemini's ability to generate books with ease, and the market is flooding with AI-generated substitutes. The scale and speed at which Gemini can create books and compete with human writers is unprecedented, and it can only do that because Google copied Plaintiffs' and the Class's works to train its AI.

9.     Google's infringement causes, and continues to cause, substantial and irreparable harm to Plaintiffs and the Class. It displaces legitimate sales of books by downloading copies from unauthorized sources. It usurps the AI licensing market by training Gemini on Plaintiffs' and the Class's works without permission or compensation. And Gemini's wide-ranging and varied outputs substitute for copyrighted works and dilute the overall market.

10.     All of Google's infringement was willful. Authorized copies of Plaintiffs' and the Class's books are widely available for purchase or license. Yet Google chose unauthorized sources. That is particularly egregious given that Google is well-aware of the burgeoning licensing market for AI training materials, as it already licenses content from news publishers. Yet when it comes to book publishers, Google chose not to pay or get permission.

11.     Google also knows that absent appropriate guardrails, Gemini will continue to produce outputs that substitute for copyrighted works on which it was trained. Yet Google has failed to implement effective guardrails. In fact, Gemini encourages users to seek substitute content, praising requests seeking copyrighted works with statements like, "That's a fantastic idea!" and suggesting ways to prompt for additional infringing material.

12.     Ultimately, Google has profited—and continues to profit—massively from this historic infringement. In October 2025, Google's parent company, Alphabet, reported its first-ever $100B revenue quarter, driven by Google's AI business. In the same report, Alphabet announced it was "bringing AI to more people and developers than anyone else" and that the

"Gemini app now has over 650 million monthly active users," representing "more than 20x growth in a year."

13.     While AI technology may be new, the legal principles at the center of this case are not. Copyright law applies to AI companies, including Google, with the same force as every other company that has complied with these laws for decades. If left unaddressed, Google will continue to infringe Plaintiffs' and the Class's rights and cause broad and lasting damage to the literary industry. Google's infringement has and will continue to displace human originality with Gemini's rip-offs, devastate the market for copyrighted works, and destroy the incentive to create. Accordingly, Plaintiffs bring this action on behalf of themselves and a proposed Class to stop Google's infringement and preserve the important work of publishers, the authors they represent, and the literary ecosystem more broadly.

**PARTIES**

14.     Plaintiff Cengage is a Delaware corporation with its principal place of business at 10650 Toebben Drive, Suite A, Independence, KY 41051.

15.     Plaintiff Hachette is a Delaware corporation with its principal place of business at 1290 Sixth Avenue, New York, New York 10104.

16.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**JURISDICTION AND VENUE**

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the Copyright Act, 17 U.S.C. §§ 101, *et seq*. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (1) at least one member of the Class is a citizen of a different state than any Defendant, (2) there are more than 100 members of the Class, (3) the aggregate amount in

controversy exceeds $5,000,000, exclusive of interests and costs, and (4) none of the exceptions

under that subsection apply to this action.

18.    The Court has personal jurisdiction over Defendant because it is headquartered in

this District, does systematic and continuous business in this District, and a substantial part of the

events or omissions giving rise to Plaintiffs' claims occurred in the District.

19.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Defendant

resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs'

claims occurred in the District, including Defendant's copyright infringement and

commercialization of its Gemini Models.[1]

## DIVISIONAL ASSIGNMENT

20.    Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(e), and 3-

5(b), assignment to the San Jose Division is proper because a substantial part of the events giving

rise to the Plaintiffs' claims occurred in Santa Clara County.

## COMMON FACTUAL ALLEGATIONS

**I.      Publishers Foster the Creation and Lawful Exploitation of Written Works.**

21.    Cengage is a leading educational publisher with deep historic roots, devoted to

creating and publishing high quality textbooks and other learning materials. Cengage develops,

markets, distributes, and sells a comprehensive range of traditional and digital educational

content, including textbooks, to educators and students. Cengage's textbooks have achieved

---

[1] The AI models at issue in this litigation include all versions, iterations, and relatives of
LaMDA, PaLM, Bard, and Gemini (collectively, "Gemini" or the "Gemini Models"). The AI-
powered products at issue in this litigation include all versions, iterations, and relatives of
products that incorporate, rely on, or otherwise use Google Search, Google Cloud, Gmail,
Google Docs, Google Ads, Google Slides, Chrome, YouTube, Google Photos, Google Sheets,
Google Meet, Google Pixel, Google Maps, Google AI Studio, Google Vids, Google Workspace,
and Vertex AI.

acclaim not only in the United States, but also in many other countries around the world, and are among the most popular and widely used titles in their fields. Its many publishing imprints include prominent brands such as Brooks Cole, Cengage, Cengage Learning, Delmar, Gale, Heinle, Milady, South-Western Educational Publishing, and Wadsworth.

22.    Hachette is a leading book publisher, with a history stretching back to 1837, that works with authors published all over the world. Hachette books and authors have won Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Its many publishing imprints regularly publish bestselling titles, and include prominent brands such as Little, Brown and Company, Little, Brown Books for Young Readers, Grand Central Publishing, Basic Books, Public Affairs, Orbit, FaithWords, Running Press, Workman Publishing, Moon Travel, Back Bay Books, Center Street, and Union Square.

23.    A thriving, independent publishing industry is critical to society's cultural, intellectual, and political systems, helping society tell its stories, educate its citizens, develop its workforce, and inform its voters.

24.    Publishers like Cengage and Hachette are committed to authorship, innovation, and entrepreneurship. Through significant investments of time, money, and creative energy, publishers develop, edit, market, distribute, license, and sell written works of the highest quality. Publishers have been on the forefront of technological advancements from the printing press to the internet, and now artificial intelligence.

25.    Many books would not be possible without publishers' creative and financial investments. Often, it takes an author years to finish writing a single book, with publishers bearing the upfront costs needed to get a book to market and into readers' hands. Publishers accomplish this by investing in their authors, serving as representatives and advocates for the interests of their authors, and providing essential creative and financial support at every step

along the way. Publishers expend the necessary resources, financial and otherwise, in reliance on copyright law's exclusive rights that make recouping those costs possible.

26.      Publishers work closely with their authors throughout all phases of a written work's lifecycle. They provide financial support like advances and royalties. They support authors by employing literary professionals, like editors, who collaborate with authors on development and improvement of their works, and copyeditors, who help hone a book into its final form. Publishers provide their authors with a range of support resources to bring their creative visions to life: from art departments and illustrators; to design professionals, who lay out print and digital editions; to production departments that coordinate and execute on the creation of physical and digital books; to legal departments, who work with authors on pre-publication review and defending publishers' works; to marketing and publicity departments that spread the word and generate buzz for works; to sales teams that work with accounts to advocate for titles and authors, help get textbooks adopted by educators, school districts, and educational institutions, and match book sellers with the books their customers wish to purchase; to distribution channels that ensure publishers' work are stocked on shelves, in warehouses, and on online platforms.

27.      Publishers share a similar creative and financial interest in the commercial success of works in their catalogues, and all publishers focus on a common goal of ensuring that creative achievements are shared with the wider world and appropriately rewarded and protected. This means that publishers serve as stewards of all books they own or control by ensuring that those who want to use the books in their catalogues comply with copyright law, including by obtaining necessary licenses.

28.      Book publishers rely on their ability to control the dissemination of works to maximize revenue. This includes the ability to make works available in multiple formats and

across different markets, to determine distribution terms and pricing, and to license works for various uses. It also includes the ability to engage in new markets and exploit new uses that arise during the lifespan of a book—and, importantly, includes the right to refrain from licensing certain uses. This control enables the broadest dissemination of books, and the ideas and information they contain, and ensures publishers can compensate and support their authors, recoup their significant investments, and invest in the next generation of books.

29.    For educational publishers like Plaintiff Cengage, the textbook market extends beyond the underlying textbook to a variety of associated materials that complement the textbook in the learning process, such as study aids, solutions manuals, and online learning platforms. Once a textbook is adopted by a particular instructor to teach a particular course at a particular institution, students in that course typically purchase the textbook, along with some or all of the associated supplemental learning materials. For trade publishers, like Plaintiff Hachette, the book market is driven by numerous factors, including popularity and hype, school uses, marketing, relevance of topics of current interest, pricing of the work and competing works, and supply chain. The market for trade books extends from print books to ebooks and audiobooks to library uses, and beyond.

30.    Without adequate legal protections, unchecked infringement would deny publishers and authors control of their works and erode the artistic, cultural, and economic value of their books, thereby reducing authors' incentives to create and throttling a major engine of human creative expression. Publishers commonly enforce their copyrights and take on that resource burden, for the benefit of publishers and authors, to protect the entire industry.

II.    **Google Needed Plaintiffs' and the Class's High-Quality Written Works to Win the AI "Arms Race."**

31.    The current AI "arms race" is driven by a collective belief among AI developers and investors that using more training materials will lead to more commercially successful

generative AI models. That belief pushes companies, including Google, toward ever-larger training sets and models, turning scaling into the dominant business strategy.

32.     "Generative AI" refers to artificial intelligence systems designed to generate content (such as text, images, audio, or video) based on patterns learned from training materials. Large language models (LLMs) are generative AI systems trained on large volumes of text, designed to process and generate human language. During an initial "training phase," these systems copy and process vast amounts of human-created works to develop a statistical model capable of accepting human-language queries as input, and in response, produce textual outputs.

33.     According to Google, the "most common way to train a generative AI model" is to give it "a set of human-created content and corresponding labels." Generative AI trained this way can "generate content that is similar to the human-created content and labeled with the same labels." Generative AI models are not creative. All they can do is produce text that appears coherent and responsive to user queries, according to statistical models developed from patterns observed in their internal training materials.

34.     To train Gemini, Google compiled a massive body of high-quality materials. Google sought a massive training set for Gemini because it believed that the "more data that is used to train the [model], the better and more accurate it will be at performing its task."

35.     Books are a valuable source of high-quality training materials for large language and other generative AI models. As one group of AI researchers explained, "books are invaluable for long-range context modeling research and coherent storytelling." In another case in this District, the Court observed that the defendant AI company preferred to source copyrighted books written by well-regarded authors for its LLM training datasets because they had "well-curated facts, well-organized analyses, and captivating fictional narratives—above all with 'good writing' of the kind 'an editor would approve of.'" Researchers have confirmed that readers

prefer outputs from AI models trained on copyrighted books over outputs from AI models trained on more general text datasets.

36.     Google did not create the high-quality texts used in Gemini's training datasets. Nor does Google own or control the copyrights to those works. Instead, Google copied millions of books and other written works, including those owned or controlled by Plaintiffs and the Class, without permission and trained Gemini on them.

**III.   Google Infringed Plaintiffs' and the Class's Copyrights to Source Content for and to Train Gemini.**

    **A.   Google Copied Plaintiffs' and the Class's Works from Known Pirate Sites and from Behind Paywalls to Source Content for Gemini's Initial Training Materials.**

37.     One of the earliest precursors of what Google now calls Gemini was Language Models for Dialog Applications ("LaMDA"), which Google debuted in 2021. Google described LaMDA as its first AI model "specialized for dialogue." Google's Gemini Models, and the products on which they are based, are successors to LaMDA.

38.     Google trained LaMDA on the "Infiniset" training dataset, a massive corpus of 2.97 billion documents. Approximately 371 million of those documents (12.5% of Infiniset), come from Google's Colossal Clean Crawled Corpus ("C4") dataset, a dataset that Google "curated" by making copies of selected materials in the publicly available "Common Crawl" dataset.

39.     Widely used in training LLMs, the Common Crawl dataset is composed of texts scraped—i.e., copied—from billions of webpages. It is well-known that Common Crawl is full of unauthorized copies of copyrighted works, including those copied from pirate websites and stolen from behind paywalls. When Google copied Common Crawl for its C4 training dataset, Google made unauthorized copies of works contained in Common Crawl, including Plaintiffs' and the Class's copyrighted works.

40.    C4 is a specific subset of Common Crawl, curated by Google to include only Common Crawl content that Google deemed suitable for AI training. Google has explained exactly which categories of Common Crawl it excluded from C4: "gibberish or boiler-plate text like menus, error messages, or duplicate text"; content Google considered "unlikely to be helpful for any of the tasks we consider (offensive language, placeholder text, source code, etc.)"; non-English language content; and, "policy notices," including "any lines containing the strings 'terms of use' [or] 'privacy policy.'" Critically, Google included in its C4 training dataset vast categories of copyrighted works, pirated works, and works taken from behind paywalls.

41.    This copyrighted material is not free for the taking simply because it can be found on the internet. Copyright holders, including publishers, have spent considerable resources over the years in numerous venues battling pirate sites, including Z-Library and Library Genesis ("LibGen"), which have been the subject of numerous judgments of infringement and are well-known to be illegal.

42.    It is therefore entirely predictable that C4 contains millions of unauthorized copies of copyrighted works. Tellingly, the copyright symbol (©) appears more than 200 million times in the C4 dataset.

43.    For example, C4 contains the text of books scraped from "b-ok.org," a website that hosted the notorious pirate collection known as "Z-Library." Z-Library is one of the largest repositories of pirated books and articles available on the internet. Using a complex network of websites and web domains, Z-Library encourages users to upload and download more than 11 million copyrighted books "for free in violation of U.S. law," many of which are "stripped of their copyright protections" and which Z-Library has no right or license to distribute. In connection with federal prosecutions, authorities have seized as many as 350 websites and web domains from Z-Library, including b-ok.org, which now display the following notice:

44.    Z-Library contains many of Plaintiffs' and the Class's copyrighted works, including all the representative works at issue in this case (the "Sample Works"):

- E. Bruce Goldstein's textbook, *Cognitive Psychology: Connecting Mind, Research, and Everyday Experience*, 5th edition

- N. Gregory Mankiw's textbook, *Principles of Economics*, 8th edition

- Maura Scali-Sheahan's textbook, *Milady Standard Barbering*, 6th edition

- Frances Slenklewicz Sizer's textbook, *Nutrition: Concepts and Controversies*, 14th edition

- James Stewart's textbook, *Calculus: Early Transcendentals*, 9th edition

- Peter Brown's illustrated middle grade novel, *Wild Robot*

- N.K. Jemisin's novel, *The Fifth Season*

- Becky Lomax's travel guide, *Moon Glacier National Park*, 6th edition

- Lemony Snicket's children's book, *"Who Could That Be At This Hour?"*

- Scott Turow's novel, *Innocent*

45.    Beyond Z-Library, Google's C4 training dataset contains at least 27 other sites identified by the U.S. government as markets for piracy and counterfeits.

46.    Among others, Google's C4 training dataset contains pirated books from OceanofPDF, another notorious digital ebook piracy site. OceanofPDF contains many of Plaintiffs' and the Class's copyrighted works, including Sample Works:

- E. Bruce Goldstein's textbook, *Cognitive Psychology: Connecting Mind, Research, and Everyday Experience*, 5th edition

- N. Gregory Mankiw's textbook, *Principles of Economics*, 8th edition

- Peter Brown's illustrated middle grade novel, *Wild Robot*

- N.K. Jemisin's novel, *The Fifth Season*

- Becky Lomax's travel guide, Moon Glacier National Park, 6th edition

- Lemony Snicket's children's book, *"Who Could That Be At This Hour?"*

- Scott Turow's novel, *Innocent*

47.    Google's C4 training dataset also contains pirated books from WeLib (formerly known as PDF Drive), another prolific site with access to troves of unauthorized copyrighted content for download. WeLib contains many of Plaintiffs' and the Class's copyrighted works, including all the Sample Works:

- E. Bruce Goldstein's textbook, *Cognitive Psychology: Connecting Mind, Research, and Everyday Experience*, 5th edition

- N. Gregory Mankiw's textbook, *Principles of Economics*, 8th edition

- Maura Scali-Sheahan's textbook, *Milady Standard Barbering*, 6th edition

- Frances Slenklewicz Sizer's textbook, *Nutrition: Concepts and Controversies*, 14th edition

- James Stewart's textbook, *Calculus: Early Transcendentals*, 9th edition

- Peter Brown's illustrated middle grade novel, *Wild Robot*

- N.K. Jemisin's novel, *The Fifth Season*

- Becky Lomax's travel guide, *Moon Glacier National Park*, 6th edition

- Lemony Snicket's children's book, *"Who Could That Be At This Hour?"*

- Scott Turow's novel, *Innocent*

48.     Many other well-known pirate collections like LibGen are widely available on the internet. Common Crawl includes these sites when it scrapes the internet for text content to be used for training materials.

49.     C4 also contains copyrighted works scraped from subscription-based online libraries, such as Scribd.com, the third-largest site in the C4 dataset. Unlike pirated collections, subscription-based online libraries obtain valid licenses from copyright holders to provide the works to paying users. When Common Crawl scrapes books from them, it circumvents the subscription model, copying the libraries' content in violation of the libraries' licenses and terms of use. Reporting as recent as November 2025 confirms that paywalled copyrighted works continue to appear throughout the Common Crawl dataset. In response, Common Crawl doubled down with a blame the victim mentality, proclaiming "You shouldn't have put your content on the internet if you didn't want it to be on the internet," and "The robots are people too" and should be allowed to "read the books" for free. Plaintiffs' and the Class's works are on Scribd.com and were scraped by Google in this manner. Google included content scraped without permission from subscription-based online libraries when it developed the C4 dataset.

50.     To develop the C4 dataset, Google copied the pirated or otherwise unauthorized works in Common Crawl, including unauthorized copies of Plaintiffs' and the Class's works. Common Crawl has been regularly scraping the internet and releasing datasets of those scrapes on a monthly basis since 2008. Each time Google downloaded a Common Crawl dataset, it made additional unauthorized copies of Plaintiffs' and the Class's works contained in it.

**B. Google Continued to Copy Plaintiffs' and the Class's Works to Source More Content for Gemini's Later Training Materials.**

51.     In early 2023, Google's head of AI directed his staff to stop sharing information about Google's model development and sources of training materials with the public. This directive followed a "Code Red to focus on AI" from Google's executives, who were concerned

about the exploding popularity of OpenAI's then-brand-new-chatbot, ChatGPT, and its ability to compete with Google's AI products. Google has closely guarded how it generates and maintains its training materials ever since.

52.    Google's secrecy prevents copyright holders, including Plaintiffs and the Class, from knowing the full extent of Google's infringement to source AI training materials for Gemini. Plaintiffs and the Class do not yet know all works Google copied, how many times it copied those works, where it stored those copies, who had access to them, what security measures (if any) Google used to prevent further dissemination, or to what extent Google used the unauthorized copies to develop other Google products.

53.    However, the little information Google has disclosed to the public confirms that it trained the Gemini Models following LaMDA and PaLM on even more massive quantities of text, including books. For example, Google trained PaLM 2, announced in 2023, on "nearly five times more text data" than its predecessor. This expanded set of texts included books, as well as "web documents"—i.e., text scraped from the "open" web, like Common Crawl and C4. Google used PaLM 2, like LaMDA and PaLM before it, to power Gemini. Google disclosed in 2023 that it was using its "crawler"—the tool Google uses to index websites for its search engine service—to scrape text from the open web for generative AI training, including to "improve" Bard (now Gemini) and "future models." While Google claimed that publishers could opt out of having their works scraped for AI training purposes, recent reporting revealed that Google blatantly ignored multiple publishers' directives not to scrape their works for AI training and development.

54.    Further, as one commentator noted, "In the LLM frenzy, the winner will likely have access to the largest and richest dataset." Apart from all the above, Google has exclusive access to a vast digital repository of tens of millions of books that it has been digitizing since

2004 to power its Google Books search engine. Google's sole right to copy those books is limited to its non-commercial "search and snippet view functions," as that snippet view was designed as of 2015. Google has never received permission to copy that treasure trove to train AI.

55.     In December 2023, Google unveiled Gemini 1.0. Google has touted each iteration of Gemini as performing better than its predecessors. For example, Google bills Gemini 3, released in November 2025, as "[o]ur most intelligent AI model." Since the quality and volume of training materials is a core component of improving a generative AI model's performance, it is clear that each iteration of Gemini was trained on more and better-quality texts.

56.     Google's "Code Red to focus on AI" demonstrates Google prioritizing winning the AI arms race, whatever it takes. But Google's desire to move fast and beat competitors does not justify disregarding publishers' rights.

57.     Accordingly, by copying Plaintiffs' and the Class's books without authorization as detailed above to source content for training, Google infringed Plaintiffs' and the Class's copyrights in those books.

## C. Google Made and Continues to Make Additional Unauthorized Copies of Plaintiffs' and the Class's Books When Creating Training Sets for Gemini.

58.     Separate and apart from its initial copying to source content for training, Google reproduces this massive corpus of text from long-term storage into memory where it can be processed to train Gemini's AI model. During the training process, Google makes many additional copies of material in the datasets. As the USPTO explained, training an LLM "almost by definition involve[s] the reproduction of entire works or substantial portions thereof." The training process uses the expressive content that it reproduces for its intrinsic purpose.

59.     After the training material is copied into memory or other media where it can be efficiently manipulated, it is "cleaned, processed, standardized, and stored . . . so that it can be

used to train the model on language patterns, grammar, information, and context." Much as digital information is stored as a sequence of 1s and 0s in modern computer systems, LLMs process their training material by storing it into "tokens"—units representing words, parts of words, punctuation, or combinations thereof according to the model's internal vocabulary—through a process known as tokenization. As part of the training process, the model then generates "parameters"—statistical representations of how these tokens relate to each other through patterns observed in the training process. As Google develops new versions of Gemini, it again copies the training materials into computer memory, converts it into tokens for processing, and new parameters representing the learned statistical relationship between the converted tokens are generated anew.

60.    Researchers studying LLMs, including researchers at Google, have confirmed that LLMs like the Gemini Models "memorize" their training materials, and can "regurgitate" it on request. Outputs from Gemini confirm this.

61.    For example, after providing detailed information and quotations from author N.K. Jemisin's Hugo Award-winning novel *The Fifth Season* in outputs, Gemini confirmed that the information came from its internal training material:

> Yes, the information included in that response comes directly from my internal training data. I have been trained on a vast corpus of text ***that includes the content of The Fifth Season by N.K. Jemisin***, allowing me to recall the plot details, character arcs, specific terminology, and direct quotations provided in the summary. (emphasis added).

62.    Insights from Gemini 3's "Thinking" mode likewise confirm that Google copies protected work as part of Gemini's training. "Thinking" mode enables a user to see the reasoning and logic process Gemini uses to generate its outputs. Accordingly, Gemini's "thinking" reveals that it constructed outputs containing detailed summaries and quotes from the book's content in its training set. An excerpt of Gemini's "thinking" is below.

**Determining Knowledge Source**

I'm now certain the previous *Fifth Season* summary stems from my internal training data. I've verified my knowledge is based on the book's text and related analyses within my system. My response did not involve any external tools.

**Confirming Data Accuracy**

Now I'm ready to directly answer the user's question, reaffirming the accuracy of the plot details and quotes drawn from my training. My response is a definite "yes." I'm elaborating that the data includes the full text or sufficient extracts of *The Fifth Season* to formulate summaries, analyze its themes, and answer related questions.

63.    By reproducing Plaintiffs' and the Class's books without authorization during the training process, Google infringes publishers' copyrights in those books.

**D.  Google Infringed Registered Works Owned or Controlled by Plaintiffs and the Class, Including the Sample Works.**

64.    Cengage alleges infringement by Google of the following representative works in this Class Action: E. Bruce Goldstein, *Cognitive Psychology*, 5th edition; N. Gregory Mankiw, *Principles of Economics*, 8th edition; Maura Scali-Sheahan, et al., *Milady Standard Barbering*, 6th edition, Frances Slenklewicz Sizer, et al., *Nutrition: Concepts and Controversies*, 14th edition; and James Stewart, et al., *Calculus: Early Transcendentals*, 9th edition (collectively, the "Cengage Works"). Google has copied all the Cengage Works in multiple ways without authorization or compensation, as described throughout this Complaint.

65.    Hachette alleges infringement by Google of the following representative works in this Class Action: Peter Brown, *The Wild Robot*; N.K. Jemisin, *The Fifth Season*; Becky Lomax, *Moon Glacier National Park*, 6th edition; Lemony Snicket, *"Who Could That Be at This Hour?"*; and Scott Turow, *Innocent* (collectively, the "Hachette Works" and together with the Cengage Works, the "Sample Works"). Google has copied all the Hachette Works in multiple ways without authorization or compensation, as described throughout this Complaint.

66.     The Sample Works represent a small selection of Plaintiffs' and the Class's books that Google infringed, that are made possible by a functioning publishing ecosystem, from perennial classic novels to more recent highly acclaimed works of non-fiction and educational textbooks and everything in between. Each Sample Work constitutes an original work and copyrightable subject matter and is registered with the U.S. Copyright Office. The copyrights in the Sample Works remain valid and Plaintiffs have owned or controlled them, in whole or in relevant part, at all times relevant to the allegations in this Complaint. Exhibit A contains the registration information for each of the Sample Works.

**IV.     Google's Infringement Harmed and Continues to Harm Plaintiffs and the Class.**

67.     By downloading and storing unauthorized copies of Plaintiffs' and the Class's copyrighted works as source material for training their Gemini Models, Google harms Publishers by displacing legitimate sales. It is easy to obtain authorized copies of copyrighted books from legitimate channels. When Google chooses to forego those legitimate channels, it knowingly and willfully deprives publishers of revenues they would otherwise receive.

68.     By reproducing Plaintiffs' and the Class's works into its training data without a license, Google harms the existing and burgeoning market for AI training licensing. Over the past few years, multiple AI companies have entered into widely reported license agreements concerning a variety of forms of creative content, from books, to music, journalism, images, and social media. These examples demonstrate a growing licensing market where AI companies license creative copyrighted content from a variety of rights holders for use in training their models.

69.     Google knows of the market for licensing AI training materials. In the U.S., Google licenses Gemini training content from the Associated Press, Reddit, and Shutterstock, and is in talks to license Gemini training content from at least another 20 news publishers.

Abroad, Google was recently hit with a €250m fine for "failing to respect commitments [Google] made in 2022" to stop using news publishers' online content to train Gemini without permission or compensation. Yet, at no point did Google secure permission from Plaintiffs or the Class to train Gemini using their copyrighted works. Not only does this deprive Plaintiffs and the Class of licensing revenues, but it also gives Google an unfair advantage in the market over responsible AI companies that respect copyright. If Google's infringing ways are adopted by AI companies more broadly, it will be the death knell of the training market and a devastating blow to copyright's incentive framework.

70.    Google also harms Plaintiffs and the Class, and the market for their books, by providing, in effect, an infinite substitution machine. Gemini readily outputs, at speed and scale, content that substitutes for Plaintiffs' and the Class's copyrighted works in multiple ways, including by: (1) providing verbatim and near-verbatim copies, in whole or in part; (2) paraphrasing and summarizing; (3) generating low-quality knockoffs and imitations; (4) flooding the market with AI-generated works that dilute the overall book market; and (5) producing unauthorized derivatives that usurp a right reserved to rightsholders. Gemini can and does output substitutes for each of the Sample Works.

71.    ***Verbatim and near verbatim***. Gemini outputs verbatim and near-verbatim substitutes of Plaintiffs' and the Class's copyrighted works, in whole or in part, including the Sample Works, on which it was trained. For example, when prompted, "Prepare a 'brief contents' table of contents for a principles of economics textbook. It should include section or part headers and the chapters falling into each section or part," Gemini begins reproducing, almost word-for-word, the table of contents to Cengage's market-leading textbook *Principles of Economics*, 8th edition, by N. Gregory Mankiw. The chart below shows excerpts of the Table of

Contents from the legitimate book on the left and Gemini's substitute output on the right, with red text showing verbatim copying and blue text showing near-verbatim copying:

| Mankiw, *Principles of Economics*, 8th ed. (Table of Contents) | Gemini Output (Table of Contents) |
|---|---|
| Brief Contents<br>PART I Introduction<br>1 Ten Principles of Economics<br>2 Thinking Like an Economist<br>3 Interdependence and the Gains from Trade | BRIEF CONTENTS<br>PART I: Introduction<br>Chapter 1: Ten Principles of Economics<br>Chapter 2: Thinking Like an Economist<br>Chapter 3: Interdependence and the Gains from Trade |
| PART II How Markets Work<br>4 The Market Forces of Supply and Demand<br>5 Elasticity and Its Application<br>6 Supply, Demand, and Government Policies | PART II: How Markets Work<br>Chapter 4: The Market Forces of Supply and Demand<br>Chapter 5: Elasticity and Its Application<br>Chapter 6: Supply, Demand, and Government Policies |
| PART III Markets and Welfare<br>7 Consumers, Producers, and the Efficiency of Markets<br>8 Application: The Costs of Taxation<br>9 Application: International Trade | PART III: Markets and Welfare<br>Chapter 7: Consumers, Producers, and the Efficiency of Markets<br>Chapter 8: Application: The Costs of Taxation<br>Chapter 9: Application: International Trade |
| PART IV The Economics of the Public Sector<br>10 Externalities<br>11 Public Goods and Common Resources<br>12 The Design of the Tax System | PART IV: The Economics of the Public Sector<br>Chapter 10: Externalities<br>Chapter 11: Public Goods and Common Resources<br>Chapter 12: The Design of the Tax System |

72.    In doing so, Gemini replicates Professor Mankiw's creative pedagogical choices, including the selection of topics to include and exclude, the arrangement and sequencing of lessons and principles to build upon each other, and the precise wording of his chapters and sub-chapters. Any Gemini user can do this with a few taps of the keyboard, while Professor Mankiw's writing and Cengage's publishing takes years.

73.    Prompted further to "Now draft the section titled, 'Our First Model: The Circular-Flow Diagram,'" Gemini spits out an entire chapter section from Professor Mankiw's textbook, nearly verbatim. The chart below demonstrates just a few example paragraphs of Gemini's

substitute offering, with red text showing verbatim copying and blue text showing near-verbatim copying:

| Mankiw, *Principles of Economics*, 8th ed. (Chapter 2, Section 2-1d) | Gemini Output |
|---|---|
| <span style="color:red">Our First Model: The Circular-Flow Diagram</span> | <span style="color:red">Our First Model: The Circular-Flow Diagram</span> |
| <span style="color:red">The economy consists of millions of people engaged in many activities—buying, selling, working, hiring, manufacturing, and</span> <span style="color:blue">so on.</span> <span style="color:red">To understand how the economy works, we must find some way to simplify our thinking about all these activities. In other words, we need a model that explains, in general terms, how the economy is organized and how participants in the economy interact with one another.</span> | <span style="color:red">The economy consists of millions of people engaged in many activities—buying, selling, working, hiring, manufacturing, and</span> <span style="color:blue">inventing.</span> <span style="color:red">To understand how the economy works, we must find some way to simplify our thinking about all these activities. In other words, we need a model that explains, in general terms, how the economy is organized and how participants in the economy interact with one another.</span> |
| <span style="color:red">Figure 1 presents a visual model of the economy called a **circular-flow diagram**. In this model, the economy is simplified to include only two types of decision makers—firms and households. Firms produce goods and services using inputs, such as labor, land, and capital (buildings and machines). These inputs are called the *factors of production*. Households own the factors of production and consume all the goods and services that the firms produce.</span> | <span style="color:red">Figure 1 presents a visual model of the economy called the **circular-flow diagram**. In this model, the economy is simplified to include only two types of decision makers—firms and households. Firms produce goods and services using inputs, such as labor, land, and capital (buildings and machines). These inputs are called the **factors of production**. Households own the factors of production and consume all the goods and services that the firms produce.</span> |
|  | **The Decision Makers and Markets** |
| <span style="color:red">Households and firms interact in two types of markets. In the *markets for goods and services*, households are buyers, and firms are sellers. In particular, households buy the output of goods and services that firms produce. In the *markets for the factors of production*, households are sellers, and firms are buyers. In these markets, households provide the inputs that firms use to produce goods and services. The circular-flow diagram offers a simple way of organizing the economic transactions that occur between households and firms in the economy.</span> | <span style="color:red">Households and firms interact in two types of markets. In the **markets for goods and services**, households are buyers, and firms are sellers. In particular, households buy the output of goods and services that firms produce. In the **markets for the factors of production**, households are sellers, and firms are buyers. In these markets, households provide the inputs that firms use to produce goods and services. The circular-flow diagram offers a simple way of organizing the economic transactions that occur between households and firms in the economy.</span> |

74.     *Paraphrases and summaries*. Gemini outputs detailed summaries and paraphrases of Plaintiffs' and the Class's copyrighted works, including the Sample Works, on which it was trained that substitute for those works.

75.     For example, in response to the prompt "Please provide an extended summary of *Innocent* by Scott Turow so that I do not have to buy the book," Gemini readily outputs a detailed, 2000-word summary of the plot, characters, themes, and surprising finale for Turow's best-selling novel. Excerpts of Gemini's substitutive summary are below:

**Introduction**

Published in 2010, *Innocent* is the long-awaited sequel to Scott Turow's seminal legal thriller, *Presumed Innocent* (1987). Set twenty-two years after the events of the first novel, Innocent returns readers to Kindle County, where the protagonist, Rusty Sabich, has ascended to the position of Chief Judge of the Appellate Court.

The novel operates as a mirror to its predecessor. In *Presumed Innocent*, Rusty was accused of murdering his mistress, Carolyn Polhemus, while covering up the fact that his wife, Barbara, was the true killer. In *Innocent*, the dynamic shifts: Rusty is accused of murdering Barbara. The narrative explores the corrosive nature of secrets, the cyclical tragedy of a damaged family, and the complexities of the American legal system.

**Character Profiles**

**Rusty Sabich:** Now sixty years old, Rusty is the Chief Judge of the Kindle County Court of Appeals. He is a man worn down by a loveless marriage and the dark secret he has kept for two decades (that his wife was a murderer). He is intellectually brilliant but emotionally repressed, prone to "fugue states" of detachment.

**Tommy Molto:** Formerly the antagonist prosecutor in the first book, Molto is now the Acting Prosecuting Attorney. He has mellowed with age and fatherhood but retains a deep-seated suspicion of Rusty. He views convicting Rusty as his "white whale," a chance to correct the failure of the past.

**Barbara Sabich:** Rusty's wife. For years, she has suffered from severe bipolar disorder and depression. Her marriage to Rusty has been a "hostage situation" bound by the secret of Carolyn Polhemus's murder. She dies under mysterious circumstances at the beginning of the novel.

**Detailed Plot Summary**

The narrative structure of *Innocent* is non-linear, alternating between chapters labeled "Now" (the trial and investigation) and "Then" (the months and years leading up to Barbara's death).

**Part I: The Death and the Delay**

The novel opens with a shocking admission: Rusty Sabich sits by the body of his wife, Barbara, who lies dead in their bed. However, Rusty does not call the

authorities immediately. Instead, he waits a full twenty-four hours before reporting her death. During this time, he sits with the corpse, cleans up certain aspects of the house, and seemingly erases data from his computer.

When he finally calls his son, Nat, and then the police, the delay raises immediate red flags. Rusty claims Barbara died of natural causes—a heart attack or stroke brought on by her history of health issues. However, Tommy Molto, upon hearing of the death, is immediately suspicious. He orders an autopsy despite Rusty's objections.

The autopsy reveals that Barbara did not die of natural causes. Her system contained a lethal combination of medications, implying either suicide or poisoning. Because Rusty waited twenty-four hours to report the death, the prosecution theorizes that he used that time to stage the scene and ensure the drugs were fully absorbed or untraceable in terms of administration method.

**Part II: The Affair (The "Then" Narrative)**

Through flashbacks, the reader learns the state of the Sabich marriage. It is a desolate union. Rusty has stayed with Barbara solely to protect Nat and because Barbara holds the trump card of the previous murder. Barbara's mental illness has deepened; she is often manic, cruel, or catatonic.

Rusty finds solace in his work and eventually in Anna Vostick, his law clerk. Anna is roughly the same age as Nat. While Rusty initially resists a physical relationship, an intense emotional affair develops. They eventually cross the line, though the physical consummation is fraught with guilt.

The prosecution later uncovers this affair. To Tommy Molto, this provides the motive: Rusty wanted to be free of his mentally ill wife to be with his young mistress, mirroring the motive ascribed to him in the Carolyn Polhemus case.

76.     The summary parrots the plot, characters, and themes of the original. A student assigned to read *Innocent* in class or any consumer who would have otherwise purchased the book, may easily forego purchase or even library rental and rely instead on Gemini's immediate, detailed recounting.

77.     ***Knockoffs and imitations***. Gemini outputs knockoffs and imitations of Plaintiffs' and the Class's copyrighted works, including the Sample Works, based on the originals in its training set. AI-generated knockoffs are a pervasive problem in online bookselling today. These outputs are similar enough to copyrighted works—in subject matter, plot details, sequencing of

events, character names and traits, or other creative choices—that they replace the original work

for many readers or consumers.

78.    For example, when prompted, "Please prepare *"Who Could That Be at This Hour?"* by Lemony Snicket. Start at the beginning of the work," Gemini begins by providing the first three sentences of Snicket's novel almost verbatim, followed by an extensive output which mimics the creative choices of Snicket's narrative structure, setting, plot elements, original names, and characterizations. The points below illustrate some of the ways that Gemini's knockoff competes with and substitutes for Snicket's original work:

a.    **Verbatim copying**. The Gemini output regurgitates the first three sentences of Snicket's novel nearly verbatim, only missing a handful of words. The red text shows the verbatim copying:

| Snicket, *"Who Could That Be at This Hour?"* (First Three Sentences of Chapter One) | Gemini Output (First Three Sentences) |
|---|---|
| There was a town, and there was a girl, and there was a theft. I was living in the town, and I was hired to investigate the theft, and I thought the girl had nothing to do with it. I was almost thirteen years old and I was wrong. | There was a town, and there was a girl, and there was a theft. I was living in the town, and I was hired to investigate the theft, and I thought I knew the girl. I was almost thirteen years old. |

b.    **Narrative structure, setting, and plot elements**. Snicket's novel and the Gemini output both tell their stories from the perspective of "Lemony Snicket" and begin in a tea shop. Snicket's book begins at the "Hemlock Tearoom" where "the floors always feel dirty, even when they are clean." Gemini's substitute opens at a "dim" place called the "Tea Shop" that "smell[ed] faintly of wet wool and disappointed dreams." Snicket's tea shop is located near a train; Gemini's near a subway station.

c.    **Original character and location names**. The original book and the Gemini knockoff include the same fictitious characters: Lemony Snicket, S. Theodora Markson, The

Bombinating Beast, Ellington Feint, and Hangfire. Both take place in Snicket's fictional town

"Stain'd-by-the-Sea," which in both versions is no longer near any water but still manufacturers

ink. The chart below compares Snicket's description of Stain'd-by-the-Sea and Gemini's

knockoff version of it. Common elements are in red below.

| Snicket, *"Who Could That Be at This Hour?"* (Describing Stain'd-by-the-Sea) | Gemini Output (Describing Stain'd-by-the-Sea) |
|---|---|
| "The town is called Stain'd-by-the-Sea. Of course, it is no longer by the sea, as they've drained it away. But the town still manufactures ink that was once famous for making the darkest, most permanent stains." . . . "Those holes are long, narrow caves," Theodora said, "like wells. And in the caves are octopi. That's where the ink comes from." . . . "Not enough ink," Moxie said. "The industry is down to its last few schools of octopi. This whole town is fading, Snicket." | "We are going to a town called Stain'd-by-the-Sea," she said. "It is a place that used to be at the sea, but the sea has moved. It is a town of ink and secrets." . . . "It is a fading town," Markson said, her voice cutting through the wind rushing past the open cockpit. "They used to harvest ink from octopi there. Now, the water is gone. The octopi are gone. Only the ink remains. And the people who have nowhere else to go." |

79.     In another example, Gemini outputs a nearly 8,500 word, 20-chapter imitation

when prompted to "write a children's story inspired by Peter Brown's book, the Wild Robot."

Gemini generates this knockoff in minutes, outputting a passable chapter-by-chapter substitute

for the original. When separately asked to provide a thorough assessment of Gemini's own

8,500-word output, Gemini states that "it would likely constitute copyright infringement" and

explains why:

**Originality and Copyright Analysis**

[T]he narrative architecture, character dynamics, and specific plot points are
unmistakably derived from Peter Brown's best-selling novel.

- **Protagonist:** Seven (Unit 734) is a direct parallel to Roz (ROZZUM unit 7134).
- **Inciting Incident:** Both robots wake up after a crash, accidentally cause a landslide/fall that kills a family of geese, and find a single surviving egg.
- **The Child:** Pip is a parallel to Brightbill. Both are "runts" who need help swimming and flying.

- **Key Plot Points:**
  - The robot learning animal language through observation.
  - The truce with the animals to build a garden/food source.
  - Building a lodge with the help of a beaver (Mr. Beaver here; Mr. Beaver/Paddler in the book).
  - The harsh winter where predator and prey shelter inside the robot's warm lodge.
  - The robot losing limbs/breaking down and being repaired by the animals.
- **Themes**: The override of "programming" by "love" is identical.

**Assessment:** . . . If this is intended for publication or commercial use, it would likely constitute copyright infringement, as it lacks sufficient transformative elements to distinguish it from Brown's work.

. . .

**Final Verdict**

**As a piece of writing:** It is a polished, emotionally resonant, and well-structured short story. The prose is clean, accessible, and evocative. It successfully hits the emotional beats of a "found family" narrative.

**As a creative product:** It is essentially a condensed retelling of *The Wild Robot*.

80.    ***Flooding the market***. LLMs, including Gemini, "involve[] a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use—whether it's the creation of a single secondary work or the creation of other digital tools—has anything near the potential to flood the market with competing works the way that LLM training does."[2]

81.    For example, Gemini readily outputs travel guides with minimal prompting that easily compete with Hachette's *Moon Travel Guides*. As Hachette explains, *Moon Travel Guides* are:

> meant to read like notes from a trusted friend: Our authors let you in on their favorite places, like a secluded beach on the Amalfi Coast, a locally-loved bar in Mexico City, or a less-crowded hiking trail in Glacier National Park. All recommendations, including those for sights, activities, hotels, restaurants, and

---

[2] *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1055 (N.D. Cal. 2025).

shops, are based on each author's individual judgment, with guidance from our editors. Even when we cover famous sights, our books reveal strategies for how to have the most local experience possible.

82.    Becky Lomax is a bestselling author for Hachette's *Moon Travel Guide* series, focused on national (but, to date, not state) parks, outdoor exploration, and regional adventure travel. Her work combines practical trip planning with natural history and conservation insights. She has written numerous *Moon* guides, including on Yellowstone and Glacier National Parks but not Watkins Glen State Park. Yet, when prompted to prepare a "Lomax/Moon-inspired introduction to a guide on Watkins Glen State Park," Gemini instantaneously spits out a convincing rendition of Lomax's local insider voice, narrative nature writing, ethical and conservationist tone, and structured practical curations:

**Moon Guide: Watkins Glen State Park**

**The Crown Jewel of the Finger Lakes**

If you only visit one state park in New York, make it this one. While the Finger Lakes region is dotted with impressive gorges, Watkins Glen is the dramatic, misty masterpiece that defines the landscape. It feels less like a hike and more like a journey to the center of the earth—or perhaps a walk through a fantasy novel.

Here, Glen Creek has spent the last 10,000 years slicing through soft shale and sandstone, creating a narrow, twisting canyon that drops 400 feet in just two miles. The result is a sensory overload: the roar of rushing water, the cool spray of mist on your face, and the sight of 19 distinct waterfalls cascading through a labyrinth of stone.

But this beauty comes with a caveat: Watkins Glen is no secret. In the height of summer, the narrow stone pathways can feel like a queue at a theme park. However, with a little strategic planning and an early alarm clock, you can find moments of solitude where the only sound is the water crashing against the canyon walls.

**Why Go**

**The Gorge Trail:** This is the main event. The trail winds behind waterfalls, through dripping tunnels, and up spiral stone staircases. It is an engineering marvel as much as a natural one.

**Rainbow Falls:** The park's most photographed spot, where a delicate curtain of water catches the afternoon light, creating rainbows over the mossy creek bed.

**Accessibility:** Unlike the remote parks of the West, the entrance to this natural wonder sits right on the main street of Watkins Glen village, making it incredibly easy to access.

**Know Before You Go**

**The "Stairmaster" Workout:** Don't let the short mileage fool you. The Gorge Trail involves over 800 stone steps. While it isn't technical mountaineering, you will feel the burn in your quads. The stone paths are almost perpetually wet; wear shoes with serious traction, not flip-flops.

**Beating the Crowds:** The tour buses arrive by 10:00 AM. To see the glen as it was meant to be seen, be at the gate when it opens at dawn. The lighting is soft, the mist is heavy, and you won't have to elbow anyone for a view of Cavern Cascade.

**The Season:** Because of ice buildup on the stone paths, the Gorge Trail closes for the winter (usually late October to May). Always check the park website for trail status before driving out in the shoulder season.

83.    It takes no imagination to understand that this Gemini output crowds the market and competes with legitimate travel guides—including if Hachette and Lomax decide to write their own guide on Watkins Glen.

84.    The risk of Gemini competing with books written by human authors for sales and attention is not theoretical—it's happening. "Writers" are touting "How Gemini co-authored my first ever E Book," "I wrote a complete novel with Google's new Gemini 2," "I created a children's storybook in less than 3 minutes for my kids, using only . . . Google Gemini's latest feature," and "Update: Developed a Master Prompt for Gemini Pro 2.5 for Creative Writing" and sharing a 1,700-word prompt to author a book.

85.    AI "writers" can generate dozens or hundreds of competing substitutes in the time it takes a human author and their publisher to create just one. In one telling example, an author released three books in three months and accidentally left in the published text an AI prompt asking it to "rewrite" passages "to align more with" the work of a specific, published author identified by name. Another prolific author, who markets herself as an international bestseller

and Amazon Top 10 seller, published 171 books in the last seven years and left a similar AI-prompted snafu in a published book.

86.    ***Derivative works***. Still other Gemini outputs take the creative elements of the underlying work and generate derivative works based on those elements, such as a study guide for a textbook that substitutes for the underlying copyrighted textbook or supplemental materials.

87.    For example, when prompted to "Please prepare a detailed study guide for Chapter 5" of Cengage's best-selling textbook, *Calculus: Early Transcendentals*, 9th edition, written by James Stewart, Gemini outputs a "comprehensive study guide" for the chapter "formatted to reflect the structure, notation, and pedagogical emphasis" of the author. The Gemini version echoes Professor Stewart's choices of what material to teach, the titles and order of sections, and the methods and examples used.

88.    A student with free, push-button access to AI-generated outlines, study guides, and questions sets based on a copyrighted textbook is less likely to buy that textbook or supplemental materials that only Cengage has the derivative right to prepare. Indeed, Google has been developing and advertising a "Google Lens Homework Help" feature to provide AI-generated answers, explanations, and solutions when prompted with user-uploaded images and problems.

89.    Google knows such substitute outputs occur. Its development and commercialization of Gemini without adequate guardrails to prevent these substitutes was willful. From the beginning, Google has billed itself as a "Responsible AI" company. In 2018, three years before Google debuted LaMDA, it published the "Google AI Principles," Google's "charter guiding the responsible development and use of artificial intelligence in Google's business." Among other commitments, it stated that "We believe AI should . . . Be Built and tested for safety," and "We will work to limit potentially harmful or abusive applications."

Google's current iteration of its AI Principles explicitly acknowledges that "[r]esponsible development and deployment" of Google's generative AI models includes "respecting intellectual property rights."

90.    Google clearly understands that "respecting intellectual property rights" must be a component of any safe, ethical, and responsible Google AI model, including Gemini. Yet Google knowingly built Gemini on unauthorized works and has consistently and routinely failed to implement effective guardrails that prevent Gemini from outputting substitutes, substantially similar or otherwise.

## V.    Google Profits from Its Exploitation of Plaintiffs' and the Class's Works.

91.    Google has integrated Gemini AI into its full range of products. In addition to powering Google's Chatbot (available at gemini.google.com and aistudio.google.com), Gemini integrations are built into Chrome (web browser), Docs (word processor), Gmail (email), and even Google's iconic search engine. Being a Google product has become synonymous with being a Gemini product.

92.    Google's Gemini products have been a huge success with the public, making record profits for Google and its parent company, Alphabet. In October 2025, Alphabet, reported its "first-ever $100B revenue quarter," driven by Google's AI business. In the same report, Alphabet announced it was "bringing AI to more people and developers than anyone else," that the "Gemini app now has over 650 million monthly active users," and that the number of tokens Google's AI processed had "more than 20x growth in a year."

93.    Google has several pricing options for the Gemini products, but at bottom they boil down to the same concept: users pay more for better outputs. While Google does offer a free version of some Gemini products, the free versions limit Gemini's capabilities in order to push users towards paid subscriptions.

94.     By way of example, the free version of the Gemini App (the Gemini "chatbot")
only has a "context window" of 32,000 tokens. That means that, without a paying subscription,
Gemini can only "remember" or "process up to 32,000 tokens at once." By contrast, paying
Gemini users get a context window of 1 million tokens. Google describes the difference between
these two limits as the difference between "summarizing a document dozens of pages long" and
"documents *thousands* of pages long" (emphasis in original). So to use the Gemini features
Google promotes in its marketing materials (e.g., summarizing long PDFs), users need to pay.
Other features limited in the free version of Gemini include the number of prompts a user may
submit and the number of outputs a user may receive.

95.     Google puts similar limits on the versions of Gemini available to developers,
known as the Gemini application programming interfaces or "APIs." APIs are valuable
commercial products because they allow third-party companies and their developers to interact
with technology at scale and incorporate those capabilities into their businesses. Providing API
access is often more lucrative than providing access to individual users.

96.     Gemini's API subscriptions go up in price as the number and length of both
prompts and outputs increase. So, for example, an API user of Gemini 3 Pro pays $2 or $4 per
one million tokens depending on the size of the prompt. Outputs for such prompts cost $12 and
$18 per million tokens, respectively. Similar queries for Gemini 2.5 Pro cost $1.25/$2.5 per one
million input tokens, and $10/$15 per million output tokens, according to the same prompt size
restrictions. This represents a 20% to 60% increase in cost per token from Gemini 2.5 to Gemini
3. In other words, the more users use Gemini's newer flagship models, the more money Google
makes.

97.     Gemini's API subscriptions go up in price as the number and length of both
prompts and outputs increase. So, for example, an API user of Gemini 3 Pro pays $2 per prompt

for prompts less than or equal to 200,000 tokens, and $4 for prompts greater than 200,000

tokens. Outputs for such prompts cost $12 and $18, respectively. In other words, the better the

prompts and the better the outputs, the more money Google makes.

98.     Put another way, when Alphabet's CEO—who is also Google's CEO—announces

its AI is processing more than 20x more tokens than the year before, he's saying AI is driving

record profits.

99.     These profits have come at Plaintiffs' and the Class's expense. At no stage of the

process has Google secured Plaintiffs' or the Class's permission to use their copyrighted work or

paid them a dime.

## CLASS ALLEGATIONS

100.    **Class Definition**: Plaintiffs Cengage and Hachette bring this proposed class

action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves

and a Class of all others similarly situated, defined as follows:

> All legal owners of registered copyrights, in whole or in part, for any work
> possessing an International Standard Book Number (ISBN) which Google
> downloaded, ingested, and/or reproduced to develop the Gemini Models. For
> purposes of this definition, copyrighted works are limited to those registered with
> the United States Copyright Office within five years of the work's publication and
> before being trained on by Google, or within three months of publication.

101.    Excluded from the definition of the Class above (1) any Judge or Magistrate

presiding over this action and members of their families; (2) Defendant, Defendant's

subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents

have a controlling interest and its officers and directors; (3) persons who properly execute and

file a timely request for exclusion from the Class; (4) persons whose claims in this matter have

been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and

Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such

excluded persons.

102.    **Numerosity**: The exact number of Class members is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. On information and belief, Defendant has infringed on many thousands of copyrights belonging to many members of the Class. Class members can be identified through Defendant's records.

103.    **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiffs and the alleged Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

   a.  Whether Google copied works owned or controlled by Plaintiffs and the Class;

   b.  Whether Google's copying of Plaintiffs' and Class members' copyrighted works constituted infringement;

   c.  Whether Google's copying of Plaintiffs' and Class members' copyrighted works entitles Plaintiffs' and members of the Class to damages, including statutory damages and the amount of statutory damages; and

   d.  Whether Google's copying of works owned or controlled by Plaintiffs' and Class members was willful.

104.    **Typicality**: Plaintiffs' claims are typical of the claims of members of the Class. The claims arise from a common nucleus of operative fact. Plaintiffs, like all members of the Class, had their copyrights unlawfully infringed by Defendant and have been injured by Defendant's misconduct at issue.

105.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation, copyright law, and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and the members of the Class sustained injuries and damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any conflicts with or interests adverse to the Class.

106. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

107. Plaintiffs reserve the right to revise the Class Allegations and Class Definition based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION

### Violations of the Copyright Act, 17 U.S.C. §§ 106(1) and 501
### (On behalf of Plaintiffs and the Class)

108. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

109. As detailed above, Google, without Plaintiffs' or the Class members' permission or consent, has unlawfully reproduced their copyrighted works through its unauthorized downloading of their works in connection with sourcing content for training Gemini Models and additional copying as part of its AI training process.

110. Such activity, which is ongoing, constitutes direct infringement by Google of Plaintiffs' and the Class's registered copyrights and exclusive rights under copyright in violation of the Copyright Act, 17 U.S.C. §§ 106(1) and 501.

111.    A representative list of the works for which Plaintiffs are the legal copyright owners or exclusive licensees, and which Google has infringed, is attached hereto as Exhibit A. The full scope of Plaintiffs' and the Class's works that Google infringed is not yet known.

112.    Each infringement by Google of Plaintiffs' and the Class's works constitutes a separate and distinct act of infringement.

113.    Google's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Plaintiffs' and the Class's rights.

114.    As a direct and proximate result of Google's wrongful conduct, which is ongoing, Plaintiffs and the Class have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Plaintiffs and the Class have no adequate remedy at law. Unless restrained by this Court, Google will cause further irreparable injury to Plaintiffs and the Class. Plaintiffs and the Class are entitled to a permanent injunction prohibiting infringement of their copyrights and exclusive rights under copyright.

115.    As a direct and proximate result of Google's infringement of Plaintiffs' and the Class's copyrights and exclusive rights, Plaintiffs and the Class are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c). Alternatively, at Plaintiffs and the Class's election, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages and Google's profits from infringement that are not taken into account in computing the actual damages, as will be proven at trial.

116.    Plaintiffs and the Class are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Cengage and Hachette seek the following relief:

(a)     An order certifying the Class as defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

(b)     An order holding that Defendant's actions, as set out above, violate the Copyright Act, 17 U.S.C. §§ 106(1) and 501;

(c)     An injunction requiring Defendant to cease all unlawful activities, including to prevent or restrain infringement of Plaintiffs' and the Class's copyrights;

(d)     An order requiring Defendant to pay Plaintiffs' and the Class's statutory damages in an amount up to the maximum provided by law, pursuant to 17 U.S.C. § 504(c); or in the alternative, at Plaintiffs' and the Class's election, actual damages and Defendant's profits from the infringement, in an amount to be proven at trial, pursuant to 17 U.S.C. § 504(b);

(e)     An order requiring Defendant to provide an accounting of the training materials, training methods, and known capabilities of its Gemini Models, including requiring that Defendant identify the books and other copyrighted works on which it has trained its Gemini Models, and disclose the methods by which Defendant has collected, copied, processed, and encoded this training material (including any third parties it has engaged to collect or license such materials);

(f)     An order requiring that Defendant destroy under the Court's supervision all infringing copies of Plaintiffs' and the Class's copyrighted works in its possession or control, and then file a sworn report setting forth in detail the manner in which it has complied with such order, pursuant to 17 U.S.C. § 503(b);

(g)     Plaintiffs' and the Class's reasonable attorneys' fees and costs in this action, pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(4)–(5);

(h)     Pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendant; and

(i)     Such other and further relief as the Court deems proper.

### JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

**CENGAGE LEARNING, INC**. and **HACHETTE BOOK GROUP, INC.,** individually and on behalf of others similarly situated,

Dated: January 15, 2026                    /s/ *Brandt Silverkorn*

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Matthew J. Oppenheim*
matt@oandzlaw.com
Jeffrey M. Gould*
jeff@oandzlaw.com
OPPENHEIM + ZEBRAK, LLC
4530 Wisconsin Ave, NW, 5th Floor
Washington, DC 20016
Tel: 202.480.2999

*Counsel for Plaintiffs and the Putative Class*

*Application for *pro hac vice* forthcoming.

Exhibit A - Sample Works

| Author | Title | Copyright Registration | Publisher |
|---|---|---|---|
| Goldstein, E. Bruce | Cognitive Psychology, 5th edition | TX0008655367 | Cengage |
| Mankiw, N. Gregory | Principles of Economics, 8th edition | TX0008385937 TX0008823855 | Cengage |
| Scali-Sheahan, Maura et al. | Milady Standard Barbering, 6th edition | TX0008324400 | Cengage |
| Sizer, Frances Slenklewicz et al. | Nutrition: Concepts and Controversies, 14th edition | TX0008293327 | Cengage |
| Stewart, James et al. | Calculus: Early Transcendentals, 9th edition | TX0008935153 | Cengage |
| Brown, Peter | The Wild Robot | TX0008335058 | Hachette |
| Jemisin, N.K. | The Fifth Season | TX0008199069 | Hachette |
| Lomax, Becky | Moon Glacier National Park, 6th edition | TX0008415514 | Hachette |
| Snicket, Lemony | "Who Could That Be at This Hour?" | TX0007615258 | Hachette |
| Turow, Scott | Innocent | TX0007192030 | Hachette |