January 27, 2026

**Via Electronic Filing**

The Honorable Susan van Keulen
United States District Court for the Northern District of California
San Jose Courthouse, Courtroom 6 – 4th Floor
280 South First Street
San Jose, CA 95113

**Re:** ***In re Google Generative AI Copyright Litigation***
**Master File Case No. 5:23-cv-03440-EKL-SVK**
**Consolidated Case No. 5:24-cv-02531-EKL-SVK**

Pursuant to Section 7(b) of the Court's Civil and Discovery Referral Matters Standing Order, Plaintiffs and Defendant Google LLC ("Google") respectfully submit this joint statement regarding the dispute over the adequacy of Google's search for documents from its Google Books Department, Google Search Team, and Core Data Acquisition Team. Fact discovery closes in 17 days, on February 13, 2026. Counsel have met and conferred but remain at impasse.

**REDACTED**

**Plaintiffs' Position:** Plaintiffs move to compel reasonable searches of specific noncustodial sources (*i.e.*, Google Drives, Google Groups, Google Chat, Google Spaces, Google Sites, Buganizer, and any other shared data repository or system) used by the Google Books ("Books"), Google Search ("Search"), and Core Data Acquisition ("CDA") teams for documents responsive to Plaintiffs' Requests for Production Nos. 13, 29, 41, 42, 54, 67, 70, 72, and 74. The documentary record and deposition testimony make clear that each of these Google teams possess unique, responsive information critical to Plaintiffs' core claims. Each group plays a critical role in collecting, processing, and curating data intended for use by the At-Issue Models, a critical step in the training process grounded in science and defined even in Plaintiffs' earliest iterations of their complaint. *See, e.g.*, ECF No. 1 at ¶¶ 6, 64–97 (describing the collection of data for use in training); ECF No. 234 at ¶¶ 1–2, 116–119 (same). Plaintiffs have raised concerns about Google's search previously, but Google declined to engage, asserting that prioritization of class certification discovery limited its obligations. Yet discovery to date shows that Google failed to conduct an adequate search of these noncustodial systems where this critical evidence is likely to be stored, resulting in significant gaps in production. Plaintiffs seek reasonable, targeted searches of those systems (which should already have been performed), scoped by the same agreed date ranges and search terms already applied to Google's custodians. Given Google's sophisticated infrastructure and ability to search these sources, there is no reason for further delay.

**Argument.** A party must conduct a reasonable search for responsive, nonprivileged documents in its possession, custody, or control. *See* Fed. R. Civ. P. 34; *Trujillo v. Princess Cruise Lines, Ltd.*, No. 2:20-cv-7451-JWH-PVC, 2021 WL 3604518, at *6 (C.D. Cal. Apr. 23, 2021); *see also Sterling Computers Corp. v. Int'l Bus. Machines Corp.*, No. 4:23-cv-04150-CCT, 2025 WL 1332320, at *6 (D.S.D. May 7, 2025) ("[W]here the requesting party shows that the responding party's 'search design, search tools, or search terms … are manifestly unreasonable,' or that 'the [responding] party has abdicated its responsibility,' court involvement is appropriate.") (cleaned up). "[I]f no responsive documents or tangible things exist, . . . the responding party should so state with sufficient specificity to allow the Court to determine whether the party made a reasonable

inquiry and exercised due diligence." *Marti v. Baires*, No. 1:08–cv–00653–AWI–SKO PC, 2012 WL 2029720, at *19 (E.D. Cal. June 5, 2012) (citations omitted). "[B]oilerplate objections or blanket refusals" are insufficient to meet a party's discovery obligations. *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2002).

Google was best positioned to select custodians with relevant information. Yet of the 25 custodians in this case, the majority of which Google selected, only David Price, Stephane Jaskiwicz, and Li Xiao were affiliated with Books, Search, or CDA. With that limited information and through discovery, Plaintiffs have now discovered that Books, Search, and CDA are teams at Google in possession of relevant information. Google never so denies, and only asserts that "Plaintiffs offer no basis to require additional search of other platforms." *Infra* at 7. For the reasons below, noncustodial sources arising out of those teams should be made discoverable to Plaintiffs.

**Google Books** and its team were integral parts of training the At-Issue Models. Google DeepMind (*i.e.*, Google's AI team) received data from Google Books for the specific purpose of developing the At-Issue Models. *See, e.g.*, Liechty Dep. 39:1–40:5 ("We receive data from the Google Books team" [for Google's generative AI models]"), 80:10–14 ("Yes, we use data we get from the Google Books team to train some of these models."). This processing and filtering by the Google Books team was further confirmed by documentary evidence and subsequent depositions. *See, e.g.*, Liechty Ex. 11 ("[W]e need to push harder on the Google books team to get better books in pretraining."); Jaskiewicz Dep. 150:9–151:7 ("So the Google Books team has developed a process that will allow other team to access the corpus. So there is software component to how you'd access and the process to obtain authorization."), 163:7–164:12 (access to Google Books data); Jaskiewicz Exs. 39, 40, 42 (use of books data); GOOG-AIC-000385162–63 (requiring approval of Google Books data by Google Books counsel). As GOOG-AIC-000584953 states, "The Google Books team has been providing training data to Gemini since the beginning." Further, beyond the initial curation of data, Google Books was responsible for [REDACTED] ." GOOG-AIC-000584953 (" [REDACTED]



[redacted].”). Google Books also indexed the books used in AI training. GOOG-AIC-000637300 (discussing the Google Books team’s “project to extend ULM with attribution capabilities” and describing how “[w]e have a tool . . . that checks for recitations [redacted], as well as the ULM Books training corpus in our index.”).

Searching the Google Books department is crucial because its leadership made decisions about which copyrighted books datasets were permissible to use as AI training data. Critical to the fair use inquiry in this case is understanding why Google Books continuously approved the use of Library Project books for use as AI training data under a theory of fair use, [redacted]. *See* Ayoub Ex. 158. Google Books abruptly ended the practice of using Publisher Partner books in 2023 as AI training data without a license to do so—but not before training ULM, LaMDA, and the first version of Gemini on those Publisher Partner books, which it still has not disclosed to publishers. *See* Vinyals Ex. 121.

Google’s ability to identify and usage of copyrighted books in the training datasets plainly goes to Google’s willful infringement. Further, Google’s creation of unauthorized copies and derivative training datasets in filtering and processing constitutes the continued infringement of Plaintiffs’ copyrighted works and bears on several fair use factors. *See* 17 U.S.C. § 107 (1) (purpose and character of use); (2) (nature of the work); (3) (amount and substantiality of the portion used).

**Google Search** is an internal team at Google tasked with sourcing vast quantities of AI training data for the At-Issue Models, including providing the data that constituted Docjoins and the Google Common Corpus, or GCC. *See* Ayoub Ex. 157. Relatedly, **CDA** was responsible for acquiring data for developing Gemini. GOOG-AIC-000761080 (“CDA team partnered with Gemini Data Pillar to [redacted]”).

Search targeted [redacted], *see* Baldridge Ex. 53 ([redacted]



[redacted]), while CDA targeted [redacted] in its web-crawling activity. *See* GOOG-AIC-000201620 ("[redacted]"); GOOG-AIC-000602798 ("[redacted]"); GOOG-AIC000764640 ([redacted]). This targeting goes to Google's willfulness.

Search worked closely with DeepMind to create datasets to develop the At-Issue Models, and its data and functions were integrated into the At-Issue Models' training data. *See* GOOG-AIC-000314174 (describing collaboration between DeepMind and Search to target categories to develop "the Google Common Corpus, a project that aims to compile a subset of Docjoins that are not subject to permissibility restrictions"); Xiao Dep. 69:21–70:2 ("[redacted]."), 83:20–85:1 (describing Search's function with GCC and Docjoins), 176:6–179:2 (Search's function in acquiring media), 283:12–285:18 (Google's "Dataset Search relies on the same technology as Google Search product"). CDA was also instrumental in the crawlers and scrapers for collecting Gemini AI training data—and it did not do it alone, but hand in hand with DeepMind. *See, e.g.*, Xiao Dep. 29:20–31:8 ("It's [a] collaboration between Gemini team and the CDA team to get more data and the data in their format to use."), 71:16–72:22 ("CDA [was] directly involved for Gemini training in second half of 2023"), 77:12–18 ("collaboration between CDA team and the Gemini data team to find more, better web data for Gemini:"); Xiao Ex. 94 (CDA describing Gemini data sources); GOOG-AIC-000762527 ("Core-Data's AI strategy is to provide, extensible and easy-to-use, scalable and safe, data handling across the AI data lifecycle, known as the Content Loop"); Liechty Ex. 25 (describing Gemini development with Docjoins, including reference to "[redacted]"); GOOG-AIC-000370492 ("We (CDA) are working with DeepMind and Research teams to solve their training data acquisition needs from the open Web and 3P partners, e.g. acquiring high quality and diverse datasets for the AI model training purposes."); GOOG-AIC-000761076 ("[redacted]."); Xiao Dep. 239:14–240:12 (describing Google's crawling method to acquire data for training).

Additionally, there were approval processes for using search data based on, *inter alia*, copyright concerns. *See, e.g.*, GOOG-AIC-000014102 (approval request for search data); GOOG-AIC-000064562 (describing GCC, including how "GCC was initiated by the Search Trust team"); GOOG-AIC-000107380 (describing communications with the Search Trust team in connection with checking whether a response from a model recites text from training data).

Search also had final approval on the use of search data to develop the At-Issue Models. GOOG-AIC-000314436 ("Data: The approval request to use Search training data has been signed off by Legal and Copyright. **The final approval is with Search leadership**.") (emphasis added); *see also* GOOG-AIC-000014104 ("█████ . This expansion in use case requires approval from Search Trust Data and Search Leads.").

Additionally, Google Search maintains the █████ . *See* Price Ex. 137; Liechty Dep. 232:17–21 ("█████ .").

Plaintiffs' request that Google conduct a reasonable search of its noncustodial systems in which the Books, Search, and CDA teams operated and where they stored and tracked key evidence is proportional. As shown above, Plaintiffs are targeting specific services and teams with unique and likely responsive documents that Google has not searched. Plaintiffs having a smattering of documents and some hours of deposition testimony describing the significance of these teams and services does not demonstrate nor replace a request for Google's reasonable search. Further, each Rule 26(b)(1) factor favors Plaintiffs: (1) these are vital issues, as they concern the unlawful taking and infringing of millions of copyright works; (2) the amount in controversy is in the billions; (3) this information is solely in the possession, custody, and control of Google; (4) Google is well-resourced; (5) the discovery sought is unique and highly relevant; and (6) the burden of searching and producing for this information does not outweigh its relevance.

Plaintiffs request that the Court order Google to conduct reasonable searches of the Google Books, Google Search, and CDA teams for documents responsive to Plaintiffs' discovery requests.

**Google's Position:** On the eve of the February 13, 2026 fact-discovery cutoff, Plaintiffs bring their sixteenth motion to compel—demanding sweeping searches of undefined "noncustodial sources" to cure supposed "gaps in production" that they do not identify and that do not exist. This follows a flurry of late-stage motions seeking to blow past Court-ordered discovery limits.[1]

Courts in this District have made clear that "[e]leventh hour motions to compel should be for wrap-up items"—genuine holes that can be filled with discrete discovery—not attempted massive or vague expansions of discovery. *Kadrey v. Meta Platforms, Inc.*, 2024 WL 4362744, at *1-2 (N.D. Cal. Oct. 1, 2024). Plaintiffs' last-minute "fire drill" concerning "foundational issue[s] that could have been raised much sooner" are not proportional to the needs of the case. *Kadrey v. Meta Platforms, Inc.*, 2024 WL 4893298, at *2 (N.D. Cal. Nov. 25, 2024). Plaintiffs seek to extend and expand discovery through unbounded demands for searches of "any" system across entire Google organizations, after more than a year of extensive document production, numerous depositions, and repeated Court rulings managing discovery scope. But Plaintiffs do not identify anything they are supposedly missing.

The lateness is dispositive. Plaintiffs' October class certification motion defined multiple proposed classes around Google Books and Google Search and relied heavily on the very discovery they now claim is deficient. *See, e.g.*, ECF 251/253-1 at 1 (Google Books), 4 (GCC), 6 (DocJoins), 13 (CDA). If genuine evidentiary gaps existed, Plaintiffs would have raised them months ago—before class certification briefing and long before the waning days of fact discovery. Plaintiffs' claim that Google "declined to engage" based on a supposed bifurcation of class discovery (*see supra* at 1) is false. Plaintiffs know merits discovery remained open at all times. Indeed, they successfully advocated for that result.

What Plaintiffs now demand is for Google to go back to the well, start over, and re-search entire organizations in the hope that something new might surface to rescue their misguided claims. This is not "wrap-up" discovery. It is an attempt, with the clock striking twelve, to cast

[1] This marks Plaintiffs' third consecutive motion for which they have declined to file, as an exhibit, the joint chart required by § 7(b) of this Court's Standing Order.

wildly about over the scope of discovery generally. The motion is both too late and unsupported by the record Plaintiffs present. It should be denied.

***Plaintiffs Fail to Identify Any "Gaps" in Noncustodial Sources of Discovery.*** Plaintiffs' motion fails at a basic level of specificity. They demand searches of broad categories of "noncustodial sources," including "Google Drives, Google Groups, Google Chat, Google Spaces, Google Sites, Buganizer, and ***any*** other shared data repository or system." *Supra* at 1 (emphasis added). But they do not identify any specific repository, discrete missing category of documents, or record evidence showing that additional responsive and non-cumulative materials are likely to exist in any of these systems. Nor do they propose any repository-specific search plan or explain why any particular platform is likely to contain unique responsive material not already produced. Indeed, during the meet and confer on this motion, Plaintiffs could barely describe what they wanted, and seemed intent on checking the meet-and-confer box so they could rush to file.

Google has already conducted extensive noncustodial discovery using a proportional, interview-based process. Google has produced thousands of documents—both custodial and noncustodial—from systems including Google Drive, Google Groups, Google Chat, Google Spaces, and Google Sites. Counsel interviewed and consulted with dozens of Google employees with relevant subject matter knowledge to identify the systems where responsive noncustodial documents were actually maintained. Google searched those identified repositories, reviewed the results, and produced responsive materials. That is how proportional discovery operates under Rule 26(b)(1): targeted identification of likely repositories through knowledgeable custodians and subject matter experts—not unstructured hit-or-miss exploration of every internal platform or technical system a large technology company operates.

Plaintiffs offer no basis to require additional searching of other platforms. As for Buganizer, Plaintiffs have long been aware of the system and on October 8, 2025, requested limited Buganizer hyperlinked documents under the ESI protocol. Just last week, Plaintiffs requested dozens more hyperlinked documents, and Google is producing responsive records. Rather than continuing to adhere to that Court-ordered process, Plaintiffs now seek an unbounded mandate to

search the entire Buganizer system, not gap-filling discovery, without any consideration of burden or showing of proportionality, and without testimony from someone suggesting something material has not been produced. The Rules do not require such boundless discovery, especially at the end rather than the start of the process, and Plaintiffs certainly offer no basis for it now.

***Plaintiffs Fail to Identify Any Topic-Area "Gaps."*** Plaintiffs' motion is largely a catalogue of discovery already produced: documents, exhibits, and deposition testimony derived from or relating to Google Books, Google Search, and Core Data Acquisition ("CDA"). Citing the existing record does not establish a gap; it demonstrates there isn't one. Across topic areas raised in their motion, Plaintiffs do not offer any testimony to suggest the discovery produced is less than ample, any missing category of documents, any repository likely to contain such documents, or any need for noncumulative evidence that more searching would produce.

<u>Google Books.</u> Books is a service and an organization, not a repository of information to be searched. Existing discovery from and relating to the service is extensive. Google designated a Books custodian, Stephane Jaskiewicz, who worked in Books since 2007 and rose to Director of Engineering. Google produced voluminous documents from his custodial files, including shared team folders in Google Drive, messages from Google Groups and Spaces, and Buganizer artifacts, and Plaintiffs deposed him for nearly seven hours. Google also produced custodial files from other individuals who regularly interacted with Books, including Kareem Ayoub, whom Plaintiffs likewise deposed for seven hours. Plaintiffs also examined multiple other witnesses on Books-related topics, including Tyler Liechty, David Price, and Oriol Vinyals.

*Plaintiffs' "data transfer" argument identifies no discovery gap.* Plaintiffs assert that Google DeepMind "received data from Google Books for the specific purpose of developing the At-Issue Models." *Supra* at 2. They cite numerous documents and considerable testimony for that proposition, demonstrating that they have received ample discovery on the point. Plaintiffs do not explain how their citations establish that relevant information is missing or new searches are justified at this late date. It is also exasperating that Plaintiffs continue to focus on upstream data acquisition that would not advance their cause. This Court has repeatedly held that determining

what content was actually used to train an at-issue model requires examination of the training data itself. Plaintiffs have all the data they can reasonably need. Demands for documents discussing intermediate repositories is beside the point. ECF 311 at 1; ECF 280-1 at 2-3.

*Plaintiffs' "[REDACTED]" argument identifies no discovery gap.* Plaintiffs next assert that the Books team "[REDACTED]." *Supra* at 2. That subject has already been the focus of extensive discovery. Google produced documents from multiple custodians directly involved in [REDACTED], including Mr. Jaskiewicz, Mr. Ayoub, Leo Vacher, and others, and Plaintiffs deposed Mr. Jaskiewicz, Mr. Ayoub, and a Rule 30(b)(6) witness (Mr. Price) on this topic. Plaintiffs themselves rely on this discovery in their class certification motion. *See* ECF 251/253-1 at 12-13. They identify no repository likely to contain noncumulative materials, and no need for any supposedly undiscovered information.

*Plaintiffs' "dataset approval / discontinuation" argument identifies no discovery gap.* Plaintiffs next assert that Books leadership made decisions about permissible datasets and discontinued use of Publisher Partner books in 2023. *Supra* at 3. Google has already produced extensive discovery on this topic. Google's Rule 30(b)(6) witness, David Price, testified regarding the reasons for this change, and Stephane Jaskiewicz likewise testified extensively. Here again, Plaintiffs point to nothing they claim to need that they did not already get.

*Plaintiffs' "identification of copyrighted books / preprocessing" argument contradicts prior rulings.* Plaintiffs finally assert that Google can "identify … copyrighted books in the training datasets" and that preprocessing and filtering constitute "continued infringement." *Supra* at 3. Their assertions directly contradict this Court's rulings. The Court has held that Google is no more able than Plaintiffs to identify copyrighted works in training data, and that this case is about training (and data used to train) at-issue models—not data ingested but not used to train (and related processing or filtering steps). ECF 311 at 2 ("[T]he Court is persuaded that only the training datasets will reveal what putative class works were ultimately used [to] train Google's AI models."); ECF 280-1 at 2-3 (complaint requires data be "used to train"; "mere 'ingestion' is not

sufficient"). Plaintiffs cannot relitigate the same theory in hopes of getting an answer they prefer.

Google Search and CDA. Though neither Search (another service) nor CDA (a team) is a repository of information, Google has produced extensive information on both. For example, Google produced responsive custodial documents from David Price (Search) and Li Xiao (CDA), and Plaintiffs deposed both for more than eleven combined hours. Tyler Liechty also testified as Google's 30(b)(6) witness on training data identification, acquisition, filtering, and processing.

*Plaintiffs' "targeted crawling" argument identifies no discovery gap.* Plaintiffs assert (without evidence) that Search and CDA "targeted" copyrighted materials in webcrawls. *Supra* at 3-4. But they identify no missing discovery. In addition to his deposition, Plaintiffs received custodial documents from Li Xiao—the founder of and principal engineer at CDA. Plaintiffs' motion repeatedly cites his testimony and documents produced from his custodial file, but does not identify any specific missing documents, any repository likely to contain them, or any noncumulative evidence additional searching throughout the CDA organization would produce.

*Plaintiffs' "final approval" argument identifies no legally relevant gap.* Plaintiffs assert that the Google Search team had "final approval" on the use of search data. *Supra* at 5. They do not explain why that allegation is relevant to their case, but in any event identify no gap. Discovery already establishes that at-issue models were trained in part on webcrawled data; the identity of internal approvers adds no legal relevance.

*Plaintiffs' "[REDACTED]" argument is unsupported and legally irrelevant.* Plaintiffs reference [REDACTED], which they have known about from documents produced as far back as April 2025 and which they asked about in multiple depositions that took place months ago. They speculate—without citations—that the filter [REDACTED] *Supra* at 5. Of note, this Court has held that filtered-out material is not relevant to liability, which is limited to content actually used in training at-issue models. ECF 311 at 2.

***Conclusion.*** Plaintiffs' basic argument here (and in their other recent motions) is that because they haven't found what they hoped for, they can start over at the very end of discovery. Absent actual discovery gaps, Rule 26(b)(1) does not permit such late-stage, unbounded discovery.

Respectfully submitted,

Dated: January 27, 2026

By: */s/ Joseph R. Saveri*

Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN 179108)
Christopher K.L. Young (SBN 318371)
Evan A. Creutz (SBN 349728)
Elissa A. Buchanan (SBN 249996)
Aaron Cera (SBN 351163)
Louis Kessler (SBN 243703)
Alexander Zeng (SBN 360220)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
cyoung@saverilawfirm.com
ecreutz@saverilawfirm.com
eabuchanan@saverilawfirm.com
acera@saverilawfirm.com
lkessler@saverilawfirm.com
azeng@saverilawfirm.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
**STRANCH, JENNINGS & GARVELY, PLLC**
1111 Broadway, Suite 300
Oakland, CA 94607
Tel. (341) 217-0550
lweaver@stranchlaw.com
adavis@stranchlaw.com
jsamra@stranchlaw.com

Ryan J. Clarkson (SBN 257074)
Yana Hart (SBN 306499)
Mark I. Richards (SBN 321252)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: 213-788-4050
rclarkson@clarksonlawfirm.com
yhart@clarksonlawfirm.com
mrichards@clarksonlawfirm.com

Tracey Cowan (SBN 250053)
**CLARKSON LAW FIRM, P.C.**
95 Third Street, Second Floor
San Francisco, CA 94103
Telephone: (213) 788-4050
tcowan@clarksonlawfirm.com

Brian D. Clark (admitted *pro hac vice*)
Laura M. Matson (admitted *pro hac vice*)
Arielle S. Wagner (admitted *pro hac vice*)
Consuela Abotsi-Kowu (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
lmmatson@locklaw.com
aswagner@locklaw.com
cmabotsi-kowo@locklaw.com

Stephen J. Teti (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

*Counsel for Individual and Representative Plaintiffs and the Proposed Class*

Dated: January 27, 2026

Respectfully submitted,

By: */s/ Paul J. Sampson*

Paul J. Sampson
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
95 S State Street, Suite 1000
Salt Lake City, UT 84111
Telephone: (801) 401-8510
Email: psampson@wsgr.com

David H. Kramer
Maura L. Rees
Qifan Huan
Kelly M. Knoll
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Fax: (650) 565-5100
Email: dkramer@wsgr.com
Email: mrees@wsgr.com
Email: qhuan@wsgr.com
Email: kknoll@wsgr.com

Eric P. Tuttle
Madison Welsh
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500
Fax: (206) 883-2699
Email: eric.tuttle@wsgr.com
Email: mjwelsh@wsgr.com

Jeremy Paul Auster
**WILSON SONSINI GOODRICH ROSATI, P.C.**
1301 6th Avenue
New York, NY 10019
212-453-2862
Email: jauster@wsgr.com

*Counsel for Defendants Google LLC And Alphabet Inc.*

**SIGNATURE ATTESTATION**

I, Joseph R. Saveri, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that the concurrence in the filing of this document has been obtained from the other signatory.

Dated: January 27, 2026

By: *<u>/s/ Joseph R Saveri</u>*
Joseph R. Saveri