Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Tel. (415) 445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens (admitted *pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, NY 10603
Tel. (415) 445-4006
gmullens@bfalaw.com

Joseph R. Saveri (SBN 130064)
Cadio Zirpoli (SBN 179108)
Christopher K.L. Young (SBN 318371)
Elissa A. Buchanan (SBN 249996)
Evan A. Creutz (SBN 349728)
Aaron Cera (SBN 351163)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1505
San Francisco, CA 94108
Telephone:      (415) 500-6800
Email:          jsaveri@saverilawfirm.com
                czirpoli@saverilawfirm.com
                cyoung@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                ecreutz@saverilawfirm.com
                acera@saverilawfirm.com

*Plaintiffs' Interim Co-Lead Counsel*
*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *In re Google Generative AI Copyright Litigation* | Master File Case No. 5:23-cv-03440-EKL-SVK<br>Consolidated Case No. 5:24-cv-02531-EKL-SVK<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Judge:      Hon. Eumi K. Lee<br>Date:       February 4, 2026<br>Time        10:00 A.M.<br>Courtroom:   7, Fourth Floor |

**UPDATED REDACTED VERSION**

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................3

I.      INTRODUCTION .................................................................................................................3

II.     COMMON EVIDENCE OF GOOGLE'S COPYRIGHT INFRINGEMENT ..............................5

      A.      The Named Plaintiffs Hold Valid Copyrights and Assert Common Claims Under the Copyright Act..............................................................................................5

      B.      High Quality AI Models Trained on Copyrighted Material Are Critical to Google's Business. ............................................................................................6

      C.      Google Systematically Copies Plaintiffs' Copyrighted Works in Ingesting, Training, and Testing the Models At-Issue. ..............................................................6

      D.      Importance of High-Quality Data to Model Development and Performance......................7

      E.      Google's Base Datasets Contain Troves of Unlicensed and Pirated Copyrighted Books and Images. ..........................................................................8

      F.      Google Trained Its Imagen Series of Models on Copyrighted Images.............................10

      G.      Google Trained Its Gemini Multimodal Model on Copyrighted Books and Images. .......10

      H.      Google Deliberately Uses Copyrighted Works to Develop Its Models.............................11

      I.      Google Entered Into A Few Limited Express Licenses with Certain Rightsholders That Expressly License Use of Copyrighted Materials to Train Its AI. ...........................12

      J.      Google Identifies, Tracks, Indexes, and Inventories Its Use of Copyrighted Materials. ...............................................................................................13

      K.      Common Evidence of Harm to Potential Markets for Class Works.................................14

III.    LEGAL STANDARD.............................................................................................................14

IV.     ARGUMENT........................................................................................................................15

      A.      The Proposed Classes Satisfy 23(a). ...............................................................................15

            1.      The Proposed Classes Are Sufficiently Numerous..............................................15

            2.      Plaintiffs' Claims Involve Common Issues of Fact and Law. .............................15

3.    Plaintiffs' Claims Are Typical of the Classes' Claims. ........................................16

4.    Plaintiffs Fairly and Adequately Represent the Classes. ......................................17

B.    The Proposed Classes Satisfy Rule 23(b)(2). ..................................................................17

C.    The Proposed Classes Satisfy Rule 23(b)(3). ..................................................................18

1.    Common Issues of Law and Fact Predominate..........................................................18

2.    Damages Are Susceptible to Classwide Measurement. ..........................................23

D.    A Class Action Is Superior to Tens of Thousands of Individual Actions..........................23

1.    The Proposed Classes Are Objectively Defined. ......................................................24

V.    APPOINTMENT OF CLASS COUNSEL ..................................................................................24

VI.    CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001),
*aff'd*, 284 F.3d 1091 (9th Cir. 2002)..............................................................19, 21, 22, 23

*Am. Geophysical Union v. Texaco, Inc.*,
60 F.3d 913 (2d Cir. 1994).............................................................................................21, 22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................................................................................................17, 18, 23

*Aquarian Found., Inc. v. Lowndes*,
127 F.4th 814 (9th Cir. 2025) ...............................................................................................19

*Atari Games Corp. v. Nintendo of Am. Inc.*,
975 F.2d 832 (Fed. Cir. 1992)................................................................................................22

*Authors Guild v. Google, Inc.*,
282 F.R.D. 384 (S.D.N.Y. 2012),
*vacated in part on other grounds*, 721 F.3d 132 (2d Cir. 2013)................................20, 24

*Bartz v. Anthropic PBC*,
2025 WL 1993577 (N.D. Cal. July 17, 2025).........................................................14, 20, 21, 24

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ................................................................................................21

*Boston Retirement Sys. v. Uber Techs., Inc.*,
2022 WL 2954937 (N.D. Cal. July 26, 2022)........................................................................17

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ...............................................................................................19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................................23

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) .................................................................................................23

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)................................................................................................................19

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
2015 WL 4776932 (C.D. Cal. May 27, 2015) ................................................................14, 24

*Glacier Films (USA), Inc. v. Turchin*,
   896 F.3d 1033 (9th Cir. 2018) ......................................................................................21

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)..........................................................................................................21

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) .................................................................................16, 18

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985).......................................................................................................22

*Hustler Mag. Inc. v. Moral Majority Inc.*,
   796 F.2d 1148 (9th Cir. 1986) .......................................................................................22

*In re College Athlete NIL Litig.*,
   2023 WL 7106483 (N.D. Cal. Sept. 22, 2023) ..............................................................18

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*,
   609 F. Supp. 3d 942 (N.D. Cal. 2022) ..........................................................................15

*In re Napster, Inc. Copyright Litig.*,
   2005 WL 1287611 (N.D. Cal. June 1, 2005) ......................................................... *passim*

*In re Telescopes Antitrust Litig.*,
   348 F.R.D. 455 (N.D. Cal. 2025)...................................................................................15

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) .........................................................................................23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F. 4th 651 (9th Cir. 2022) ...........................................................................14, 18, 19

*Owino v. CoreCivic, Inc.*,
   60 F.4th 437 (9th Cir. 2022) ..........................................................................................16

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ....................................................................................15, 18

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)........................................................................................................23

*True Health Chiropractic, Inc. v. McKesson Corp.*,
   896 F.3d 923 (9th Cir. 2018) .........................................................................................24

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)...................................................................................................18, 20

*UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*,
   446 F. Supp. 2d 1164 (E.D. Cal. 2006)..........................................................................19

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
        2000 WL 710056 (S.D.N.Y. June 1, 2000) ................................................................22

*United States v. Wilson*,
        900 F.2d 1350 (9th Cir. 1990) ...............................................................................14

*Walker v. Univ. Books*,
        602 F.2d 859 (9th Cir. 1979) .................................................................................21

*Wal-Mart Stores, Inc v. Dukes*,
        564 U.S. 338 (2011)........................................................................................14, 15

*Wang v. Chinese Daily News, Inc.*,
        737 F.3d 538 (9th Cir. 2013) ..................................................................................15

*West v. Cal. Servs. Bureau, Inc.*,
        323 F.R.D. 295 (N.D. Cal. Dec. 11, 2017) ..............................................................15

*Wolin v. Jaguar Land Rover N. Am., LLC*,
        617 F.3d 1168 (9th Cir. 2010) ................................................................................16

**STATUTES**

17 U.S.C. § 107....................................................................................................................4, 21

17 U.S.C. § 410....................................................................................................................5, 19

17 U.S.C. § 501........................................................................................................................3

17 U.S.C. § 504....................................................................................................................3, 23

**RULES**

Fed. R. Civ. P. 23(a) ..............................................................................................................15

Fed. R. Civ. P. 23(b)(2)...........................................................................................................18

Fed. R. Civ. P. 23(b)(3)...........................................................................................................18

Fed. R. Civ. P. 23(g) ..........................................................................................................17, 24

**OTHER AUTHORITIES**

4 Nimmer on Copyright § 13D.02 .............................................................................................19

## <u>NOTICE OF MOTION AND MOTION</u>

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 4, 2026 at 10:00 a.m. in Courtroom 7, Fourth Floor, of this Court, located at 280 South First Street, San Jose, California, Plaintiffs will respectfully move this Court for certification of the following Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), 23(c)(4), and 23(g) of the Federal Rules of Civil Procedure.

### A.    Books Class

**Books Class:** All legal or beneficial owners of registered copyrights for any work possessing an International Standard Book Number (ISBN) which Google downloaded and/or ingested to develop its GLaM, LaMDA, PaLM, ULM/PaLM 2, Imagen, or Gemini base models ("At-Issue Models") or their descendants. For purposes of this definition, copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Google, or within three months of publication.

**Google Books Library Project Subclass:** All legal or beneficial owners of a registered copyright for any work possessing an ISBN, which Google acquired via the Google Books Library Project and was used by Google to develop its At-Issue Models or their descendants. For purposes of this definition, copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Google, or within three months of publication.

**Google Books Partner Program Subclass:** All legal or beneficial owners of a registered copyright for any work possessing an ISBN, which Google acquired via the Google Books Partner Program and was used by Google to develop its At-Issue Models or their descendants. For purposes of this definition, these copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Google, or within three months of publication.

**Pirated Books Subclass:** All legal or beneficial owners of a registered copyright for any work possessing an ISBN, that reflect URL provenance from Shadow Libraries, used by Google to develop its At-Issue Models or their descendants. For purposes of this definition, these copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Google, or within three months of publication.

### B.    Images Class

**Images Class:** All legal or beneficial owners of a registered copyright for any two-dimensional image, drawing, painting, photograph, whether analog or digital, used by Google to develop its Imagen and Gemini base models or their descendants. For purposes of this definition, these copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Google, or within three months of publication.

In the alternative, Plaintiffs seek to certify a class pursuant to 23(c)(4). The issues Plaintiffs seek to certify include the elements of the copyright claim. Excluded from the Class and Subclasses are the works of any legal or beneficial owners of registered copyrighted works that are the subject of express and restricted license agreements with Google permitting it to use those works with respect to Google's "artificial intelligence and machine learning technologies" products and services. Also excluded are Defendant Google LLC; any of Google's co-conspirators; any of Google's parent companies, subsidiaries, and affiliates, including but not limited to Alphabet; any of Google's and its parents' officers, directors, management, employees, subsidiaries, affiliates, or agents; and the judges and chambers staff in this case, as well as members of their immediate families.

The Named Plaintiffs request that the Court appoint them as Class representatives; Joseph R. Saveri of Joseph Saveri Law Firm, LLP and Lesley E. Weaver of Bleichmar Fonti & Auld LLP as Co-Lead Counsel, with Brian Clark of Lockridge Grindal Nauen PLLP, and Ryan Clarkson of the Clarkson Law Firm, P.C. as Class Counsel.

The Motion is based on this Notice of Motion and supporting Memorandum of Points and Authorities; the Joint Declaration of Proposed Co-Lead Counsel Lesley E. Weaver and Joseph R. Saveri ("Counsel Decl.") in Support of Class Certification; the Declaration of Gregory S. Mullens ("Mullens Decl.") in Support of Class Certification and exhibits attached thereto;[1] the Expert Reports of Meredith McCarron (Ex. 1 to the Mullens Decl.) ("McCarron Rep."); David Doermann (Ex. 2 to the Mullens Decl.) ("Doermann Rep."); Victoria Furniss (Ex. 3 to the Mullens Decl.) ("Furniss Rep."); and Michael Smith (Ex. 4 to the Mullens Decl.) ("Smith Rep."); the reply briefing in further support of this Motion; the arguments of counsel; and any such other matters as the Court may consider.

## STATEMENT OF ISSUES TO BE DECIDED

1. Should the Court certify the Classes and subclasses under Rule 23 of the Federal Rules of Civil Procedure given that Google copied Plaintiffs' and Class Members copyrighted works to train Google's LLM models in a uniform manner and without license?

2. Should the Court appoint Plaintiffs Almond, Andersen, Barer, Fink, Larson, Leovy,

---

[1] All exhibits referenced herein and cited in the McCarron Rep., Doermann Rep., Furniss Rep., and Smith Rep. are attached to the Mullens Decl. ("Mullens Ex. __").

McLennan, and Zhang as representatives of the Classes?

3.    Should the Court appoint Joseph R. Saveri of Joseph Saveri Law Firm, LLP, Lesley E. Weaver of Bleichmar Fonti & Auld LLP, Brian Clark of Lockridge Grindal Nauen PLLP, and Ryan Clarkson of the Clarkson Law Firm, P.C. as Class Counsel, with Joseph R. Saveri and Lesley E. Weaver as Co-Lead Counsel?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiffs' copyright claim is well-suited for class certification pursuant to Rule 23. Each requirement of Rule 23(a) is satisfied, and there is an overwhelming predominance of common questions of law and fact under Rule 23(b).

At the heart of this case is a single claim of violation of copyright law. Without license, Google systematically and repeatedly copied Plaintiffs' and the classes' copyrighted works. Google used the Class Works without permission to develop, build and bring to market Google's generative artificial intelligence ("AI") products, including for its LaMDA, PaLM, ULM/PaLM 2, GLaM, Imagen, and Gemini models.[2] From the CEO on down, Google violated copyright law knowingly and intentionally. Google did so because it required vast quantities of high-quality works to build and develop these models, in a race with other AI companies, including OpenAI, Meta Platforms, and Anthropic. Google could have licensed those materials, or excluded copyrighted materials from its training sets. Google did neither. Instead, Google willfully copied and used them, violating 17 U.S.C. § 501.

At trial, Plaintiffs and all class members will rely on the same common body of evidence to prove their copyright claim. Each element—ownership of a valid copyright and that Google copied plaintiff's original expression—will be proven by common evidence. *See* 17 U.S.C. § 501(a)-(b). Each element turns on *Google's* conduct, not the conduct of any individual class member. Likewise, the factors required to assess statutory damages involve common evidence of Google's conduct, including the circumstances of the infringement, willfulness, and the need to punish the infringer. *See* 17 U.S.C. § 504(c). And evidence of fair use will also rely on common evidence. While it is settled that affirmative defenses cannot be relied

---

[2] A glossary of terms is attached as Appendix C to the Doermann Rep. For purposes of this Motion, "Class Works" refers to the works covered by these classes and subclasses.

on to defeat class certification, each fair use factor focuses on Google's conduct, its generative AI products, and the generalized effects of that conduct on the market at large. *See* 17 U.S.C. § 107.

Common proof will show Google's deliberate ingestion and improper use of copyrighted material in immense datasets, including material from pirated websites Google obtained by crawling the web. To build, train, and evaluate the models, Google maintains lists, logs, and records of the works it ingested and used. This makes sense. As Plaintiffs' expert Dr. Doermann explains, for Google to improve its models, it needs to know which inputs improve their performance. Tracking each model's recipe is critical to improve model performance and remain competitive. Ex. 22, Dai Tr. 246:8-247:7; Ex. 62 at -889; Ex. 13, Carver Tr. 68:20-69:4; Ex. 53 at -536 ("███████████████████████████████████████ ████████████████████████████████████"); Doermann Rep. ¶ 186. Google's internal teams can and do identify the copyrighted materials in its datasets and training sets by publisher, title, word count, and token count when this information is necessary to tune or train their models. *See* Doermann Rep. Part VI; Ex. 22, Dai Tr. 245:18-247:7, 313:10-317:19; Ex. 41 at -651 ("Generative AI brings new needs. Now the metadata is a required input for the models to *understand* the media."). So too can Google here.

Google has invested significant resources to disguise its unlawful acts. In 2022, facing the threat of litigation by rightsholders, Google implemented what it calls a "recitation checker." This filter seeks to identify copyrighted material and prevent its verbatim "regurgitation" by its products—*e.g.*, "checking" to see if its products "recite" protected material. Ex. 13, Carver Tr. 89:14-18; 113:13-114:8; Ex.18, Vinyals Tr. 120:8-121:1. This safeguard was only necessary because Google trained its models on protected works in the first instance. Ex. 73 at -375 (discussing implementing filter or license in the alternative); Ex. 104 at -225-26 ("models like ULM are trained on Google books data that's also copyrighted, so there are some similar recitation concerns there too."). When asked why Google implemented this tool at the back end, Google's witnesses invoke privilege. Ex. 20, Ayoub Tr. 263:19-264:3; Ex. 22, Dai Tr. 135:10-136:4. But implementation of this tool itself proves that Google can identify the Class Works blocked by the filter and confirm their copyrighted status.

Prior to the recitation filter, creators could prompt Google products to reveal infringing use more easily, although the model still has the ability to output near verbatim copies. Ex. 99 at -764; Ex. 18, Vinyals Tr. 121:10-122:15; Ex. 55 at -454. Plaintiffs' expert team led by Meredith McCarron has therefore

examined sample training sets provided by Google. Each proposed Named Plaintiff holds copyrights of text or image content Plaintiffs' experts have found in those samples. That use was not licensed.

Commonality (and predominance) are further called upon by Google's expected defenses—most notably, that "fair use" bars relief for all rightsholders. The nature and extent of Google's use of Class Works, and the market harm it has caused, are subject to common proof, including from Plaintiffs' expert Michael Smith, the nation's leading economist on these questions. Dr. Smith presents compelling evidence of market harm, relying on Google's own internal analyses, such as: (a) Google's internal evaluations of the value of Class Works to itself; (b) potential ways to pay for licenses; and (c) its strategic decisions to pay only certain publishers a depressed price for AI training licenses, leaving the vast majority of creators with no notice that their copyrights have been violated and no compensation for it, either. Smith Rep. ¶¶ 10-12, 34-38, 40-50. And finally, the evidence clearly shows that when Google wanted to enter into licenses with copyright holders to train their AI models, it did so using express language: "Google Products" means Google and its affiliates' products and services, including artificial intelligence and machine learning technologies." Plaintiffs' expert Victoria Furniss points to common industry practice to support this argument. No such licenses exist for the proposed class and subclasses.

## II.    COMMON EVIDENCE OF GOOGLE'S COPYRIGHT INFRINGEMENT

### A.    The Named Plaintiffs Hold Valid Copyrights and Assert Common Claims Under the Copyright Act.

Plaintiffs are authors and artists. Each owns copyrights registered with the U.S. Copyright Office, and each book authored by Named Plaintiffs has an ISBN. *See* Exs. 156-181 (registrations); McCarron Rep. Appx. G (ISBNs). Each Plaintiff asserts claims under the Copyright Act for Google's unauthorized copying of their works to train its Generative AI Models. All asserted works were registered within five years of publication, prima facie evidence of copyright validity. *See* Exs. 156-181 (registrations); 17 U.S.C. § 410(c). Plaintiffs' experts demonstrate a reliable methodology to identify Plaintiffs' and Class Works in Google's training data. The exemplar training datasets contain millions of copyrighted works including dozens by Plaintiffs. *See* McCarron Rep. at §VIII.

**B.**    **High Quality AI Models Trained on Copyrighted Material Are Critical to Google's Business.**

The fight for dominance in generative AI technologies by Google, OpenAI and others has been compared to the nuclear arms race.[3] Google's Generative AI Models, like those of the other technology giants, require unprecedented volumes of high-quality training data, including books and images. Doermann Rep. ¶¶ 34; 107-61; Ex. 66 at -199 ("A Plan to 50T Unique Tokens"); Ex. 71 at -584-585; Ex. 18, Vinyals Tr. 165:11-166:16. Google needs high-quality data suitable to develop the LLM and image-diffusion models at-issue here. Books, and other long form texts, are of particular value to LLM development. Ex. 60 at -399 ("Yup, a strong pointer that: removing books sucked…"). Books provide vast, structured, and diverse datasets for training, allowing the models to replicate grammar, knowledge, and complex reasoning skills. Doermann Rep. Part IV.C.3 & D; Ex. 127 at -676. ("Language modeling on knowledge-heavy data such as filtered Docjoins and Books requires learning several important capabilities such as logic, reasoning, and the knowledge itself. These capabilities combined with the higher quality of these corpora compared to dialogue data account for some of ULM's improvements over PaLM."); Ex. 17, Xiao Tr. 153:22-154:8 ("At high level, intuitively, a good written book is better than badly written book to train the model."). Similarly, copyrighted images and associated metadata are highly valuable for developing diffusion models and help drive popular demand for image creation by Google's products. Doermann Rep. ¶¶ 118-26.

Google's At-Issue Models were released beginning in 2021 after years of development and investment of hundreds of millions if not billions of dollars. *See* Doermann Rep. Part IV.B (describing evolution of each model). By using Plaintiffs' works without permission or license, Google attempted to avoid paying Plaintiffs a license or other compensation for the use of their copyrighted works.

**C.**    **Google Systematically Copies Plaintiffs' Copyrighted Works in Ingesting, Training, and Testing the Models At-Issue.**

Google's teams ingest, copy, store, and use copyrighted works, including pirated material, at massive scale, to create, train, and refine their AI Models. *See* Glossary at p. 3, 4, 5. To do so, Google employed and adhered to a formulaic, uniform, and systematic process. *See* Doermann Rep. Parts III-V. This process subjects every piece of training data, including the Class Works, to an identical series of

---

[3] Who's ahead in the AI arms race — Microsoft? Google? Meta?

copying and processing steps. *Infra* § II.J. Relying on Google's internal documents, Dr. Doermann describes this process generally. Doermann Rep. Parts III-V. The uniform iterative process involves evaluation, pre-training, and post-training (also referred to as tuning). Doermann Rep. Part III. A & B.

Generally, the "training" occurs in discrete phases (collectively known as the "training pipeline"). These phases include, in order: (1) the ingestion or acquisition of data; (2) processing of data; (3) pretraining; (4) model evaluation; and (5) finetuning (or "post-training"). Doermann Rep. ¶¶ 42, 44-47; *See* Ex. 65 at -375; *see* Glossary at 3-5. Pretraining occurs when the model is first fed pretraining data, which may be comprised of several datasets. In order to calculate statistical probabilities fundamental to neural networks, the model is exposed to the datasets multiple times, with each full pass referred to as an "epoch." Doermann Rep. ¶44; Ex. 82 (spreadsheet breaking down epochs run for specific dataset); Ex. 17, Xiao Tr. 345:2-18; *see* Glossary at 2. Each of these uses is a copyright violation subject to common proof. For example, Google runs tests and simulations to measure efficiency and performance, adjusting the data mix to improve model performance, using copyrighted materials on a large scale, and keeping records of what it has used. After a model is pre-trained, resulting in a base or foundational model, it proceeds to fine-tuning or post-training, further refining its abilities. *See* Glossary at 2. At every step of this process, Google used copyrighted material to facilitate these actions, without permission. *See* Doermann Rep. Parts III, V.

### D. Importance of High-Quality Data to Model Development and Performance.

Google executives and engineers well understand that model performance, and the statistical methodologies that undergird them, depends on getting the right mix of data inputs for the desired output. Ex. 53 at -536 (reflecting Sergey Brin involvement in meetings on Books dataset). Key indicators of accuracy, speed and performance are measured, compared, and closely watched. Google "chose to use copyrighted books because they found that using non-copyright has a big impact on" model performance. Specifically, "using only public domain books to train the model…resulted in lower performance on several benchmarks." Ex. 22, Dai Tr. 189:7-190:7; Ex. 78 at -823. Google also knew its competitors were using copyrighted books as training data. Ex. 59 at -991. "High-quality" training data produced better models and performance. *See* Doermann Rep. ¶¶ 87-94, 118-26; KPIs for gen AI: Measuring your AI success | Google Cloud Blog; Ex. 127 at -678 ("Ablations showed that models trained on DocJoins and Books data significantly outperform models trained on dialogue data."); Ex. 80 (describing "online books" as "high quality, diverse text data"); Ex. 60 at -399 ("Yup, a stronger pointer that: removing books sucked..."); Ex.

71 ("It is important to emphasize that the team is keen to get access to high volume/high quality books asap and that format is critical").

E. **Google's Base Datasets Contain Troves of Unlicensed and Pirated Copyrighted Books and Images.**

Google turned to three primary sources to obtain high-quality content: (1) Google Books Library Project; (2) the Google Books Partner Program; and (3) books and images sourced through Google's web-crawling. Unlike its AI competitors, Google had acquired particular experience with, and access to large datasets, including high-quality books data. By the time it began developing its LLMs in earnest, Google had access to over 40 million books in what was internally referred to as the "Books" corpus: the titles associated with Google's Book Library Project, which digitized collections from academic institution libraries, and the Partner Program, which allowed authors to sell electronic versions of copyrighted and other works through the Google Play app store. Doermann Rep. Part III.C; Ex. 58 at -988; Ex. 102 at -953-955.

Beginning in 2004, in connection with the Google Print Library Project, Google approached universities and other public institutions to obtain agreements to digitize and make available their holdings. Ex. 15, Jaskiewicz Tr. 32:17-34:4; Ex. 23, ¶ 2. Long predating Google's development of AI models, *not one* of these agreements says *anything* about use for AI training models. Ex. 15, Jaskiewicz Tr. 24:8-18; Ex. 19, Price 30(b)(6) Tr. 33:13-34:19; Ex. 21, Barker Tr. 33:20-34:16. Google also established its Google Play Books Partner program, by which authors and publishers permit Google to have access to digitized books which are available for Google Search and made available for purchase in the ePub file format on the Google Play app store. Ex. 23, ¶ 6; Ex. 15, Jaskiewicz Tr. 24:8-18, 34:5-36:21; Ex. 19, Price 30(b)(6) Tr. 33:13-34:19. Again, there is no license for AI use; the record shows that Google used the vast amounts of books for AI training knowing it had no right to do so. *See* Ex. 19, Price 30(b)(6) Tr. 59:5-60:17 (testifying Google had not entered into any agreements to use web publisher data to train its AI models before Gemini); Ex. 22, Dai Tr. 391:10-16 ("…as far as I know, we don't do deals for data we already have or already possess."). Google knew that terms of service applicable to its web products did not permit AI training without specific additional permission or authorization. Ex. 63 at -967; Ex. 90 at -597; Ex. 19, Price 30(b)(6) Tr. 33:13-34:19, 39:4-17. Google did not inform the libraries, publisher partners, or authors

that it would use their books, many of which are subjects of copyrights, to develop and train Google's large language models, including those at-issue in this case. Ex. 15, Jaskiewicz Tr. 20:20-21:11, 24:19-25:6; Ex. 57 at -985-986; Ex. 107 at -330. Without this lawsuit, they may be in the dark about whether it is happening at all. Plaintiffs' experts' limited testing of the highly curated datasets Google would agree to produce thus far, and documents produced to-date, confirms that Google used copyrighted books copied from Google's Books Library Project (also referred to as "Scanned Books") and Partner Program to train LaMDA, PaLM, ULM/PaLM 2 and GLaM; and for Gemini, from Google's Books Library Project. Ex. 79 at -423 ("Datasets in LaMDA Pretraining" included "Books V2" which is described as "English Google Books data (in-copy right) in-house curated Books1 & Books 2"); Ex. 86 at -160-164; Ex. 32 at -258-259, -263; Ex. 31 at -223, -225, -229; Ex. 199 at -533, -537; Ex. 22, Dai Tr. 150:18-153:6; Ex. 14, Liechty Tr. 80:10-22; 82:14-83:4; 168:12-18; *see also generally* McCarron Rep. (confirming presence of copyrighted books including Plaintiffs' in LaMDA's books dataset and Gemini v1's books dataset). Common evidence shows that every At-Issue Model was trained and developed using copies of Class Works at each step of the training pipeline, including but not limited to ingestion and curation of the training data, processing, pre-training, evaluation, and fine-tuning/post-training. Doermann Rep. Parts III, V.

### 1. Common Evidence Shows Google Crawled Websites Containing Copyrighted and Pirated Material.

Google has crawled and scraped a staggering amount of information, including text and images posted on the internet, without regard to copyright protection or other security measures. *See* Doermann Rep. Part IV.C.1. Google's own search efforts included high-quality texts, including copyrighted books in widespread standardized formats such as PDF (documents) and ePUB (e-books). Ex. 17, Xiao Tr. 55:21-57:7. The exemplar training data made available for inspection to-date confirms that Google has used copyrighted books crawled and copied from internet sources, including illicit Shadow Libraries. *See* Ex. 6, Am. R&O to Pls' RFA No. 264. Shadow libraries, like Libgen, Z-Library, and others, obtain information through a variety of methods, including user uploads, scanning print books, and stealing content from publisher databases using compromised credentials. *See* Glossary at 5; Ex. 5. Pirated material like this is contained in the datasets used to train LaMDA, ULM/PaLM 2, and various Gemini models including those used for Google's Bard product (now Gemini). McCarron Rep. ¶¶ 16(e); 143; 170; *see also* § VIII; Ex. 27.

The early generative AI models—GLaM, LaMDA, PaLM, ULM/PaLM 2—were trained with Google's actual knowledge of copyright infringement. Ex. 78 at -823; Ex. 103 at -098, -100. Google stored and organized its collections of texts, images, and other data it obtained in its own mammoth private nonpublic datasets or databases. Google used data from or derived from such datasets to train, test and develop its AI models, including the At-Issue Models. *See generally* Doermann Rep. Part III.B-C; *See, e.g.*, Ex. 105; Ex. 86; Ex. 30; Ex. 95; Ex. 38; Ex. 124; Ex. 122; Ex. 97; Ex. 32; Ex. 31; Ex. 34; Ex. 116; Ex. 31; Ex. 94 (data cards and data approvals for models).

## F.    Google Trained Its Imagen Series of Models on Copyrighted Images.

Similarly, Plaintiffs' experts have proven that Google developed its text-to-image models, Imagen, on copyrighted and pirated material. McCarron Rep. ¶¶ 127-130, 165-168. Like copyrighted books, Google required high-quality images and accurate, high-quality text metadata to contextualize images and otherwise improve model performance. Ex. 69 at -272, -278. Google tapped into its webcrawl datasets, including ImageJoins, for high-quality (copyrighted) images and accompanying metadata. Google also used datasets known to include copyrighted works taken from sources such as ██████████ without authorization, by acquiring the metadata, comparing that metadata to its in-house trove of webcrawled images, and copying those images to create its own AI-training datasets. Doermann Rep. ¶¶ 118-26; *See* Ex. 115 at -445, -452 (identifying as "Opportunities" third-party datasets and "Legal complications and friction" for their use).

## G.    Google Trained Its Gemini Multimodal Model on Copyrighted Books and Images.

Fearing it would be left behind in its race against competitors, Google cut corners. As Geoffrey Hinton, Google's early AI developer, warned: "[T]he current competitive landscape will force Google's hand to develop AI faster in order to maintain its leadership in this space. As a consequence, responsibility and ethical practice might be bypassed." Ex. 22, Dai Tr. 299:8-21; Ex. 198 at -240, -241. He was right. In November 2022, OpenAI introduced its chatbot, ChatGPT, to the public. Google's response, confirmed by Alphabet CEO Sundar Pichai, was a moon shot "AI-first strategy" pivot to develop Gemini, as well as its Gemini app chatbot and the Gemini multimodal model. Nonetheless, Gemini's performance continued to lag, while its competitors accelerated. Internal recognition of the risk of using copyrighted material and ensuing debate regarding how to address it made matters worse. Ex. 61 at -854, -862, -867, -871, -887; Ex.

89 at -491, -502, -506, -508, -512; Ex. 91 at -976; Ex. 93 at -043. Over the objection of engineers, the Gemini team's access to Google Books and Webcrawled-datasets was restricted to mitigate risk, but the unsatisfactory first versions of Gemini 1.0 in the Spring of 2022 demonstrated how crucial books were. While Google executives, engineers and lawyers debated using copyrighted material and the significant risk it would visit on the company, Google was falling further and further back. Ex. 87 at -855-857; Ex. 200 at -986 ("I'll repeat that every single one of these messages weakens us / pushes our core contributors further from DeepMind and closer to our competitors who (wrongfully) have no regard to data issues."). Google's Gemini team needed more and better data to turn around Gemini's poor performance to meet Gemini 2 milestones in 2023. Faced with a Hobson's choice, Google's executives made the decision to use copyrighted works. Doermann Rep. Part IV.C.4. In furtherance of its goals, Google sought out and identified third-party datasets as a source of additional training data, including FineWeb, FineWeb2, FineWeb-edu, and Common Crawl. Doermann Rep. Part IV.C.2; Ex. 36 at -740-742; Ex. 115 at -559 (describing certain data acquisition efforts); Ex. 84 (identifying further sources of data for AI training including third-party datasets). The exemplar training data shows, Google used copyrighted books copied from webcrawled sources, including known Shadow Libraries, to train Gemini. *See* Ex. 27.

**H.      Google Deliberately Uses Copyrighted Works to Develop Its Models.**

Google officers, executives and engineers know that the high-quality books and other data are copyrighted, but Google copies them to develop its AI Models anyway. *See*, *e.g.*, Ex. 88 at -929; Ex. 91 at -970, -980; Ex. 54 at -862; Ex. 78 at -823; Ex. 113 at -412; Ex. 74 at -279; Ex. 67 at -621 (incorporating web-crawled data "may include content from artists who don't want to opt in."). Google elected to run the risk of "$10Bs-$100Bs in potential fines." Ex. 57 at -985. It was not until 2023, under the threat of litigation, that Google attempted to exclude publisher-provided books from Gemini and negotiated some licenses with a few small and mid-sized publishers. Ex. 93 at -040; Ex. 52 at -515. Google knew that using copyrighted works for AI training without permission was legally risky. Ex. 15, Jaskiewicz Tr. 278:19-279:19, 341:5-342:8, 343:3-16; Ex. 70 at -420 ("Value of Licensed Datasets" include "Reduction of copyright challenges (e.g., infringement risk) …")); Ex. 91 at -976 ("Book publishers likely to see LLM training on their books as copyright infringement. Could withdraw their content from Google Play Books file a lawsuit against Google."); Ex. 93 at -035; Ex. 89 at -502, -508, -512, -529. But it proceeded anyway—

confident it could afford the costs of litigation that would follow. Ex. 52 at -533 ("[C]an we train the 64B model on the full original dataset, to maximize capabilities for Phase 3 as well as Alphabet internal use, and only use the restricted mixture for the 20B model? (which | understand is what PAs want to deploy?)"); Ex. 200 at -985 ("**Problem.** It turned out that Play Books had provided data to the Gemini team…so the team is flagging that this needs to get filtered out. It's worth stating that ULM-24b has shipped with some of these datasets … in their training mix -- G has accepted this business risk as a temporary measure because the models will be replaced e.g. by Gemini asap.")

The public release of generative AI models in 2022 brought increased attention to their development. At the end of 2022, Google had begun developing its "recitation checker", a tool to prevent its public-facing models from regurgitating, verbatim, even portions of the copyrighted materials on which Google had trained the models. The aptly named tool was intended to prevent Google's models from reproducing copyrighted works. Google has refused to disclose the details of this tool.[4] Regardless, in addition to constituting proof of knowledge and intent, the existence of the tool shows that Google has developed a technique for identifying the copying of copyrighted material in connection with its AI Models and has identified specific occasions where the model has done so. Doermann Rep. ¶¶ 74-85; Ex. 125 at -043.C ("[Recitation checker] is intended to both allow for attribution where valuable, and recitation blocking of copyrighted material as necessary (for example for Books data).").

I.    **Google Entered Into A Few Limited Express Licenses with Certain Rightsholders That Expressly License Use of Copyrighted Materials to Train Its AI.**

In July, 2023, the New York Times and publisher Elsevier contacted Kent Walker, President of Global Affairs and Chief Legal Officer of Google and Alphabet, to demand compensation for AI training on their protected materials. Ex. 57 at 985. Google teams met internally to develop a pricing model in response. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 77 at -332, -374; Smith Rep. ¶ 34. Google ultimately decided that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Smith Rep. ¶ 29; Ex. 195 at -494; Ex. 93 at -033, -035-038, -049-050. However, Google executed some licenses that specially permit use to improve "Google and its affiliates' products and services, including

---

[4] Plaintiffs dispute Google's improper assertions of privilege and arbitrary limitations of scope and have pending and future motions before the Magistrate Judge to obtain such materials.

artificial intelligence and machine learning technologies." Ex. 118 at -952; Furniss Rep. ¶¶ 46-50. Notably, each of these license agreements uses similar or identical language to create licenses with respect to Google's AI products. *See, e.g.*, Ex. 119 at -977, -978 (▇▇▇▇▇ granting license defining "Google Products" as "including artificial intelligence and machine learning technologies"); *accord* Ex. 40 at -474 (▇▇▇▇▇); Ex. 50 at -355 (▇▇▇▇▇); Ex. 117 at -938 (▇▇▇▇▇). For this reason, Plaintiffs' proposed classes exclude works covered by these express licenses. For purposes of this Motion, this proves that Google itself used a "common" approach to create those licenses. Google has simply chosen not to pay Class members because it is too expensive. *See* Smith Rep. ¶ 38 ("It is economically reasonable to conclude that paying nothing shows market harm.").

### J. Google Identifies, Tracks, Indexes, and Inventories Its Use of Copyrighted Materials.

Google also tracks and indexes the data used to train its AI Models in the ordinary course of business. This recordkeeping is necessary to measure model performance. Whether sourced from Google Books's Library Project or Publisher Partner sources, DocJoins or DeepCrawl, the data is sortable and retrievable, including by filetype and quality score. *See* Ex. 17, Xiao Tr. 116:4-20; *see also* 250:21-251:11. Google also tracked prior internal approvals for datasets, treating them as blanket authorization for later use, even when those datasets contained copyrighted works. *E.g.*, Ex. 98 at -398 ("Search Data Approvals for Project Bard" indicating for each training dataset used for Bard "Existing ULM approval" or "Existing LaMDA approval"). Google even maintains spreadsheets identifying copyrighted materials that it can parse to identify word counts attributed to specific publishers. The Google Books team can generate lists of books with their word count and their titles. Gemini lead engineer Andrew Dai confirmed that source code reflects the titles, authors, and publishers of certain copyrighted books he was removing, stating unequivocally: "we store the titles for the Gemini books dataset." Ex. 22, Dai Tr. 360:14-361:3. Google maintains detailed records of training data sets containing copyrighted works sourced from Google's crawling of the public internet (e.g., DocJoins, ImageJoins, and Deepcrawl datasets) as well as third-party data ingested via Google's Core Data Acquisition team. That database is sortable by metadata fields and documents are readily producible from it. *See* Ex. 17, Xiao Tr. 116:4-20; *see also* 250:21-251:11. As Plaintiffs' expert Dr. Doermann notes, this makes sense: how else can Google know what inputs drive performance to improve

its models? Doermann Rep. ¶¶ 43, 163-186; e.g., Ex. 59 at -993-994; Ex. 127 (internal report tracking changes in data mixture and performance from PaLM and PaLM2).

### K.    Common Evidence of Harm to Potential Markets for Class Works.

There is a market for the Class Works, and Google's conduct adversely impacted it. Google's internal estimates demonstrate market viability for licensing copyrighted content for AI training, with pricing models ranging from ███████████. Smith Rep. ¶¶ 34-37; Ex. 21, Barker Tr. 27:4-8, 29:1-5 Ex. 192 at -929-930. Companies have recognized the commercial value of copyrighted content for AI training by entering into licensing agreements for that express purpose, including with Google. Furniss Rep. ¶¶ 46-55; Smith Rep. ¶ 37 (noting HarperCollins paid $5,000 per book and many authors and agents deemed this too low). Google's deliberate avoidance of legitimate licensing channels creates widespread harm to this marketplace. Smith Rep. ¶¶ 35-50. Google evaded legitimate market participation through legal strategy, internally acknowledging that "licensing … can create precedent that weakens [its] fair use argument by creating a market for data." Ex. 108 at -433; *see also* Ex. 109 at -445, -446; Ex. 190 at -843. By doing so, Google artificially depressed the potential marketplace for the Class Works, satisfying its own demand through illegitimate acquisition and unauthorized uses rather than legitimate marketplace transactions. Smith Rep. ¶¶ 10-12, 40-43; Ex. 91 at -976. *See United States v. Wilson*, 900 F.2d 1350, 1356 (9th Cir. 1990) (recognizing that "stolen information always commands less than legitimate information" and thus the actual "market value [of the stolen information] has got to be many times higher").

## III.    LEGAL STANDARD

To certify a class action, a district court must be satisfied that the requirements of Rule 23 have been met by a preponderance of the evidence. S*ee Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 664-65 (9th Cir. 2022) (en banc). Courts conduct a "rigorous analysis" of the class allegations to ensure that the requirements of Rule 23(a) and one of the requirements of Rule 23(b) have been met. *Wal-Mart Stores, Inc v. Dukes*, 564 U.S. 338, 345, 351 (2011). Courts in the Ninth Circuit have certified cases just like this one. *See, e.g.*, *Bartz v. Anthropic PBC*, 2025 WL 1993577 (N.D. Cal. July 17, 2025); *In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611 (N.D. Cal. June 1, 2005); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932 (C.D. Cal. May 27, 2015).

## IV.    ARGUMENT

### A.    The Proposed Classes Satisfy 23(a).

Under Federal Rule of Civil Procedure 23(a), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). All prerequisites are met here.

#### 1.    The Proposed Classes Are Sufficiently Numerous.

The proposed classes satisfy Rule 23(a)'s numerosity requirement. Before a class can be certified, the court must determine that it is "so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). In the Ninth Circuit, numerosity is generally satisfied if the class includes forty or more members. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 959 (N.D. Cal. 2022); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. Dec. 11, 2017) ("A class or subclass with more than 40 members 'raises a presumption of impracticability [of joinder] based on numbers alone.'") (citation omitted). Plaintiffs' experts have already identified millions of copyrighted works in the exemplar training data, and the actual count will be far greater. *See* McCarron Rep. § VIII; *see also* Doermann Rep. Part V (tracing data sets across Google models). Thus, joinder is impracticable.

#### 2.    Plaintiffs' Claims Involve Common Issues of Fact and Law.

The proposed classes also satisfy Rule 23(a)(2). Commonality under Rule 23(a)(2) requires only a at least one significant question be "'capable of classwide resolution,' meaning that answering the question 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 467 (N.D. Cal. 2025) (quoting *Wal-Mart*, 564 U.S. at 350). It is a modest threshold that Plaintiffs satisfy. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)).

Here, numerous questions of law and a fact are common to the class. They include: (1) whether Google copied copyrighted works; (2) how Google copied—and used—Plaintiffs' copyrighted work in connection with the generative AI models at-issue in this case; (3) whether Google obtained permission to

do so; (4) the number of copyright violations; and (5) whether Google's conduct was willful, along with the other factors to be considered under Rule 702. Common questions of fact or law with respect to Google's fair use defense include (1) the purposes and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect on the potential market. Finally, the remedies to which Plaintiffs and the Classes are entitled also involve common questions of law and fact. "In other words, the question is appropriate for class-wide resolution because either [Google's] company-wide policies and practices violated the law and the rights of the class members, or they didn't." *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 445 (9th Cir. 2022).

Google's copying and use of the copyrighted works occurred through uniform systems and pipelines, using the same processes for all creators' works. Systematic and uniform copying and training is necessary to manage the massive scale of data needed to train an effective Generative AI Model. Doermann Rep. Parts III.A-B; IV, V. Common evidence—Google's internal records, data acquisition records (e.g., records pertaining to acquisition from Google Books, Partner Program, and pirated websites), source code, experts' analysis of the training datasets, and other common evidence will resolve issues classwide. This common treatment satisfies Rule 23(a)(2).

### 3. Plaintiffs' Claims Are Typical of the Classes' Claims.

Rule 23(a)(3)'s typicality requirement is satisfied here. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (under Rule 23's permissive standard, class representatives' claims are typical if they are "reasonably co-extensive with those of absent class members."). In other words, "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted). Plaintiffs' claims and those of the class all arise from Google's common course of conduct, namely Google's unauthorized copying of Plaintiffs' copyrighted works. *See supra* § II.C. Plaintiffs' claims all rely on the same common facts and do not differ from class member to class member. Issues regarding beneficial ownership do not make Plaintiffs' claims atypical. Every potential class member has allegedly been injured by Google's unauthorized copying of works for which the class members own copyright interests. *See In re Napster*, 2005 WL 1287611, at *4. Each Plaintiff owns the

copyright to a work (books: Almond, Barer, Larson, Leovy; images: Anderson, Fink, Larson, McLennan, Zhang) subjected to Google's common approach to collecting data for training and building its commercial Generative AI Models. *Id.*; *see supra* § II.A.

### 4. Plaintiffs Fairly and Adequately Represent the Classes.

Plaintiffs also satisfy Rule 23(a)(4)'s adequacy requirements. "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To determine whether plaintiffs will fairly and adequately represent a class, courts consider whether the named plaintiffs: (i) have any conflicts of interest with other class members; and (ii) will prosecute the action vigorously on behalf of the class. *See Boston Retirement Sys. v. Uber Techs., Inc.*, 2022 WL 2954937, at *4 (N.D. Cal. July 26, 2022).

Plaintiffs' interests are fully aligned with the Classes. All were injured by Google's common course of conduct and share the same objective: to stop the infringement and secure just compensation. As in *Napster*, "plaintiffs' interests in prosecuting this action include protecting the royalties that they earn from the reproduction and distribution of their copyrighted works and obtaining compensation for the unauthorized use . . . ." *In re Napster*, 2005 WL 1287611, at *5. This interest is widely shared by other copyright owners. *Id.* Plaintiffs are committed to this litigation. They have actively participated, produced extensive written discovery, given testimony, and stand ready to proceed through trial and any appeals. Counsel Decl. ¶¶ 4-14; Ex. 7, Almond Tr. 8:6-11; 20:18-22:5; 33:8-34:1; 340:17-341:16; 344:15-21; 345:21-25; 346:1-19; 346:20-23; 346:25-347:4; 347:16-19; Ex. 8, Andersen Tr. 295:22-296:6; Ex. 9, Barer Tr. 13:5-25, 24:25-25:22, 26:12-18; Ex. 10, Larson Tr. 295:1-18; Ex. 11, Leovy Tr. 41:23-42:23, 44:9-15, 115:3-18; Ex. 12, McLennan Tr. 45:25-46:14, 49:6-161. There is no conflict of interest between Plaintiffs and class members. Plaintiffs' chosen counsel are equally committed to pursuing this action, highly qualified, and have already substantially advanced this case. *See generally*, Counsel Decl.; *see* Fed. R. Civ. P. 23(g). They have extensive experience in class action litigation, including challenging generative-AI products and have vigorously pursued the interests of the proposed class. *See* Counsel Decl., Exs. A-D. Adequacy is therefore satisfied.

### B. The Proposed Classes Satisfy Rule 23(b)(2).

Certification of a claim for injunctive relief under Rule 23(b)(2) is proper when "the party opposing

the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The requirements for certification under this provision focus on the defendant's conduct rather than individual class member circumstances. Rule 23(b)(2) is "unquestionably" satisfied when class members seek uniform injunctive or declaratory relief to prohibit or remedy policies or practices affecting the entire class. *In re College Athlete NIL Litig.*, 2023 WL 7106483, at *6 (N.D. Cal. Sept. 22, 2023) (quoting *Parsons*, 754 F.3d at 688). Certifying a Rule 23(b)(2) class does not require a finding of predominance. *Id.* Google has admitted that even for the selected subsets of training models it allowed Plaintiffs to sample, At-Issue Models continue to rely on copyrighted datasets. Doermann Rep. Part V. Harm is thus ongoing. An injunction prohibiting Google from copying or using Class Works for Generative AI Model training, absent a proper license, would benefit every member of the Class equally. Google's uniform action has applied to all Class Members throughout the relevant period, and the requested injunctive relief would prohibit continuation of the challenged conduct, thereby delivering consistent remedial benefits across the entire proposed class. *In re College Athlete NIL Litig.*, 2023 WL 7106483, at *6. If Plaintiffs prevail, injunctive relief precluding Google from copying Class Works to train its AI models without a license would inure to the benefit of the entire class. Rule 23(b)(2) is thus satisfied.

### C.    The Proposed Classes Satisfy Rule 23(b)(3).

Rule 23(b)(3) requires that (1) common questions predominate over individual questions and (2) a class action be superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). Plaintiffs bring just one claim to this Court for certification. Common evidence satisfies both requirements.

#### 1.    Common Issues of Law and Fact Predominate.

Rule 23(b)(3)'s predominance requirement "tests whether [the] proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Olean*, 31 F.4th at 668 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). The rule is satisfied when "a common nucleus of facts and potential legal remedies dominates [the] litigation." *Hanlon*, 150 F.3d at

1022. Plaintiffs must show that a predominating common question or questions are "*capable* of class-wide resolution." *Olean*, 31 F.4th at 667. Here, the heart of this litigation centers on Google's conduct.

### a)    Infringement Will be Resolved Through Common Proof.

The predominance analysis naturally "begins … with the elements of the underlying cause of action." *Olean*, 31 F.4th at 665. Copyright infringement is a strict liability offense with two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of works that are original. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1171 (E.D. Cal. 2006). Questions of intent or reliance are necessarily common. Google committed copyright infringement by taking "for free something [it] would ordinarily have to buy." *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd*, 284 F.3d 1091 (9th Cir. 2002).

### (1)    An Objective, Common Methodology Will Identify the Class.

Each member of the proposed class owns a copyright to a class work registered within five years of publication. Registration can be shown by reference through registration records from the Copyright Office. 17 U.S.C. § 410(c); *Aquarian Found., Inc. v. Lowndes*, 127 F.4th 814, 819 (9th Cir. 2025). Even where "proof of ownership, registration, and actual damages" may require "a work-by-work inquiry," courts have not hesitated to certify copyright class actions. *In re Napster*, 2005 WL 1287611, at *7.

### (2)    Proof of Google's Conduct Establishes Copying.

Google's unauthorized copying of unlicensed copyrighted material in connection with its training data pipeline directly infringes a copyright holder's exclusive right of reproduction. *See A&M Recs. v. Napster*, 239 F.3d at 1014; *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("[D]ownloading copyrighted material ... violates the copyright holder's ... right to reproduction."); *see also* 4 Nimmer on Copyright § 13D.02 ("For instance, photocopying the entirety of a novel is plainly actionable."). The question of whether the use of Plaintiffs' copyrighted works to develop Google's generative AI models will be shown by common service. *See supra* § II.

Judge Alsup put particular emphasis on Judge Patel's analysis of predominance in the *Napster* case.

> [Although] ownership, registration, and actual damages ultimately require[] a work-by-work inquiry, viewing these determinations as purely "individual issues" ignores the fact that the claims of every member of the class are uniformly premised upon the uploading or

> downloading of a copyrighted work by Napster users. . . . There can be no serious dispute that these issues are sufficiently "significant" to warrant adjudication of the parties' dispute on a representative rather than individual basis, nor is there any question that considerations of judicial economy heavily favor litigating these common issues once, as part of a single class action, rather than rehashing the same questions of law and fact in each of what could likely amount to thousands of individual lawsuits.

*Bartz*, 2025 WL 1993577, at *15 (quoting *In re Napster*, 2005 WL 1287611, at *7 (citations omitted)); *see also Tyson Foods*, 577 U.S. at 453. Here, as in *Bartz*, there is no dispute that Google copied millions of copyrighted books and images to train its generative-AI models. *Bartz*, 2025 WL 1993511, at *9. Proof of Google's training process, and unauthorized use of Plaintiffs' copyrighted works, is common evidence. *See supra* § II.E-J. The training data itself shows that Google maintains, indexes, and inventories the data it uses to train its models. This includes internal records showing which copyrighted works were copied and their provenance. Ex. 201 at -901. As described above, Google is perfectly capable of identifying what copyrighted materials have been used when it wishes. And Plaintiffs' experts have shown a methodology to identify specific works within Google's training datasets. *See generally* McCarron Rep. The Copyright Register and ISBN numbers provide additional means to identify copyrighted works. *Id.* ¶¶ 104-119.

As the *Bartz* court recently explained, unauthorized copying of works for AI training data is "the classic case for certification." 2025 WL 1993577, at *9. Infringement of this nature "can and should be proven on a classwide basis." *Id.*; *see also Authors Guild v. Google, Inc.*, 282 F.R.D. 384, 395 (S.D.N.Y. 2012) ("Every potential class member's claim arises out of Google's uniform, widespread practice of copying entire books without permission of the copyright holder. . . . Whether this practice constitutes copyright infringement does not depend on any individualized considerations."), *vacated in part on other grounds*, 721 F.3d 132 (2d Cir. 2013); *In re Napster*, 2005 WL 1287611 at *7 (finding predominance even though "proof of ownership, registration, and actual damages" may require "a work-by-work inquiry"). In addition to the granular record of copyrighted material contained in Google's LLM training data, this evidence distinguishes this case from *Bartz* where Judge Alsup denied class certification of a Books3 class because of the paucity of the evidence of reliable useful metadata. *See* 2025 WL 1993577, at *6, 12-13. Here, in contrast, Google compiled the metadata and other information, using this information itself to track and identify works in the training data. *See* Ex. 22, Dai Tr. 242:9-247:7. Trial of these claims will be straightforward. *See* Pltfs.' Proposed Trial Plan.

### b)    Fair Use Will Be Resolved through Common Proof.

Common issues predominate with respect to fair use. As in *Bartz*, "there is no reason to believe it would not be susceptible to treatment by common evidence and common methods." 2025 WL 1993577, at *15. The fair use analysis requires evaluation of four nonexclusive factors: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and 4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Fair use is a "mixed question of law and fact." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24 (2021) (citation omitted).

Whether fair use is an available defense is a common question. Courts have routinely rejected fair use for acquiring unauthorized copies to avoid payment obligations. *See, e.g.*, *BMG Music v. Gonzalez*, 430 F.3d 888, 890-91 (7th Cir. 2005) (finding no fair use where defendant's downloading, playing, and retaining a song for future use was "a direct substitute for a purchased copy"). The Court should do the same here, and in any case, "there is no reason to believe [fair use] would not be susceptible to treatment by common evidence and common methods." *Bartz*, 2025 WL 1993577, at *15.

Common evidence demonstrates Google's use of the Class Works through uniform unauthorized copying of millions of works into its AI training pipeline. *See* McCarron Rep. Sec. VIII; Doermann Rep. Part III & V.a; *see supra* § II. And "the fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement." *Walker v. Univ. Books*, 602 F.2d 859, 864 (9th Cir. 1979). *See, e.g.*, *A&M Recs. v. Napster*, 239 F.3d at 1015 ("exploitative unauthorized cop[ying] of copyrighted works" in order "to save the expense of purchasing authorized copies" is not fair use); *BMG Music*, 430 F.3d at 891 ("[D]ownloading full copies of copyrighted material [via P2P network] without compensation to authors cannot be deemed 'fair use'" as "copiers such as [defendant] cannot ask courts (and juries) to second-guess the market and call wholesale copying 'fair use.'"); *Glacier Films (USA), Inc. v. Turchin*, 896 F.3d 1033, 1043 (9th Cir. 2018) (rejecting "baseless" argument that file-sharing via a P2P network "was permitted by the doctrine of fair use"); *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918-22 (2d Cir. 1994) ("Conceptualized in this way, it is not obvious why it is fair for Texaco to avoid having to pay at least some

price to copyright holders for the right to photocopy the original articles."). Google's deliberate circumvention of licensing channels evidences bad faith that undermines any fair use claim. *See Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright . . . ."); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 843 (Fed. Cir. 1992).

To the extent Google asserts copying Class Works for AI training is transformative, this question is answered by common proof. Unauthorized copying of copyrighted works even to avoid paying for personal, noncommercial use is non-transformative. *See UMG Recordings, Inc. v. MP3.Com, Inc.*, 2000 WL 710056, at *1 (S.D.N.Y. June 1, 2000) (The "mere fact" that copyright infringement is "clothed in the exotic webbing of [a new technology] does not disguise its illegality."). Here, as in copyright cases addressing the then-new technology of file-sharing of copyrighted works, the Court should find that unauthorized copying of works is not transformative. *See*, *e.g.*, *A&M Recs. v. Napster*, 239 F.3d at 1015.

The works at-issue include books and images, all squarely within the confines of copyright subject matter under § 101. 17 U.S.C. § 101. Google's training data and internal records provide uniform evidence of the scope of acquisition and use of the works. Proof of the amount and substantiality of the portion used will also be proved by common evidence. Google copied the Class Works when it ingested them for use as training data for its Generative AI models. *Hustler Mag. Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) (finding that wholesale copying "militates against a finding of fair use").

Finally, Plaintiffs will offer common proof with respect to market effects. Google's internally established budgets for obtaining licensing for copyrighted works and robust licensing market demonstrate that the market effect of Google's copying is uniform. Smith Rep. ¶¶ 32-38. Google's internal analysis and recognition of market viability also acknowledges that Google knew these rights must be acquired and the authors and publishers expect to be paid. Smith Rep. ¶¶ 34 -37; Ex. 194 at -494. (Google's AI Business ████████████████████████████████████████████████████████ ); Ex. 93 at -041 (████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ ); Ex. 64 at -262; Ex. 85 at -524-525. *Am. Geophysical Union*, 60 F.3d at

931 (finding it "appropriate to consider the loss of licensing revenues in evaluating 'the effect of the use upon the potential market for or value of'" infringed work). By acquiring free versions rather than purchasing the Class Works (or paying a fee to license the works to train its AI Models), Google avoided market transactions. *See A&M Recs. v. Napster*, 239 F.3d at 1015 (finding no fair use where copying avoided purchasing costs). Indeed, Google's copying, use, and retention is conduct that, if it became widespread, "would adversely affect the potential market for the copyrighted work." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984).

### c)   Google's State of Mind Will Be Shown Through Common Proof.

Willful copyright infringement is established when it occurs "with knowledge that the defendant's conduct constitutes copying infringement." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 957 (9th Cir. 2001). Willful infringement expands the statutory damages range up to $150,000 per infringed work. 17 U.S.C. § 504(c)(2). For a class involving millions of copyrighted works, the difference is measured in the billions. Google's state of mind is a matter of common proof. *See In re Napster*, 2005 WL 1287611, at *4.

### 2.   Damages Are Susceptible to Classwide Measurement.

To satisfy predominance, damages must be "susceptible of measurement across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The Ninth Circuit has held that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Plaintiffs seek statutory damages, the calculation for which is straightforward: the number of infringed works multiplied by the statutory penalty is Google's liability. *See* 17 U.S.C. § 504(c). *See, e.g.*, *In re Napster*, 2005 WL 1287611, at *10 (certifying class before right holders selected between statutory and actual damages). In the alternative, Plaintiffs could seek disgorgement their actual losses and disgorgement of Google's profits from copyright infringement. *See* 17 U.S.C. § 504(b).

### D.   A Class Action Is Superior to Tens of Thousands of Individual Actions.

Rule 23(b)(3)'s superiority prong is satisfied. Class treatment, including a single trial,[5] will achieve "economies of time, effort, and expense" and promote "uniformity of decisions as to persons similarly situated." *Windsor*, 521 U.S. at 615 (citation omitted). This is especially true here, where damages available

---

[5] Plaintiffs' proposed trial plan is filed concurrently.

to individual copyright holders do not come close to compensating for the resources necessary to litigate this technically complex case against Google. *Id.* at 617. Plaintiffs' trial will efficiently adjudicate common issues available for thousands of class members. *See* Pltfs.' Proposed Trial Plan. As Judge Alsup recently recognized, "if not brought as a class action, there will likely be no action at all. . . . For good reason: Defendant is formidable. Few if any . . . could muster comparable resources [and] find counsel willing to work pro bono or on a contingency basis..." *Bartz*, 2025 WL 1993577, at *16 (citation omitted).

### 1. The Proposed Classes Are Objectively Defined.

There is no ascertainability requirement in the Ninth Circuit. *See True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 929 (9th Cir. 2018). "Adequately demonstrating that class members can be identified is sufficient for ascertainability because, 'in the Ninth Circuit, there is no requirement that the identity of the class members . . . be known at the time of certification.'" *Flo & Eddie*, 2015 WL 4776932, at *7 (cleaned up). Regardless, the classes and subclasses are defined based on objective criteria. All class members can be identified through (1) official copyright registrations, demonstrating that each class member has a valid copyright registration with the United State Copyright Office for the works-in-suit (and the registration date), and (2) data maintained by Google that identifies the specific textual and visual content that was illegally downloaded, reproduced, scanned, copied, and used to train and develop Google's AI Models without authorization. Exs. 156-181 (registrations); McCarron Rep. ¶¶ 16; 131-164; 169-170; Doermann Rep. Part V. *See, e.g.*, *Authors Guild*, 282 F.R.D. at 391 ("[G]iven the sweeping and undiscriminating nature of Google's unauthorized copying, it would be unjust to require that each affected [author] litigate his claim individually.").

### V. APPOINTMENT OF CLASS COUNSEL

Plaintiffs request that the Court appoint Joseph R. Saveri of Joseph Saveri Law Firm, LLP and Lesley E. Weaver of Bleichmar Fonti & Auld LLP as Co-Lead Class Counsel, together with Brian Clark of Lockridge Grindal Nauen PLLP, and Ryan Clarkson of the Clarkson Law Firm, P.C. as Class Counsel. *See generally*, Counsel Decl. Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Courts consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation,

and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Proposed Class Counsel satisfy Rule 23(g)'s requirements. They possess the necessary experience, resources, and demonstrated commitment to prosecute these complex claims against Google. Counsel Decl. ¶¶ 21-42, Exs. A-D. Class counsel conducted thorough pre-filing investigations into Google's training practices, pursued extensive written discovery, and supervised technical training data inspection. *Id.* ¶ 29. They have litigated key motions on case sequencing and discovery, defended Class Representatives at deposition, and secured 30(b)(6) and 30(b)(1) testimony establishing the core common proof that will drive resolution of this important matter on a classwide basis. ¶¶ 4-13. Additionally, they have invested substantial time and resources to understand Google's system, analyze its uniform training pipeline, and translate complex technical processes into cognizable legal claims. *Id.* They possess the technical knowledge to challenge Google's defenses and the financial resources to fund this litigation through trial and any appeal. ¶ 38. For these reasons, the Court should appoint Class Counsel.

## VI.    CONCLUSION

For the foregoing reasons, the Court should certify the Class under Rules 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

Dated: October 14, 2025                                                     Respectfully submitted,


By:    */s/ Lesley E. Weaver*                            By:    */s/ Joseph R. Saveri*
Lesley E. Weaver (SBN 191305)                  Joseph R. Saveri (SBN 130064)
Anne K. Davis (SBN 267909)                       Cadio Zirpoli (SBN 179108)
Joshua D. Samra (SBN 313050)                   Christopher K.L. Young (SBN 318371)
**BLEICHMAR FONTI & AULD LLP**          Elissa A. Buchanan (SBN 249996)
1330 Broadway, Suite 630                            Evan A. Creutz (SBN 349728)
Oakland, CA 94612                                      Aaron Cera (SBN 351163)
Telephone: (415) 445-4003                          **JOSEPH SAVERI LAW FIRM, LLP**
lweaver@bfalaw.com                                   601 California Street, Suite 1505
adavis@bfalaw.com                                     San Francisco, CA 94108
jsamra@bfalaw.com                                    Telephone: (415) 500-6800
                                                              jsaveri@saverilawfirm.com
Gregory S. Mullens (admitted *pro hac vice*)    czirpoli@saverilawfirm.com
**BLEICHMAR FONTI & AULD LLP**          cyoung@saverilawfirm.com
75 Virginia Road, 2nd Floor                          eabuchanan@saverilawfirm.com
White Plains, NY 10603                               ecreutz@saverilawfirm.com
Telephone: (415) 445-4006                          acera@saverilawfirm.com
gmullens@bfalaw.com

*Plaintiffs' Interim Co-Lead Counsel*

Brian D. Clark (admitted *pro hac vice*)
Laura M. Matson (admitted *pro hac vice*)
Arielle S. Wagner (admitted *pro hac vice*)
Consuela Abotsi-Kowu (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
bdclark@locklaw.com
lmmatson@locklaw.com
aswagner@locklaw.com
cmabotsi-kowo@locklaw.com

Stephen J. Teti (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 456-7701
sjteti@locklaw.com

Ryan J. Clarkson (SBN 257074)
Yana Hart (SBN 306499)
Mark I. Richards (SBN 321252)
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: 213-788-4050
rclarkson@clarksonlawfirm.com
yhart@clarksonlawfirm.com
mrichards@clarksonlawfirm.com

Matthew Butterick (SBN 250953)
**BUTTERICK LAW**
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
mb@buttericklaw.com

*Additional Counsel for Individual and Representative Plaintiffs and the Proposed Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Lesley E. Weaver, attest that concurrence in the filing of this document has been obtained from the other signatories. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of October, 2025, at Oakland, California.

/s/ *Lesley E. Weaver*
Lesley E. Weaver