DAVID H. KRAMER, SBN 168452
Email: dkramer@wsgr.com
MAURA L. REES, SBN 191698
Email: mrees@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

ERIC P. TUTTLE, SBN 248440
Email: eric.tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500

PAUL J. SAMPSON (admitted *pro hac vice*)
Email: psampson@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 S. State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 401-8510

*Counsel for Defendant*
GOOGLE LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| *In re Google Generative AI Copyright Litigation* | Master File Case No.: 5:23-cv-03440-EKL<br>Consolidated with Case No.: 5:24-cv-02531-EKL<br><br>**DEFENDANT GOOGLE LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:          February 4, 2026<br>Time:          10:00 a.m.<br>Courtroom:   7<br>Judge:         Hon. Eumi K. Lee<br><br>**UPDATED REDACTED VERSION** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION.............................................................................................................................1

BACKGROUND.............................................................................................................................2

A.    Google's Development Of Its Generative AI Models.......................................................2

B.    The Plaintiffs And The Individualized Issues Their Claims Raise. ..................................5

ARGUMENT ...............................................................................................................................10

I.    Plaintiffs' Newly-Revealed Class Definitions Are Improper. .........................................10

II.    Plaintiffs Have Failed To Prove Common Issues Predominate. .....................................12

  A.    Ownership and registration present individualized questions..............................13

  B.    Google's defenses present individualized questions.............................................17

  C.    Plaintiffs' alleged damages cannot be established with common proof. ..............21

III.    Plaintiffs Have Failed To Prove Superiority. ....................................................................22

IV.    The Requests for Injunctive Relief and Issue Classes Should Be Denied. .......................25

CONCLUSION ............................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
2011 WL 11733702 (C.D. Cal. Jan. 11, 2011)................................................................24

*Auscape Int'l v. Nat'l Geographic Soc'y*,
2003 WL 23531750 (S.D.N.Y. July 25, 2003) ...............................................................13

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)...........................................................................................2, 3

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ...........................................................................20

*Bartz v. Anthropic PBC*,
791 F. Supp. 3d. 1038 (N.D. Cal. 2025) ...................................................2, 5, 15, 17, 24

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024).........................................................................................1

*Brod v. Gen. Pub. Grp., Inc.*,
32 F. App'x 231 (9th Cir. 2002).........................................................................................7

*Brunson v. Cook*,
2023 WL 2668498 (M.D. Tenn. Mar. 28, 2023).................................................................7

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................................................................................20

*Carol Wilson Fine Arts, Inc. v. Qian*,
671 F. App'x 701 (9th Cir. 2016).......................................................................................6

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .....................................................................................................21, 22

*Concord Music Grp., Inc. v. Anthropic PBC*,
772 F. Supp. 3d 1131 (N.D. Cal. 2025) ...............................................................14, 20, 25

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018) ...................................................................25

*Davis v. AT&T Corp.*,
2017 WL 1155350 (S.D. Cal. Mar. 28, 2017)..................................................................12

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
528 F.3d 696 (9th Cir. 2008).............................................................................................21

*Desire, LLC v. Manna Textiles, Inc.*,
986 F.3d 1253 (9th Cir. 2021)...........................................................................................21

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*,
870 F.3d 978 (9th Cir. 2017)...............................................................................................6

*Est. of Berlin v. Stash Recs., Inc.*,
    1996 WL 374176 (S.D.N.Y. July 2, 1996) .................................................................... 13

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998) ....................................................................................................... 13

*Field v. Google Inc.*,
    412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................................ 19

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
    654 F.3d 958 (9th Cir. 2011) ......................................................................................... 13

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
    2015 WL 4776932 (C.D. Cal. May 27, 2015) ........................................................... 15, 16

*Football Ass'n Premier League Ltd. v. YouTube. Inc.*,
    297 F.R.D. 64 (S.D.N.Y. 2013) ................................................. 1, 12, 13, 15, 20, 22, 23, 25

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com LLC*,
    586 U.S. 296 (2019) ...................................................................................................... 7, 16

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021) ........................................................................................................... 21

*Hartmann v. Google LLC*,
    2022 WL 684137 (S.D.N.Y. Mar. 8, 2022) .................................................................... 13

*In re Napster, Inc. Copyright Litig.*,
    2005 WL 1287611 (N.D. Cal. June 1, 2005) ........................................................ 15, 16, 21

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    153 F.3d 82 (2d Cir. 1998) ............................................................................................. 15

*Kadrey v. Meta Platforms, Inc.*,
    788 F. Supp. 3d 1026 (N.D. Cal. 2025) ..................................................................... 20, 21

*Kihn v. Bill Graham Archives LLC*,
    2022 WL 18935 (9th Cir. Jan. 3, 2022) ...................................................... 1, 12, 17, 25

*Murphy v. Murphy*,
    2025 WL 963999 (E.D.N.Y. Mar. 30, 2025) ................................................................. 13

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
    971 F.3d 1042 (9th Cir. 2020) ....................................................................................... 19

*Palmer Kane LLC v. Scholastic Corp.*,
    2012 WL 2952898 (S.D.N.Y. July 16, 2012) ................................................................. 17

*Paramount Pictures Corp. v. Int'l Media Films Inc.*,
    2013 WL 3215189 (C.D. Cal. June 12, 2013) ................................................................ 13

*Quevedo v. Macy's, Inc.*,
    2011 WL 13124445 (C.D. Cal. Mar. 9, 2011) ................................................................ 11

*Reitman v. Champion Petfoods USA, Inc.*,
    830 F. App'x 880 (9th Cir. 2020) ................................................................................... 25

*Resnick v. Copyright Clearance Ctr., Inc.*,
    2003 WL 22176619 (D. Mass. Sept. 22, 2003).................................................................13

*Rojas v. Bosch Solar Energy Corp.*,
    2022 WL 717567 (N.D. Cal. Mar. 9, 2022) .....................................................................12

*Schneider v. YouTube, LLC*,
    649 F. Supp. 3d 872 (N.D. Cal. 2023) ..............................................................................19

*Schneider v. YouTube, LLC*,
    674 F. Supp. 3d 704 (N.D. Cal. 2023) ...................................... 1, 12, 13, 15, 17, 19, 20, 25

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ..........................................................................................................12

*Utopia Ent., Inc. v. Claiborne Par.*,
    2006 WL 8435006 (W.D. La. Jan. 10, 2006)....................................................................13

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996)..............................................................................................25

*Van v. LLR, Inc.*,
    61 F.4th 1053 (9th Cir. 2023)............................................................................................17

*Vulcan Golf, LLC v. Google Inc.*,
    254 F.R.D. 521 (N.D. Ill. 2008) .......................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...........................................................................................1, 17, 23, 25

*WB Music Corp. v. Rykodisc*,
    1995 WL 631690 (E.D. Pa. Oct. 26, 1995) ......................................................................13

*Wu v. Pearson Educ. Inc.*,
    2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012)............................................................12, 17

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)...........................................................................................22

**STATUTES**

17 U.S.C. § 101 ..............................................................................................................................6

17 U.S.C. § 103 .........................................................................................................................7, 16

17 U.S.C. § 107 ............................................................................................................................20

17 U.S.C. § 201 ....................................................................................................................6, 7, 13

17 U.S.C. § 411 .........................................................................................................................7, 16

17 U.S.C. § 412 ............................................................................................................................16

17 U.S.C. § 501 .......................................................................................................................13, 14

17 U.S.C. § 504 .......................................................................................................................21, 25

17 U.S.C. § 505 ................................................................................................................25

17 U.S.C. § 507 ................................................................................................................19

**RULES**

Civil L.R. 16-9 ................................................................................................................12

Fed. R. Civ. P. 37 ............................................................................................................22

**OTHER AUTHORITIES**

Compendium of U.S. Copyright Office Practices (3rd ed. Jan. 28, 2021)..................................7, 9

U.S. Copyright Office Circular 22, *How to Investigate the Copyright Status of a Work* ................................................................................................................13

U.S. Copyright Office, *Copyright and the Music Marketplace* (Feb. 2015)................................13

U.S. Copyright Office, *Orphan Works and Mass Digitization* (June 2015) ................................14

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Mot. | Plaintiffs' Notice of Motion and Motion for Class Certification, ECF 251 (redacted), 253-1 (sealed) |
| Mullens Decl. | Declaration of Gregory S. Mullens in Support of Plaintiffs' Motion for Class Certification, ECF 252 |
| Mullens Ex. | Exhibit to the Declaration of Gregory S. Mullens |
| McCarron Rpt. | Expert Report of Meredith McCarron (Corrected), Exhibit 1 to the Declaration of Gregory S. Mullens |
| Doermann Rpt. | Expert Report of David S. Doermann, Ph.D., Exhibit 2 to the Declaration of Gregory S. Mullens |
| Furniss Rpt. | Expert Report of Victoria Furniss, Exhibit 3 to the Declaration of Gregory S. Mullens |
| Carver Decl. | Declaration of Brian Carver in Support of Google's Opposition to Class Certification |
| Price Decl. | Declaration of David Price in Support of Google's Opposition to Class Certification |
| Price Ex. | Exhibit to the Declaration of David Price |
| Auster Decl. | Declaration of Jeremy P. Auster in Support of Google's Opposition to Class Certification |
| Psounis Rpt. | Expert Rebuttal Report of Konstantinos Psounis, Ph.D., Exhibit 146 to the Declaration of Jeremy P. Auster |
| Patry Rpt. | Expert Report of William Patry, Exhibit 147 to the Declaration of Jeremy P. Auster |
| Sullivan Rpt. | Expert Rebuttal Report of Ryan Sullivan, Ph.D., Exhibit 148 to the Declaration of Jeremy P. Auster |
| Ex. | Exhibit to the Declaration of Jeremy P. Auster |
| Harold Decl. | Declaration of Paul Harold in Support of Google's Motion for Sanctions |
| Harold Ex. | Exhibit to the Declaration of Paul Harold |
| SACC | Second Amended Consolidated Class Action Complaint, ECF 234 |
| ISBN | International Standard Book Number |

**INTRODUCTION**

To justify class treatment, Plaintiffs must "'prove' that there are critical questions or issues that can be resolved on a class-wide basis" that "predominate over individual ones." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1260 (9th Cir. 2024) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The principal "common" question Plaintiffs identify— whether Google deployed "uniform systems and pipelines" to copy works for training its AI models, Mot. 16—will not "drive the resolution" of this case. *Dukes*, 564 U.S. at 350. And the centerpiece of Plaintiffs' motion—a purported methodology to ascertain which works were used to train Google's AI models, *see* Mot. 4-5; Doermann Rpt.; McCarron Rpt.—is an abysmal failure, rife with errors and wholly unreliable. But a class would not be appropriate here even if there were some infallible list of every work Google used for training. Such a list would only answer the first of innumerable legally and factually complex questions inherent in each individual Plaintiff's copyright infringement claim: Who owns the work and the rights allegedly infringed? How? Under what law? Was the work registered? Validly? When? Did Google have a license to use the work? From whom? To do what? Does fair use permit use of that work? Is the claim time-barred? These questions are all *individual*, as are the work-specific questions needed to assess the existence and amount of damages, if any. Google has shown as much throughout this case, repeatedly highlighting individualized defects in the named Plaintiffs' claims. Indeed, the Court directed Plaintiffs to "account for Google's arguments when preparing their class certification motion." ECF 128 at 7 n.4. Yet Plaintiffs make no attempt to explain how these questions or the countless others that would arise across a class could be answered with common evidence.

Equally striking is Plaintiffs' failure to even acknowledge the great weight of authority against certification of copyright class actions. In *Kihn v. Bill Graham Archives LLC*, 2022 WL 18935, at *2 (9th Cir. Jan. 3, 2022), the Ninth Circuit held that "individual issues of license and consent" were, by themselves, sufficient to preclude certification. Other courts too have resoundingly rejected putative copyright class actions. *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 727 (N.D. Cal. 2023); *Football Ass'n Premier League Ltd. v. YouTube. Inc.*, 297 F.R.D. 64, 65 (S.D.N.Y. 2013) ("*Premier League*"). The individualized issues here are just as plentiful and

complex. Yet Plaintiffs cite none of these decisions, much less try to distinguish them. Instead, Plaintiffs misrepresent *Bartz v. Anthropic PBC*, 791 F. Supp. 3d. 1038, 1054 (N.D. Cal. 2025), claiming it held that "unauthorized copying of works for AI training data is 'the classic case for certification,'" Mot. 20. But the class certified in *Bartz* was limited to claims of infringement based solely on "torrent[ing]," i.e., mass downloading of pirate libraries to create a general repository of books, which is not at issue in this case. *See* 791 F. Supp. 3d at 1045, 1051. The court *refused to certify* a proposed class of works "used for training," *see id.* at 1059. No court has ever certified a class anything like the copyright classes Plaintiffs here have proposed.

Plaintiffs' inability to establish predominance should end the certification inquiry, but Plaintiffs' motion fails for other reasons as well. For one, Plaintiffs' new class definitions dramatically differ from the one offered in the complaint, were concealed from Google up until Plaintiffs filed their motion, and reintroduce a fail-safe element that led this Court to strike Plaintiffs' prior definition. Plaintiffs' attempt to redefine the classes at this late stage and to circumvent the Court's prior rulings cannot stand. Beyond that, Plaintiffs' new definitions incorporate complex qualifications for class membership and vague terms that would make the task of identifying class members an unmanageable mess, rendering class treatment far inferior to individual litigations. Plaintiffs' motion for class certification should be denied.

## BACKGROUND

### A.    Google's Development Of Its Generative AI Models.

Since its founding, Google's core mission has been to organize the world's information and make it universally accessible and useful. To that end, Google has developed artificial intelligence models, trained on extraordinarily large volumes of data, that are capable of generating new, original outputs and helping users accomplish a wide array of tasks. These models require massive amounts of diverse, high-quality data, so that they are better able to learn patterns. While the data used to train particular models vary, Google has a number of sources of data that it is authorized to obtain and to use, including by express licenses, implied licenses, and the doctrine of fair use. They include:

**Google Books**. As described in the landmark case *Authors Guild v. Google, Inc.*, 804 F.3d

202 (2d Cir. 2015), Google developed the Google Books service, which allows the public to search and identify books with relevant terms and to view snippets of matching text. Price Decl. ¶ 11. To accomplish this, Google partnered with leading research libraries to scan and index "more than 20 million books," and established in court that its copying of those materials to build and maintain the service was a manifestly transformative fair use, not copyright infringement. *Authors Guild*, 804 F.3d at 208. Through Google's Partner Program, book publishers added to the service by providing Google with copies of millions more books. Price Decl. ¶¶ 10-11; Mullens Ex. 14 at 419:10-14. Today, publishers also use the Partner Program to sell eBooks through the Google Play Store. *Id*. ¶ 11. All of the named Plaintiffs' books at issue appear in Google Books and/or Play Store. *See* Auster Decl. ¶¶ 45-46, 61, 81, 100-01, 116, 123-24; Exs. 32-33, 49-52, 70-71, 91-102, 114-15, 126-37. Given this vast universe of books scanned and/or delivered to Google, Plaintiffs' incantations of "Shadow Libraries" and "Piracy" are badly misplaced.

**Web-crawl**. Google also acquires third-party content through web crawling: using automated software tools to visit billions of web sites and collect the content that they contain, from books and book excerpts, to images, to prose and computer code. Price Decl. ¶ 17. Since its inception, Google has crawled the web to locate content to support its search services, and for nearly that long, it has relied on the internet standard robots.txt protocol to guide its collection and use of the content it locates. *Id.* ¶¶ 17-18, 21. More than 80% of websites today employ robots.txt instructions, directing "crawlers" on what content they may access. *Id.* ¶¶ 18-20. Google has long made clear how to deploy such instructions and how it will interpret them. *Id.* ¶ 22. Many Works-in-Suit were published on websites with robots.txt instructions expressly or impliedly authorizing Google to access, acquire, and use the sites' content in accordance with those instructions. *See* Auster Decl. ¶¶ 26, 47, 65-66, 83, 104-07, 128-29; Exs. 21, 34-35, 56-57, 75-76, 104-07, 140-44; Price Decl. ¶¶ 23-24.

**User-Uploaded Data.** Google offers a wide variety of services hosting user-generated content that can be made publicly available, including YouTube, Google Photos, and Blogger. Users of these services agree to Google's universal Terms of Service and some service-specific terms. Price Decl. ¶¶ 3-6. As one of the most innovative companies in the world, Google is

constantly improving its products and developing new ones. It does not always know how it may need or want to use content in these efforts. Accordingly, when users upload content to Google, they broadly authorize Google to "use [users'] content" for the purposes of "operating and improving the services …. [and] developing new technologies and services." Ex. 8 at -5080-81. Users who upload content to Google's YouTube service "grant to [Google] [a] … license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it) in connection with the Service and [Google's] (and its successors' and Affiliates') business." Ex. 17 at -4854-55; *id.* at -4849 (defining "YouTube" as "Google LLC"). Many Works-in-Suit were uploaded to Google services and thereby licensed to Google. *See* Auster Decl. ¶¶ 20-24, 42-43, 62-64, 77-80, 97-99 & n.6, 126; Exs. 10-16, 18, 29-31, 53-55, 63-69, 90, 138-39.

**Third-Party Data.** Google also contracted with various partners, such as Reddit, Shutterstock, and numerous publishers, for access to and broad permissions to use their data. Price Decl. ¶¶ 7-9. These partner agreements are often individually negotiated, and their terms can vary significantly. Price Decl. ¶ 8. In many of these agreements, Google's partners agreed to deliver and provide access to data through Google's preferred means and formats, and "to the extent a license is required," to grant Google a license to use the data "in connection with Google Products, including to develop and improve them." *E.g.*, Mullens Ex. 118 at -952-53.

Through these licenses, Google secured expansive use rights in content uploaded to third-party services. For example, pursuant to Reddit's User Agreement, a user who uploads content to Reddit grants Reddit a "license to use that Content," including "the right for [Reddit] to make Your Content available for syndication, broadcast, distribution, or publication by other companies, organizations, or individuals who partner with Reddit," and "the right to use Your Content to train AI and machine learning models." Ex. 19 § 5. Reddit, in turn, authorized Google to ███████ ███████████████████████████████████████████████████ ████████ Mullens Ex. 112 § 2.1; *see also id.* § 1.11 (defining "Google Products" to mean "Google and its Affiliates' products and services, including artificial intelligence and machine learning technologies"); Price Decl. ¶ 9; *see also* Mullens Ex. 42 (similar authorization from Shutterstock for over 500 million images).

Plaintiffs' breathless, largely imagined background narrative, which takes up more than half their brief, ignores that Google's training data was acquired through legitimate means, falsely suggesting that Google obtained it through "piracy." But Plaintiffs offer no evidence that Google acquired training data through "torrenting" or downloading "pirate libraries" (as in *Bartz*). In reality, as Plaintiffs do not actually dispute, Google acquired tens of millions of books through the Google Books Library Project and commercial agreements with publishers in its Partner Program. And it obtained untold images and still more texts by crawling the public web in operating its search engine, while honoring website preferences in accordance with the industry standard robots.txt protocol. Google also acquired license rights to countless works when users like the named Plaintiffs uploaded them to Google through services like Blogger and YouTube or provided them to those who then licensed them to Google. Plaintiffs' accusations of "piracy" amount to nothing more than Google's automated web crawls of billions of sites incidentally capturing content from a handful of locations that Plaintiffs have declared to be "shadow libraries." Plaintiffs do get one thing right: with respect to its acquisition of content, Google is very much "[u]nlike its AI competitors." Mot. 8.

## B.    The Plaintiffs And The Individualized Issues Their Claims Raise.

Discovery from the named Plaintiffs has shown that this case is exceptionally ill-suited for class treatment. It has proved nearly impossible to gather critical details about each Plaintiff's ownership of copyrighted works, assignments, registrations, and licensing history. Auster Decl. ¶¶ 2-8. In many instances, Plaintiffs refused to provide such information, claiming that it was too burdensome to collect or was in the possession of third parties; Google was forced to file two successful motions to compel against Plaintiffs and subpoena 13 publishers, just to get foundational information. *Id.* ¶¶ 4-7. That process underscores that classwide proceedings would be unmanageable. Nevertheless, as set forth in greater detail in the accompanying Auster Declaration, the evidence Google was able to accumulate powerfully demonstrates that individualized issues predominate in just the named Plaintiffs' claims.

***Hope Larson*** is a graphic novelist who alleges that Google infringed a book she created called *All Summer Long* and that she would be in Plaintiffs' just-debuted "books" class. SACC

¶¶ 67-70; Mot. 17. In an earlier complaint, Larson also claimed Google infringed the cover art of her book, *Chiggers*. Auster Decl. ¶ 36. After Google showed that the cover art was never registered, *id.*, Larson admitted she had no viable claim and dropped it. Ex. 25 at 46:1-13, 47:6-20, 48:7-49:15.

Larson claims to own the copyright in *All Summer Long*, Ex. 23 at 4-5, and is listed as the claimant on its registration, Mullens Ex. 159. But she is not currently and never has been an owner of any rights in that work. Larson testified that she created *All Summer Long* "in [her] capacity as an employee of Girlcomix, Inc," and that she was "acting within the scope of [her] employment" when she did so. Ex. 25 at 96:1-13; 103:22-104:7. *All Summer Long* was thus a "work for hire," rendering Girlcomix the author and legal owner from the moment of the work's creation. *See Carol Wilson Fine Arts, Inc. v. Qian*, 671 F. App'x 701, 702 (9th Cir. 2016); 17 U.S.C. §§ 101(1), 201(b) (ownership of work for hire). And because Larson "never had ownership," she cannot be a beneficial owner either. *See DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 988 (9th Cir. 2017). Girlcomix later granted a publisher "the sole and exclusive right to exercise and license" *All Summer Long*, Ex. 27 at -28, 33-35, rendering that publisher the owner of those rights. Again, Larson owns nothing.

Despite that, Larson claims that she and her publisher licensed *All Summer Long* to numerous third parties, including Google. Auster Decl. ¶¶ 38-47. Her publisher provided Google with a copy of *All Summer Long* for inclusion in Google Books, Ex. 25 at 197:21-198:1. And Google identified posts of excerpts from *All Summer Long* to YouTube and Blogger that Larson's publisher made or authorized.[1] For her part, Larson admitted that she made no effort to identify all authorized online postings of *All Summer Long*, claiming it would be "[i]nfeasible" to even try because she "would have to dig through the whole Internet." *Id.* at 152:9-152:21, 156:16-157:20, 189:12-24.

***Sarah Andersen*** is a cartoonist who alleges that Google infringed the copyrights in six

---

[1] Larson's publisher uploaded a video trailer to YouTube that promotes the *All Summer Long* graphic novel and includes excerpts showing the cover page of the book and select inner pages, licensing all that to Google. Ex. 25 at 207:20-208:10. The publisher also gave the work to reviewers, who in turn uploaded excerpts to Google's Blogger service, again thereby licensing Google to use them. *Id.* at 211:19-212:17; 214:12-21.

images, and that she would be in the newly-proposed "images" class. ECF 234-2 at 2-7; *see also* SACC ¶¶ 30-33; Mot. 17. As this Court has already seen first-hand, Andersen exemplifies the "fact-bound" inquiry needed to determine whether a work has been validly registered. ECF 216 at 9. All of the registrations Andersen asserts are for "collective works." *Id.* at 8; SACC Ex. A. A collective work registration excludes material previously published. 17 U.S.C. § 103(b); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices (3d ed. Jan. 28, 2021) ("Compendium") § 618.6. Posting a work on social media services such as Twitter qualifies as a prior publication. *Brunson v. Cook*, 2023 WL 2668498, at *13-14 (M.D. Tenn. Mar. 28, 2023). Three of Andersen's Works-in-Suit are images of webcomics that she readily admits she published on Twitter (Exs. 44, 45, 47) before registering the collective works in which they appear. Ex. 39 at 203:2-205:14, 210:21-212:6. These images are therefore not covered by her registration (nor any other), and she cannot pursue her copyright claims as to these works. 17 U.S.C. § 411(a); *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com LLC*, 586 U.S. 296, 296-97 (2019) (registration a prerequisite to suit).[2]

**Mike Lemos** is an illustrator who alleges that Google infringed his copyrights in three images—*Shark Fink Sticker*, *Caffeine Case from Outer Space*, and *Butterflies & Snakes*. SACC ¶¶ 75-78. While Lemos claims to be the sole author and owner of the three images, Ex. 2 at 3, discovery revealed significant ownership issues. Auster Decl. ¶¶ 12-15. Lemos testified that he created *Shark Fink* and *Caffeine Case* while he "worked for" Sojourn Design LLC as an illustrator, suggesting they may be works for hire owned by the company. *See* 17 U.S.C. § 201(b); Ex. 4 at 107:18-20, 134:6-13, 136:22-137:1. Lemos was "unable to admit or deny" whether Sojourn Design owns any exclusive rights. *See* Ex. 3 at 10-12, 15-18, 28-30, 33-36, 45-47, 50-53. The third work, *Butterflies & Snakes*, was commissioned by a rock band for use as their album's cover art, and the band "worked together [with Lemos] to develop" it. Ex. 5 at -2516. In light of that history, the band is likely a co-owner. *See* 17 U.S.C. § 201(a) (ownership of joint works); *Brod v. Gen. Pub. Grp.,*

---

[2] Andersen's Works-In-Suit have been licensed widely, including to Google, *see* Auster Decl. ¶¶ 57-69, but Andersen could not provide full information about those licenses because her literary agent and publisher handled licensing and she considered an investigation into those licenses too burdensome, as it would require "a very detailed search" of documents and "conversations with multiple different entities," Ex. 39 at 104:25-105:3, 228:4-229:22; Ex. 36 at 6-8.

*Inc.*, 32 F. App'x 231, 234 (9th Cir. 2002). Regardless, Lemos admitted the band was entitled to, and did license Google to use the image by uploading it to YouTube. Auster Decl. ¶ 24 & Ex. 18.

Lemos testified that it would take him months just to identify everyone licensed to use his Works-in-Suit, Ex. 4 at 273:9-274:5, and it would require considerable additional effort to determine the terms of those licenses and whether licensees had further sublicensed the works, *id.* at 283:15-285:3. It is clear, however, that Lemos had two Google accounts and repeatedly uploaded his Works-in-Suit to Google services, including Blogger, Google Photos, and YouTube, thereby licensing Google to use them to develop its products and services. *See* Auster Decl. ¶¶ 18-23. In addition, Lemos uploaded *Butterflies & Snakes* to the online service Reddit, Ex. 4 at 247:25-248:17, thereby broadly licensing it to Reddit which in turn, broadly licensed it to Google. Mullens Ex. 112. Finally, Lemos published a personal website, Ex. 4 at 292:22-294:20, where he uploaded *Shark Fink* and *Caffeine Case*, Ex. 1 at 9. Lemos included a "robots.txt" file on the site with instructions authorizing Google to access and use the contents. *See* Price Decl. ¶¶ 23-24; Auster Decl. ¶ 26. *See* Ex. 4 at 297:19-25, 298:23-299:15 (Lemos wanted internet users to be able to find his website through search engines like Google).

A year of litigation revealed Lemos' claims as meritless. Two days before Plaintiffs' class motion was filed, Lemos dropped out of the case without explanation, along with another named Plaintiff. ECF 246, 247.

***Steve Almond*** is an author who alleges Google infringed his copyrights in six books and that he is in a new "books" class. SACC ¶¶ 17-27; Mot. 17. Almond entered into publishing agreements for each of his six works but he did not produce these agreements for three of them, forcing Google to subpoena his publishers to obtain them (and other license agreements Almond never disclosed). Auster Decl. ¶¶ 89. In all six publishing agreements, Almond granted his publishers exclusive legal rights to use and license others to his works. *See, e.g.*, Ex. 82 ¶ 2(a) (granting Zando LLC rights to "license, grant, dispose of or sell, as applicable"). Almond's publishers then granted further licenses, including a clearly dispositive one to Google that authorized it to "copy, reproduce, display, perform, adapt, use, communicate and make the [work] available to the public (in whole or in part) as part of and/or through the Google Services (or any

of them)." *See, e.g.*, Price Ex. C § 3.1(d); Price Decl. ¶¶ 13-14.

At least two of Almond's Works-in-Suit include previously published material. *See* Ex. 81 at 77:25-79:1, 85:4-86:12, 105:9-16. Almond admitted at his deposition that the *B.B. Chow* book is a "collection of short stories," that were "previously published" before *B.B. Chow*'s publication in 2005, *id.* at 89:15-20, 105:6-8. The *B.B. Chow* registration fails to disclose that it is a collective work that included previously published material. Auster Decl. ¶¶ 91-92. And the previously published material is not covered by the registration. Compendium § 618.6. *Which Brings Me to You*—composed of back-and-forth letters—also has previously published content, but Almond could not specify what was and was not. Auster Decl. ¶ 93.

*Connie McLennan* is a visual artist who alleges that Google infringed her copyright in images from a children's book titled *The Rainforest Grew All Around* ("*Rainforest*"). SACC ¶¶ 89-95; ECF 234-1 at 30. She is supposedly a member of a new "images" class. Mot. 17. Through extensive investigation, Google learned that McLennan used her Google accounts to upload the relevant images from *Rainforest* to Blogger, thereby licensing Google to use them. Auster Decl. ¶¶ 77-78 & Exs. 63, 64, 65, 66, and 67; *see also* Ex. 61 at 221:13-222:17, 222:18-223:14, 223:21-224:25, 225:7-226:2 (admitting she made four of these posts). McLennan also produced dozens of copies of *Rainforest*'s images from her Google Photos account. Ex. 61 at 102:2-18; Auster Decl. ¶ 79 & Ex. 68. And Google discovered through its own investigation that McLennan's publisher authorized a marketing agency to upload a promotional video to YouTube that included images from *Rainforest*, including the cover image, again granting Google expansive rights to use them. Auster Decl. ¶ 80 & Ex. 69; Ex. 61 at 265:19-267:19.[3]

**Plaintiffs' Alleged Harm.** Plaintiffs intoned in the SACC that they "suffered actual damages" from Google's alleged infringement, including harm to the value of their works and loss of "licensing revenues [they] would have received had Google properly licensed [their] works for AI training purposes." *E.g.*, SACC ¶¶ 29, 34. But at their depositions, no Plaintiff could identify

---

[3] McLennan's publisher has also licensed *Rainforest* to Google, providing it for inclusion in Google Books, *see* Ex. 61 at 212:23-214:22. It has also offered nearly half of *Rainforest* as a PDF free preview on its own website, *see id* at 194:21-196:22, and authorized Google's web crawlers access to the PDF in robots.txt instructions, Auster Decl. ¶ 82 & Ex. 74.

any such harm. None could point to lost sales or lost licensing opportunities. Auster Decl. ¶¶ 131-32. Several Plaintiffs also could not confirm whether they would ever be willing to license their Works-in-Suit for AI training, or on what terms. *Id.* ¶ 133. Plaintiffs also could not identify any AI-generated works that affected the market for their works, with Almond and Leovy admitting they had never even seen an AI-generated work similar to theirs. *Id.* ¶¶ 134-36.

## ARGUMENT

### I.    Plaintiffs' Newly-Revealed Class Definitions Are Improper.

The Court previously "admonishe[d] Plaintiffs' counsel" for failing to disclose their "intention to significantly alter their proposed class definition." ECF 128 at 8-9. Plaintiffs ignored the Court's explicit warning. Their motion seeks certification of classes that (i) differ materially from the proposed class in the operative complaint they were permitted to file; (ii) were hidden from Google until Plaintiffs filed their motion; and (iii) reintroduce the fail-safe problem that led the Court to strike a prior definition. Plaintiffs offer no explanation or excuse for these untimely redefinitions, which should be rejected.

Through multiple complaints, Plaintiffs proposed broad classes that included all U.S. owners of copyrighted works that Google used to train its AI models. *See, e.g.*, ECF 28 ¶ 398(b); ECF 47 ¶ 90. Google repeatedly explained that these classes were doomed because "of the individualized issues associated with" them. ECF 93 at 19:10-17. Hoping to mask that problem, Plaintiffs filed an amended complaint with a fail-safe class definition that Google moved to strike. ECF 91 ¶ 164, ECF 98. The Court granted Google's motion and directed Plaintiffs to revert to a proposed class definition "substantially the same" as their prior one. ECF 128 at 6. The Court later granted Google's motion to dismiss in part and without leave to amend, concluding that the "pleadings must be settled" because amendments would "further delay" the case and "unduly prejudice" Google. ECF 216 at 22. The SACC that Plaintiffs filed on September 25 sought to certify a class of: "All persons or entities domiciled in the United States who owned a United States copyright in any work used by Google to train Google's Generative AI Models during the Class Period." SACC ¶ 163.

Just three weeks later, Plaintiffs filed this motion with five new, radically different class

definitions. The new classes have again been extensively gerrymandered from what Plaintiffs were ordered to plead, making them narrower in some ways and broader in others. Plaintiffs now try to carve out a subset of books (those with identifiers called ISBNs) drawn from various sources (the "Google Books Library Project," the "Google Books Partner Program," and "Shadow Libraries"), still purport to cover all images, but only want to include works that were registered within five years of publication and before being trained on by Google. Mot. 1. While these new class definitions try (and fail) to define away some of the individualized issues in the class definition they pleaded, Plaintiffs have introduced new ones. Their new classes are no longer limited to works Google "used … to train," or to persons "domiciled in the United States," and now supposedly include anyone in the world owning a U.S.-registered work that was "downloaded and/or ingested to develop" various AI models. The impropriety of Plaintiffs' last-minute attempt to redefine their proposed class—from works used in training, to works merely downloaded—was readily apparent to Magistrate Judge van Keulen, who rejected the gambit, recently ruling Plaintiffs may not expand their case from one focused on "use[] … to train" to a sprawling and indefinite case encompassing all works that were "mere[ly] 'ingest[ed]'" or downloaded. ECF 280-1 at 3.

To make matters worse, Plaintiffs have reintroduced a fail-safe concept, purporting to exclude from their new proposed classes any copyright owners whose works are covered by a license specifically authorizing use for generative AI. As before, unable to explain how they can address the issue of authorization on a classwide basis, Plaintiffs purport to avoid it definitionally. But as the Court already explained, that tactic is improper:

> Google is correct that the class definition is fail-safe because "Plaintiffs have tied class membership to the *prima facie* elements of their [copyright] infringement claims." ... Specifically, the class is defined to include only those persons who "own a valid copyright registration" for one or more works that "were infringed upon" by Google "without license or authorization."

ECF 128 at 4. Notably, Plaintiffs do not define the universe of licenses they have in mind, justify applying the exclusion to some but not other Google licenses, or describe how they propose to determine what works are subject to those licenses. The fail-safe exclusion is grounds enough to "den[y] certification." *Quevedo v. Macy's, Inc.*, 2011 WL 13124445, at *5 (C.D. Cal. Mar. 9, 2011).

In any event, Plaintiffs had every opportunity to disclose their new class definitions to Google and the Court—but they never did. In response to Google's interrogatory about their class contentions, Plaintiffs hewed to the complaint's definition. *E.g.*, Harold Ex. A at 3. In an October 1, 2025 case management statement, which should have included "[a] description of the class or classes," Civil L.R. 16-9(b), Plaintiffs again failed to disclose them. Nor did Plaintiffs disclose the new classes in the pre-motion meet-and-confer required by this Court's Standing Order, Order § VII—because they did not bother to meet and confer at all. Harold Decl. ¶ 4.

Plaintiffs' motion offers no explanation for their new definitions or any excuse for their failure to disclose them earlier, ***even though they knew and disclosed their intention to their proposed experts months ago***. Harold Decl. ¶¶ 5-9. Regardless, no "authority permit[s] such [] major amendment[s] to the class definition at the certification stage," *Rojas v. Bosch Solar Energy Corp.*, 2022 WL 717567, at *4 (N.D. Cal. Mar. 9, 2022), especially where Plaintiffs attempt "an end-run" around the Court's Orders settling the pleadings, *Davis v. AT&T Corp.*, 2017 WL 1155350, at *4 (S.D. Cal. Mar. 28, 2017). The Court should deny certification on this basis alone.

## II.    Plaintiffs Have Failed To Prove Common Issues Predominate.

In the predominance analysis required by Rule 23(b)(3), "[a]n individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (cleaned up). Plaintiffs do not come close to proving predominance. The elements of a *prima facie* infringement claim— ownership of a valid copyright, registration, infringement—all require consideration of "evidence that varies from member to member," and work to work. Any individual claims that establish those elements must then survive a gauntlet of defenses, including license, statute of limitations, and fair use, which themselves each turn on particularized evidence. After that, a complex, individualized damages analysis would be required. Unsurprisingly, courts routinely reject certification of copyright classes. *E.g.*, *Kihn*, 2022 WL 18935, at *2; *Schneider*, 674 F. Supp. 3d at 717; *Premier League*, 297 F.R.D. at 65; *Wu v. Pearson Educ. Inc.*, 2012 WL 6681701 (S.D.N.Y. Dec. 21, 2012);

*Utopia Ent., Inc. v. Claiborne Par.*, 2006 WL 8435006 (W.D. La. Jan. 10, 2006); *Resnick v. Copyright Clearance Ctr., Inc.*, 2003 WL 22176619 (D. Mass. Sept. 22, 2003); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2003 WL 23531750 (S.D.N.Y. July 25, 2003), *aff'd*, 282 F. App'x 890 (2d Cir. 2008); *Est. of Berlin v. Stash Recs., Inc.*, 1996 WL 374176 (S.D.N.Y. July 2, 1996); *WB Music Corp. v. Rykodisc*, 1995 WL 631690 (E.D. Pa. Oct. 26, 1995). This Court should as well.

### A.    Ownership and registration present individualized questions.

*Ownership.* Only "[t]he legal or beneficial owner of an exclusive right under a copyright" may sue for "infringement of that particular right." 17 U.S.C. § 501(b). Ownership must be proven on a work-by-work (and right-by-right) basis. Plaintiffs' classes include untold putative owners the world over, yet Plaintiffs make no effort to show how they will "demonstrate copyright ownership on a classwide basis." *Schneider*, 674 F. Supp. 3d at 718.

Proving ownership will require individual mini-trials for each copyrighted work and jury resolution of a host of individualized and disputed questions. *Premier League*, 297 F.R.D. at 66; *Feltner v. Columbia Pictures Television, Inc*., 523 U.S. 340, 353 (1998) (7th Amendment provides right to jury resolution of factual disputes). In the United States, ownership "vests initially in the author or authors of the work," except in cases of works-for-hire. 17 U.S.C. § 201(a). Identifying the authors of a work is necessarily work-specific, intensive, and is often disputed. *See*, *e.g.*, *Murphy v. Murphy*, 2025 WL 963999, at *6 (E.D.N.Y. Mar. 30, 2025) (finding material disputes of fact over book authorship). Ownership may be transferred by assignment or "by operation of law" or by inheritance, 17 U.S.C. § 201(d), and where ownership has been transferred, the assignee "faces the additional burden of proving valid chain of title." *Hartmann v. Google LLC*, 2022 WL 684137, at *4 (S.D.N.Y. Mar. 8, 2022). That too is often disputed. *E.g.*, *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 963 (9th Cir. 2011); *Paramount Pictures Corp. v. Int'l Media Films Inc.*, 2013 WL 3215189, at *1 (C.D. Cal. June 12, 2013) (adjudicating "competing chains of title"). There is no comprehensive database that reflects accurate and up-to-date ownership information, and in many instances, ownership information is completely lacking. *See*, *e.g.*, U.S. Copyright Office Circular 22, *How to Investigate the Copyright Status of a Work*, at 3 (registration records "may be incomplete or lacking entirely"); U.S. Copyright Office, *Copyright and the Music Marketplace*

(Feb. 2015), at 62-63 (registration database "is not a comprehensive resource;" "[registration] records are far from complete," "will not reflect a change in ownership" and cannot be "reliably linked to registration records"). There are large numbers of registered but "orphan" works, whose owners cannot be identified. *See* U.S. Copyright Office, *Orphan Works and Mass Digitization* 38 (June 2015) (between 17% and 25% of books and similar works are orphans). Even creators often do not know or cannot show what works they own. *See* Auster Decl. ¶¶ 15, 33, 52, 89, 111, 121 (discussing Plaintiffs' inability and refusal to identify the legal owners of exclusive rights to their Works-in-Suit); *Concord Music Grp., Inc. v. Anthropic PBC*, 772 F. Supp. 3d 1131, 1136-37 (N.D. Cal. 2025) (Lee, J.) (injunction against use of works "owned or controlled" by publishers would be "vague and unwieldy" given the need for publishers to "establish[] ownership or control" and the "unknowable universe" of works at issue).

Timing also matters. An owner may sue for infringement "committed while he or she is the owner." 17 U.S.C. § 501(b). Thus, class members must make individualized showings that they owned the particular exclusive right at the particular time the alleged infringement occurred—a monumental task given the frequency with which copyrights are assigned and the variety of datasets and models at issue.

Plaintiffs themselves have acknowledged that they face complex ownership problems that require thorough individualized investigation. *See, e.g.*, ECF 163 at 7-9 ("complex ownership questions" cannot be litigated on a "substantially underdeveloped" record); ECF 178 at 22:24-25 (facts surrounding ownership claims are "better explored through a … deposition"). Larson lacks any ownership interest in her sole Work-in-Suit because it was created as a work-for-hire. *See supra* at 5-6. Before he dropped out, Lemos claimed to be the sole owner of his works, but discovery raised serious questions about whether they were works for hire and/or jointly-authored and owned. *See supra* at 7-8. And none of the named Plaintiffs could or would identify the exclusive rights owned by their publishers (under agreements Google had to subpoena from publishers). Auster Decl. ¶¶ 15, 33, 52, 89, 111, 121. Copyright Office registration records are no cure-all; discovery in this case shows they are not accurate and complete. *Compare* Mullens Ex. 174 (registration certificate listing "Jill Leovy" only), *with* Ex. 109 at 4-5 (listing Leovy and six other entities as

"owners"); Auster Decl. ¶ 33 (actual owner of Larson's work not identified in registration certificate). And Plaintiffs' proposed expert testified that registration records "wouldn't be sufficient" to determine ownership because of the need to "review any related documentation." Ex. 149 at 51:12-25; *see also* Patry Rpt. ¶¶ 10-20 (detailing myriad individualized ownership issues). The complexity and corresponding burden of unraveling ownership questions would be multiplied exponentially across the supposedly millions of putative class members, even more so now that Plaintiffs purport to expand their classes to include foreign works, ownership of which is determined by foreign laws. *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 91 n.11 (2d Cir. 1998); *see also Premier League*, 297 F.R.D. at 67.

Finally, as discovery showed in this case, documents and depositions will undoubtedly reveal ownership claims as meritless. Even if Plaintiffs could somehow identify a putative class of parties *claiming* copyright ownership, that would not obviate the need for individualized document productions and review, testimony, and ultimately adjudications regarding those claims. *Cf. Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 528 (N.D. Ill. 2008) (use of government trademark database for putative class would not avoid "time-consuming inquiries regarding ownership").

The rare instances where courts have certified copyright classes are of no help to Plaintiffs. The *Bartz* court acknowledged that proof of ownership entailed a "'work-by-work inquiry," including by consideration of "sworn declarations subject to challenge" through "summary judgment" or "trial." 791 F. Supp. 3d a 1061 (quoting *In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005)). Nevertheless, the *Bartz* court underestimated the task, considering only the chance of "competing claimants" to the same work—and believing they would be "very few." *Id.* It did not address how to manage fraudulent or mistaken claims of ownership or account for the defendant's right to discovery to contest claims of ownership. *Id. In re Napster*, on which *Bartz* heavily relied, certified a narrow class of fewer than 27,000 songwriters and music publishers who retained a *single* agent as their "common licensing and collection agent." 2005 WL 1287611, at *1, 4-5. And in *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 WL 4776932, at *11 (C.D. Cal. May 27, 2015), the record did not demonstrate that "contentious ownership inquiries" would arise. The record here shows the opposite. *Cf. Schneider*, 674 F. Supp.

OPPOSITION TO CLASS CERTIFICATION                   -15-            MASTER FILE CASE NO.: 5:23-CV-03440-EKL

3d at 722 (denying class certification due to individualized ownership inquiries; distinguishing *In re Napster* and *Flo & Eddie*).

*Registration.* Valid registration with the Copyright Office is a prerequisite to infringement lawsuits for "any United States work" (17 U.S.C. § 411(a); *see Fourth Est.*, 586 U.S. at 296-97); a membership requirement for each putative class member (Mot. 1); and a requirement for statutory damages for any work (17 U.S.C. § 412). The evidence here shows, and Plaintiffs do not dispute, that registration is an individualized inquiry.

The flaws Google has identified in Plaintiffs' own claims illustrate the complexity of the registration inquiry. Larson was forced to drop a work that Google showed was not registered. *See* Ex. 25 at 46:1-13, 48:7-49:15. Andersen proffers registrations in collective works, which exclude material previously published. 17 U.S.C. § 103(b). But she freely admits publishing several Works-in-Suit prior to filing registrations, rendering those works outside the scope of any registration and her claims on them subject to dismissal. *See supra* at 6-7. Similarly, Almond asserts registrations in collections of short stories, including one work (*The Evil B.B. Chow and Other Stories*) where Almond admitted "every short story … was previously published," a fact not disclosed on the registration. Ex. 81 at 105:6-16. As the Court has already recognized, resolving whether a work was validly registered requires a "fact-bound" inquiry based "on a more complete record." ECF 216 at 9. It would be impossible to conduct this inquiry as to millions of absent class members.

Instead of explaining how they would address obvious problems in establishing valid registrations, Plaintiffs compounded them. Now, in place of representing anyone with a registration, Plaintiffs propose to represent only those whose registrations came within five years of the publication of their work. But determining when a work was first published is itself an individualized, "fact-bound" question. *Id.* at 9; *see, e.g.*, Ex. 81 at 79:15-81:3 (Almond does not know when or where portions of his book were first published). And that is not remotely the only registration issue requiring work-by-work exploration. *See, e.g.*, Patry Rpt. ¶¶ 10, 21-25 (detailing myriad individualized registration issues). Plaintiffs have not shown how these registration issues could be adjudicated on a classwide basis.

**B.** **Google's defenses present individualized questions.**

"[A] class cannot be certified" if the proposed method for resolving individual claims would curtail the defendant's right to "litigate its statutory defenses to individual claims." *Dukes*, 564 U.S. at 367. Moreover, courts must assess "manageability of the potential class-member-by-class-member discovery process and trial" necessary to adjudicate "valid defense[s]." *Van v. LLR, Inc.*, 61 F.4th 1053, 1067-69 & n.11 (9th Cir. 2023). Thus, courts including the Ninth Circuit have refused to certify copyright class actions based on defenses and the individualized inquiries they would require. *Kihn*, 2022 WL 18935, at \*2; *Schneider*, 674 F. Supp. 3d at 723. In this case, individual defenses such as license, fair use, and time-bars all require individualized proof.

*License.* License defenses are inherently individualized, as they turn on particular documents, testimony, state (or foreign) law, questions of identity, and more. Indeed, the Ninth Circuit in *Kihn* held that "individual issues of license and consent" were by themselves sufficient to require reversal of a class certification order. 2022 WL 18935, at \*2. Other courts have recognized the same. *E.g.*, *Schneider*, 674 F. Supp. 3d at 723 (explaining that "'individual issues of license' in themselves typically preclude certification of copyright class actions"); *Pearson Educ. Inc.*, 2012 WL 6681701, at \*4 (decertifying class where multiple layers of licenses introduced individualized issues); *Palmer Kane LLC v. Scholastic Corp.*, 2012 WL 2952898, at \*9 (S.D.N.Y. July 16, 2012). And the licensing issues are far more complicated here, given that Google has tens of thousands of licenses from content providers, book publishers, and authors, plus millions more from every party who uploads content to Google's services, including many covering the use of Plaintiffs' Works-in-Suit. Price Decl. ¶¶ 28-30; Auster Decl. ¶¶ 20-24, 42-44, 62-64, 77-80, 97-99, 126. The individualized issues inherent in investigating licenses readily distinguishes this case from *Bartz*, where the defendant did not assert a license defense. *Cf. Bartz*, 791 F. Supp. 3d at 1061.

Identifying valid licenses will require obtaining and examining a chain of documents from various parties, and interpreting the specific language of those documents, which will differ across class members, works, and agreements. *See generally* Price Decl. For example, Plaintiff Almond licensed *All The Secrets In The World* to his publisher, Zando LLC, which then licensed Google to "copy, reproduce, display, perform, adapt, use, communicate and make [it] available to the public

(in whole or in part) as part of and/or through the Google Services (or any of them)." *Id.* ¶ 13. Putting aside the effort it took just to identify and obtain these agreements, analyzing this single license chain requires assessing what rights Almond owned, what rights he granted Zando, what rights Zando granted Google, whether those rights covered the work, and whether those rights covered Google's use. A similar work-specific and agreement-specific investigation and analysis would be required for all Plaintiffs, all putative class members and each work. *See, e.g.*, Auster Decl. ¶¶ 121, 125 (discussing Barer's license to Wild Blue Press and its license to Google for *Murder in the Family*).

The required licensing chain analysis would not be limited to books. For example, Lemos licensed use of one of his images to Reddit by uploading it to that platform, with Reddit in turn licensing Google's use. *Id.* ¶ 25; Mullens Ex. 112. Lemos separately admitted in deposition that his co-owner or licensee, Crooked Eye Tommy, was authorized to grant licenses to use a work, and did so repeatedly, authorizing use by Google through uploads to YouTube. Auster Decl. ¶ 24. Andersen granted a license to Mattel to use her images in a board game, which then authorized a third party to upload and license those images to Google via YouTube. *Id.* ¶¶ 62-63.

Plaintiffs admit that Google secured "express licenses" that would potentially cover use of works for training AI models, but they purport to exclude those works from the class—effectively conceding that licensing demands a work-by-work inquiry. Mot. 1, 12-13. While Plaintiffs contend these agreements "use[] similar or identical language to create licenses" (*id.* at 13), endless individualized fact inquiries would still be needed to determine *what works* are covered by the licenses to Google. ███████████████████████████████████

█████████ Price Decl. ¶ 9. Former Plaintiff Lemos did not disclose his upload of a Work In Suit to Reddit, and Andersen could not tell whether an upload of her work to Reddit was authorized by her publisher. Auster Decl. ¶¶ 25, 69. In fact, each Plaintiff argued that it would be too burdensome (and perhaps take months) for them to even identify, much less describe the universe of licenses they granted to others for the Works-in-Suit, and thus to determine what other licenses to Google may exist. *See* Auster Decl. ¶¶ 17, 39-41, 57-59, 64, 73-75, 94-96, 113-114, 124. On top of all this, disputes will surely arise concerning whether Plaintiffs' agents and licensees had authority to grant

the licenses they did, presenting still more issues to be investigated and adjudicated. *See* Price Decl. ¶¶ 28-30; *Schneider*, 674 F. Supp. 3d at 712-13 (recounting individualized issues arising from plaintiff disputing a third-party's authority to license work).

Finally, Plaintiffs ignore the express and implied authorizations websites grant Google through robots.txt instructions. *See Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1112-13 (D. Nev. 2006) (discussing history and interpretation of robots.txt instructions); Price Decl. ¶¶ 17-27. For decades, website owners have used the robots.txt protocol to convey access and use permissions for the content of their sites to automated web crawlers, like Google's. *Field*, 412 F. Supp. 2d at 1115-16 (failure to utilize standard robots.txt protocol to disallow Google's crawler is reasonably interpreted as authorizing Google to copy and include the site in search services). Today, the instructions are nearly ubiquitous. They can be found on sites like Lemos', conveying authorization to Google's crawler to access and index the site's contents, including his works. Price Decl. ¶¶ 23-25, and they function similarly on countless other sites where Plaintiffs or their agents have authorized their Works-in-Suit to appear. *See* Auster Decl. ¶¶ 47, 66, 82-83, 105-106, 130. As discovery in this case has shown, to assess the application of robots.txt instructions to any particular content, one needs to determine where each work appears online, whether it appears there with appropriate authorization, and what the site's robots.txt instructions were at each relevant time Google crawled and acquired the site's contents. Price Decl. ¶ 30. That individualized investigation proved highly challenging just for the named plaintiffs, and would be impossible at scale.

***Statutory and Contractual Limitations.*** Conspicuously absent from Plaintiffs' motion is any mention of the statute of limitations or how it could be addressed on a classwide basis. It could not. By statute, all infringement claims must be brought within three years. 17 U.S.C. § 507. And any claims by a plaintiff with a YouTube account, relating to content they posted or authorized (which includes at least Plaintiffs Larson, Andersen, McLennan and Lemos), are barred unless brought within one year. Ex. 17 at -4862; *Schneider v. YouTube, LLC*, 649 F. Supp. 3d 872, 886 (N.D. Cal. 2023). Further complicating matters, this Circuit applies a "discovery rule" requiring analysis of when a party "reasonably should have discovered [an] alleged infringement." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1047-48 (9th Cir. 2020). Accordingly,

each claim will require an individualized determination of when the alleged infringement occurred, and when the owner actually, or should have, discovered it. Similar efforts would be required for each putative class member, and the task would be made enormously more complex for Plaintiffs' impermissibly redefined classes based on "ingestion" or downloading of works, rather than on use in training. Google has been obtaining content such as by crawling the web and downloading materials for decades. *E.g.*, Mullens Ex. 34 at -13945 (noting inclusion of "historical archives" in dataset); Ex. 157 at 324:2-22 (Google uses "historical web crawl" data dating back to at least 2017 for "evaluation, ablation, or candidate purpose[s]").

*Fair Use.* Plaintiffs contend (Mot. at 21-23) that Google's fair use defense will be resolved through common proof. Perhaps, if the Court joins two others in this district in holding that training on copyrighted works is so manifestly transformative as to render it fair use as a matter of law. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1034 (N.D. Cal. 2025); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025). But beyond recognition of Google's obvious transformative purpose, a fair use analysis requires a case-by-case and work-by-work analysis. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-79 (1994); *Premier League*, 297 F.R.D. at 66-67 ("[T]he analysis required to determine 'fair use,' and other defenses, is necessarily specific to the individual case."); *Schneider*, 674 F. Supp. 3d at 721 (fair use "highly individualized"). Indeed, by definition, the remaining statutory factors all require an analysis specific to "*the* copyrighted work" at issue. 17 U.S.C. § 107 (nature of "the" work, amount of "the" work used; effect of the use on market for "the" work).

It is difficult to see (and Plaintiffs certainly do not show) how these work-specific factors could ever be established with common proof. The nature of each work and the amount of any work used will require individualized evidence. Expert handwaving about presumptive harm to theoretical markets for works generally is no substitute for the testimony of the named Plaintiffs who all candidly admitted that Google's training actually had no effect on the market for their particular works. *See Kadrey*, 788 F. Supp. 3d at 1056 (rejecting argument that "market harm can be inferred" and requiring evidence specific to the "markets for [plaintiffs'] books"); Auster Decl. ¶¶ 131-37; Sullivan Rpt. ¶¶ 14-16; *cf. Concord Music Grp.*, 772 F. Supp. 3d at 1140 (Lee, J.)

(rejecting Plaintiffs' proposed expert Michael D. Smith's testimony on purported market harm as "both conclusory and speculative"). And Plaintiffs' assertion that they have collectively been denied a hypothetical license fee they might have charged Google is a circular and invalid approach because "harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." *Kadrey*, 788 F. Supp. 3d at 1052; *see also Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 38 (2021) ("cautioning against the 'danger of circularity'").[4]

### C.    Plaintiffs' alleged damages cannot be established with common proof.

Plaintiffs' damages claims likewise involve numerous individualized issues that "will inevitably overwhelm questions common to the class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). For statutory damages, a work must be "registered prior to commencement of the infringement" or within three months of first publication. *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 699 (9th Cir. 2008). That threshold eligibility determination will require work-specific assessments of whether and when a work was validly registered, when any alleged infringement commenced, and the date of first publication. *See id.* Only one statutory damages award is available for compilations or derivative works, requiring determination of the value of individual contributions to avoid impermissible duplicative recoveries. 17 U.S.C. § 504(c)(1). And since statutory damages are "'intended as a substitute for profits or actual damage'" that should "compensate the injured party," that too will require individualized evaluations. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1271 (9th Cir. 2021) (cleaned up). Plaintiffs' unexplored

---

[4] Google's fair use defense also undermines Plaintiffs' argument that Google's supposed "willful[ness]" is a question on which common proof might be presented. Mot. 22. Plaintiffs failed to present any evidence suggesting Google knew that training generative AI models constituted infringement (and given that two courts have already held it is fair use, it is perfectly reasonable for Google to have held the same view). Regardless, Plaintiffs are again trying to paper over individualized issues. How, for example, could Google have willfully infringed a work for which it had a license or reasonably believed it had a license? How could it have willfully infringed works by downloading (or "ingesting") them through the same web crawling process it has used without incident for 25 years, one that is authorized by the robots.txt protocol to which Google adheres? Here too, Plaintiffs must offer work- and claim-specific proof that Google knew its actions were infringing. And again, Plaintiffs do not even try. That makes this case unlike *In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611 (N.D. Cal. June 1, 2005), where there was common evidence in the form of a single "notice of infringement that Napster received from plaintiffs …, which listed over 90,000 copyrighted musical works that were allegedly owned by members of the proposed class" and which Napster ignored. *Id.* at *4.

Case 5:23-cv-03440-EKL    Document 446    Filed 04/24/26    Page 29 of 33

assertion that the appropriate amount within the broad statutory range should be identical for every "infringed work" (Mot. 23) makes little sense given that works are plainly of different value, and were impacted, if at all, differently. *See* Psounis Rpt. ¶¶ 49-51 (value of any single work in the training data is infinitesimally small, yet not uniform). Further, Plaintiffs never disclosed their exotic theory that all putative class members were damaged equally. Ex. 161 at 34-35 (Initial Disclosures); *see* Ex. 78 at 15 (refusals to provide damages contentions because "expert testimony is necessary to provide a response"). It thus is properly disregarded. *See* Fed. R. Civ. P. 37(c)(1).

Plaintiffs' task would be even harder for any actual damages claim. Assessing "the nature and amount of damages" is necessarily individualized, requiring a member-by-member and work-by-work analysis of supposedly lost income (whether through reduced sales, royalties, licensing opportunities, or otherwise) or Google's supposed profits, and whether any such losses or profits were caused by the alleged infringement. *Premier League*, 297 F.R.D. at 68. Plaintiffs' assertion that damages are "'susceptible of measurement across the entire class'" is entirely conclusory. Mot. 23 (quoting *Comcast*, 569 U.S. at 35). They cite no evidence, offer no expert testimony or classwide damages model, and provide no basis for avoiding or streamlining the manifold individualized inquiries that assessing damages will entail. Nor do they have any answer to their own testimony which casts serious doubt on whether they have suffered any damages at all. *See, e.g.*, Ex. 39. at 292:18-23, 293:23-295:21; Ex. 25 at 253:9-262:8.

### III.    Plaintiffs Have Failed To Prove Superiority.

In addition to failing to demonstrate predominance, Plaintiffs have not carried their burden of showing that a class action would be superior to alternative means of adjudication. Plaintiffs "bear[] the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). There is none here, because "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually." *Id.* at 1192. These issues would be "much better handled in separate cases where each can receive individual attention." *Premier League*, 297 F.R.D. at 67. Indeed, only individual litigation can avoid the unfair prejudice to Google that class treatment would inflict, allowing Google to expose the sort of defects that led two of the ten plaintiffs to drop their claims

entirely, a third to drop one of the works she asserted, and should prompt others to consider dismissals. Google plainly needs and is "entitled to contest each" element and each defense in any putative class member's case, but class treatment risks "obliterat[ing]" the "unique nature of each work and of its infringement … in a sea of other claims." *Id.*; *see also Dukes*, 564 U.S. at 350. Plaintiffs' suggestion that a single trial could somehow resolve all such issues and claims is not a serious one.

Plaintiffs' proposed classes would necessitate discovery and mini-trials just to determine class membership for purposes of class notice. In addition to the merits determinations baked into Plaintiffs' definitions, the language incorporates vague, undefined terms that themselves call for individualized determinations, such as "trained on," "downloaded and/or ingested to develop," and "used … to develop." *See supra* at 11. Plaintiffs also seek to exclude from each class some unknown set of works subject to "express and restricted license agreements," but they do not propose any plan for identifying those licenses, the works they cover, or the copyright owners they would exclude. Mot. 2. Plaintiffs also would exclude those whose works were registered more than five years before first publication, but offer no common means of identifying who that might be, given the need for individualized proof on publication. These are not readily (or even realistically) identifiable groups.

Unsurprisingly, Plaintiffs have not shown they can identify all members of the classes they propose, such as the owners of each book that Google supposedly illicitly acquired for training, or of each image Google used in the training process. Plaintiffs proffer a data analyst, Merry McCarron, who avers that material in training datasets can be matched to copyrighted works based on metadata. But her approach is mere guesswork and yields absurd results, such as "matching" the agenda for a 2010 meeting of the Edmonds, Washington city council with a French-language book published in 1979. Ex. 152 at 203:13-20; 205:20-206:6 (McCarron: "I wouldn't consider that a mistake. It's just how the text matching works."). It also involves systemic coding flaws that led her to conclude, for example, that a work with no named author was a 100% match to a copyright registration based on supposed similarity in author identity. *Id.* at 156:18-159:20. On top of these and countless other damning errors, McCarron performed no manual validation to confirm that the

"matched" work appeared in Google's training data, relied on no published standard for her similarity thresholds, and calculated no false negative rate. *Id.* at 113:12-116:20, 148:1-9, 150:24-151:10. By her own admission, her process also double- and triple-counts the same work within the same dataset, inflating the number of supposed "matches." *E.g.*, *id.* at 136:16-144:9 (single copyright registration resulted in "over a hundred matches"). Further, in multiple instances, McCarron did not analyze the training data Google actually used, but rather unfiltered "supersets" of data available to be used, severing the connection between her conclusion and the question of whether a registered work was used for training. *Id.* at 55:21-57:17, 266:22-268:12.[5] And she concedes Plaintiffs have been unable to locate any so-called "pirated" works belonging to any named Plaintiffs, meaning there is no one to represent that subclass. *See id.* at 111:5-9; *see also Abdullah v. U.S. Sec. Assocs., Inc.*, 2011 WL 11733702, at *1 n.1 (C.D. Cal. Jan. 11, 2011) (request for subclass abandoned where "no class representative [wa]s designated"). McCarron's "methodology" is not a means of identifying putative class members, as she freely admits. Ex. 152 at 125:2-21. Rather, it is a means of creating a queue of dubious leads that still require match-by-match human analysis. And that matching would be merely an appetizer before the main course of impossibly individualized questions about ownership, registration validity and timing, license and more.[6]

Finally, assuming Plaintiffs' predominance and ascertainability problems magically disappeared with the wave of a proposed expert's wand, they do not ever explain why class

---

[5] Plaintiffs say they can identify relevant images based on whether a file's "caption text" contains the title and author of a visual work. *See* McCarron Rpt. ¶ 131. That is the same unreliable identification method that Judge Alsup cited in denying certification of a proposed class in *Bartz*, 791 F. Supp. 3d at 1058 ("title-author combination" insufficient to reliably identify works).

[6] Plaintiffs also suggest they can identify class members using Google's recitation checker—a tool that Google developed to provide citations and block unwanted repetition of training data in the *output* of its models. Carver Decl. ¶ 3. That tool cannot be used to identify the works Google used in its training processes in any practical way. *Id.* ¶¶ 11-15; Ex. 151 at 214:9-215:5; 216:13-20; 222:19-21; 226:7-10 (Plaintiffs' proposed expert admitting that "a human" would need to review possible matches identified by the recitation checker and have "an actual copy" of the work to be identified to confirm the matches' validity); Ex. 146 ¶¶ 17-38 (explaining the difficulty and inherent unreliability of using the recitation checker to identify works). But again, assuming Plaintiffs had a way of identifying works Google actually trained on, they would be miles away from identifying putative class members, and no closer to solving their predominance problems.

treatment is necessary. Congress "designed" the Copyright Act to facilitate and encourage individual claims. *See Premier League*, 297 F.R.D. at 66. It provided for "statutory damages," which "give[s] litigation value to each individual case" (*id.*; 17 U.S.C. § 504(c)), and for attorneys' fees to prevailing parties (17 U.S.C. § 505), ensuring that litigation costs do not deter meritorious claims. If copyright owners believe they have been wronged, an individual action is a superior alternative to the procedural morass that class treatment would entail.

## IV.    The Requests for Injunctive Relief and Issue Classes Should Be Denied.

Plaintiffs seek injunctions that would bar Google from "copying or using Class Works for Generative AI Model training, absent a proper license." Mot. 18. To certify a Rule 23(b)(2) injunctive-relief class, predominance must be "'self-evident,'" and the injunction must "'benefit[] all [class] members at once.'" *Kihn*, 2022 WL 18935, at *3 (quoting *Dukes*, 564 U.S. at 362-63). Predominance here is far from self-evident; it is non-existent. Entitlement to injunctive relief would entail still more individualized inquiries into irreparable harm and the lack of an adequate remedy at law. *See, e.g.*, *Concord Music Grp.*, 772 F. Supp. 3d at 1138-41 (Lee, J.) (denying preliminary injunction where plaintiffs introduced only "general" evidence of harm); *supra* at 9-10 (describing lack of evidence of harm to Plaintiffs).

Plaintiffs make a two-sentence "alternative" request for Rule 23(c)(4) issue classes. Mot. 2. Such a "perfunctory" request should be denied. *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *26 (N.D. Cal. May 8, 2018); *Schneider*, 674 F. Supp. 3d at 727. And the individualized issues, which "make Rule 23(c)(4) certification inefficient," *Reitman v. Champion Petfoods USA, Inc.*, 830 F. App'x 880, 882 (9th Cir. 2020), show that issues classes would not "significantly advance the [case's] resolution," *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1229 (9th Cir. 1996).

## CONCLUSION

Plaintiffs cannot mask the fatal flaws in their individual claims by pretending to act on behalf of an imaginary class. Certification should be denied.

Respectfully submitted,

Dated: November 20, 2025

By: */s/ David H. Kramer*

David H. Kramer, SBN 168452
Email: dkramer@wsgr.com
Maura L. Rees, SBN 191698
Email: mrees@wsgr.com
Eric P. Tuttle, SBN 248440
Email: eric.tuttle@wsgr.com
Paul J. Sampson (admitted *pro hac vice*)
Email: psampson@wsgr.com

*Counsel for Defendant* GOOGLE LLC