**GAW | POE LLP**
Randolph Gaw (S.B. # 223718)
rgaw@gawpoe.com
One Embarcadero Ctr., Suite 1200
San Francisco, CA 94111
Tel: (415) 766-7451

**SLARSKEY LLC**
David N. Slarskey (*pro hac vice pending*)
dslarskey@slarskey.com
Adam Hollander (*pro hac vice pending*)
ahollander@slarskey.com
Deepa Devanathan (*pro hac vice pending*)
ddevanathan@slarskey.com
Phillip Gasperetti (*pro hac vice pending*)
pgasperetti@slarskey.com
825 Third Ave, 32nd Floor
New York, NY 10022
Tel: (212) 658-0661

**ARCHSTONE LAW GROUP, P.C.**
Brenda Ulrich (*pro hac vice pending*)
bulrich@archstonelaw.com
Riverside Center
275 Grove Street, Suite 2-400
Newton, MA 02466
Tel: (781) 314-0100

*Attorneys for Proposed Intervenors and the Proposed Subclass*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| *In re Google Generative AI Copyright Litigation* | Master File Case No. 5:23-cv-03440-EKL<br>Consolidated Case No. 5:24-cv-02531-EKL<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE ON BEHALF OF PLAINTIFFS MICHAEL SULLIVAN, KENNETH S. SALADIN, ZVI BODIE, ALAN J. MARCUS, KEVIN PATTON, LION DEN INC., AND DANA LOEWY**<br><br>Judge: Hon. Eumi K. Lee<br>Date: January 6, 2027<br>Time 10:00 A.M.<br>Courtroom: 7, Fourth Floor |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

NOTICE OF MOTION .......... v

PRELIMINARY STATEMENT .......... 1

RELEVANT FACTS AND BACKGROUND .......... 3

A. Background .......... 3

B. Proposed Intervenors and Similarly Situated Textbook Authors Have Discrete Interests from the Named Plaintiffs and Non-Textbook Authors in the Putative Class .......... 4

ARGUMENT .......... 6

I. Intervention As of Right Should Be Granted .......... 6

A. Proposed Intervenors Meet the Second and Third Factors of Intervention as of Right .......... 7

B. Proposed Intervenors' Motion to Intervene is Timely and Meets the Fourth Factor of Intervention as of Right .......... 8

II. Alternatively, Permissive Intervention Should Be Granted .......... 9

CONCLUSION .......... 10

# TABLE OF AUTHORITIES

**Cases**

*Abdurahman v. Alltran Fin., LP*
330 F.R.D. 276 (S.D. Cal. 2018) ........ 9

*Am. Rivers v. Wheeler*
2020 WL 5993229 (N.D. Cal. Oct. 9, 2020) ........ 8, 9

*Baykeeper v. U.S. Env't Prot. Agency*
2020 WL 228279 (N.D. Cal. Jan. 15, 2020) ........ 6

*Bernstein v. Cengage Learning, Inc.*
No. 1:19-cv-07541 (ALC) (SLC) (S.D.N.Y. Nov. 8, 2024) ........ 8

*Flynn v. McGraw Hill LLC*
No. 1:21-cv-00614 (LGS) (S.D.N.Y. Jan. 22, 2021) ........ 8

*Freedom from Religion Found., Inc. v. Geithner*
644 F.3d 836 (9th Cir. 2011) ........ 10

*In re Lendingclub Sec. Litig.*
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ........ 10

*Kalbers v. U.S. Dep't of Just.*
22 F.4th 816 (9th Cir. 2021) ........ 8, 9

*Martinez v. City of Oxnard*
229 F.R.D. 159 (C.D. Cal. 2005) ........ 9

*Scholl v. Mnuchin*
483 F. Supp. 3d 822 (N.D. Cal. 2020) ........ 9, 10

*Sloan v. Gen. Motors LLC*
2020 WL 5517244 (N.D. Cal. Sept. 14, 2020) ........ 10

*Smith v. L.A. Unified Sch. Dist.*
830 F.3d 843 (9th Cir. 2016) ........ 6, 9

*United States v. State of Or.*
745 F.2d 550 (9th Cir. 1984)........................................................................................ 9

**Statutes**

17 U.S.C § 501 ................................................................................................................ 3, 6
Fed. R. Civ. P. 24(a)......................................................................................................... 3, 6
Fed. R. Civ. P. 24(b) ................................................................................................... 3, 9, 10

**Other Authorities**

H.R. REP. 94-1476 ............................................................................................................. 2

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** that on January 6, 2027, at 10:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Eumi K. Lee, in Courtroom 7–14th Floor of the United States District Court for the Northern District of California in the San Jose Courthouse, 280 South 1st Street, Room 2112, San Jose, California, 95113, Proposed Intervenors Michael Sullivan, Kenneth S. Saladin, Zvi Bodie, Alan J. Marcus, Kevin Patton, Lion Den Inc., and Dana Loewy ("Proposed Intervenors") and the proposed textbook-author subclass (the "Proposed Subclass") shall, and hereby does, move this Court, for an order granting Proposed Intervenors' Motion to Intervene individually and on behalf of the Proposed Subclass. Pursuant to Section VIII(A) of the Court's Standing Order, they certify compliance with the Court's meet and confer requirement which took place on August 25, 2026, and September 2, 2026. Plaintiffs and Defendant oppose the relief requested in the Motion.

**STATEMENT OF THE ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

1. Should Michael Sullivan, Kenneth S. Saladin, Zvi Bodie, Alan J. Marcus, Kevin Patton, Lion Den Inc., and Dana Loewy be permitted to intervene in this action individually and on behalf of a Proposed Subclass of textbook authors to protect the distinct interests of textbook authors encompassed within the putative class?

## PRELIMINARY STATEMENT

Michael Sullivan, Kenneth S. Saladin, Zvi Bodie, Alan J. Marcus, Kevin Patton, Lion Den Inc., and Dana Loewy ("Proposed Intervenors") are textbook authors seeking to intervene in this action to protect their own distinct interests and those of textbook authors who are members of the putative Class ("Proposed Subclass"). While Proposed Intervenors are cognizant that the Court may view the application as untimely—in which case the Proposed Intervenors will file the proposed Complaint in Intervention as a new, related case—Proposed Intervenors submit that intervention to this action, particularly if the Court grants class certification, with the Court having considered the issues that this application presents, is an efficient manner of proceeding. Proposed Intervenors *support* the pending motion for class certification, with the designation of textbook authors as a separately-represented subclass.

As detailed herein, Proposed Intervenors and similarly situated textbook authors have discrete interests from other putative class members: textbook authors operate in educational markets that differ materially from trade and scholarly markets. Google's illegal copying of textbook works and training of its artificial intelligence ("AI") program poses unique harms to textbook authors, and causes additional damages, that are distinct (and at times diverge) from those suffered by other Class members. Textbooks authors' legal and economic interests arise not only from the subject matter of their textbooks, but from textbooks' pedagogical structure, sequencing, exposition, and educational presentation of that subject matter. And the legal relationships among textbook authors and their publishers is typically structured differently than as between other authors and their publishers.

Textbook authors are experts in both subject matter and in effective pedagogical strategies for teaching that subject matter. Both are critical in creating an effective textbook, which may distinctly be substituted by AI programs, as compared to novel literary works. Stated differently, while Google's Gemini may not provide a direct substitute for Tolstoy's "War and Peace," its training and use of textbook materials directly undermines the market for pedagogical materials, to the authors' detriment. When a student forgoes the proven textbook for a free, less reliable market substitute (trained on the proven textbook), it takes revenues from authors and likely leaves the student worse off as well.

In addition, textbook works typically undergo substantial revisions and updates on a regular schedule, *e.g.*, every three years, resulting in multiple editions over the life of the work. Textbooks are often written and edited by multiple authors or author teams, whose composition may change from edition to edition as older authors retire or junior authors are added to the project. The differences in the writing and revision process of trade books vs. textbooks results in publishing contracts that are markedly different in these subclasses of books. The market for textbooks includes sales of new editions, which capture new and changing information, and reflect changes in an author's approach to communicating educational material. In contrast to textbooks, most trade books have a single author and rarely are released in multiple editions—or if they are, are only nominally altered.

In light of the different commercial structure to textbook and other markets, the copyright registration norms between publishers and authors are different between trade books and textbooks. Publishers of trade books typically register copyrights in the name of trade authors, giving those trade authors direct access to the copyright claims presented here. By contrast, textbook authors typically assign to their publishers the right to register copyrights in the name of the publisher, which helps ease the administrative burdens associated with managing textbooks in their relevant market, *e.g.*, extensive licensing, sub-licensing, permissions, and bulk sales or licenses to academic institutions or school districts, as well as changing author teams and registration of multiple editions. Unlike trade authors, textbook authors rely upon their beneficial interests in their copyrights.[1]

These are not theoretical distinctions or interests, as evidenced by the experience of textbook authors in the similar *Bartz v. Anthropic* action, where several trade-author class representatives brought suit against Anthropic for illegal copying of works and training of its "Claude" AI program. In that action—where publishers' counsel interceded just weeks before a settlement was proposed—textbook authors were without separate representation and ended up being treated differently and less favorably in the settlement than trade and academic authors, including by being subject to a claims administration process that favors textbook publishers. In light of that experience, and the approval of

[1] 17 U.S.C § 501 states that either the "legal or beneficial owner" of a copyright is entitled "to institute an action for any infringement of that particular right." House Report 94-1476 states that "A 'beneficial owner'. . . would include, for example, an author who has parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees."

the *Bartz* settlement a few months ago, Proposed Intervenors became aware of the need for intervention and separate representation for the subclass of textbook authors in this case (and other similar cases), to protect the rights and claims of textbook authors.

Proposed Intervenors seek to intervene in this action individually and on behalf of the Proposed Subclass under 17 U.S.C. § 501(b), Rule 24(a)(2) of the Federal Rules of Civil Procedure and, in the alternative, under Rule 24(b), to protect the distinct interests of textbook authors encompassed within the putative class.[2] Proposed Intervenors have a right to intervene in this action under Rule 24(a)(2) of the Federal Rules of Civil Procedure for several reasons: first, 17 U.S.C. § 501(b) provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled" to institute an action to protect their rights. Second, textbook authors', including Proposed Intervenors', interests are not adequately represented by the parties to this action. Third, disposition of this action may impair Proposed Intervenors' and textbook authors' ability to protect their interests. And finally, this motion is timely. In the alternative, Proposed Intervenors should be permitted to intervene in this action under Rule 24(b) of the Federal Rules of Civil Procedure. Proposed Intervenors and the Proposed Subclass are not raising new claims. Subject-matter jurisdiction here is based on federal questions. The motion is timely. And Proposed Intervenors' and the Proposed Subclass's claims share a common question of law or fact with the main action: *i.e.*, questions pertaining to the unauthorized acquisition, reproduction, distribution, and use of copyrighted literary works.

In sum, Proposed Intervenors seek to protect their own rights, and represent the rights and interests of textbook authors, and should be permitted to do so.

## RELEVANT FACTS AND BACKGROUND

### A. Background

In this putative class action, Plaintiffs allege copyright and Digital Millennium Copyright Act violations arising from Google LLC's ("Google" or "Defendant") unauthorized acquisition, reproduction, distribution, and use of copyrighted visual and literary works to develop and train

[2] Attached to this motion is Proposed Intervenors' Proposed Complaint in Intervention ("Proposed Compl."), which sets forth their claims and the basis for subclass treatment, including for Proposed Intervenors as textbook-author subclass representatives and for the undersigned as separate, independent counsel for the Proposed Subclass.

Google's generative AI models. (Second Amended Consolidated Complaint ("Amended Complaint"), ECF No. 234 ¶ 1.) The operative complaint alleges that Google illegally obtained copies of registered copyright works and improperly used those works to create its commercial AI business. (*Id.*) The Amended Complaint defines, and was brought on behalf of, a putative class of legal or beneficial owners of registered copyrights for the works used by Google to train Google's Generative AI Models, with a class period beginning January 1, 2017, and running through the present. (*Id.* ¶¶ 162–63.)

**B. Proposed Intervenors and Similarly Situated Textbook Authors Have Discrete Interests from the Named Plaintiffs and Non-Textbook Authors in the Putative Class**

Proposed Intervenors are textbook authors who have authored multiple different textbooks. *See* Proposed Compl. ¶¶ 11–30. Proposed Intervenors and the members of the Proposed Subclass of similarly situated textbook authors are members of the putative class as defined in the Amended Complaint. Based on their identity as textbook authors, and the nature of textbooks relative to other types of works at issue, Proposed Intervenors and members of the Proposed Subclass have a discrete set of interests in this litigation on top of (and at times different from) the named Plaintiffs. Accordingly, Proposed Intervenors seek to intervene to protect the distinct interests of textbook authors who are members of the putative class.

Textbook authors operate in educational markets and under industry norms that differ materially from those of trade and scholarly authors, creating divergent interests and proof needs on market harm and damages. *See* Proposed Compl. ¶ 3. There is reason to believe the markets for textbooks may be more vulnerable than trade books to competition and market displacement from AI outputs. The casual reader who wants to read an author's latest novel has no interest in an AI-generated substitute. But, the student who wants to learn Physics in what they think will be "the easy way," will readily seek out a free LLM substitute. As noted above, textbook authors' legal and economic interests arise not just from Defendant's textual copying of the work, but also from Defendant's improper use of textbooks' pedagogical structure, sequencing, exposition, and educational presentation to undercut the market *for those textbook works specifically*. The named Plaintiffs are all trade authors, visual authors, and cartoonists, whose work—unlike the work of textbook authors—may not be *directly*

*replaced* by LLM tools. Pursuing relief for the Proposed Subclass will accordingly require evidence and relief distinct from trade authors. Proposed Compl. ¶ 4.

Moreover, as contrasted with other types of works, textbook publishers often hold or assume exclusive copyrights and centralize registration, enforcement, and permissions, while textbook authors retain beneficial and revenue interests in their works. Textbook publishing contracts generally do not include clear language regarding the split of damages leading to inherent intra-class conflicts over control, licensing, and allocation that undercut the adequacy of the named Plaintiffs and their counsel to represent members of the Proposed Subclass. Pawlak Declaration ("Decl.") ¶ 9. By contrast, trade contracts often include clauses that explicitly state that recoveries from infringement suits will be split 50/50 between authors and publishers. Textbook publishing frequently involves multiple contributors across editions and formats and extensive supplemental materials, likely requiring different damages models. Proposed Compl. ¶¶ 3, 75. Textbook contracts frequently require assignment or transfer of copyright to publishers while reserving author royalty and participation rights. In connection with any settlement or recovery, publishers and authors, and potentially the authors, themselves, in negotiations with the publishers, will be conflicted with respect to allocating recovery proceeds, because damages are generally based on the work infringed, without regard to the relative rights of the stakeholders in that work (*i.e.*, the authors and publishers). Proposed Compl. ¶¶ 79–81; Pawlak Decl. ¶¶ 7–9.

This not a theoretical concern, and it is the emergence of these conflicts that led to the decision by these Plaintiffs to bring suit with their own counsel. In *Bartz*, where the class was represented by several trade authors, textbook authors obtained materially less favorable and more burdensome, settlement terms, on a record that did not develop their own unique damages theories, as compared to trade authors who were directly represented. Whereas in settlement, other authors were afforded the benefit of a default 50/50 split on proceeds, between authors and publishers, textbook authors were obligated to identify and advocate for a particular split of the recoveries associated with their works, in a multi-step, complicated adversarial process between publishers and the authors, where publishers are far fewer in number, better resourced, and coordinated to act strategically and influence a more favorable outcome for themselves. *See* Pawlak Decl. ¶¶ 7–9; Slarskey Decl. ¶¶ 5–6. Textbook authors

were not separately represented as a subclass in the *Bartz* litigation, and were ultimately subjected to choosing between this more burdensome, undefined claim process or opting out from the settlement entirely. In light of the approval to that settlement, Proposed Intervenors are determined to take action to protect their separate interests, whether that is through intervention and recognition *here*, or through a separate related case.

## ARGUMENT

### I. Intervention As of Right Should Be Granted

Intervention as of right under Rule 24(a)(2) is appropriate upon satisfaction of a four-factor test: (1) the applicant must assert a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (2) the applicant's interest is not adequately represented by the parties to the action; (3) the applicant must be situated such that disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and (4) the applicant's motion must be timely. Fed. R. Civ. P. 24(a); *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 853 (9th Cir. 2016). Rule 24(a)(2)'s requirements are "broadly interpreted in favor of intervention." *Smith*, 830 F.3d at 853 (quotation omitted); *see also Baykeeper v. U.S. Env't Prot. Agency*, 2020 WL 228279, at *2 (N.D. Cal. Jan. 15, 2020) ("Rule 24(a) is underscored by a 'liberal policy in favor of intervention.'" (citation omitted)).

Proposed Intervenors should be permitted to intervene as of right because they satisfy each of the "mandatory" factors: (i) 17 U.S.C. § 501(b) provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it . . . . The court may require the joinder, and shall permit the intervention, of any person having or claiming an interest in the copyright"; (ii) the applicants' interests are not adequately represented by the parties to the action because there is no named plaintiff whose pleaded role is to represent textbook authors as a distinct group; (iii) the resolution of the class action will (1) either bind Proposed Intervenors and the textbook authors or (2) will require them to opt out and pursue their claims separately. Either outcome impairs Proposed

Intervenors and the Proposed Subclass from pursuing their claims fairly and in a judicially efficient manner; and (iv) the application is timely.

### A. Proposed Intervenors Meet the Second and Third Factors of Intervention as of Right

The second "mandatory factor," that the applicants' interests are not adequately represented by the parties to the action, and the third "mandatory factor," that the applicants must be situated such that disposition of the action may, as a practical matter, impair or impede their ability to protect those interests, clearly weigh in favor of intervention after a closer look at the experience of textbook authors in the *Bartz v. Anthropic* litigation, a similar class action brought by authors whose works were pirated to train AI models, highlights this divergence of interests.

In *Bartz*, when authors and publishers proceeded without a recognized textbook-author subclass, settlement and allocation structures emerged through mediation, which treated textbook authors differently and less favorably than trade and academic authors, including subjecting textbook authors to processes that favored publishers during claims administration. Pawlak Decl. ¶¶ 7–9; Slarskey Decl. ¶¶ 5–6. There, the "Publishers' Coordinating Counsel" interceded just weeks before an initial mediation and produced preliminary settlement efforts without separate textbook-author representation. Pawlak Decl. ¶ 2; Slarskey Decl. ¶ 4. The resulting proposed plan for allocation lacked clarity on author-publisher splits, which prompted judicial concern about behind-the-scenes arrangements disadvantaging authors. Pawlak Decl. ¶¶ 8–10.

Textbook authors, through the Textbook and Academic Authors Association ("TAA"), were belatedly invited to participate, informally, in later rounds of mediation. Pawlak Decl. ¶ 2. Unfortunately, given that TAA was added just a week before a distribution plan was required by the court, the absence of a formal role for textbook author representation, and the outsized influence of the "Publisher's Coordinating Counsel", the settlement process for "educational works" deferred the question of how to split settlement proceeds on textbooks to a post-claims filing "meet and confer" process. Pawlak Decl. ¶¶ 3–6, 8. While *trade and scholarly* authors could opt for a default 50/50 split with their publishers on each work, textbook authors were required to navigate additional, complicated

adversarial steps to establish their recoveries. Pawlak Decl. ¶¶ 7–8; Slarskey Decl. ¶ 6. Such burdens imposed upon textbook authors benefit the textbook publishers, who are far fewer in number, better resourced, and far more sophisticated to position themselves for a greater share of the recoveries. Pawlak Decl. ¶ 9. Still, at least one major educational publisher then communicated inaccurate information to textbook authors during the claims process, which unfairly threatened to depress author shares, and which necessitated separate intervention efforts by the undersigned on behalf of the TAA, to obtain remedial action. Pawlak Decl. ¶¶ 11–12; Slarskey Decl. ¶ 7.

Without intervention now, the existing Plaintiffs may (just as in *Bartz*) pursue strategies, settlements, or narrowing of claims that inadequately protect textbook authors. There is a contentious history between textbook authors and their publishers, leading to extensive industry-wide litigation between textbook authors and their publishers. *See*, *e.g.*, *Bernstein v. Cengage Learning, Inc.*, No. 1:19-cv-07541 (ALC) (SLC) (S.D.N.Y. Nov. 8, 2024), ECF No. 323-2; *Flynn v. McGraw Hill LLC*, No. 1:21-cv-00614 (LGS) (S.D.N.Y. Jan. 22, 2021). Proposed Intervenors seek intervention, before class-certification, Rule 23(g) appointments, or settlement architecture crystalize, to ensure that textbook authors' distinct interests are protected fully and fairly in this litigation. *See Am. Rivers v. Wheeler*, 2020 WL 5993229, at *2 (N.D. Cal. Oct. 9, 2020) ("A putative intervenor bears a 'minimal' burden to show the inadequacy of representation and need only show the representation of its interests 'may be' inadequate.").

### B. Proposed Intervenors' Motion to Intervene is Timely and Meets the Fourth Factor of Intervention as of Right

The fourth "mandatory factor," timeliness, "hinges on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 822 (9th Cir. 2021) (quotation omitted). "[T]imeliness is determined by the totality of the circumstances." *Id.* at 823 (quotation omitted).

First, Proposed Intervenors' application is timely at this stage of the proceeding. No class has been certified; no class representative or class counsel has been appointed. And a schedule for

summary judgment motions has not been set. Moreover, no settlement has been presented for approval. *See Abdurahman v. Alltran Fin., LP*, 330 F.R.D. 276, 280 (S.D. Cal. 2018) (finding a motion to intervene filed prior to class certification to be timely); *Martinez v. City of Oxnard*, 229 F.R.D. 159, 162 (C.D. Cal. 2005) (finding a motion to intervene while discovery was still being conducted to be timely); *see also United States v. State of Or.*, 745 F.2d 550, 552 (9th Cir. 1984) ("Mere lapse of time alone is not determinative."). Courts in the Ninth Circuit have allowed "intervention after much longer delays and, on occasion, all the way into the remedial phase of litigation." *Kalbers*, 22 F.4th at 826–27 (collecting cases).

Second, Defendant will not be prejudiced by inclusion of Proposed Intervenors and their representation of the textbook-author subclass because as explained *infra*, Proposed Intervenors were only recently made fully aware that their and the Proposed Subclass's interests will not be adequately represented. *See id.* at 825; *Smith*, 830 F.3d at 857–58 (finding arguments that permitting intervention "would prolong the litigation" to be unindicative of prejudice). Textbook authors' ongoing experience in *Bartz* confirmed that their separate interests need to be represented.

Third, Proposed Intervenors seek to intervene now because there is a potential that if they do not do so, the existing Plaintiffs may pursue strategies, settlements, or narrowing of claims that inadequately protect textbook authors. Proposed Intervenors have met all four "mandatory factors" and should be permitted to intervene as of right. *See Am. Rivers*, 2020 WL 5993229, at *2–3 (the analysis turns on "practical considerations, not technical distinctions" and a proposed intervenor's "different and necessary viewpoint" necessitates intervention as of right (quotation omitted)).

## II. Alternatively, Permissive Intervention Should Be Granted

The Court may also exercise its discretion and allow permissive intervention under Rule 24(b). For permissive intervention, the applicants need only show that: (1) independent grounds for jurisdiction exist; (2) the motion is timely; and (3) the intervenors' claim or defense shares a common question of law or fact with the main action. Fed. R. Civ. P. 24(b); *Scholl v. Mnuchin*, 483 F. Supp. 3d 822, 825 (N.D. Cal. 2020). Further, in exercising its discretion, the Court should consider "whether

the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3); *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1177 (N.D. Cal. 2017).

If the Court does not grant Proposed Intervenors permission to intervene as of right, permissive intervention is appropriate: (i) Proposed Intervenors and the Proposed Subclass are not raising new claims and subject-matter jurisdiction here is based on federal questions, *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011) (finding that the independent jurisdictional grounds requirement does not apply in such a circumstance); (ii) the motion is timely, as discussed above; and (iii) Proposed Intervenors' and the Proposed Subclass's claim arise from Google's acquisition, reproduction, distribution, and use of copyrighted works in its generative AI models and therefore share a common question of law or fact with the main action, Proposed Compl. ¶¶ 102–06. In addition, there will be no delay caused by Proposed Intervenors' participation, here. *Cf. Sloan v. Gen. Motors LLC*, 2020 WL 5517244, at *8 (N.D. Cal. Sept. 14, 2020) ("[C]ourts regularly permit intervention *after* class certification" (emphasis added)).

Moreover, permissive intervention will assist the Court by ensuring that textbook-author interests—distinct from publishers and trade authors—are adequately presented through subclass considerations, tailored proof of market harm, appropriate class governance, and fairness regarding any pro rata recovery received from this suit. Granting intervention will the save the Court resources later if it has to approve a settlement containing compensation structures, as the Court can take comfort that this distinct subclass of textbook authors will have been properly at the table. *See Scholl*, 483 F. Supp. 3d at 825 ("[T]he court may consider . . . whether the party seeking intervention will significantly contribute to the full development of the underlying factual issues in suit and to a just and equitable adjudication of the legal questions presented.").

Whether under the mandatory or permissive standard, Proposed Intervenors should be permitted to intervene in this action to protect the distinct interests of textbook authors encompassed within the putative class.

## CONCLUSION

For the foregoing reasons, Proposed Intervenors' motion to intervene should be granted.

Dated: September 28, 2026
New York, New York

Submitted By:

**SLARSKEY LLC**

By: */s/ David Slarskey*
David N. Slarskey (*pro hac vice application pending*)
dslarskey@slarskey.com
Adam Hollander (*pro hac vice application pending*)
Deepa Devanathan (*pro hac vice application pending*)
Phillip Gasperetti (*pro hac vice application pending*)
825 Third Ave, 32nd Floor
New York, NY 10022
Tel: (212) 658-0661

**ARCHSTONE LAW GROUP, P.C.**
Brenda Ulrich (*pro hac vice pending*)
bulrich@archstonelaw.com
Riverside Center
275 Grove Street, Suite 2-400
Newton, MA 02466
Tel: (781) 314-0100

**GAW POE LLP**

Randolph Gaw (S.B. #223718)
rgaw@gawpoe.com
One Embarcadero Ctr., Suite 1200
SAN FRANCISCO, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

*Attorneys for Proposed Intervenors and the Proposed Subclass*