# Exhibit 2

**GAW | POE LLP**
Randolph Gaw (S.B. # 223718)
rgaw@gawpoe.com
One Embarcadero Ctr., Suite 1200
San Francisco, CA 94111
Tel: (415) 766-7451

**SLARSKEY LLC**
David N. Slarskey (*pro hac vice* ~~*pending*~~)
dslarskey@slarskey.com
Adam Hollander (*pro hac vice* ~~*pending*~~)
ahollander@slarskey.com
Deepa Devanathan (*pro hac vice* ~~*pending*~~)
ddevanathan@slarskey.com
Phillip Gasperetti (*pro hac vice* ~~*pending*~~)
pgasperetti@slarskey.com
825 Third Ave, 32nd Floor
New York, NY 10022
Tel: (212) 658-0661

**ARCHSTONE LAW GROUP, P.C.**
Brenda Ulrich (*pro hac vice pending*)
bulrich@archstonelaw.com
Riverside Center
275 Grove Street, Suite 2-400
Newton, MA 02466
Tel: (781) 314-0100

*Attorneys for Proposed Intervenors and the Proposed Subclass*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MICHAEL SULLIVAN, KENNETH S. SALADIN, ZVI BODIE, ALAN J. MARCUS, KEVIN T. PATTON, LION DEN INC., and DANA LOEWY individually and on behalf of all others similarly situated,<br>*Plaintiffs*,<br><br>v.<br><br>GOOGLE LLC,<br>*Defendant.* | Case No. __________<br><br>**CLASS ACTION COMPLAINT IN INTERVENTION**<br><br>**Class Action**<br><br>**Demand for Jury Trial** |

Plaintiffs Michael Sullivan, Kenneth S. Saladin, Zvi Bodie, Alan J. Marcus, Kevin Patton, Lion Den Inc., and Dana Loewy ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned counsel, for their Complaint against Defendants Google LLC ("Google" or "Defendant") allege as follows:

## INTRODUCTION

1. This is a class action brought by textbook authors (the "Subclass") whose copyrighted textbooks Google copied, reproduced, distributed, and used without authorization to build and train its generative large language models ("LLMs"), text-to-image diffusion models ("T2I models"), and multimodal large language models ("MLLMs"), including Gemini and Imagen.

2. Without license, consent, credit, or compensation to the textbook authors, Google obtained Plaintiffs' and the Subclass's copyrighted textbooks from pirated "shadow library" sources, reproduced them, distributed them to others while torrenting them, removed copyright-management information from them, and used them to train its LLMSs.

3. Plaintiffs are textbook authors. Textbook authors occupy a distinct position in the market for written works, as textbooks are created, marketed, and sold for the specific purpose of teaching academic subjects to students in classroom and course settings at educational institutions. Textbooks are reviewed and selected by instructors and through formal adoption processes, are typically updated, revised, and published in successive editions on a regular basis, and are commercialized in educational markets that fundamentally differ from the markets for trade books and scholarly works.

4. Those distinctions are central to this litigation and precipitated the need for Plaintiffs to intervene on behalf of a Subclass of textbook authors in *In re Google Generative AI Copyright Litig.*, 5:23-CV-03440-EKL (N.D. Cal.). The market for textbooks and the risk that AI models trained on textbooks will substitute for and dilute that market turns in part upon evidence of textbook adoption, revision economics, and customer purchasing decisions that are unique to textbook authors as compared to other categories of authors.

5. Each Plaintiff assigned exclusive publication and distribution rights under the Copyright Act to his or her respective publisher, subject to the publisher's contractual obligation to

pay royalties to the Plaintiff based on the publisher's exploitation of those exclusive rights. Accordingly, each Plaintiff is the beneficial owner of copyright in his or her work and is entitled to institute an action for infringement of the copyright, pursuant to 17 U.S.C. § 501(b).

6. Plaintiffs assert a claim for direct copyright infringement on behalf of themselves and a Subclass of textbook authors.

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq.~~, and the Digital Millennium Copyright Act, 17 U.S.C. § 501.~~

8. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and has purposefully availed itself of this forum, and the conduct giving rise to Plaintiffs' claim occurred substantially in this District.

9. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is headquartered in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District, including alleged copyright infringement.

**INTRADISTRICT ASSIGNMENT**

10. Assignment of this action is governed by the District's Assignment Plan. Because this is an Intellectual Property Action, it is assigned on a district-wide basis under Civil L.R. 3-2(c) and General Order No. 44, rather than to a particular division under Civil L.R. 3-2(d).

**PARTIES**

11. Plaintiff Michael Sullivan is an individual residing in Florida and is Professor Emeritus of Mathematics at Chicago State University, where he taught for more than 35 years.

12. Dr. Sullivan is the author of more than 120 mathematics textbooks and editions published by Pearson Education, Inc., W.H. Freeman & Co. and BFW Publishing Group (subsidiaries of Macmillan Publishers) and John Wiley & Sons, Inc., including the widely adopted titles *College Algebra*, *Algebra & Trigonometry*, *Precalculus*, *Trigonometry: A Unit Circle Approach* (12th Edition, Pearson Education), *Precalculus: Concepts Through Function* series (5th Edition, Pearson Education),

*Precalculus: Enhanced with Graphing Utilities* series (9th Edition, Pearson Education), and *Calculus for the AP Course* (4th Edition, W. H. Freeman and Company).

13. Dr. Sullivan has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that give him standing within the Subclass.

14. Dr. Sullivan is a past president of the Textbook & Academic Authors Association ("TAA"), a member organization whose mission is to advance the interests of textbook and academic authors. TAA's "Michael Sullivan Lecture on Textbook & Academic Authoring" is named in his honor. He currently serves as TAA's Treasurer.

15. Plaintiff Kenneth S. Saladin is an individual residing in Georgia and is Distinguished Professor of Biology, Emeritus, at Georgia College & State University.

16. Dr. Saladin is the author of 21 titles and editions of English-language textbooks of human anatomy and physiology published by McGraw Hill, LLC. Dr. Saladin's textbooks include *Anatomy & Physiology: The Unity of Form and Function*, *Human Anatomy*, and *Essentials of Anatomy & Physiology*.

17. Dr. Saladin has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that, give him standing within the Subclass.

18. Plaintiff Zvi Bodie is an individual residing in Massachusetts and is Professor Emeritus of Finance at the Questrom School of Business at Boston University, where he taught for more than four decades.

19. Dr. Bodie is a co-author of the leading finance textbooks published in multiple editions, including *Investments* and *Essentials of Investments,* published by McGraw Hill, LLC, and *Financial Economics*, published by Pearson Education, Inc..

20. Dr. Bodie has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that give him standing within the Subclass.

21. Plaintiff Alan J. Marcus is an individual residing in Massachusetts and is the Mario J. Gabelli Endowed Professor of Finance at the Carroll School of Management at Boston College.

22. Dr. Marcus is a co-author of leading finance textbooks in multiple editions, including *Investments*, *Essentials of Investments*, and *Fundamentals of Corporate Finance*, all published by McGraw Hill, LLC.

23. Dr. Marcus has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that, give him standing within the Subclass.

24. Kevin T. Patton is an individual residing in Missouri who worked as an anatomy & physiology (A&P) professor for several decades, teaching at the high school, community college, undergraduate, and graduate levels. Dr. Patton is President Emeritus of the Human Anatomy & Physiology Society and a founder of the HAPS Institute, a continuing education program for A&P professors. He is also a past President of the Textbook & Academic Authors Association.

25. Dr. Patton is the author of multiple successive editions of widely adopted anatomy and physiology textbooks published by Elsevier, Inc., including *Anatomy & Physiology*, *Structure & Function of the Body*, and *The Human Body in Health & Disease.* Dr. Patton authored his textbooks as an employee of Lion Den Inc., an S-Corporation of which he is the president and owner.

26. Lion Den Inc. is a Missouri S-Corporation solely owned by the Patton Trust dated May 13, 2005, of which Dr. Patton and his wife are both grantors and trustees.

27. Lion Den Inc., together with Dr. Patton, have beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that give him and his company standing within the Subclass.

28. Dana Loewy is an individual residing in California and is Professor Emerita of Business Communication at Cal State Fullerton.

29. Dr. Loewy is the co-author of multiple successive editions of leading business communications textbooks published by Cengage Learning, Inc., including *Business Communication: Process & Product* and *Essentials of Business Communication*.

30. Dr. Loewy has beneficial interests, copyrights, exclusive rights, royalty interests, contractual rights, or other legally protected interests in these and other works that give her standing within the Subclass.

31. Each Plaintiff assigned exclusive publication and distribution rights to his or her respective publisher via a publishing contract with the publisher. The grant of rights is subject to the publisher's contractual obligation to pay royalties to the Plaintiff based on the publisher's exploitation of those exclusive rights. Accordingly, each Plaintiff is the beneficial owner of copyright in his or her work and is entitled to institute an action for infringement of the copyright, pursuant to 17 U.S.C. § 501(b). If the publishing contract is terminated, the grant of copyright typically reverts to the Author, who then holds both legal and beneficial copyright.

32. A schedule of named Plaintiffs' representative works is attached hereto as **Exhibit A-1 to A-6.** One or more edition and/or version of each of the representative works has been registered as a literary work in the U.S. Copyright Office. Each of the registrations is valid and subsisting.

33. Defendant Google is a Delaware corporation with its principal place of business in Mountain View, California. Google is alleged to have developed and trained its generative AI systems using copyrighted works without authorization.

## FACTUAL ALLEGATIONS

### I. General Allegations

34. Plaintiffs, individually and on behalf of the Subclass, allege that Defendant reproduced and distributed their copyrighted works without authorization in connection with sourcing content for, developing, and training Google's LLMs, T2I models, and MLLMs.

35. LLMs, such as the early versions of Gemini and Bard, accept user text prompts as input text and generate responsive text as output. An LLM's ability to produce coherent and convincing responses to prompts depends heavily on the size and quality of the datasets used for its training.

36. The training of an LLM is critical since the more data an LLM has to train on, the better it is at predicting word patterns.

37. Thus, the more data a model is trained on, the more commercial viability it has.

38. T2I models, like Imagen, use text prompts to create image outputs through a machine-learning technique called diffusion. T2I models are trained by copying an enormous quantity of digital images with associated text captions, extracting protected expression from these works, and transforming the protected expression into a large set of numbers called weights that are stored within the model.

39. MLLMs, like the current version of Gemini, are LLMs that accept input and generate output in multiple formats. MLLMs are built with training datasets that comprise of a variety of text, image, audio, and video data. Like LLMs and T2I models, the training of MLLMs requires making multiple copies of the works in the training dataset—including the protected expression within those works.

**A. Google Trained Gemini on Copyrighted Works**

40. Gemini's predecessor, Bard, was launched in March 2023. Google developed Bard using an LLM called LaMDA.

41. LaMDA was developed and trained on Google's Infiniset Dataset ("Infiniset"), a vast 1.56 trillion-word corpus of internet content that incorporates the C4 Dataset ("C4"). C4, created by Google in 2020, is a filtered version of the Common Crawl dataset. C4 contains massive quantities of copyrighted materials, including works found on piracy sites or nonconsenting digital libraries, and through subscription services.

42. Common Crawl is the largest freely available collection of web crawl data and one of the most important sources of pre-training data for large language models." Its web archive consists of petabytes of data collected since 2008. It completes crawls of the internet and releases its web archives generally every month.

43. The third largest site within C4 is Scribd.com ("Scribd"), a subscription-based digital library with 60 million e-books and audio books that compensates authors "for their content through a revenue-sharing model based on the number of reads their work receives from subscribers."

44. Google's Infiniset (which encompassed C4) was a foundational dataset used to train Bard, Gemini's predecessor. Upon information and belief, Google used Infiniset and C4 to train Gemini.

45. Google has not revealed the sources of the rest of its training corpora. Google for example has only identified other training data as "web documents." On information and belief, Google likely used other datasets containing copyrighted works to train Gemini.

46. Plaintiffs' investigation of Google's willful infringement remains ongoing. Upon information and belief, Plaintiffs anticipate that discovery will reveal substantial additional evidence of willfulness, in addition to further evidence of the presence of Plaintiffs' Works in Gemini training datasets because per Google's own research, books have been a vital and large part of its LLM training datasets.

**B. Google Trained Imagen on Copyrighted Works**

47. In November 2022, Google made Imagen publicly available to a select group of users through its AI Test Kitchen app.

48. In May 2023, Google made Imagen even more widely available through its commercial AI cloud-computing service, called Vertex AI, and in October 2023, Google made Imagen even more widely available through a tool called Search Generative Experience.

49. In December 2023, Google released the successor to Imagen, called Imagen 2. Unlike the paper that accompanied the initial version of Imagen, Google's introduction of Imagen 2 carefully omits a detailed description of its training dataset.

50. By incorporating vast numbers of copyrighted works within its training datasets, Google built Imagen on a foundation of misappropriated intellectual property—namely, the contents of the Large-Scale Artificial Intelligence Open Network's dataset LAION-400M—directly profiting from the unauthorized copying of others' creative efforts.

51. LAION-400M is a dataset of 400 million training images assembled from images accessible on the internet. A download of the LAION-400M dataset also includes a list of metadata records, one for each training image.

52. The actual images referenced in the LAION-400M dataset records are not included with the dataset. To facilitate the copying of these images, Beaumont created a software tool called "img2dataset" that takes the LAION-400M metadata records as input and makes copies of the

referenced images from the URLs in each metadata record, thereby creating local copies for the user. The "img2dataset" tool is distributed from a page controlled by Google on GitHub.

53. Training a model on the LAION-400M dataset is infeasible without first using "img2dataset" or another similar tool to download the images from the URLs in the dataset. In other words, when Google trained Imagen on LAION-400M, as it did, it first and necessarily had to make one or more copies of each image. Then, when training the model, Google made more unauthorized copies and reproduction of the images.

54. Imagen 3, released in August 2024, represents the latest iteration of Google's T2I model, showcasing even greater sophistication and precision in generating high-quality visuals. Based on the methods and datasets used to train its predecessors, as detailed above, it is highly likely that Google relied on LAION-5B to train Imagen 3. This reliance would have involved the unauthorized use of copyrighted works contained within LAION-5B, continuing the pattern of infringement that has defined the development of the Imagen series.

55. Defendant's conduct affected works across a broad range of categories, including fiction, nonfiction, children's books, poetry, memoirs, dramatic works, scholarly works, as well as textbooks.

56. The putative Subclass consists of all textbook authors holding legal or beneficial copyrights in works reproduced, distributed, or otherwise used by Defendant without authorization.

57. On information and belief, each copied work is an original work, comprises copyrightable subject matter, is registered with the U.S. Copyright Office, and remains subject to valid copyrights in which Subclass members have a legal or beneficial interest.

58. On information and belief, Defendant's unauthorized use displaced legitimate sales and licenses, deprived authors and publishers of revenues, and usurped the market for licensing copyrighted works for AI training.

59. On information and belief, a market exists for licensing copyrighted works for AI training. AI companies could have tried to negotiate agreements with publishers, media companies, academic institutions, or individual authors for access to books, articles, and journals for model

development and training. Google did not take these actions with respect to the textbooks it copied and distributed.

60. Throughout, Defendant acted willfully and with knowledge that its conduct was unlawful.

61. Google's Generative AI Models can generate outputs that substitute for copyrighted works, including outlines, summaries, low-quality alternative versions, imitations, and derivative works. This impacts the market for textbooks in particular, insofar as textbooks are designed to teach and impart knowledge and structures for learning.

62. Using copyrighted textbooks to train an LLM and/or an MLLM harms the market for those works by helping to enable the rapid generation of countless works that compete with the originals, even if those works themselves are not necessarily infringing. LLMs and MLLMs can generate massive amounts of text in significantly less time that it would take to write that text, and using a fraction of the creativity.

63. Google has integrated its Generative AI models into its principal commercial products and services, including Google Search, Google Cloud, YouTube, Google Photos, and has derived substantial commercial benefit from models trained on the copied works.

## II. Textbooks and Textbook Authors

64. Textbooks are written works created for the express purpose of teaching academic subjects to primary school, high school, college, graduate, professional, and continuing education students and are marketed, offered, or selected for assignment to students in classroom or course settings.

65. The primary goal of textbooks is to teach the content of a field or subfield in a knowledgeable, coherent, and approachable way that serves the purposes of instructors and students in that field or subfield. Over decades of writing these textbooks, each author develops a unique voice that becomes their distinctive style. A particular textbook is selected and adopted not only because of the title or subject matter but because the author has a style that works for the intended learners.

66. For example, Plaintiff Michael Sullivan's *Precalculus*, now in its 12th Edition, teaches the content of the undergraduate precalculus course, including graphs, functions, and analytic

geometry, in a way that is accessible to students and that prepares those students to go on to study calculus.

67. Plaintiff Kenneth S. Saladin's *Anatomy and Physiology: The Unity of Form and Function*, now in its 10th Edition, has achieved its large market share mainly on the strength of a unique style and pedagogic organization not seen in competing textbooks on the same subject.

68. Plaintiffs Zvi Bodie and Alan J. Marcus's *Essentials of Investments*, having 12 editions registered to Plaintiffs Bodie and Marcus, and currently in its 2024 release registered to Plaintiff Marcus**,** presents investment analysis and investment theory to undergraduate business students in a way that is consistent with the approach of the CFA (Chartered Financial Analyst) Institute.

69. Plaintiff Kevin Patton's *Anatomy & Physiology* is designed as an accessible course book, especially for teaching nursing students or others entering the biological sciences, and for instructors desiring a more conversational, narrative approach to the subject matter.

70. Plaintiff Dana Loewy's *Essentials of Business Communication,* now in its 13th edition, teaches best practices in business communication supported by the latest research, with a practical focus on current technology and transferable workplace skills.

71. Most textbook authors are experienced classroom instructors, skilled writers, and subject matter experts in their fields. They each bring their unique combination of knowledge, experience, and skills to writing their textbooks.

72. Textbooks in any particular academic area cover the field in a variety of ways, reflecting the unique backgrounds, interests, and styles of their authors, as well as the needs of their intended audience of instructors and students.

73. The subject matter that a textbook conveys, whether trigonometric functions, the respiratory system, or the operation of security markets, is not itself protected by copyright. What is protected, and what gives a textbook its value, is the author's selection, organization, and sequencing of material, the examples and explanations that the author develops to effectively convey the information to the student, and the author's voice and pedagogical style.

74. Unlike trade books, which are seldom revised, textbooks typically have regular revision cycles to keep their treatment of the subject matter up to date with developments in the field, their

pedagogy current, and to stay aligned with instructor preferences, student needs, and adoption standards. Each revision requires a substantial investment of time, research, and resources by the author. One result of illegal training on pirated textbooks, and market substitution of students who turn to artificial intelligence alternatives, is that students can receive inferior, incomplete, or out-of-date guidance—but which appears to be authoritative. Searches on Gemini for the named Plaintiffs and their publications resulted in exactly such responses, providing feedback to users that purports to be ~~"in the style of" or "~~taking the approach of~~"~~ specifically named textbook authors. For example, when asked to explain the first chapter of Dr. Sullivan's *Precalculus: Enhanced with Graphing Utilities*, 6th Edition, Gemini~~ChatGPT~~ ~~stated: "I'll use the same sort of progression Sullivan uses . . . ."~~gave the exact title of the chapter and provided breakdowns of the information section by section.

75. Many textbooks, including those authored by Plaintiffs, have lives that extend over many editions and many decades. These textbooks become a central part of the authors' life work, commitments, reputations, and livelihoods.

76. Although different textbooks in any field have different emphases, viewpoints, and styles, successful textbooks share a reputation in their fields, and in particular among the adopters and instructors who select them for use in the classrooms, for accessibility, reliability, and effectiveness.

77. Textbooks play an important role in shaping the academic fields and subfields that they cover, and in shaping the education of the students who use them.

78. Because of the importance of textbooks in academia, many textbook authors establish their professional reputation not only on the basis of their teaching and research, but also on the quality, impact, and adoptions of their textbooks.

## III. The Textbook Market

79. The markets for textbooks, on the one hand, and trade books (both fiction and non-fiction), on the other, are fundamentally different. The trade book market consists primarily of people who choose to purchase books for personal reasons, e.g., for their own edification, curiosity, or entertainment. A casual reader looking for a novel by J.K. Rowling or a popular history book by David McCullough will not accept a substitute by another author or generated by an LLM.

80. In the textbook market, by contrast, the final purchaser is *not* the person who selects the book. The market for textbooks is driven by adoptions, i.e., instructors, schools, or educational systems who consider the textbook options available in a specific subject area and then "adopt" the one they think best suits the needs of their instructors and students. The textbooks are then assigned to students in specific courses.

81. Purchasing decisions are fundamentally different in the textbook market than in the trade book market because the person who *chooses* the textbook is not the same person who is *required* to purchase it. The purchaser at the elementary or secondary school level is typically a school system or individual school required to make the purchase and is continually looking for ways to cut costs from its budget. In the higher education space, the purchaser is the student assigned the textbook by their instructor. In either situation, the purchaser has a powerful incentive to avoid the cost of purchasing a textbook if a "free" version of that same book, or a "good enough" substitute, can be found via an LLM.

## IV. <u>Defendant's Use of Textbooks to Train Its AI Models Threatens to Displace the Textbook Market</u>

82. Because textbooks cover academic fields and subfields in engaging, effective and up-to-date ways, they are uniquely valuable in the training of LLMs and MLLMs.

83. On information and belief, textbooks constitute a large proportion of the books that Defendant used to train its LLMs and MLLMs.

84. Defendant's LLMs trained on sets of textbooks in various fields are capable of feeding back to users comprehensive information about those fields, often with detailed references to specific authors and their organization of and approach to the subject matter.

85. Textbooks are required purchases by students (in higher education) and schools (in K-12 settings). Students, instructors, and schools feel strong pressures to reduce the cost of educational materials. As a result, textbooks are uniquely susceptible to displacement by LLMs trained on textbooks in that field.

86. As LLMs and MLLMs become more powerful and widespread, and if they are allowed to continually update their content by ingesting new editions of textbooks as they come out, instructors,

schools, and adoption and curriculum committees may consider dropping textbook adoptions altogether in favor of substitutes that rely on the use of Generative AI Models.

87. LLMs and MLLMs threaten the textbook market by destroying the incentives for textbook authors to continue writing and revising high quality textbooks, to the detriment of the textbook authors on whose work the LLMs and MLLMs rely and the student learners whose education may be compromised by their reliance on outputs.

88. Gemini and other generative AI agents threaten to displace human-authored textbooks with cheaper AI-generated textbooks or textbook equivalents, at the expense of losing the valuable authorial voice, research, expertise, and perspective provided by textbook authors.

89. On information and belief, licensing markets exist, or could be developed, that would permit Defendant to make use of Plaintiffs' textbooks in exchange for fair compensation. Defendant bypassed such licensing efforts by obtaining Plaintiffs' textbooks without license, thus threatening to displace the very sources on which it relied.

90. On information and belief, when Defendant used massive numbers of books without permission or compensation to their authors, they were aware that such use would likely displace and dilute the market for the works used in the training.

**V. <u>Plaintiffs' Claim is Timely</u>**

91. Plaintiffs and the members of the Subclass did not know, and in the exercise of reasonable diligence could not have known, that Google had copied their textbooks because Google concealed the conduct at the heart of this claim.

92. This action is therefore brought within three years after Plaintiffs' claim accrued under 17 U.S.C. § 507(b), and Google's infringing conduct has in any event continued throughout the Class Period.

## CLASS ACTION ALLEGATIONS

93. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Subclass: All textbook authors who hold legal or beneficial ownership of a United States copyright in a textbook that Google downloaded, copied, reproduced, uploaded, and/or otherwise used to train its Generative AI Models between January 1, 2017, and the

present (the "Class Period"), and that was registered with the United States Copyright Office (i) within five years of the work's first publication and before Google's copying, or (ii) within three months of the work's first publication.

94. For the purposes of the Subclass, a textbook is defined as a book in any medium, including printed and digital, created for the express purpose of teaching academic subject matter to primary school, secondary school, college, university, graduate, professional, or continuing education students and marketed, offered, or selected for educational instruction in a classroom or course setting.

95. Excluded from the Subclass are Defendant; its officers, directors, employees, parents, subsidiaries, and affiliates; all governmental entities; and the judge and chambers staff assigned to this case and their immediate families.

96. The Subclass is so numerous that joinder of all members is impracticable. On information and belief, textbook authors number in at least the thousands, and textbooks constitute approximately twenty-five percent of the works within the broader population of works Google copied.

97. Questions of law and fact common to the Subclass predominate over any individual questions, including whether Google reproduced the Subclass's textbooks, whether Google distributed them by torrenting, whether Google removed copyright-management information, whether Google's conduct was willful, whether such use infringed the Subclass's exclusive rights, whether Google's use harmed the market for textbooks through substitution or dilution, and the appropriate relief.

98. Plaintiffs' claim is typical of the Subclass's claim because Plaintiffs and the Subclass are textbook authors whose registered textbook works were copied, distributed, and used by Google in the same manner and who suffered the same type of harm.

99. Plaintiffs will fairly and adequately protect the interests of the Subclass. They are textbook authors with no conflicts with other Subclass members, and they have retained counsel experienced in copyright and class-action litigation, including attorneys at Slarskey LLC and Archstone Law P.C. who have represented textbook authors for many years.

100. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, and Defendant has acted on grounds generally applicable to the Subclass, making final relief appropriate for the Subclass as a whole.

101. Plaintiffs' counsel, Slarskey LLC, Archstone Law P.C., and Gaw | Poe LLP, are qualified and experienced in representing textbook authors and litigating class actions and should be appointed Subclass Counsel under Federal Rule of Civil Procedure 23(g).

## CAUSE OF ACTION

### COUNT I — Direct Copyright Infringement (17 U.S.C. §§ 106(1), 106(2), 106(3), 501)

102. Plaintiffs incorporate by reference each of the foregoing paragraphs.

103. Plaintiffs and the Subclass own or hold beneficial interests in the exclusive rights in their registered textbook works under 17 U.S.C. § 106, including the rights of reproduction and distribution, and preparation of derivative works.

104. Google directly infringed upon Plaintiffs' exclusive rights through multiple distinct acts of unauthorized reproduction and use: a) copying of works when assembling training datasets through tools like "img2dataset"; b) multiple reproductions during the pre-training and training phases of model development; and/or c) creating derivative works when assembling training datasets or during the pretraining and training phases of model development.

105. Google deliberately copied huge quantities of copyrighted works, knowing these works would form the foundation of their commercial AI products. The fact that the training datasets contained copyrighted works is not a secret. For example, it is well-known that the LAION datasets contained copyrighted images. Further, the C4 dataset contains numerous instances of the presence of the copyright symbol which denotes a copyrighted work. Google's conscious decision to proceed without obtaining licenses, despite clear indications of copyright protection, demonstrates the willful nature of its infringement.

106. Google's infringement was willful, as demonstrated by: a) deliberate copying from datasets known to contain copyrighted material; b) use of content from known piracy sites; c) failure to implement any meaningful copyright compliance measures; and d) continued exploitation despite knowledge of ownership claims. Plaintiffs and the Subclass are entitled to statutory damages, or at

their election actual damages and Google's profits, together with injunctive relief, costs, and attorneys' fees under 17 U.S.C. §§ 502, 504, 505.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Subclass, respectfully request that the Court enter judgment and grant relief as follows:

a. Certifying this action as a class action, appointing Plaintiffs as Subclass Representatives, and appointing Slarskey LLC, Archstone Law P.C., and Gaw | Poe LLP as Subclass Counsel;

b. Entering judgment that Defendants infringed Plaintiffs' and the Subclass's copyrights and violated 17 U.S.C. § 501;

c. Awarding statutory damages, or at Plaintiffs' and the Subclass's election, actual damages and Defendant's profits, under 17 U.S.C. § 504;

d. Award injunctive relief as detailed above, and all other appropriate injunctive and equitable relief deemed just and proper;

e. Awarding pre- and post-judgment interest, costs, and reasonable attorneys' fees as permitted by law; and

f. Granting such other and further relief as the Court deems just and proper.

Plaintiffs demand a trial by jury on all claims and issues so triable.

Date: November 2~~September 28~~, 2026

**SLARSKEY LLC**

By: */s/ David Slarskey*
David N. Slarskey (*pro hac vice ~~application pending~~*)
dslarskey@slarskey.com
Adam Hollander (*pro hac vice ~~application pending~~*)
Deepa Devanathan (*pro hac vice ~~application pending~~*)
Phillip Gasperetti (*pro hac vice ~~application pending~~*)
825 Third Ave, 32nd Floor
New York, NY 10022
Tel: (212) 658-0661

**ARCHSTONE LAW GROUP, P.C.**

Brenda Ulrich (*pro hac vice pending*)
bulrich@archstonelaw.com
Riverside Center
275 Grove Street, Suite 2-400
Newton, MA 02466
Tel: (781) 314-0100

**GAW POE LLP**

Randolph Gaw (S.B. #223718)
rgaw@gawpoe.com
One Embarcadero Ctr., Suite 1200
SAN FRANCISCO, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

*Attorneys for Proposed Intervenors and the Proposed Subclass*